PATRICK J. EVANS - State Bar No. 110535
pevans@pevanslawoffice.com
LAW OFFICE OF PATRICK J. EVANS
16897 Algonquin Street, Suite F
Huntington Beach, CA 92649
Tel.: (714) 594-5722; Fax: (714) 840-6861
Counsel to Plaintiffs,
Floyd Chodosh, Sue Eicherly,
Myrle Moore, Ole Haugen,
Todd Peterson and Rodger Kane, Jr.

# IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

## SOUTHERN DIVISION

| | |
|---|---|
| FLOYD CHODOSH, SUE EICHERLY, MYRLE MOORE, OLE HAUGEN, TODD PETERSON, and RODGER KANE, JR., <br><br> Plaintiffs, <br><br> v. <br><br> JOHN SAUNDERS, ROBERT COLDREN, ICC 35902 LLC, a Delaware limited liability company, 3187 REDHILL LLC, a Delaware limited liability company, PACIFIC CURRENT PARTNERS, a California limited liability company, DIANA MANTELLI, GEORGE FIORI, LISA SALISBURY, ALLEN L. THOMAS, CARY WOOD, EDWARD SUSOLIK, and FIDELITY NATIONAL TITLE COMPANY, a California corporation, <br><br> Defendants. | CASE NO.: CV-____-____   (___) <br><br> **COMPLAINT FOR:** <br><br> 1. **Violations of 18 U.S.C. §1962(c); RICO** <br><br> 2. **Violations of 18 U.S.C. §1962(d); Conspiracy to Violate 18 U.S.C. §1962(c); RICO; and** <br><br> 3. **Unjust Enrichment under California law.** <br><br> **JURY TRIAL DEMANDED** |

# COMPLAINT

## I.   JURISDICTION

1.    The subject matter jurisdiction of this Court is conferred and invoked pursuant to 28 U.S.C. §1331, and the Racketeer Influenced and Corrupt Organizations Act ("RICO") 18 U.S.C. § 1961 et seq. (specifically 18 U.S.C. § 1964(c).

2.    The aggregated amount in controversy exceeds One Million Dollars ($1,000,000), exclusive of interest and costs.

3.    There is jurisdiction over Plaintiffs' unjust enrichment claim under California common law pursuant to 28 U.S.C. § 1367

## II.   VENUE AND PERSONAL JURISDICTION

4.    Plaintiffs incorporate by reference all preceding paragraphs.

5.    Venue is proper in this judicial district under 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391(a), (b) and (c). A substantial part of the events and omissions giving rise to this action occurred in the Central District of California. Most of the parties reside or do business or both in this district.

6.    The Central District of California is also the appropriate venue in that the main underlying lawsuit involved, *Chodosh v. PBPA*, OCSC #30-2010-00423544 (Nov. 2010, appeal, G053798, Op. 12/17/18) and related actions described herein, (Exhibit Z hereto) were brought in the Orange County Superior Court for California situated within this District. Also, Plaintiffs brought a related prior federal action in this District.

## III.   PREFACE AND NATURE OF ACTION

7.    Plaintiffs incorporate by reference all preceding paragraphs.

8.    Plaintiffs Floyd Chodosh, Sue Eicherly, Ole Haugen, Myrle Moore, Rodger Kane Jr. and Todd Peterson bring this complaint ("Complaint") against Defendants for claims based upon personal knowledge of facts, documents and events, and as to other matters upon

information and belief following their own and their counsel's investigation. Plaintiffs state and allege as follows:

9.     In this Complaint, Plaintiffs describe, allege, and demonstrate that the Defendants and non-defendant co-conspirators engage and conspire in predicate crimes to carry out a pattern of judge crime racketeering that violates federal and state law and makes for unlawful racketeering activity through an association in fact enterprise under and within the meaning of the Racketeer Influenced and Corrupt Organization Act, 18 U.S.C. §1961 et seq. ("RICO").

10.     Plaintiffs homes and those of another 112 seniors were in the "resident owned" senior (55+) Palm Beach Mobilehome Park, situated on a prime Pacific Ocean front parcel in San Clemente, California (the "Park"). (Exhibit "A", Exhibits A – Z attached; Table of Contents at end of Complaint)

11.     The seniors had a homeowners' association ("HOA") the Palm Beach Park Association ("PBPA"), which operated and managed the Park. Each senior was a PBPA member and had a lease for a Park space.

12.     The ocean front Park was the prize, the racketeering enterprise's financial objective.  The Board President, Directors and attorneys lured, misled and betrayed the HOA seniors into voting to sell the Park to the President's undisclosed affiliates at a very low price.

13.     Plaintiffs tried to stop the sale, but a judge "fixed" the case, enabling the taking of seniors' homes and millions in real estate equity.  The wrongdoer Defendants, by a judge they bribed to fix the sale, acquired the rare coastal parcel at millions of dollars less than its market value.

14.     The sale stole the seniors' real estate equity in their Park and homes.  The racketeering enterprise injured Plaintiffs by carrying out HOA taking of their homes without compensation.  In addition, the wrongdoers embezzled millions of the seniors' HOA cash.

15.     California ethics law and the judge handbook state: "fixing is the quintessential bad act of a judge."   Judge misconduct that "fixes" a case abuses the victims, offends justice, and undermines public confidence in the courts.   In this case, court documents and judicial admissions prove the judge "fix" (Exhibits B - G).

16.     The "fix" was done in the new case Plaintiffs filed in 2015 to enjoin the Park sale, *Haugen v. PBPA*. The new case was assigned to the judge on their main case, *Chodosh v. PBPA,* filed in 2010.  Knowing the judge was biased against them, Plaintiffs made peremptory challenge to disqualify.  The presiding judge removed him and appointed a new judge.

17.     Weeks later, Plaintiffs applied for a temporary restraining order ("TRO") to halt the fiduciary fraudulent Park real estate sale.  The new judge was not in court.  The new judge's clerk sent the parties to the disqualified judge's court.  He was not there.  From vacation, he called in to order the TRO postponed to a later date in his court.

18.     Then the vacationing and disqualified judge decreed an order re-qualifying himself back on to the case.  Four (4) hours later, the fraudulent Park sale closed by recorded deed.

19.     A disqualified judge cannot "self-re-qualify."  A person, whether disqualified as juror, athlete, contestant, competitor, team member or otherwise, knows he or she cannot reverse the disqualification, i.e. "self-re-qualify" and put himself or herself back in the position or on the team.

20.     The wrongdoer judge concocted "self-re-qualification" as the device to "fix" the case so he could enable the fiduciary fraudulent sale that stole millions from the seniors.

21.     Court documents reflect the disqualified judge's misconduct and judge crime with his phony "self-re-qualification."   (Exhibits B, C, D and E) The "fix" is proven by sequential court documents, altered and backdated

pleadings, case docket with out of order entries, and the Judge's affidavit.

22.    The Park-Buyer Defendants had to have asked the disqualified judge to intervene right when necessary to thwart the TRO.  But under oath, the judge denied ex parte communication caused him to "call in" right on time to save the sale.  (Exhibit E)

23.    The judge says he spontaneously called in from vacation, on a case not in his court, on which he had been disqualified, just in time to enter an order continuing the TRO so that the fiduciary fraudulent Park sale would close by recorded deed four (4) hours later.   By denying unlawful ex parte contact, Plaintiffs believed the judge committed perjury.

24.    Plaintiffs took action against the wrongdoer judge and his "fix." They fought the fiduciary breaching HOA Board and its self-dealing real estate broker president and her accomplices in the fiduciary fraudulent Park sale. Plaintiffs went after the "fixing" judge, complaining to the presiding judge, the appellate court, the judge commission, the attorney general, and others to secure justice for themselves and fellow seniors.

25.    The presiding judge, the appellate court, the judge commission and the attorney general did nothing about the judge "fix".   They ignored it.   Worse, they wrongly said the fix was proper judge conduct. They empowered judge crime that enabled and caused the fiduciary theft from seniors of their homes and millions in real estate equity and HOA cash, making some elders and veterans homeless.

26.    After more than two (2) years on appeal, the main case was remanded back to the same wrongdoer judge. Plaintiffs again filed peremptory challenge.  The judge had to recuse "instantly".  But denigrating the law, the judge waited six (6) months to remove himself, making for a second time the judge disobeyed that he was disqualified.

27.    The judge perjured himself again.  Each month, to receive his

paycheck, the judge had to sign an affidavit, under oath, declaring he was up to date on matters submitted to him for decision.  He was not; he had not acted on Plaintiffs' peremptory challenge.  For his paychecks, the judge again committed perjury. (Exhibit C)

28.    Before the appeal and then after it, the judge rigged the case against Plaintiffs and perjured himself about it.  The sequence of court documents proves the judge wrongdoing. The renewed judge misconduct hurt the elderly Plaintiffs by delaying refunds of illegal HOA loan payments.

29.    Plaintiffs are informed and believe, and thereon allege, that the judge engaged in willful judicial misconduct and judge crime in 2019 because he suffered no consequences for his quintessential judge bad act "fix" of the Park sale in 2015.  The presiding judge, appellate justices, judge commission and California State Attorney General had done nothing to investigate, discipline or prosecute the judge's "fix" in 2015 that enabled the illicit Park sale.  Rather, they allowed and approved it.

30.    The "fixing" judge felt entitled to harm and retaliate against Plaintiffs by blatant disregard of disqualification.  He knew there would be no inquiry, investigation or question about it.  With assurance of no repercussions, the judge could and was willing to commit the perfect crime.

31.    Plaintiffs are informed and believe, and thereon allege, that the judge was part of a racketeering judge crime enterprise ("Enterprise") where judges and justices, retired judges and justices practicing as "neutrals" (i.e. "private" judges for arbitration or mediation), alternative dispute resolution ("ADR") vendor companies, attorneys and clients, the judge oversight disciplinary agency Commission on Judicial Performance ("CJP"), and the California attorney general ("AG") act and conspire to enable judge "fixes" to benefit favored clients and customers, attorneys, and themselves.  Hiding behind immunity and secrecy, with judges judging judges, they all disregard

their oaths to law, ethics and the people in order to give the green light to judge crime.

32.   For their own advantage or pecuniary gain, the Enterprise participants act and conspire to put in a "fix" for the favored side and its attorneys. In this case, the favored side was the buyer group allied with the self-dealing HOA Board and its President, and their attorneys.  They would realize millions with the judge 'fix" of the fiduciary fraudulent Park sale and HOA fund embezzlement,

33.   The judge fix crime vested the Defendant Park Buyers with privilege to make huge illegitimate profits by taking the seniors' and Plaintiffs' real estate and HOA cash.   Defendants were licensed to perpetrate barefaced fiduciary fraud, self-dealing, and crime against seniors, all of which the "fixing" judge, the presiding judge, appellate justices, the CJP and AG would act and conspire to ignore and support. They all turned a blind eye to judge crime.  (Exhibits G and H)

34.   Federal Rule of Civil Procedure 9(b) provides a party must "state with particularity the circumstances that constitute fraud."   A complaint must "raise a reasonable expectation that discovery will reveal evidence of [the alleged infraction]." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556, 127 S. Ct. 1965 (2007)    These standards are met by the facts, events, circumstances, documents and allegations of this Complaint, which by necessity must be and is comprehensive and lengthy.

35.   This Complaint is a detailed and documented factual case example of how the judge crime racketeering Enterprise operates to trample and denigrate justice by making sure its victims, at all times, are denied a fair and impartial judge, and instead delivered a bought-off biased judge beholden to the criminal judge Enterprise.

36.   Plaintiffs are informed and believe that the Enterprise continues

to injure them, their fellow Park seniors, and other litigants in other cases, by the repugnant practice of empowering the judge "fix" as the perfect crime.

37. Against the Defendants and the non-Defendant co-conspirators, Plaintiffs describe, allege, and expose the following Enterprise, its actors and conspirators, their predicate crimes, the pattern and repetition of RICO violations, and Plaintiffs' claims and injury.

## IV.   PARTIES

38. Plaintiffs incorporate by reference all preceding paragraphs.

### A.   Plaintiffs

39. FLOYD CHODOSH, SUE EICHERLY, OLE HAUGEN, MYRLE MOORE, RODGER KANE, JR. are residents of the State of California, residing in Orange, Riverside and San Bernardino counties. TODD PETERSON is a resident of the State of Arizona.

40. Plaintiffs were homeowners in the resident owned, all senior Palm Beach Mobilehome Park, in San Clemente, California (the "Park"), owned by the homeowners' association ("HOA") that operated and held record title to the Park, called the "Palm Beach Park Association" ("PBPA").

### B.   Defendants

41. JOHN SAUNDERS, upon information and belief, is a resident with place of business in Orange County, California. He is a principal, manager or controlling person of the LLCs (described below).

42. ROBERT COLDREN, a California licensed attorney, upon information and belief, is resident and has his place of business in Orange County.  He is a principal, manager and controlling person of the LLCs and PCP (described below).

43. ICC 35902 LLC is a Delaware limited liability company with office and place of business in Orange County.

44. 3187 REDHILL LLC is a Delaware limited liability with office

and place of business in Orange County. (with ICC 35902, the "LLCs")

45.    PACIFIC CURRENT PARTNERS ("PCP") is a California limited liability company with office in Orange County.

46.    EDWARD SUSOLIK, a California licensed attorney, upon information and belief, resides and works in Orange County.

47.    DIANA MANTELLI, HOA PBPA President, has her places of residence and work in Orange County.

48.    GEORGE FIORI, PBPA Director and Treasurer, upon information and belief, resides and works in Orange County.

49.    LISA SALISBURY, a California licensed attorney and real estate broker, upon information and belief, resides and works in Orange County.

50.    ALLEN THOMAS, a California licensed attorney, upon information and belief, is a citizen and resident of the State of California, with his residence and place of work in Los Angeles County.

51.    CARY WOOD, a California licensed attorney, upon information and belief, resides and works in Los Angeles County.

52.    FIDELITY NATIONAL TITLE COMPANY, is a California corporation with places of business in Los Angeles and Orange Counties.

## V.    NON – PARTY ENTERPRISE CO-CONSPIRATORS

53.    Plaintiffs incorporate by reference all preceding paragraphs.

### A.    Non-Defendant Co-Conspirators in the Enterprise

54.    Plaintiffs are informed and believe, and thereon allege, that the Enterprise included taxpayer paid judicial officers, judges and justices, and public officials, aligned and coordinated with the world's largest ADR company JAMS, Inc., ("JAMS") and its private judge "neutral" and co-founder, Hon. John K. Trotter (Ret.) who was also the founding and first Presiding Justice of the Orange County Court of Appeal, 1982-1987.

55.   The judicial officers and public officials, along with JAMS and its co-founder James K. Trotter, would have or claim immunity or quasi-immunity and other defenses that would or could shield them from civil liability.

56.   Naming these co-conspirators Defendants would detract from Plaintiffs' RICO litigation objective, which is to recover, from Defendants, compensation for the financial injury Defendants and co-conspirators caused to Plaintiffs' property.

57.   Co-conspirators' immunity is a key component of their racketeering described and alleged herein and integral to Enterprise function.

58.   The non-defendant co-conspirator participants were and are indispensable to the conduct and success of the Enterprise.

59.   The Defendants benefitted financially and could not have been successful in the Enterprise without the participation and contributions of the non-defendant co-conspirators.

**B.    Identity of the Non-Defendant Co-Conspirators**

60.   JOHN K. ("JACK") TROTTER (Ret.) co-founded JAMS.   He retired from the bench where he had served since 1982 as the first and founding Presiding Justice of the Orange County Fourth District, Div. 3 Court of Appeal.

61.   JAMS is the largest ADR vendor in the world, with headquarters in Orange County, California.   Retired justices and judges started JAMS in 1982 and expanded it rapidly by recruiting retired judges and justices, initially mostly from Orange County.   JAMS has offices and facilities in Los Angeles County and other locations around the USA and globe.

62.   NANCY WIEBEN STOCK (Ret.), was Plaintiffs' original trial judge in *Chodosh v. PBPA*.   Judge Stock (Ret.) is private judge, a JAMS

"neutral." She joined JAMS in early 2014.

63.   GAIL A. ANDLER (Ret.) was the judge appointed to replace Judge Moss in the case *Haugen v. PBPA* under Judge Margines' disqualification order (11/30/15; Exh. B). Judge Andler (Ret.) is a private judge, a JAMS "neutral." She joined JAMS in 2017.

64.   ROBERT J. MOSS is an Orange County Superior Court Judge and was the trial judge in the main case, *Chodosh v. PBPA*, and disqualified judge in *Haugen v. PBPA*, where he wrongfully ousted Judge Andler.

65.   CHARLES MARGINES is an Orange County Superior Court Judge. He was the Presiding or supervising Judge when he disqualified Judge Moss in the Park sale case (*Haugen v. PBPA*) on November 30, 2015. (Exhibit B).

66.   KATHLEEN O'LEARY is the Presiding Justice of the California Court of Appeal, Fourth District, Division 3, at its Orange County courthouse. She entered rulings in Plaintiffs' appeals.

67.   WILLIAM BEDSWORTH is an Associate Justice in the Fourth District Court of Appeal, Division 3, at its Orange County courthouse. He entered rulings in Plaintiffs' appeals and wrote the opinion for appeal of the main case *Chodosh v. PBPA*. (G053798, 12/17/18)

68.   The COMMISSION ON JUDICIAL PERFORMANCE("CJP") is an agency of the California judiciary, Cal. Const. Art. VI, §8, with headquarters in San Francisco.

69.   GREGORY DRESSER is CJP Director and Chief Counsel.

70.   VICTORIA HENLEY is former CJP Director and Chief Counsel, in charge of CJP in and before April 2016. She retired at end of 2017.

71.   XAVIER BECERRA, the California Attorney General, ("AG Becerra"), since 2017, has worked in Sacramento at the Office of the Attorney General in the California Department of Justice.

72.    Senator KAMALA HARRIS was the thirty-second California Attorney General in charge of the Office of the Attorney General in the California Department of Justice from 2011 to 2017.   Xavier Becerra succeeded her in January 2017.

73.    Plaintiffs are informed and believe, and thereon allege, that other persons, known and unknown, may have participated or conspired in the violations and wrongful conduct alleged herein and in furtherance of the conspiracy and Enterprise described herein, and following discovery, may be added as defendants or conspirators in this action.

### C.    Non-Defendant HOA Palm Beach Park Association

74.    The seniors' HOA PBPA, held the seniors' title to the resident owned Park in trust.  An HOA is a fiduciary for its members.

75.    PBPA is and was a non-profit mutual benefit corporation owned by the seniors.  Breaching their fiduciary duties, the HOA President and Director and the HOA attorney Defendants wrongfully operated PBPA in and for the benefit of the Enterprise and themselves.

76.    Although part of the alleged association-in-fact Enterprise, PBPA itself is not named as a Defendant or as a non-defendant co-conspirator because it is non-profit corporation that Defendants wrongly use in their Enterprise illegitimate endeavors.

## VI.    BACKGROUND FACTS

77.    Plaintiffs incorporate by reference all preceding paragraphs.

### A.    The Palm Beach Mobilehome Park

78.    Plaintiffs lived in their seniors only (+55) mobilehome park, the "Palm Beach Mobilehome Park", operated by a homeowners' association in which they and other residents were members, the "Palm Beach Park Association" ("PBPA").

79.    In 2010 litigation ensued over the HOA and Park conversion to

"resident owned park" (an "ROP"; Calif. Civil Code §799(c); Business & Prof. Code §11010.8) by which the HOA members became "resident owners". Unfortunately, the ROP leases, loans and other transactions were done all wrong, violating HOA, real estate, securities, subdivision and other laws.

80.   In May 2013, in the main case *Chodosh, et al. v. PBPA*, (filed 2010), before Judge Nancy Wieben Stock, Plaintiffs prevailed in a phase I trial.  Judge Stock found there was an "illegal loan from an illegal lender." (Transcript Ph. I Ruling, May 21, 2013, pg. 17, line 17)

81.   In the PBPA unlawful detainer action that started the Park litigation, PBPA tried to evict Plaintiff Eicherly for non-payment of rent and HOA loan.  (*PBPA v. Eicherly*, [2010], Exhibit Z) Judge Stock ruled the PBPA "membership and lease, . . . constitute real property."  (Minute Order, 11/18/11, pg. 2)

82.   Judge Stock also held as unlawful the PBPA tactic of seizing seniors' homes without legal process, stating that PBPA "had attempted an illegal strict foreclosure".  (Ibid.) It was unlawful strict foreclosure for PBPA, by and through mere Board mere vote, to terminate HOA membership and take a senior's home, as President Mantelli stated, "for nothing."

83.   Apart from losing in court, PBPA became subject to California Department of Business Oversight ("DBO") consent decree that forbade sale of homes in the Park because PBPA lacked the required securities permit for its ROP memberships.  (Exhibit J)

**B.   The JAMS Mediation with Justice Trotter (Ret.)**

84.   At PBPA request, having seen JAMS' website about its ADR services, Plaintiffs attended mediation at JAMS with Justice Trotter (Ret.) PBPA paid for the mediation.  A $4,750,000 cash settlement was reached, but PBPA did not have the money.

85.   At Judge Stock's direction, Plaintiffs returned to mediation at

JAMS with Justice Trotter (Ret.)  He joined JAMS in 1987 after serving as first presiding justice of the Orange County Court of Appeal since 1982.  He promoted JAMS' business of selling ADR services, and recruited Orange County judges and justices to join JAMS.

86.    At the first mediation Justice Trotter told Plaintiffs that he personally knew "Judge Nancy."  At the second "mediation" he conveyed a new PBPA offer to settle and buy Plaintiffs' homes in the Park, not for cash, but for small down payments and large promissory notes.  Plaintiffs refused the "promise to pay."   Justice Trotter directed Plaintiffs and the HOA Board President and Directors to meet alone in a room without lawyers.

## C.    Attempted Extortion; Judge Stock Goes to JAMS

87.    Alone in a conference room with the Board President and Directors, Plaintiffs still refused the HOA offer of its promise to pay.  PBPA President Mantelli summoned Justice Trotter.  He threatened and told Plaintiffs that the HOA "settlement was a 'gift' and that he would personally tell 'Judge Nancy' that Plaintiffs refused to settle . . . and were the reason why settlement was not reached." Plaintiffs still refused.

88.    A month later, back in court, in December 2013, trial Judge Stock reversed her prior position and went against Plaintiffs.   Then, abruptly, in January 2014, Judge Stock retired and went to JAMS.

## D.    After JAMS, Plaintiffs Always Lose in Court

89.    Plaintiffs were victorious at the Phase I trial in May 2013. In PBPA unlawful detainer actions Judge Stock affirmed Plaintiffs' real property rights.  HOA PBPA's wrongdoing was factually established and readily demonstrable as violating homeowner association, real estate, securities, lending, and other laws; PBPA transactions were illegal.

90.    But after refusing Justice Trotter's dictated HOA no money settlement in November 2013, and his promise and threat to malign them

to their trial judge Hon. Nancy Wieben Stock (Ret.), Plaintiffs consistently lost in court on wrongful decisions that were contrary to fact and law.

91.    Starting in 2014, new trial Judge Robert Moss routinely ruled against Plaintiffs and the law and facts. He engaged in willful judicial misconduct by intentionally disregarding the law to cause Plaintiffs to lose their cases.

92.    Judge Moss reversed Judge Stock, declaring that Plaintiffs had no "real property interest consisting of their PBPA membership and membership lease." (*Chodosh v. PBPA*, Ph. II ruling, J. Moss, 10/3/14, pg. 2) Judge Moss permitted the HOA to take a senior's home with only a Board of Directors vote; he permitted illegal strict foreclosure.

### E.    Plaintiffs Sue JAMS and Justice Trotter

93.    After Judge Stock retired to JAMS and Judge Moss unswervingly ruling against them, Plaintiffs feared Justice Trotter (Ret.), true to his word with his promise and threat at the "mediation," had maligned them to Judge Stock and the Orange County judges. Plaintiffs were terrified that Justice Trotter had sent the message to Judge Moss that Plaintiffs, for having defied Justice Trotter and JAMS, were to be made to lose in court.

94.    In May 2014, Plaintiffs sued JAMS and Justice Trotter (Ret.) for mediator misconduct, *Chodosh v. JAMS and John K. Trotter*, D070952, D070953 (4th DCA, Div. 1, 9/17/17) When the case reached appeal, the Orange County justices refused to recuse.  But then the California Supreme Court transferred the appeal to Division 1 in San Diego.

95.    The trial and appellate courts ruled that Justice Trotter's promise and threat to malign Plaintiffs to their trial judge by ex parte contact, although "discouraged," was permissible and protected mediator conduct. (Op. at 19; see Evid. Code §1121 leg. comments)

96.    In their 2014 lawsuit against JAMS, Plaintiffs had not alleged that Justice Trotter or JAMS had actually communicated with Judge Stock or that Justice Trotter had done what he promised and threatened.

97.    After Division 1 issued its opinion September 2017, Plaintiffs were informed of evidence that between September – November 2013, JAMS and Justice Trotter had arranged for Judge Stock to join JAMS.

98.    With new evidence, Plaintiffs concluded that in late 2013 it was highly probable and near certain that Justice Trotter had communicated ex parte to besmirch them to their trial judge Hon. Nancy Wieben Stock.

99.    Plaintiffs concluded that Justice Trotter had made good on his promise and threat to interfere in Plaintiffs' case by ex parte communication to the trial judge; that he had maligned and sullied Plaintiffs to their trial judge before he gave her a JAMS job, and had contacted other judges.

100.   Starting 2014, other judges and justices, the non-defendant co-conspirators herein, joined Judge Moss to wrongly rule against Plaintiffs or not take required action for them, causing Plaintiffs to lose in both the trial and appellate courts in Orange County.

**F.    HOA President Self-Dealing and Fraud to Sell Park**

101.   During the same 2013 – 2014 time-frame as the JAMS "mediation," Defendant Diana Mantelli, the HOA President, a real estate broker, conspired to have the HOA sell the coastal mobilehome Park at millions below its market value to her undisclosed affiliate, comprised of Defendants Saunders and Coldren and their companies.

102.   Judge Moss supported Mantelli and bolstered the Enterprise by declaring in court that HOA President Mantelli was "credible."  He boosted her before the HOA member spectators, helping her to deceive them about her concealed fiduciary fraud and self-dealing.  Among other things, Judge Moss knew that, on Mantelli's watch, $1,000,000 HOA reserves went

missing and HOA financials had ceased to be available to members.

103.  Mantelli and the HOA attorneys purposefully did not pursue proper legal action for the HOA and its members.  Instead of solving and settling the problems so the seniors could keep and enjoy their Park and homes, Mantelli and the Defendant HOA lawyers acted to place the Park in peril and panic.

104.  In January 2014 Mantelli had the members vote to approve an HOA assessment increase of $400 per month to pay for Defendant HOA attorney Thomas' legal fees.  (Exhibit K) PBPA securities violations (lack of permit to sell ROP memberships) resulted in DBO consent decree that halted home sales in the Park.  (Exhibit J)

105.  Mantelli orchestrated higher HOA dues and inability to sell homes to pressure the seniors.  Higher dues and prohibited home sales would be Mantelli's leverage to position and posture the sale of the Park as the only solution for the HOA and its members.

106.  Since 2013, Mantelli and the HOA attorneys had recurring opportunity to settle the litigation at costs far lower than the HOA legal fees (Exhibit O), but deliberately refused to pursue the resolution opportunities and did not disclose them to the members.

107.  In 2013, while the case was before Judge Stock, on the record, Plaintiffs offered to settle by selling their homes to the Park for $4,000,000. The Park could have re-sold the homes to recoup most of the $4,000,000, for a "net" settlement cost that would have been a fraction of the millions the HOA paid for attorneys' fees. President Mantelli and the HOA attorneys did not pursue or disclose the settlement offer to the HOA members.

108.  PBPA could have rectified its securities violations by obtaining a securities permit.  (Exhibit J) PBPA could have asserted claims and defenses against lender Thrivent, making the 2018 balloon payment a non-

factor in any HOA decision to sell the Park.  Instead, the HOA allowed the lender violations to go unanswered, ultimately paying Thrivent a six-figure pre-payment fee to sell the Park in the fiduciary fraudulent sale. (Exh. L)

109.  Mantelli's and the attorney Defendants' self-serving objective, the key to the Enterprise, was to take the Park from the seniors at price millions of dollars below market value and use proceeds for big legal fees. They breached their fiduciary duties to address Park problems for the good of the seniors and the goal of keeping the Park.  They were conflicted, as Defendants' fiduciary duties clashed with their self-dealing to steal the Park real estate and its value for themselves.

110.  Plaintiffs are informed and believe, and thereon allege, starting in early 2013, that Mantelli, Saunders and Coldren acted and conspired to take the Park from the seniors.  Mantelli did not tell the HOA seniors about the Saunders and Coldren Park sale until May 2015.  (Exhibit L)

111. On and around May 9, 2015, she and Saunders and HOA attorneys pitched the sale to the members.  (Exhibit L) They said the sale was the only option.  They blamed the Plaintiffs. In truth, PBPA could have resolved the Park's problems easily and economically. Honest and faithful HOA Board and attorneys would have kept the Park for the HOA seniors.

112.  As a real estate broker, Mantelli was aware she had fiduciary duty as broker and HOA President to market and list the Park for sale in a commercially reasonable manner. She had to solicit and procure competing offers, and have a current appraisal.  As fiduciary she had to sell the asset for the best possible price.

113.  Breaching her duties and self-dealing, Mantelli directed the sale of the Park to her accomplices.  She rigged a fiduciary fraudulent real estate sale for millions below market. She schemed on it for two and a half years before telling the members about the sale, while concealing a higher, cash,

no-broker commission offer that, as Board President, she had received from Hometown America.  (Exhibit M)

114.  Real Estate Broker Mantelli knew her duty to disclose personal connections and expected post-closing benefits with and from the Park-buyer Defendants Saunders and Coldren.   Mantelli also knew that she had to disclose to the HOA members any competing offer made for the Park, especially a cash offer at a higher price, (Exhibit M).

115.  When members asked, she denied she knew the buyer, or that she would personally benefit from the sale.  She concealed her relationship with the buyer and that the rigged sale included a six figure broker commission.

116.  The Board received an unsolicited competing cash offer from Hometown America.  It had a higher price and no broker commission. It would have put about $20,000 more into the pocket of each HOA member. (Exhibit M)   President Mantelli, the Defendant PBPA Directors Fiori and Smith, and the HOA attorney Defendants Thomas and Wood and Salisbury, did not disclose the better offer to the HOA members.

117.  HOA bylaws required membership vote for the Park sale. There was no independent election inspector.  Mantelli oversaw the balloting and announced the members had voted to approve the sale.

G.   The *Haugen v. PBPA* case for TRO to Stop the Park Sale

118.  On November 12, 2015, Plaintiff Ole Haugen filed a lawsuit to stop the fiduciary fraudulent, self-dealing sale of the Park. *Haugen v. PBPA*, OCSC #30-2015- 00919837.  (Exhibit B)

119.  *Haugen v. PBPA* threw a wrench in the Enterprise plan to acquire the Park at millions under value.  Plaintiffs are informed and believe, and thereon allege, that the *Haugen* lawsuit clouded title, causing Defendant Fidelity National Title Company to suspend title insurance

underwriting.

120.  As a related case, *Haugen v. PBPA* was assigned to the main case (*Chodosh v. PBPA*) trial judge Robert J. Moss, who had routinely intentionally disregarded the law to wrongly rule against Plaintiffs.

121. Mr. Haugen filed a Calif. Code of Civil Procedure §170.6 peremptory challenge to disqualify Judge Moss.  On November 30, 2015, Supervising Judge Charles Margines granted the disqualification, removing Judge Moss and re-assigning *Haugen v. PBPA* to judge Hon. Gail A. Andler. (Exhibit B)

## H.    Application for TRO to Stop Park Sale

122.  In early December, 2015, Plaintiffs learned that HOA President Mantelli, Saunders, Coldren and their accomplices planned to close the fraudulent Park sale on Tuesday, December 22, 2015.

123.  On Monday, December 21, 2015, Plaintiff Haugen filed ex parte (Exh. B) for a temporary restraining order ("TRO") to stop the fiduciary fraudulent Park sale.  The ex parte hearing was set for the next day before Judge Andler.

124.  The morning of Dec. 22, 2015 Judge Andler did not take the bench.   Her clerk directed the parties to go to Judge Moss' courtroom.

125.  Judge Moss was not in his courtroom; he had announced that he would be on vacation. (Exhibit B) Disqualified Judge Moss had been disqualified; he had no power to act in *Haugen v. PBPA*.   He had acknowledged his disqualification on the record.  (Exhibit B)

126.  But that morning, December 22, 2015, Judge Moss suddenly called in to his clerk to make and issue orders in the case.  Disqualified Judge Moss first entered, promptly at the 9:00 a.m. TRO hearing time, an order to delay the hearing to a later date in his courtroom. (Exh. B)

127.  At 9:29 a.m. Judge Moss entered an order "self-re-qualifying"

himself back on to *Haugen v. PBPA*. He purported to overrule and strike the Presiding Judge's order disqualifying him.  (Exhibit B)

128.   That afternoon, Tuesday, Dec. 22, 2015, at 1:18 p.m., four (4) hours after disqualified Judge Moss called in from vacation at 9:00 a.m. to thwart the TRO, the Park sale transaction deed recorded.  (Exhibit B) HOA PBPA President Defendant Mantelli signed the deed.

129.   Disqualified and vacationing Judge Moss had called in right on time to delay the TRO, "self-re-qualify," and intervene to save and enable the scheduled give-away sale of the Park.

## I.   "Self-Re-Qualification" and "Fix" – Offense to Justice

130.   Presiding Judge Margines ordered Judge Moss disqualified on November 30, 2015. (Exhibit B) The next day, Judge Moss acknowledged and admitted: "I don't have jurisdiction if they file a §170.6" That day, December 1, 2015, PBPA attorney Defendant Wood filed, for hearing by Judge Andler, what he entitled an "Objection" to the Code of Civil Procedure §170.6 disqualification of Judge Moss.  (Exhibit B)

131.   There is no such thing as a trial court "objection" to a §170.6 peremptory challenge. A §170.6 disqualification order can be contested only by writ of mandate to the appellate court.  (Code of Civil Procedure §170.3(d), *People v. Hull* (1991) 1 Cal. 4th 266, 267)

132.   Judge Moss made the objection the purported legal basis for his "self-re-qualification."  There were no legal grounds for it.  There was no way Judge Moss could self-re-qualify.

133.   Section 170.6 disqualification is a central due process component.   Opining in *Hemingway v. Superior Court* (2004) 122 Cal.App.4th 1148, 1159, Presiding Justice O'Leary emphasized: "The right to exercise a peremptory challenge under section 170.6 is a substantial right and an important part of California's system of due process that promotes

fair and impartial trials and confidence in the judiciary.  (citation omitted)  Courts must refrain from any tactic or maneuver that has the practical effect of diminishing this important right."

134.  Judge Moss' trampling his §170.6 disqualification defiled California law and due process.  There is no judge misconduct more egregious than defying disqualification in order to "fix" a case.  There is no judge wrongdoing more serious than the "fix," which the judge handbook and CJP badge the "quintessential" judge bad act.

135.  Judge Moss engaged in the worst willful judicial misconduct.  He committed crime from the bench to "fix" the case for Defendants.

**J.   Loan More than Purchase Price; HOA Funds Gone**

136.  With the Park sale, Defendants stole millions in Park seniors' real estate equity.  The deceitful Park purchase was a devastating fraud on the elders, and an incredibly and criminally too-good to be true deal for the Park-buyer Defendants.

137.  Defendants bought the Park for better than no money down.  They secured greater than 100% financing; a real estate loan that paid the purchase price and gave them over $1,000,000 for pocket money!

138.  The $37,000,000 purchase price, based on a two (2) year old appraisal, was discounted for "free rent" and a $2,000,000 credit to litigate and settle with Plaintiffs.  The final price of $34,395,200, was more than a million dollars less than the $35,797,500 purchase money loan.

139.  The over 100% loan to value financing allowed buyers to pocket about $1,000,000 at closing.  The sale price was about $2,000,000 below the competing Hometown America offer that Defendants concealed from the HOA members.  (Exhibit M)

140.  After closing, President Mantelli and the PBPA Directors and attorney defendants impounded $1,000,000 as reserves.  PBPA has never

accounted to the members for the impound or the sale proceeds.   PBPA annual financials stopped in 2013.  Since 2015, President Mantelli and the directors have withheld HOA financial information.

141.  Further discount from the sale price was made by a $2,000,000 "credit" for Plaintiffs' litigation.   After the sale Saunders was to indemnify PBPA and pay its attorneys' fees to litigate against Plaintiffs, and to use the credit to settle with Plaintiffs.   There was no settlement.   Shifting the burden from Saunders to the seniors, Mantelli had PBPA pay legal fees from the $1,000,000 reserve she held back from the seniors.

## K.   Plaintiffs Discover and Declare Judge Moss "Fix"

142.  Judge Moss concealed his "self-re-qualification" by not serving his first self-re-qualification order, falsifying court filed documents and doctoring the docket by entries out of chronological order (Exhibits C, D).

143.  Judge Moss' clerk did not serve the first "self-re-qualification" order on 12/22/15.  The next day, 12/23/15, the clerk entered and did serve a second "self-re-qualification" order.   The second order was vague and misleading.  Judge Moss had realized his first order precisely showed willful judicial misconduct. He tried to cover it up with a second, vague order.

144.  Despite Judge Moss' cover up, in 2016 Plaintiffs discovered his "call in" from vacation and facts and documents for the fix of the Park sale.

145.  After discerning the facts of Judge Moss' wrongdoing and the sequential court documents that prove it, Plaintiffs stated, and their counsel declared in pleadings and open court, that disqualified and vacationing Judge Moss "fixed" the Park sale when he called in to halt the TRO.

146.  In July 2018, PBPA attorneys asked that the Orange County Appellate Court hold Plaintiffs' counsel in criminal contempt for his accusation that Judge Moss had "fixed" the Park sale and for statements directed to the appellate justices.  (G053798 Dkt. 7/17/18)

147.  The appellate court did not hold Plaintiffs' counsel in contempt for his statement that Judge Moss "fixed" the case. (Op. 20) There could be no contempt because it was true, Judge Moss had "fixed" the case.

**L.   Park Buyer Defendants Request Judge Moss "Fix"**

148.  Plaintiffs are informed and believe and thereon allege that the Defendant Park buyers' attorney Defendant Susolik caused to be communicated ex parte, in Dec. 21-22, 2015, to Judge Moss, or arranged or coordinated or learned of such ex parte communication, the request that disqualified Judge Moss call in from his vacation to thwart Plaintiff Haugen's TRO to ensure Susolik's client Saunders and his co-defendant Park buyers Coldren, the LLC's and PCP would be able to close the illicit, lucrative Park purchase from the defrauded HOA and its deceived members.

149.  In March 2016, Plaintiffs accused buyer Defendants Saunders and Coldren and their LLCs and attorneys Coldren and Susolik and Salisbury and title company Fidelity of making or knowing about the Judge Moss "fix," thereby engaging in conspiracy to obstruct justice in violation of Calif. Penal Code §182(a)(5) They did not deny it.  (Exhibit I)

150.  At the Dec. 28, 2015 TRO hearing before Judge Moss, Wood and Thomas and Judge Moss all knew that the sale had closed, but that Plaintiffs' counsel did not know it had closed.  They did not give notice before or at the Dec. 28 hearing that the TRO hearing was moot because of the already closed Park sale.

**M.   Writ to Court of Appeal to Overturn the "Fix"**

151.  Plaintiffs contested Judge Moss' "fix" of the Park sale with a motion to disqualify Judge Moss, which he denied, and then by a writ of appeal to the Orange County Court of Appeal.

152.  Non-Defendant co-conspirators Presiding Justice O'Leary and Associate Justice Bedsworth denied the writ and upheld Judge Moss' fix of

the Park sale. (Writ, G053512, Dkt. 5/26/16) Justice O'Leary bypassed her admonition in *Hemingway*, supra, 122 Cal.App.4th at 1159 that: "Courts must refrain from any tactic or maneuver that has the practical effect of diminishing this important right [§170.6]." Judge Moss' "fix" was such "tactic and maneuver."

## N.  Objection to Orange County Appellate Justices

153.  Four (4) months after the December 22, 2015 Park sale and conclusion of trial, in April 2016 Judge Moss entered judgment against Plaintiffs in the main case *Chodosh v. PBPA*.

154.  Plaintiffs appealed Judge Moss' judgment, and protested, by motions to disqualify, that Orange County Court of Appeal justices could not hear their appeal because Plaintiffs had sued JAMS and Justice Trotter, with which the justices had personal and pecuniary actual or potential contacts and entanglements.

155.  JAMS and Justice Trotter opposed Plaintiffs' objection advocating that the Orange County justices should not recuse. (D070952, Dkt. 7/22/16) The Orange County appellate court justices complied with JAMS' request to not recuse. However, the California Supreme Court transferred *Chodosh v. JAMS* to Div. 1, the San Diego appellate court.

## O.  Plaintiffs sue Judges and Justices in Section 1983 action

156.  In December 2016 Plaintiffs sued Judge Moss and other defendants in a section 1983 action, *Sue Eicherly, Floyd Chodosh, et al., v. Kathleen O'Leary*, *Presiding Justice, Court of Appeal, Fourth District, Div. 3; William Bedsworth, Div. 3 Associate Justice, Robert Moss, Charles Margines, Superior Court Judges, Mantelli, Saunders, et al.,* (D.C. No. 8:16-cv-02233 - CJC-KES)(filed 12/9/16; dismissal on *Rooker-Feldman* upheld, Ninth Circuit No. 17-55446, dismissal reversed to be "without prejudice," 01/03/18).

157.  Plaintiffs alleged that the judicial officer defendants had acted and conspired to allow the Judge Moss "fix" of the Park sale by flouting §170.6.   On *Rooker-Feldman* doctrine, the case was dismissed without prejudice, leaving open and viable Plaintiffs' claims against Judges Moss and Margines and Justices O'Leary and Bedsworth.

### P.    Justices O'Leary and Bedsworth Refuse to Recuse

158.  Between 2016 – 2019, Plaintiffs repeatedly brought motions to disqualify the Orange County justices, based on their connections with Justice Trotter and JAMS. Plaintiffs requested that Presiding Justice O' Leary and Justice Bedsworth not act in the appeal since Plaintiffs' had sued them in federal court.  (Motions to disqualify, *Chodosh v. JAMS*, G [became: D070952], Dkt. 7/8/16, 7/25/16, 8/25/19; *Chodosh v. PBPA*, G053798, Dkt. 5/3/18, 7/6/18, 1/2/19, 1/8/19); *Eicherly v. PBPA*, G052396, Dkt. 12/8/16, 1/11/17) Moreover, the justices had to recuse because Plaintiffs' federal claims against Justices O'Leary and Bedsworth remained open and viable.

159.  They did not recuse over Plaintiffs' lawsuit against JAMS and Justice Trotter. They knew the first presiding justice of their court and JAMS principal was prime source for their future retirement income.  They were on first name basis with Justice Trotter.  He called Presiding Justice O'Leary "KO" and she called him "Jack."

160.  Justices O'Leary and Bedsworth created the appearance of impropriety of justices sitting on an appeal where the appellants sued their court's first presiding justice and the ADR company to which the majority of retired justices from their court had gone to work after leaving the bench.

161.  Justices O'Leary and Bedsworth ignored Plaintiffs' federal lawsuit.  They did not recuse.  They created the appearance of impropriety where justices sit on the appeal of parties and their lawyer that have sued the justices in federal court.

162.  There is an appearance of impropriety when a justice empanels himself or herself on an appeal where the appellants and their attorney sued the justice. Justices O'Leary and Bedsworth deliberately and wrongly put themselves on Plaintiffs' appeal after Plaintiffs sued them.  Then, as would be expected, they ruled against Plaintiffs.

163.  Justices O'Leary and Bedsworth had to recuse.  But for the Enterprise to be in position to injure Plaintiffs, they wrongly appointed and empaneled themselves to Plaintiffs' appeals.

### Q.    Orange County Justices Wrongly Rule Against Plaintiffs

164.  Presiding Justice O'Leary disrupted Plaintiffs' lawful right to obtain testimony from Judge Moss.  As soon as it was docketed, she denied Plaintiffs' motion to take Judge Moss' deposition, violating Court Rule 8.54(b)(1) that mandated no decision until after fifteen days, the deadline for motion opposition.  (G053798, Dkt. 4/3/18)

165.  Judge Moss' April 2016 judgment was too far-fetched to uphold entirely.  Justice Bedsworth and his panel reversed Judge Moss and ruled the HOA rent and loan charges were unlawful; that Plaintiffs did not owe any money to the HOA. (*Chodosh v. PBPA* G053798, 12/17/18 at 24) On remand, HOA PBPA was ordered to return illegal HOA loan payments it had collected from Plaintiffs.

166.  Straining to affirm Judge Moss, among other erroneous rulings, Justice Bedsworth held PBPA did not need a securities permit, (Op. 21) contradicting the prior finding of the state agency having jurisdiction over PBPA, the Department of Business Oversight ("DBO"), which found PBPA "was required to obtain a permit."  (Exhibit J, pg. 4, ¶16)

### R.    HOA Keeps Homes for Non-Payment of Rent and Loan Not Owed

167.  As key support to the Enterprise, Justice Bedsworth had to opine

to achieve the financial objective of taking the Park and homes.  Defendants and their surrogate PBPA had to win to keep Plaintiffs' homes.  Justice Bedsworth's Enterprise function was to wrongly deny Plaintiffs real property rights and recovery for their financial injury inflicted by the HOA unlawful leases and loans.

168.  Years before, in what Judge Stock had ruled were illegal "strict foreclosures," (the abrupt forfeiture of real property without legal process) the HOA had summarily taken Plaintiffs homes for non-payment of rent and loans. (*PBPA v. Eicherly* (filed 4/9/10), Minute Order 11/18/11, pg. 2)

169.  On appeal of *Chodosh v. PBPA*, in December 2018, the Orange County Court of Appeal, by opinion author Justice Bedsworth, (whom Plaintiffs had sued in federal court two (2) years earlier), held that Plaintiffs did not owe their HOA for rent or loan. (Op. 12/17/18 at pg. 17, "judgment reversed for unpaid rent"; Op. at pg. 18, fn. 19, pg. 22), Plaintiffs have "no liability at all for the $200,000 assessment" and "The [Judge Moss] judgment [in *Chodosh v. PBPA*] is reversed to the extent it provides that the appellants [i.e. Plaintiffs] owe any money to PBPA." (Op. at 23)

170.  But Justice Bedsworth upheld and did not rectify PBPA having terminating Plaintiffs' HOA memberships and taken their homes for non-payment of the rent and loans which he opined Plaintiffs never owed.  He did not order PBPA to compensate Plaintiffs for their homes.   Under the Bedsworth opinion, PBPA kept Plaintiffs' homes, taken by strict foreclosure, as President Mantelli testified, for "nothing."

## S.   Judge Moss Does Not Recuse; Sits on Remanded Case

171.  On March 20, 2019, the appellate court remanded *Chodosh v. PBPA* back to Judge Moss.  In 2016, Plaintiffs had sued Judge Moss in federal court, complained about him to CJP and declared that he obstructed justice and perjured himself.  In open court, Plaintiffs' counsel stated that

Judge Moss had "fixed" the Park sale.  Despite the attacks, Judge Moss did not recuse from the remanded case.

172.  On May 20, 2019, Plaintiffs filed a Code of Civ. Proc. §170.6 peremptory challenge to disqualify Judge Moss. (Exhibit F) Under binding Orange County appellate court authority penned by Presiding Justice O'Leary, Judge Moss had to grant the §170.6 "instantly".  (*Hemingway*, supra, 122 Cal. App. 4th at 1157-58 "instant" action on §170.6 vital to "confidence in the judiciary.")

173.  Judge Moss sat on the §170.6 challenge for over six (6) months. Finally, he granted it by order entered Nov. 20, 2019. (Exh. F)

**T.    Judge Moss' Perjury to Collect his Paychecks**

174.  While Judge Moss ignored Plaintiffs' §170.6 disqualification for a second time, each month he falsely affirmed, under oath, that he was entitled to his paycheck because his submitted matters were up to date. He swore: "I [Judge Moss] have no pending, undetermined matters that were submitted for decision before [fill-in-date]."

175.  The affidavits were not true.  Judge Moss had not acted on Plaintiffs' §170.6 disqualification that had been "submitted for decision before" the affidavits' cut-off dates, starting June 2, 2019. (Exhibit F)

176.  After months of perjury on affidavits to collect his paychecks, Judge Moss granted the §170.6 challenge by his order entered Nov. 20, 2019. (Exhibit F)

177.  Judge Moss stated he "was unaware of the [§170.6] filing." (Order 11/20/19) It was no excuse.  See, e.g., Exhibit F, *In the Matter Concerning Judge Brian Lamb* (CJP 7/2/19 pgs. 4-5, "fact that a judge [that perjures salary affidavit] may be unaware . . . is not a defense.")

178.  In 2016 Judge Moss committed perjury by false statement that he had no ex parte communication about his strategic call in from vacation

to thwart the TRO, "self-re-qualify," and save the sale.   In 2019 Judge Moss perjured himself several times for his paycheck.   Judge Moss follows a pattern of perjury that serves the Enterprise.

### U.    CJP "No Action" - Four Years After J. Moss Complaint

179.   On April 25, 2016, Plaintiffs submitted a complaint to CJP about Judge Moss. (Exhibit G) In response, the CJP and its former and current Directors did nothing about Judge Moss' court document proven "fix" of the fiduciary fraudulent Park sale.

180.   Three (3) years after Plaintiffs' complaint, CJP (and its legal counsel the AG) wrongly purported to approve disqualified Judge Moss' re-assumption of jurisdiction as what it improbably called an "exercise of judicial discretion." (*Padilla, Chodosh v. CJP* and AG, Demurrers, 12/20/18 and 7/19/19, pg. 10, fn. 2, 4)) (Exhibit G, 12/20/18 Demurrer excerpt)

181.   Under CJP and court decisions, a disqualified judge taking back the case is the highest and worst judge wrongdoing; it is willful judicial misconduct.  When done to make a "fix", it is the "quintessential" judge bad act.  *Inquiry Concerning Judge William R. Danser, No. 172* (6/2/05; CJP website), pg. 25 quoting *Inquiry Concerning Judge Michael E. Platt, No. 162* (CJP 2002), p. 20, 48 Cal. 4th CJP Supp. 227, 233   Judge Moss was not exercising "judicial discretion" when he "self-re-qualified" and then "fixed" the case to enable the Park sale.  He was committing a crime.

182.   A year later, i.e., four years (4) after the April 2016 complaint to CJP, on May 14, 2020, CJP notified Plaintiffs "the commission found no basis for action against judge [Moss] or determined not to proceed further in this matter."  (Exhibit G)

183.   For years, CJP did nothing about the Judge Moss "fix."  Worse, CJP approved and enabled the "fix," falsely stating the "quintessential" judge bad act was proper "judicial discretion."  (Exhibit G, Dem. 12/20/18)

184.  In stark contrast, CJP acted promptly to respond to public outcry about Judge Persky imposing lenient sentence on student athlete that sexually assaulted an unconscious woman.   Within weeks, CJP quickly issued its decision exonerating Judge Persky.   CJP did not address Plaintiffs' complaint about Judge Moss for over four (4) years.  (Exhibit G)

## V.   CJP Does Not Refer Judge Crime Evidence; It Hides It

185.  CJP rule and policy provides for identification and referral of evidence of judge crime submitted by the public. CJP tells the public it has referred evidence of judge crime to prosecuting authorities on "multiple occasions."  (Exhibit T; Rule Report, 8/29/17, pg. 15, re: Rule 102(g)) The statement is false.    Worse, CJP never turns over judge crime evidence to prosecutors.  On the contrary, CJP hides it.

186.  Upon receipt of evidence of possible judge crime, the CJP may or may not consider it, then vote to refer, or not refer, the evidence to prosecuting authorities. (CJP Rule 102(g); Policy Declaration 4.2; see, Exhibit T) CJP repudiates that it has mandatory duty to refer judge crime evidence to prosecutors.   It espouses a special CJP privilege to decide whether or not to refer judge crime evidence to prosecutors.

187.  CJP has three (3) judicial officer commissioners, two (2) judges and one (1) justice.  They are bound to the canons of ethics. They must refer judge crime evidence to prosecutors.  A judge or justice cannot vote to not report judge crime. But that is what they do when they sit on CJP.

188.  CJP judge and justice members, subject to the canons of the Code of Judicial Ethics, must report to law enforcement evidence of another judge's crime. (Canon 3D(1); D. Rothman, Hon. R. Fybel, Hon. R. MacLaren, and M. Jacobson, *California Judicial Conduct Handbook*, (4th Ed. 2017) supra., pg. 335-6, §5:68 ("*Handbook*"); ("judge's duty" to report crimes and misconduct of another judicial officer is "an affirmative obligation under

canon 3D."); See, *Judicial Council of California, Memorandum*, 11/10/06, pg. 4 ("*CJC Memo*." "If a judge has reliable information that another judge has committed a serious criminal offense, the conduct must be reported to the CJP and the appropriate law enforcement agency." ref. Rothman, *Handbook*, (2nd Ed. 1999), §5.65, p. 153), Exhibit Q)

189.  As its pattern and practice, CJP expects and requires its judge members to always vote to not refer judge crime evidence.  CJP compels its judge and justice members to transgress their Canon 3D(1) ethical duty to report evidence of judge crime to law enforcement.

190.  In 2019 CJP was audited for the first time since its formation in 1960. The State Auditor report title states the Auditor's conclusion: "*Weaknesses in [CJP] Oversight Have Created Opportunities for Judicial Misconduct to Persist.*" (*Audit of CJP, No. 2016 -137*, 4/25/19) The Audit finding and conclusion corroborate that CJP wrong practices cause "judicial misconduct to persist."  (See, report extract, Exhibit N)

**W.   AG Becerra – No Action On Judge Moss – Defers to CJP**

191.  On excuse of "lacks the resources," California Attorney General Becerra refused to investigate or prosecute Judge Moss.  (Exhibit E)

192.  Like CJP, AG Becerra falsely labeled the Judge Moss' fix "exercise of judicial discretion." (Exhibit E) With full facts and documentation proving Judge Moss' wrongdoing, AG Becerra ignored and condoned it; he enabled the Judge Moss "fix" that was judge crime.

193.  AG Becerra has a policy of not investigating or prosecuting judge crime.  AG Becerra has his office direct the public to send all complaints about judges to CJP, knowing CJP will conceal any judge crime evidence.

194. Consistent with his refusal to act on Judge Moss' crime perpetrated on vulnerable seniors, AG Becerra has never prosecuted a judge.

195.  Before AG Becerra, his predecessor Senator Kamala Harris, California attorney general 2011-2017, under the same policies she passed on to AG Becerra, also failed to prosecute judge crime.  The last California judge prosecution was of Judge Danser in 2003.  He fixed tickets for friends and celebrities.  (See, Exhibit T)

## X.   CJP and AG Conspiracy Allows Judge Moss' "Fix" Crime

196.  AG refers to CJP members of the public that complain about judge crime.  The AG has a pattern and practice of incorrectly informing the public that the CJP has "exclusive jurisdiction" to consider evidence of judge crime.  (Exhibit R)

197.  The AG does not tell the public that the AG – not the CJP – is responsible for investigating judge crime.  The AG knows that judge crime evidence the public submits to CJP will not be referred to law enforcement, that CJP will file it away with no action.

198.  CJP's tactic to prevent the public from knowing that it does not prosecute judge crime is CJP assertion of absolute secrecy.  CJP did not allow the state auditor to review CJP file judge crime evidence.  CJP refuses to provide statistical information as to any judge crime referrals.  (Exhibit T)

199.  Because CJP and AG conspire and cooperate to gather and conceal public complaints with evidence of judge crime, and did so in this case, Judge Moss suffered no penalty, repercussion, or investigation for his willful judicial misconduct and judge crime.  CJP and AG conspired to enable the Judge Moss "fix" that took from seniors millions of dollars in real estate equity and cash.

## Y.   Judge Moss Example of Pattern of Judge Crime

200.  CJP and the AG neither investigated nor punished Judge Moss misconduct and crime to "fix" the Park sale and perjure himself about it in 2015.  As a result, they enabled and encouraged judge criminality.

201.  Years after he "fixed" the Park sale, in 2019 Judge Moss again wrongly defied his disqualification and repeatedly perjured himself on affidavits to collect his paychecks from the public coffers.  (Exhibit F)

202.  The assured lack of repercussions or consequences for Judge Moss' judicial misconduct and crime, or for that of any other judge or justice that acts in and for the Enterprise, is the foundation that establishes and permits the ongoing pattern of judge crime integral to Enterprise success.

## VII.   BACKGROUND FACTS OF DEFENDANTS' RACKETEERING

203.  Plaintiffs incorporate by reference all preceding paragraphs.

### A.   Defendants Take Millions in Real Estate Equity and HOA Cash

204.  By and through the Enterprise, Defendants converted and took millions of dollars of real estate equity and HOA cash from the seniors for Defendants' own use and enrichment.

205.  The financial objectives, in round-numbers, which the Enterprise planned and achieved, were to acquire the Park for about $15,000,000 under the appraised value (as determined by the lender on the sale), to embezzle about $1,000,000 in the seniors' HOA reserve and more from sale proceeds, estimated to be about another $1,000,000, and most lucrative of all, to force the seniors to sell their individual mobile homes to Defendants for pennies on the dollar compared to what the seniors had paid in earlier years when they had their own senior resident owned park.

206.  The judge fixed Park sale and accompanying HOA money embezzlement, perpetrated on the Plaintiffs and 112 other seniors, in one swoop defrauded them out of an estimated $20,000,000 in total real estate equity and cash.

207.  Plaintiffs' collectively paid $1,095,000 for their homes, which they lost when the Enterprise caused them to lose their cases and appeals

by fixing the Orange County court process against them.

208. HOA PBPA President Mantelli took office January 2013. Plaintiffs are informed and believe, and thereon allege, that she commenced the racketeering soon thereafter.  She would deceive the seniors into selling the Park to her buyer at a price way below market.

209. Under President Mantelli, the HOA seller did not procure a current appraisal, list the property for sale, solicit or seek competing offers, or do any marketing sales analysis.   President Mantelli hired no independent inspector of elections for the election whether to sell the Park to her buyer.  She oversaw the ballots herself, then announced the vote approved the sale.

210. Mantelli stood before the members and falsely stated that she would receive nothing from the Park sale and that she did not know the buyer Saunders or his broker.  In truth, she would receive substantial kickback benefits, including a contract to manage the Park.

211. Standing beside President Mantelli and backing-up her self-dealing, were HOA attorney Defendants Salisbury, Thomas, and Wood. They helped deceive the HOA members to accept and vote for the fiduciary fraudulent sale. They had their fiduciary HOA client sell its land with no current appraisal, no listing, and no marketing to obtain competing offers.

212. They knew that in December 2015, the HOA had received a higher cash offer with no broker commission. (Exhibit M) They helped Mantelli conceal the better offer.  Neither she nor they told the members about the offer at higher price and no real estate commission that would place about $20,000 more in the pocket of each of the 112 HOA members.

213. The attorney Defendants (Thomas, Wood and Salisbury) breached their fiduciary duties to the HOA and its members, authorizing and carrying out the below market rigged sale that would benefit

Defendants and yield to attorneys Salisbury and Thomas millions of dollars of the seniors' money for legal fees.

214. Breaching fiduciary duties, President Mantelli and her accomplices, attorney Defendants Wood, Thomas and Salisbury, made no effort to resolve litigation and take measures whereby the seniors could and would have kept their resident owned park ("ROP").   Instead, in January 2014, Mantelli had the members vote to specially assess themselves an additional $400 / month in HOA dues to pay attorneys' fees to PBPA attorneys Thomas, Salisbury and others. (Exhibit K)

215. Thomas nearly always appeared in court with Wood.  Their junior attorneys, Ms. Domineh Fazel and Ms. Sivi Pederson, also frequently double-teamed pleadings and hearings.  Thomas' fees, billed to the HOA, were twice, triple or higher multiple of the fees that Wood charged the insurance company for the same work or appearance.

216. HOA PBPA spent millions for legal fees, (Exh. O) to the point that the legal fees were far more than the 2013 Plaintiffs' settlement offer that Mantelli and Thomas and Wood did not present to the HOA members.

217. Mantelli and Thomas and the Defendant HOA attorneys had no intention to settle the litigation for the HOA and its seniors' benefit.  They adhered to the Enterprise objective to use the litigation as a device to deceive and direct the seniors into believing they had to sell the Park.

**B.    Defendants Inform HOA Members Sale is only Option**

218. In or about May 9, 2015, Mantelli, Saunders and Defendants announced the sale of the Park to the HOA members, arguing it was the only option, which was false.

219. Mantelli, Smith and Fiori concealed that Saunders had bribed them and Director Dan Smith to approve the sale, and later did not disclose Board receipt of a higher price, no broker commission, cash offer.

220. President Mantelli and Thomas and Wood and Salisbury maligned the Plaintiffs and incited the HOA members to not believe Plaintiffs that the litigation could be resolved and the Park kept.

221. Judge Moss assisted the scheme by ruling against Plaintiffs over the law and facts proving their case. He allowed PBPA to operate as a failed and unlawful "resident park" with illegal leases and loans. Judge Moss acted as if PBPA were a legitimate HOA following the law under direction of faithful and honest fiduciaries. PBPA itself was fiduciary fraud victim.

222. Judge Moss knew, among other things, that under President Mantelli and Director and Treasurer Fiori, PBPA seven figure reserves had gone missing and that, since Mantelli became HOA President in 2013, PBPA had not rendered financial statements to the members for years.

223. With HOA spectators in his court, Judge Moss praised President Mantelli, giving her credibility.

224. With Judge Moss' fixed and wrong decisions and praise of her, Mantelli told the members they were "winning". Mantelli depicted herself as the Cowgirl Park Sheriff, reassuring members "I've got your back." (Exh. P) In truth, self-dealing President Mantelli was back-stabbing the members.

225. Defendants promoted the sale as the way to end the $400 / month extra HOA dues per member for legal fees, which was overwhelming many fixed income seniors. Defendants falsely advised the seniors they could not correct the PBPA lack of securities permit that placed consent decree moratorium on sale of homes in the Park. (Exhibit J)

226. The misled HOA members asked questions and got dishonest answers. Their fiduciary HOA Board President's, Directors' and attorneys' duplicity and Judge Moss' misconduct and crime prevented the members from ascertaining that the real enemies were the fiduciary breaching and self-dealing President Mantelli, the HOA Board and attorneys along with

the Park-buyer Defendants, Saunders and accomplices.

227.  The HOA seniors would not grasp, until after the Park sale closing, that Mantelli and the Defendants' design all along was to buy the Park and take their homes at millions below fair value or for nothing, to steal their HOA reserves and a substantial part of the Park sale proceeds, and to oust them from the Park by raised rents and forced home buy out at low price.

### C.   Judge Moss and Justices Always Rule for PBPA

228.  Judge Moss, and later Justice O'Leary and Justice Bedsworth, contributed to the Enterprise by ruling against Plaintiffs and the law and facts and in favor of PBPA, but really for the benefit of Mantelli and the Enterprise.

229.  Because of *Jesinoski v. Countrywide Home Loans* 574 U.S. 931 (2015) Judge Moss was forced to rule that Plaintiffs had a valid "truth in lending ("TILA") claim (15 U.S.C. § 1601 et seq.) against PBPA for its illegal HOA loans made to Plaintiffs and many members, secured by lien on the homes.

230.  Otherwise, Judge Moss intentionally disregarded the law and ruled against Plaintiffs, in ways that were wrong and absurd, such as finding HOA real property mortgage loans violated TILA, but then ruling that Plaintiffs owned no real property.   He correctly ruled that PBPA was not a statutory "Davis Stirling" HOA, but then applied Davis Stirling case law to uphold a Mantelli rigged HOA election. He ignored HOA law that made the election invalid for lack of secret ballots and independent inspector. Judge Moss approved HOA use of marked ballots, and President Mantelli as ballot handler, vote counter and result announcer.

231.  Phase IV trial concluded December 15, 2015.   Judge Moss announced he would be away for two (2) weeks.  (Exhibit B) That is when

he "called in" on *Haugen v. PBPA*, a case on which he was disqualified.

**D.      *Haugen v. PBPA* – The TRO that Judge Moss "Fixed"**

232.   *Haugen v. PBPA*, filed Nov. 12, 2015, (Exhibit B) impeded the Enterprise objective to close the illicit below market Park purchase. However, the Park Buyer Defendants and Defendant Fidelity worked out a way to close the fraudulent sale.

233.   Then on Dec. 21, 2015, Mr. Haugen filed for the TRO to enjoin the sale.   This was an unforeseen sale impediment.   Fidelity could not readily insure the new owner's title and the lender's deed of trust lien with a TRO looming.   The TRO imperiled the Park sale closing, the Enterprise's prime financial objective.

234.   The TRO was set to be heard by the new judge, Hon. Gail Andler. Plaintiffs are informed and believe, and thereon allege, that Defendants feared that Judge Andler, unlike Judge Moss, would follow the facts and law and rule for Plaintiff Haugen and enjoin the below market give-away Park sale and its illicit gain.

235.   Plaintiffs are informed and believe that the Park-buyer Defendants, on December 21, 2015, panicked that the sale, scheduled for closing the next day, Dec. 22, 2015, would not occur because of the TRO to be heard by Judge Andler.

236.   Plaintiffs are informed and believe, and thereon allege, that the Park Buyer Defendants hatched the plan to have ex parte contact and communication with Judge Moss, and to bribe him so that he would phone in from vacation to thwart the TRO, even though he had been disqualified in the *Haugen v. PBPA* case and had no judicial power to act in it.

**E.      Attorney Susolik Allegedly Arranged the "Fix"**

237.   Plaintiffs are informed and believe and thereon allege, that in December 21-22, 2015, Defendant Susolik made or caused to be made ex

parte contact and communication with Judge Moss to request his "call in" to thwart the TRO.  (Exhibits B, W)

238.  Susolik's client Saunders was not in the case.   But Susolik showed up to court on Dec. 22, 2015 to hear disqualified Judge Moss' call in to thwart the TRO.  Judge Moss dictated to his clerk a Minute Order which included: "Appearances: Edward Susolik/Peter S. Bauman, Callahan & Blaine, specially appearing for John Saunders." The sale closed four (4) hours after Judge Moss' call-in.   (Exh. B)

239.  Plaintiffs are informed and believe, and thereon allege, that the Park Buyer Defendants, by or through Defendant Susolik, bribed and directed Judge Moss to make the "call in" to save the Park sale from the TRO; to make sure the Park sale transaction closed as scheduled by recorded deed that same day, which it did.

### F.    Saunders and Coldren Bribe HOA Directors

240.  On the HOA seller side, Plaintiffs are informed and believe, and thereon allege, that Saunders and Coldren bribed HOA President and Director Mantelli into her fiduciary fraud and self-dealing with a kickback commission upon closing of the fraudulent Park sale.

241.  Plaintiffs are informed and believe, and thereon allege, that Saunders and Coldren further bribed Mantelli by promise she would manage the Park post-closing.   After closing, Mantelli, through "Primo Management Partners, Inc." ("PMP") managed the Park. (Exhibit Y)

242.  Plaintiffs are informed and believe, and thereon allege, that Salisbury also held a PMP interest.  Plaintiffs are informed and believe, and thereon allege, that Saunders and Coldren bribed HOA PBPA President Mantelli and legal counsel Defendant Salisbury with promise of post-closing park management, in exchange for their breaching fiduciary duties to steer PBPA to sell the Park to Saunders and Coldren for millions under market.

243.  To assure HOA Park sale approval, Plaintiffs are informed and believe that Mantelli, Saunders and Coldren bribed HOA Directors Defendant George Fiori and non-defendant HOA Director Dan Smith by promise to purchase, post-Park closing, their homes in the Park at inflated six figure prices not available to other residents, and to sell to Fiori an ocean view home in the Park on favorable terms.

244.  Plaintiffs are informed and believe that after closing, Fiori and Smith sold their homes to Saunders and affiliates at overstated six figure prices.  Smith moved away. Fiori sold one home in the Park to Saunders and stayed in another home in the Park of his choosing.

### G.   Highly Profitable Under Market Park Purchase

245.  The Park purchase yielded millions of dollars of gain for the buyers.  They borrowed $35,797,000 for the Park purchase, (Exh. B) more than $34,395,200 purchase price, allowing the buyer principals, after escrow costs, to pocket about $1,000,000 cash at closing.

246.  Using a lender's loan to value ratio of seventy percent (70%), a $35,797,500 loan means the lender had an appraisal for $51,139,000.  The Park buyers paid $34,395,200, so their ill-gotten real estate equity gain was $16,743,800, with another $1,000,000 cash for pocket money.  For no money down, all with borrowed money on a real estate loan, Defendants instantly stole about $18,000,000 in real estate equity from the seniors.

### H.   Distribution of Park Sale Proceeds; Missing Money

247.  From the HOA sale proceeds, PBPA attorneys received legal fees totaling $1,113,815 (See Exhibit O)

248.  After closing, Mantelli and the Park attorney defendants withheld $1,000,000 as a "reserve", which Plaintiffs are informed and believe and thereon allege, they used to pay Attorney Defendant Thomas, despite Saunders agreement to indemnify PBPA for legal fees.

249. Plaintiffs are informed and believe, and thereon allege, that before and after the Park sale, Mantelli converted and diverted for herself and PBPA attorneys Thomas, Salisbury and others approximately $2,000,000 in HOA dues paid by the HOA seniors and out of Park sales proceeds.

250. Plaintiffs are informed and believe, and thereon allege, that Mantelli and PBPA, 2015 - 2020 provided no meaningful accounting for PBPA of the withheld sale proceeds, and have spent most of it on legal fees and other expenses that benefit Defendant Mantelli and Defendant PBPA attorneys and their law firms.   Plaintiffs are informed and believe, and thereon allege, that from the Park sale proceeds, Mantelli and other Defendants have embezzled substantial funds that rightfully belong to the Park seniors.

## I.   Ouster of Senior Residents – More Racketeering Profit

251. After closing, Saunders and affiliates commenced to force buy outs of the seniors from their homes.  Most residents had paid six figure prices when or before the Park was a "resident owned park."

252. To promote the Saunders sale to the HOA members, in sales materials to the members distributed May and June 2015, Mantelli and Saunders falsely told the members that post-closing they would receive a space lease with favorable terms and fixed rent. (Exhibit L)

253. But after Saunders and Coldren became the Park principal owners, the promised terms did not materialize.  Instead, rents went up, and home sale values went down.   There was no promised favorable lease, but a one-sided landlord document with large rent increases.

254. Plaintiffs are informed and believe, and thereon allege, that Saunders and accomplices have purchased homes from Park residents at prices that were a fraction of what the residents paid for their homes.

255.  The ultimate value in the Park and objective for the Park Buyer Defendants is to own all of the homes in the Park in order to easily convert the Park to a higher use than mobilehome park without the obstacle of residents that own their mobilehomes; to have them as just renters.  The fraudulent and self-dealing sale, with its post-sale oppressive space leases, peddled and promoted to the seniors by deceit, achieved such goal.

## VIII.  BACKGROUND FACTS FOR CO-CONSPIRATORS JUSTICE TROTTER, JAMS AND JUDICIAL OFFICERS

256.  Plaintiffs incorporate by reference all preceding paragraphs.

257.  Plaintiffs are informed and believe, and thereon allege, that the base racketeering and predicate crime for the Enterprise operation to undermine and deny justice for Plaintiffs originated with the participation of non-defendant co-conspirators Justice Trotter and JAMS.

### A.    Justice Trotter and JAMS Racketeering

258.  At the second mediation, (Nov. 21, 2013) when Plaintiffs would not accept an HOA promissory note settlement, Justice Trotter told and threatened that if they did not accept the HOA promissory note, he would contact "Judge Nancy" and malign Plaintiffs by falsely stating they had prevented settlement.

259.  Plaintiffs are informed and believe, and thereon allege, that Justice Trotter was acting as agent for Mantelli, Saunders, Coldren and other Defendants, in an attempt to extort that became completed extortion upon Plaintiffs loss of their homes and value by final court judgment.

260.  Plaintiffs are informed and believe and thereon allege that Justice Trotter's attempted extortion was intended to coerce Plaintiffs to take the HOA promise to pay settlement, and if they did not, that he would malign them to their trial "Judge Nancy" to negatively impact their case.

261.  Plaintiffs did not give in to the attempted extortion.  Afterwards,

Judge Stock was on the bench for another month, December, 2013.  She reversed herself against Plaintiffs in favor of PBPA, ordering a jury trial where previously she had said there would be only a bench trial. (PBPA wrongdoing facts were not disputed; there was nothing for, and never was, a jury trial.)  January 2014 Judge Stock retired and joined JAMS.

262.  Plaintiffs are informed and believe, and thereon allege, that Justice Trotter communicated with Judge Stock in or about late November 2013, and that he indicated or communicated his desire that she reverse herself to go against Plaintiffs in the case *Chodosh v. PBPA*, in exchange for which her job at JAMS would be better assured.

263.  Plaintiffs are informed and believe, and thereon allege, by doing so, JAMS and Trotter for themselves and as agents for Defendants park buyers bribed Judge Stock to rule and act against Plaintiffs.

264.  On December 22, 2015, Judge Moss illegally "self-re-qualified" after he thwarted Plaintiffs' TRO and enabled the fiduciary fraudulent Park sale.  By his willful judicial misconduct and crime of "self-re-qualification", disqualified Judge Moss ousted assigned Judge Gail Andler. (Exhibit B) Judge Moss said he "reassumed jurisdiction."  (Exhibit E)

265.  Judge Andler had a duty to report Judge Moss' misconduct to the CJP and prosecuting authorities.  (See, Canon of Ethics 3D(1), *Handbook*, 4th Ed. 2017, pg. 335-6, §5:68; 2nd Ed.§5.65, p. 153) Plaintiffs are informed and believe, and thereon allege, that Judge Andler did not protest, report, or take action about disqualified Judge Moss' unlawful "reassuming jurisdiction" that ousted her from the Park sale case *Haugen v. PBPA*, thwarted the TRO, and enabled the fraudulent Park sale.

266.  About a year after Judge Moss' (Dec. 22, 2015) illegal takeover of a case before her, in January 2017, Judge Andler joined JAMS.

267.  Plaintiffs are informed and believe, and thereon allege, that

JAMS obstructed justice and rendered influence or bribed Judge Andler so that she would refrain from complying with Canon of Ethics 3D(1) et al. and not report Judge Moss to CJP and prosecuting authorities.

268.  JAMS wanted to ensure success of Judge Moss' willful judicial misconduct with his "call in" from vacation to fix the fiduciary fraudulent Park sale for the benefit of JAMS favored "repeat business" clients.  The JAMS favorites were to acquire the Park, and with JAMS help, they did.

269.  During the litigation in *Chodosh, et al. v. J. Trotter and JAMS* (D070952, filed 5/7/14) and afterwards, in that case and others, JAMS advocated against Orange County justices recusing in the case (Dkt. 7/22/16).  The justices were friends with their predecessor justices, most of whom worked at JAMS, and could invite them to join JAMS post-bench service. The JAMS, Trotter / Orange County Court of Appeal connections and Plaintiffs having sued JAMS, made for glaring appearance of impropriety that the Orange County justices would be perceived as likely biased in favor of JAMS and against litigants that had sued JAMS.

270.  But JAMS did not do the right thing and support the justices' recusal so as to eliminate the overpowering appearance of impropriety. JAMS unlawfully and unethically advocated for the Orange County appellate court justices to stay on the case, and did so in face of the fact that the majority of living Orange County justices had, post-retirement, joined JAMS to earn compensation three or more times higher than their public servant pay while on the bench.

271.  Plaintiffs are informed and believe, and thereon allege, that at all times during the Palm Beach Park litigation, from November 2013, through 2019, that JAMS unlawfully and unethically exerted influence over the Orange County judges and justices that are non-defendant co-conspirators herein, Judge Moss and Judge Margines, Justice O'Leary and

Justice Bedsworth, and Judge Andler.

272.  Plaintiffs are informed and believe, and thereon allege, that Justice Trotter and JAMS wielded such influence with the intent and purpose to obstruct justice and deny honest judicial officer services for Plaintiffs so that Defendants, who are favored JAMS "repeat business" customers, could deprive and divest Plaintiffs and the Park seniors of their real estate equity in their Park and homes and embezzle HOA cash.

## B.   Judge and Justice Racketeering

273.  Judge Moss, Presiding Justice O'Leary, and Justice Bedsworth are the principal judicial officers that engaged in willful judicial misconduct intended to injure Plaintiffs' in their property. Their main misconduct method was to sit on, hear and decide Plaintiffs' cases or appeals when they were disqualified and had to recuse.

274.  They denied Plaintiffs, at all times, an impartial judicial officer, staying on the case or appeal to wrongly rule against Plaintiffs and the law and fact, i.e. to intentionally disregard the law.

275.  In December 2015 Judge Moss "self-re-qualified", or as he put it "reassumed jurisdiction" to intervene and fix the Park sale.  (Exhibit E, pg. 8, ¶6, line 25) Presiding Judge Margines, whose §170.6 disqualification order (Exhibit B) Judge Moss trampled and purported to reverse, ignored Plaintiffs' complaint about Judge Moss' "call" in of the "fix." (Exhibit Q)

276.  Years later, in 2019, after remand of the case from appeal, Judge Moss again disregarded Plaintiffs' §170.6 peremptory disqualification, on which the law required him to act "instantly," keeping himself on the case for six (6) months, during which time Judge Moss perjured himself by falsely stating on salary affidavits that he was up to date on matters submitted to him for determination.  (Exhibit F)

277.  Orange County Court of Appeal Presiding Justice O'Leary and

Justice Bedsworth unlawfully sat on and decided Plaintiffs' appeals.  They had to recuse given that Plaintiffs in December 2016 had sued them in federal court alleging they had conspired with Judge Moss to conceal his judge crime with the "fix".

278.  Instead, Justice O'Leary and Justice Bedsworth stayed on Plaintiffs' appeals, precisely and wrongly intentionally disregarding the law by ruling to inflict injury on Plaintiffs and impede and obstruct their pursuit of justice.

279.  As soon as it was docketed, Presiding Justice O'Leary denied Plaintiffs' motion to take Judge Moss' deposition.  She acted too quickly and contrary to court rule.   To conceal and protect the Enterprise, she intentionally disregarded the law, as it was crucial that Judge Moss not be subject to Plaintiffs' deposition questioning about how he "called in" to fix the fiduciary fraudulent Park sale.

280.  Justice Bedsworth authored the *Chodosh v. PBPA* opinion (12/17/18) against Plaintiffs, holding they did not owe rent or for HOA loans, but that HOA PBPA could still keep Plaintiffs' homes even though it had taken them by strict foreclosure for non-payment of the rent and loans that he ruled Plaintiffs did not owe.

281.  In May 2016, Presiding Justice O'Leary and Justice Bedsworth denied Plaintiffs' writ to enforce challenge to disqualified Judge Moss' "call in" from vacation to fix the Park sale.  They upheld the "fix."

282.  Like Judge Moss, Justices O'Leary and Bedsworth were critical to the Enterprise objective of taking the Park from Plaintiffs and the other seniors by subjecting Plaintiffs to biased justices in the Enterprise and committed to ruling against Plaintiffs and fact and law, i.e. judicial officers that would engage in the willful judicial misconduct of intentional disregard of the law in order to injure one side for the benefit of the other side.

283.  Justices O'Leary and Bedsworth's essential usefulness to the Enterprise was to back and uphold Judge Moss' wrongdoing, which they did. They upheld the rulings of a judge that fixed a case.

### C.   Justice Bedsworth Wrongful Use of Contempt

284.  Justice Bedsworth threatened Plaintiffs' counsel with contempt for stating Judge Moss "fixed" the Park sale and for statements in motions to disqualify the justices.  Plaintiffs are informed and believe, and thereon allege, that Justice Bedsworth made the contempt threat to assist the Enterprise believing the threatened contempt would deter Plaintiffs' inquiry into the racketeering crimes.

285.  Before oral argument, by letter (Dkt. 7/17/20) to Presiding Justice O'Leary, copied to all Div. 3 Justices, PBPA attorney Jeffry Smith, a partner of Defendant Attorney Wood, sought to have Plaintiffs' counsel held in contempt for having stated that Judge Moss "fixed" the give - away sale of the Park and for statements made in motions to disqualify Div. 3 Justices, including assailing the non-recusal of Presiding Justice O'Leary and Justice Bedsworth.  (See, transcript 7/20/18 extracts, Exhibit S)

286.  At oral argument, Justice Bedsworth stated the proceeding would include the court's consideration of PBPA's request that Plaintiffs' counsel be held sanctioned and in contempt.

287.  Justice Bedsworth inquired: "So you just told us that Judge Moss engaged in willful, judicial misconduct and was part of a fix of the case; is that correct?"  Plaintiffs' counsel affirmed, "that's right."  Justice Bedsworth declared: "That sounds to me like direct contempt."    Counsel responded: "Well, let's have an OSC [Order to Show Cause] re: contempt. Let's get Judge Moss in here and see what he has to say."

288.  Justice Bedsworth announced that the court: "[W]ill consider whether we're going to have an OSC re contempt."   Counsel explained:

"Well, all we need to do is ask Judge Moss a few questions. It's pretty simple."  (Transcript 7/20/18, pgs. 9-10; see Exhibit S)

289.  Following oral argument, Plaintiffs filed Offer of Proof for the Judge Moss fix.  (Dkt. G053798, 7/23/18)

290.  Justice Bedsworth and the panel did not find contempt; acquitting Plaintiffs' counsel of the criminal contempt charges.

291.  By not finding contempt against counsel that declared, in open court, that Judge Moss did a "fix," Justice Bedsworth, under California law, had adjudicated that the Judge Moss "fix" charge was true.  If it were not true, under *In re Koven* (2005) 134 Cal. App. 4th 262, 265, 272, Bedsworth had to hold counsel in contempt for falsely stating a judge did a "fix."  An attorney false "fix" charge most egregiously impugns the court. (Ibid.) Justice Bedsworth finding no contempt confirmed the truth of the "fix."

292.  In his Opinion, Justice Bedsworth pointedly disallowed counsel the "attention" of a hearing for "contempt proceedings." (12/17/18, Op. at 21) In his Order denying rehearing, (01/09/2019) he emphasized the court did "not give [the] attorney the spotlight of a contempt hearing." (Exhibit S)

293.  Plaintiffs are informed and believe, and thereon allege, that Justice Bedsworth had another reason to not pursue contempt, that to do so would mean Plaintiffs' counsel, at the contempt hearing, would place Judge Moss on the stand under oath for testimony that would expose Judge Moss' crime, the Enterprise and its actors, including Justice Bedsworth.

294.  Plaintiffs are informed and believe, and thereon allege, that Justice Bedsworth threatened Plaintiffs' counsel with contempt as part of his racketeering for the Enterprise, with the objective of intimidating counsel to cease investigation of the Judge Moss fix, the key crime vital to the Enterprise.

295.  Justice Bedsworth knew that judicial integrity mandated not

pursing contempt against counsel that acted appropriately to declare the Judge Moss "fix," but holding Judge Moss accountable for his judicial misconduct and crime in fixing the Park sale case. Proper procedure was to refer Judge Moss to prosecuting authorities as required by Canon of Ethics 3D(1) and *Handbook* authority.

296. Justice Bedsworth did not honor his oath and ethical duty to refer Judge Moss for discipline and criminal prosecution. Instead, acting for the Enterprise, he threatened contempt where he knew there was none.

## IX.    BACKGROUND FACTS FOR CJP AND AG CONSPIRACY

297. Plaintiffs incorporate by reference all preceding paragraphs.

298. Plaintiffs are informed and believe, and thereon allege, that non-Defendant co-conspirator Commission on Judicial Performance ("CJP") and its non-defendant co-conspirator Director and Chief Counsel Gregory Dresser and the current California Attorney General ("AG") non-Defendant co-conspirator Xavier Becerra, conspired in the Enterprise to ignore Judge Moss' willful judicial misconduct and judge crime, and to allow it.

### A.    CJP and AG Act to Ensure No Judge Crime Prosecution

299. CJP is "the governmental entity charged with the protection of the public from judicial corruption." *Adams v. CJP* (1994) 8 Cal.4th 630, 665. "The duty of the Attorney General [is] to see that the laws of the State are uniformly and adequately enforced." Calif. Const. Art. V, §13  However, as Plaintiffs demonstrate, CJP does not protect the public from judge corruption, and the AG fails to uniformly and adequately enforce the law against crime-committing judges.

300. CJP and AG both fail in their duties to protect the public from miscreant judges. Since the AG does not see to it that state law is enforced against crime-committing judges, and because district attorneys ("DA") follow AG example, no AG prosecution of judge crime makes rare DA judge

crime prosecution.

301. The last DA prosecution was Judge Danser in 2003.  In 1990 Judge Boags was convicted.  Both did "fixing," and were convicted of conspiring to pervert and obstruct justice, Penal Code §182(a)(5).  There is no record that the California attorney general has ever prosecuted a judge.

302.  Federal prosecutors convicted San Diego judges and an attorney for RICO conspiracy, 18 U.S.C. §  1962(d), through a pattern of racketeering activity with multiple acts of bribery in violation of Calif. Penal Code §92, §93, extortion in violation of 18 U.S.C. §1951, and mail fraud under 18 U.S.C. §§  1341 and 1346. *U.S. v. Frega*, 179 F.3d 793 (9th Cir. 1999) (See, Exhibit T)

303.  Under their conspiracy with the Enterprise, AG Becerra (and before him attorney general Harris) refuse to receive judge evidence from the public.  AG Becerra informs the public that complaints about judge crime must be sent to CJP; that CJP has "exclusive jurisdiction" over judge complaints.  AG Becerra and before him, attorney general Harris, act and acted to assure CJP received all publicly reported evidence of judge crime.

304.  The AG does not explain to the public that evidence of judge crime, such as bribery or falsification of court records, is for the AG to investigate as crime to be prosecuted for criminal penalty, while complaint about judge misconduct goes to CJP for consideration of disciplinary action, such as censure, admonition, suspension or removal from office.

305.  Inappropriately and disastrously for the public, the scheme insures that all judge crime reporting lands at CJP.  There, CJP staff attorneys cull and identify the publicly submitted judge crime evidence and forward it to the commission.  (Policy Decl. 4.2)  The commission considers the evidence then votes whether or not to refer the judge crime evidence to prosecuting authorities. (CJP Rule 102(g); Policy Decl. 4.2; See, Exhibit T)

306. CJP has three (3) judicial officers as members; two superior court judges and one appellate justice. (Calif. Const. Art. VI, §8 (a)) Code of Judicial Ethics, Canon 3D(1) mandates a judge report evidence of another judge's crime. (See, *Handbook*) A judge or justice, under canons of ethics, has no power, right or privilege, as a CJP commissioner or otherwise, to vote to ignore or to not refer judge crime evidence to prosecuting authorities.

307. CJP rule and policy compel its judge and justice commissioner members to agree to a commission decision to not refer evidence of judge crime to prosecutors. CJP requires its judge members to defy and bypass their Canon 3D(1) obligation to report judge crime for possible prosecution.

308. CJP has never referred a judge for criminal prosecution. (See rule and policy statistics, Exhibit T) However, CJP falsely tells the public that it has referred judge crime to prosecutors on "multiple occasions." (Exhibit T)

**B.    CJP and AG Conspiracy to Not Investigate Judge Crime**

309. The AG tells the public to send evidence of judge crime to the CJP. The AG office never receives evidence of judge crime from the public. With no evidence, in its office, the AG has no judge crime to investigate.

310. The AG wrongly directs the public to send evidence of judge crime to the CJP. The AG knows that CJP will shelve and conceal the evidence and not refer any of it to the AG or DA other prosecuting authority. The AG knows CJP will suppress and conceal judge crime evidence.

311. The CJP and AG scheme functions flawlessly with the result that, going back decades, CJP has never referred a judge for prosecution, and the AG has never prosecuted a judge.

312. Judges in the Enterprise, to be inclined to commit crimes, are given assurance that the CJP and AG will not investigate their judge crimes, and that any evidence the public sends showing their judge crime

will be sent to CJP where it will be "deep-sixed." Enterprise judges and justices are made comfortable that they will not be investigated, disciplined or prosecuted for their judge crime committed from the bench.

313. The CJP and AG conspiracy in the Enterprise has the purpose and effect of allowing and encouraging judges to accept bribes and commit crimes from the bench, on guarantee they will not be disciplined or prosecuted.

## C.   AG Becerra and former AG Harris Permit Judge Crime

314. Plaintiffs are informed and believe, and thereon allege, that AG Xavier Becerra's refusal to investigate or prosecute facts of judge crime was in line and following the same practice conducted by his immediate predecessor, former attorney general and now Senator Kamala Harris.

315. Like AG Becerra, Harris has a record of never prosecuting and deliberately ignoring facts of probable judge crime and of falsely stating that complaints of judge crime are for the CJP, not the AG.

316. As one example, Harris ignored attorney-submitted documentary evidence where the judge falsified court records to deprive a woman of child custody or visitation. The complaint was for judge crime. Harris responded saying the judge complaint must go to CJP. (Exhibit U) Harris gave a pass to the crime-committing judge.

## D.   CJP and AG Conspired to Enable Judge Moss' Crime

317. Breaching their duties and in denigration of their functions as guardians of the public against judicial corruption, CJP and its current and former Chief Director Dresser and Henley, along with AG Becerra, actively supported and upheld Judge Moss' crime against the seniors. (Exhibit G) They not only did nothing about it, but also wrongfully acted to prevent Plaintiffs from exercising their right to take the deposition of Judge Moss.

### E.    Judge Moss Knows he can get away with Judge Crime

318.   Judge Moss felt assured that CJP, its chiefs Dresser and Henley, and AG Becerra and former AG Harris would overlook his "fix" in 2015. They did; he faced neither CJP discipline nor AG criminal prosecution.

319.   Judge Moss was comfortable that the CJP and AG would afford him, as a corrupt judge in the Enterprise, the privilege to commit the perfect crime – judge crime for which the watchdog authorities guarantee there would be no discipline or prosecution.

320.   As a result, Judge Moss committed more judge crime in 2019, perjuring himself on salary affidavits to receive his paychecks, while sitting on the Plaintiffs' §170.6 disqualification to delay their day in court for refund of HOA loan payments that they desperately needed. (Exhibit F)

321.   Judge Moss' pattern of misconduct and crime, and CJP and AG Becerra inaction and toleration, prove that the Enterprise can and does count on CJP and AG to enable judges and justices to commit crimes for the Enterprise without risk of discipline or prosecution.

## X.    ENTERPRISE WRONGLY BARS JUDGE MOSS DEPOSITION

322.   Plaintiffs incorporate by reference all preceding paragraphs.

323.   The Defendants and their co-conspirators knew that the Enterprise would be exposed if Judge Moss truthfully answered a few questions, starting with: Why did he call in right on time to thwart the TRO and to save the sale - if nobody asked him to?

324.   Normally a litigant cannot obtain judge testimony. Calif. Evid. Code §703   However, A judge can testify about statement or conduct that could be a crime, the subject of CJP investigation, or where a person aware of the facts might reasonably entertain a doubt that the judge would not be impartial. Evid. Code §703.5 (b), (c), (d); Calif. Code Civ. Proc. §170.1(a)(6)(iii).

325. Disqualified Judge Moss' thwarting the TRO and "self-re-qualification" were judge crime.  Plaintiffs had complained to CJP; the matter was subject of CJP investigation.  (Exhibit G) A person aware of the facts of the disqualified Judge Moss strategic "call in" to fix the Park sale would entertain a doubt as to Judge Moss' impartiality. Under Evid. Code §703.5 (b), (c) and (d), Plaintiffs had the right to take Judge Moss' deposition.

326. Plaintiffs subpoenaed Judge Moss for his deposition twice.  He ignored the subpoenas and speciously objected.

327. Defendants and their non-defendant co-conspirators display a pattern of wrongfully acting to deny and prevent Judge Moss' deposition. On April 3, 2018, Plaintiffs made motion in the Orange County appellate court to take the deposition.  Justice O'Leary denied Plaintiffs' motion as soon as it was docketed.  (Dkt. 4/3/18) Justice O'Leary did not wait for the time to pass as Court Rule 8.54(b)(1) required; her denial was immediate.

328. CJP and AG told the Sacramento Superior Court not to allow Judge Moss deposition.  CJP and AG acknowledged Judge Moss "assigning the case back to himself." They admit the wrongdoing, since a disqualified judge cannot "assign back to himself."  But going against the law, CJP and AG characterized Judge Moss' willful judicial misconduct as "exercise of judicial discretion." They vilified Plaintiffs' seeking to take Judge Moss' deposition as an "abusive litigation tactic."  (*Padilla and Chodosh v. CJP and AG*, Demurrer, 12/20/18, pg. 10 and fn. 2, Exhibit G)

329. Justice Bedsworth did not hold Plaintiffs' counsel in contempt for declaring case "fix" in open court.  He opined "not to give an attorney the spotlight of a contempt hearing based on a statement the attorney made in open court."  He rejected the suggestion: "[L]et's have an OSC re contempt. Let's get Judge Moss in here and see what he has to say about things." (Trans. 7/20/18, pg. 9, Exh. S)

330. The appellate court, CJP and AG all supported Judge Moss' wrongful refusal to be deposed because they knew that if Judge Moss did speak, he alone could expose and detail key Enterprise communications, workings and Enterprise members' roles, predicate crimes, and activities.

331. Plaintiffs are informed and believe, and thereon allege, that the Defendants and non-party co-conspirators acted separately, serially, and in concert to forestall the deposition of Judge Moss and to carry out the objective to protect the Enterprise by preventing Judge Moss' testimony.

## XI. PATTERN AND ENTERPRISE EVIDENCE; ITS CONCEALMENT; INJURY TO PLAINTIFFS' PROPERTY

332. Plaintiffs incorporate by reference all preceding paragraphs.

333. Despite the racketeers' efforts to conceal their wrongdoing, Plaintiffs ascertained facts and evidence for and of the pattern and practices of RICO violations alleged herein, which violations have been and remain continuous and ongoing, occurred in this case over the past approximately eight (8) years (2013 – 2020), and continuing.

334. Judge Moss concealed his self-re-qualification by having the clerk not serve the 12/22/15 "self-re-qualification" Minute Order.  (Exh. B)

335. Judge Moss back-dated and falsified pleadings on the case Register of Actions, i.e. the docket. (Exhibit D) Judge Moss admitted: "With respect to the filing times listed in the Register of Actions, I do not believe all of them are accurate."  (J. Moss Answer, 4/29/16, pgs. 8-9; Exhibit E)

336. Complicit in Judge Moss "self-re-qualification" concealment, Attorney Defendant Wood suppressed and withheld the TRO Opposition papers that Judge Moss had falsified and back-dated and listed out of order on the Docket. (Exhibits C, D)

337. Wood received the electronic service returned copies, which are further proof of Judge Moss ex parte communication.

338.  Because of their related section 1983 federal action (8:16-cv-02233) against non-defendant co-conspirators Justices O'Leary, Bedsworth and judges Moss and Margines, in 2017 and 2018 Plaintiffs ascertained more evidence of connections and communications between Defendants and the non-defendant co-conspirators.

339.  In or about November 2017, the opinion in *Chodosh, et al. v JAMS* and Justice Trotter, G070952, unpub. opinion, 9/13/17); 2017 Cal. App. unpub. LEXIS 6237; 2017 WL 4020447, brought forth witnesses who placed Judge Nancy Wieben Stock, around the time of the "mediation" (Nov. 2013), in discussions with JAMS.  Plaintiffs did not have this information during *Chodosh v. JAMS*, *Trotter*, 2014 – 2017.

340.  The CJP "no action" letter dated May 14, 2020 (Exh. G) was still more evidence of its conspiracy in the Enterprise, as described and alleged herein.  The letter proved deliberate CJP casting aside judge crime evidence.

341.  The Enterprise inflicted injury upon Plaintiffs by bribed and conflicted judicial officers that wrongfully ruled against Plaintiffs, culminating in late 2018 and early 2019 with the Orange County Court of Appeal, in *Chodosh v. PBPA* (G053798), the Justice Bedsworth authored Opinion (12/17/18) and Order denying Rehearing Petition (01/09/19)("Opinion" and "Order").

342.  Petitions for discretionary reviews to the California and United States Supreme Courts (Nos. S253784 and 18-9669) were denied 3/13/19 and 11/25/19.

343.  With the Opinion, the Order, and denial of discretionary reviews, Plaintiffs financial injury by HOA taking of their homes without compensation, although contrary to law and the vile product of Enterprise racketeering, became final in the state courts.  This unjust defeat on appeal (12/17/18 – 11/25/19) marked and established ascertainable and calculable

injury to Plaintiffs' property for RICO claims.

344. At all times, Plaintiffs have reasonably and diligently investigated Defendants' and their co-conspirators and Enterprise members' actions and wrongdoing.

345. Defendants' and the non-defendant co-conspirators' concealment and impediments to Plaintiffs' inquiry, as described and alleged herein, delayed and prevented Plaintiffs' ascertainment of the pattern of predicate crimes and racketeering.

346. Any applicable statutes of limitations have been tolled by Defendants' and the non-defendant co-conspirators' knowing, ongoing and active concealment and denial of the events, documents and facts alleged herein that constituted and revealed the pattern of racketeering.

347. Defendants and their non-defendant co-conspirators are estopped from asserting or relying on any statute of limitations defense against Plaintiffs' claims.

## XII.   SCHEME, MOTIVES, FRAUDULENT INTENT AND INJURY

348. Plaintiffs incorporate by reference all preceding paragraphs.

349. The Enterprise scheme is and was to force and enable the fiduciary fraudulent, self-dealing give-away real estate sale of the Palm Beach Park and the taking of Plaintiffs' homes by denying impartial justice.

350. Defendants and non-defendant conspirators have various motives to conduct the Enterprise.

### A.   The Fraud and Racketeering Scheme

351. To carry out the Defendants' and Enterprise objective, at least four (4) categories of fraud and racketeering activity were necessary.

352. First, Plaintiffs' meritorious cases and claims had to be thwarted, quashed and denied at all times by biased and bribed judicial officers that would, by willful judicial misconduct, intentionally not follow

the law in order to rule against Plaintiffs.

353.  In 2013, before JAMS and Justice Trotter's promise and threat to malign Plaintiffs to their trial judge, Judge Stock had found the facts and law were for Plaintiffs.

354.  After Justice Trotter and JAMS, starting in 2014, there had to be and was, on the part of the non-defendant co-conspirator judges and justices hearing Plaintiffs' cases, willful judicial misconduct to disregard law and fact in order to enter wrong rulings designed to injure Plaintiffs by denying their rights to impartial justice.

355.  Complementing the judicial corruption, there had to be and was the undermining of judicial and executive oversight to ensure that no crime-committing judge or justice would be disciplined or prosecuted; that neither CJP nor AG would pursue judge crime.

356.  Second, the Defendants could not do what was best for HOA PBPA and its members. The Defendant Board President and Directors would not faithfully carry out their fiduciary duties.  Rather, they would breach, and did breach, their duties by deceiving and defrauding the beneficiaries of their trust, the Park member seniors, so that Defendants could take and embezzle the seniors' real estate equity and HOA cash and the Plaintiffs' homes.

357.  There could be no settlement of the Park litigation to keep the Park for the seniors, which could have easily been done.  The Defendant HOA President and Directors concealed from the members Plaintiffs' reasonable and achievable 2013 settlement offer.

358.  Instead, Defendants in HOA meetings, Defendants agitated to blame the Plaintiffs for HOA difficulties, including the extra $400 / month for PBPA attorney fees and the consent decree that stopped home sales. (Exhibits K, J)

359.  Third, the Enterprise had to deceive the Park residents into believing that selling the Park to the Park-buyer Defendants was in their best interests along with the deception that such sale was the "only option." Defendants would steer the seniors to vote for the fraudulent give-away of the Park.  This included concealing from the members the higher and better offer that was all cash and fast close with a major institutional buyer.

360.  Fourth, the Enterprise would be founded on the two (2) pillars of public corruption racketeering – <u>immunity</u> and <u>secrecy</u>.  The judges and justices have immunity.  JAMS and Justice Trotter claim immunity.  CJP Chiefs and the attorney generals will claim immunity.  Immunity drives the willingness of those having it to commit, ignore, or allow crimes.

361.  CJP asserts the privilege to absolute secrecy, calling it "confidentiality" derived from the California constitution.  The judges and justices and JAMS assert confidentiality.  Attorneys generals claim it.

362.  In the Enterprise, many of the actors are immune and all are secretive and not transparent about facts and events and communications that would prove the Enterprise.  They all hide that they allow judge crime.

## B.  Defendants' Motives – Take Park - Embezzle HOA Cash

363.  Defendants Saunders and Coldren and their LLCs and PCP were motivated to utilize the Enterprise to acquire the Park and Plaintiffs' homes and HOA cash by fraud and deceit.  Their attorney Defendant Susolik was motivated to earn legal fees and demonstrate ability to contact judges ex parte after hours to seek a judge "fix."

364.  Defendants Mantelli and Fiori sought to self-deal and breach fiduciary duty to obtain secret commissions and compensation.  HOA and Park Buyer Defendants' counsel Salisbury worked both sides, driven by receipt of illicit legal fees and bribes and the need to prove her worth to her real client Coldren.

365.  PBPA attorneys Thomas and Wood displayed their eagerness to assist fiduciary breach and self-dealing in exchange for legal fees paid by the HOA and its insurance company.  Attorney Wood showed his willingness to withhold evidence.

366. Defendants Mantelli, Fiori and the HOA attorney Defendants Thomas, Wood and Salisbury were motived to embezzle and divert millions in HOA cash to their own use, guised as legal fees and without accounting to the members.

### C.   Defendant Fidelity Title Company's Motive

367. Defendant Fidelity insured title of the lender, Thrivent Association for Lutherans, that in 2007 made a $16,100,000 real estate loan to PBPA for Park acquisition.  The HOA would acquire the Park and convert to "resident owned park" ("ROP").  Civil Code §799(c) The PBPA attorney testified he did the ROP conversion "all wrong" such that the Thrivent Deed of Trust was impaired.  The defective ROP and the loan made for an unlawful "blanket" mortgage.

368. Fidelity's motive was the sale would eliminate the cost to Fidelity of having to pay title insurance to Thrivent and PBPA, which would have benefitted the HOA seniors, but not Fidelity.

369.  Fidelity would escape liability for the Thrivent loan.  The loan would be paid off at closing with HOA sale money.  The Enterprise enabled Fidelity to pass the cost of its title error and policy loss to the HOA seniors.

### D.   Non-Defendant Co-Conspirator JAMS' Motive

370.  Plaintiffs are informed and believe, and thereon allege, that Justice Trotter's and JAMS' motives and objectives in the racketeering and Enterprise were to satisfy JAMS favored "repeat business" customers, the Park-Buyer Defendants Saunders and Coldren and their related entities, and their attorneys and the PBPA attorney Defendants.

371.  Justice Trotter and JAMS would promote repeat business by an example of JAMS' ability to deliver client favorable court outcomes to benefit JAMS repeat customers.

372.  JAMS' racketeering to deliver results for repeat customers paid off in this case.  JAMS got for its customers the results they sought.

373.  JAMS showed it could influence the Orange County courts for repeat JAMS customers, to the detriment of the other parties, the Plaintiffs and Park seniors, who presented no prospect of producing repeat business for JAMS.

### E.   Co-Conspirator Judges and Justices Motives

374.  Plaintiffs are informed and believe, and thereon allege, that non-Defendant co-conspirator Judge Moss was bribed with financial remuneration to render his perfectly timed "call in" from vacation to fix the fiduciary fraudulent Park sale.

375.  Plaintiffs are informed and believe, and thereon allege, that non-Defendant co-conspirators Judges Stock, Moss, Margines, Andler, and Justices O'Leary and Bedsworth had pecuniary motives and objective in the Enterprise to enhance their prospects of a post-bench lucrative private judge position at JAMS.  For Judges Stock and Andler, it paid off; they became JAMS "neutrals," i.e. "private" judges, in 2014 and 2017 respectively.

### F.   Non-Defendant Conspirator CJP and Directors' Motives

376.  Agency non-Defendant CJP and its current and past Directors Dresser and Henley, Plaintiffs are informed and believe, were and are motivated to aid the Enterprise by conspiring to carry out racketeering and predicate crimes that ensure no discipline for Judge Moss and other judges and justices in the Enterprise.

377.  Dresser and CJP (and previously Henley), contrary to their duty to protect the public from judicial corruption, were and are incentivized to

protect and shield judicial officers from consequences for wrongdoing.

378. Plaintiffs are informed and believe, and thereon allege, that CJP and its Directors' motive for the racketeering was and is to ingratiate themselves with the judiciary and the retired judge ADR industry, whose "private" judges or "neutrals" count among them many retired state court justices and judges and federal judges and former California Supreme Court justices.

## G.   Non-Defendant Co-conspirator AG Motives

379. Plaintiffs are informed and believe, and thereon allege, that Defendant AG Becerra and his predecessor attorney general Senator Kamala Harris, were motivated to not investigate or prosecute judge crime because they believed the non-action would enhance support from the judiciary and the bar for their election bids. They believed that not investigating and prosecuting judge crime would avoid election time controversy or disfavor among the judiciary and the State Bar.

380. Plaintiffs are informed and believe, and thereon allege, that non-defendant co-conspirator AG Becerra and his predecessor former AG Harris are and were motivated to conspire to aid the Enterprise by currying favor with CJP, and for *quid pro quo* of CJP assistance in elections.

381. CJP helped elect AG Becerra.  During the November 2018 election, CJP pursued disciplinary charges against already retired El Dorado County Superior Court Judge Steven Bailey, the Republican candidate for Attorney General running against AG Becerra.

382. Trouncing its precedents, CJP went after retired Judge Bailey for "improper action" and "prejudicial conduct."  Previously, CJP disciplined an already retired judge only for "willful judicial misconduct," the third and highest level of judge wrongdoing. (Compare, *Inquiry Concerning Former Judge Steven C. Bailey, No. 202*, (2/27/2019) to *Inquiry Concerning Former*

*Judge William H. Sullivan, No. 163* (5/17/2002) and *Inquiry Concerning Former Judge James R. Simpson, No. 168* (12/9/2002); see, CJP website)

383.  CJP pursued already retired Judge Bailey for "improper action" and "prejudicial conduct."  Precedents were for "willful judicial misconduct."

384.  Plaintiffs are informed and believe, and thereon allege, that non-party co-conspirators CJP and AG Becerra conspired to obstruct justice for Plaintiffs and shield Judge Moss from investigation or prosecution for their own *quid pro quo*, CJP election assistance for AG Becerra in exchange for AG practice to not investigate or prosecute crime-committing judges like Judge Moss.

## XIII.  USE OF THE MAILS AND WIRE AND INTERSTATE COMMERCE IN FURTHERANCE OF THE ENTERPRISE

385.  Plaintiffs incorporate by reference all preceding paragraphs.

386.  Defendants' and the non-defendant co-conspirators have used the mail and electronic communications for the Enterprise operation from 2013 to the present, and continue to do so.  Their mailing and electronic dissemination of deceptive and false information violated and continues to violate 18 U.S.C. §1341 and §1343.

### A.  JAMS' Use of Mail and Wire to Send False Information

387.  At all times 2013-2017, by mail, electronic transmission, wire and internet, JAMS directed to Plaintiffs and the public false advertising that JAMS has high integrity and ethics.  *JAMS, Inc. v. Superior Court (Kinsella)* 1 Cal. App. 5th 984, 205 Cal. Rptr. 3d 307 (2016) found: "[JAMS] statements that '[e]verything we do and say will reflect the highest ethical and moral standards' and that JAMS is 'dedicated to neutrality, integrity, honesty, accountability, and mutual respect in all our interactions' are . . . . specific statements representing how JAMS conducts its operations with neutrality, integrity, honesty and accountability. They are certainly

intended to be relied upon by customers of its services . . ..”  Id. at 995-996

388.  JAMS mailings and electronic transmissions of such message to Plaintiffs in 2013-2014, upon which they reasonably relied, were false and misleading and fraudulent.

389.  Plaintiffs are informed and believe and thereon allege, that their case facts and events demonstrate that JAMS has no integrity, is dishonest, biased and dedicated to the denigration of justice and its replacement with “private” rendered JAMS’ justice, in which the JAMS favored customers “win” in court because JAMS attempts to extort litigants and influences judges and justices and otherwise acts to obstruct justice to give advantage to its preferred “repeat business” customers and their attorneys.

390.  Under its business model, JAMS enjoys (a) near total immunity, hiding its justice obstruction wrongdoing behind laws of mediation confidentiality and quasi-immunity which inoculate JAMS from accountability (e.g. Evid. Code §1119; *Howard v. Drapkin* (1990) 222 Cal.App.3d 843), and (b) courts with judges and justice whom, because of such law, with few exceptions, rule in JAMS favor.

391.  Before and until late 2016, as to Plaintiffs and the public, JAMS promoted itself by mail and electronic media with the falsities quoted above, that it was an honest and forthright vendor of ADR services, thereby violating 18 U.S.C. §1341 and §1343.

392.  Plaintiffs are informed and believe, and thereon allege, that as a result of the above referenced rare case where JAMS lost, *JAMS, Inc. v. Superior Court (Kinsella)*, in or about late 2016, JAMS website added a “disclaimer” and that in or about 2019, JAMS dropped its superlatives, no longer broadcasting as it did to Plaintiffs, the JAMS promise that “everything we do and say will reflect the highest ethical and moral standards” and that JAMS was “dedicated to neutrality, integrity, honesty

and accountability."

393.   Starting around 2019, JAMS replaced these "Mission" "values" with "Purpose" "values" that: "JAMS believes and is committed to: Neutrality, Integrity" etc. (Compare, JAMS "Mission, Vision, Values" [2014] and JAMS "Purpose, Vision, Values" [2020], Exhibit X) JAMS ceased to promise integrity but still believes in it.

394.   Before, when Plaintiffs went to mediation with Justice Trotter, JAMS promised integrity. Now JAMS "believes" in it, but only commits to integrity; it does not promise it.

395.   Plaintiffs are informed and believe, and thereon allege, that JAMS dropped its old "values" of promising integrity and ethics because JAMS realized that, as to Plaintiffs' litigation and the *Kinsella* opinion, and Plaintiffs are informed and believe, in other matters, JAMS had not and did not keep its promise to have integrity and exercise the highest ethics.

396.   By mail and electronic media, JAMS fraudulently promised integrity and to be ethical, but did not have integrity or ethics.

### B.   Defendants' Use of Mail and Wire to Mislead

397.   From 2015 through 2019, Defendants mailed documents to Plaintiffs and Park member seniors with false and misleading and fraudulent information about the HOA and its Directors and the Park sale, and the sale proceeds. The materials failed to disclose that HOA President Mantelli, Director Smith and Director Fiori would be compensated for steering the sale of the Park to Saunders and his accomplices. (See, e.g., Exhibit L)

398. Defendants use of the mail and electronic communication throughout Enterprise operation 2013 to January 2019 included mailing and transmitting numerous documents and letters to Plaintiffs and their counsel that were false and fraudulent.

**C.     Judge and Justice Use of Mail and Wire to Mislead**

399.  Non-defendant Judge Moss issued false court orders that were mailed or sent electronically, including his orders of 12/22/15 to stop the TRO and self-re-qualify. (Exhibit B) He backdated the TRO Opposition pleadings and docketed them out of chronological order.  (Exhibits C and D) He transmitted his "answer" to disqualification (Exhibit E) which had material untruths.

400. Presiding Justice Kathleen O'Leary and Justice William Bedsworth caused to be issued and mailed or sent electronically court orders that were false or wrongful and in furtherance of the Enterprise, including denial of Judge Moss' deposition (Dkt. 04/03/18), and orders in which they refused to recuse.

401. Up until late 2016, Justice O'Leary authorized the Orange County appellate court to display on the biographies of retired justice Trotter and other justices their JAMS affiliation. JAMS had been on the court website for years.

402.  In 2016, Plaintiffs protested use of the website to promote JAMS. Justice O'Leary had to remove JAMS.  (Dkt. 8/4/16)

403.  Plaintiffs contend the false and free advertising for JAMS, on the court website, violated 18 U.S.C. §1343. It was electronic communication to the public, in furtherance of the scheme, promoting JAMS through official court channels.

**D.     CJP and AG Use of Mail and Wire to Mislead**

404.  CJP uses mail and wire to disseminate to the public the false information that CJP has referred judge crime evidence to prosecuting authorities on "multiple occasions."  (Exhibit T) It disseminates annual reports that misleadingly tout CJP performance as protective of the public.

405.  The AG falsely tells the public, by mail and wire, that all

complaints about judges, including possible judge crime, must be sent to the CJP, as it has "exclusive jurisdiction" for judge oversight. (Exhibits R, U)

### E.    Engagement and Use of Interstate Commerce

406.  Plaintiffs are informed and believe, and thereon allege, that Defendants engaged in interstate commerce, including contacting out of state and foreign real estate lenders to loan more than 100% financing for the Park sale acquisition.

407.  JAMS and the buyer Defendants carried out the Enterprise by and through interstate commerce, including Park Buyer Defendants borrowing millions from Jeffries LoanCore, an out of state lender that, upon information and belief, made the loan using sovereign nation funds placed with Jeffries for investment in U.S. real estate loans.

408.  JAMS engages in interstate and international commerce through its offices throughout the United States and in other countries.

## XIV.  PREDICATE CRIMES

409.  Plaintiffs incorporate by reference all preceding paragraphs.

410.  Defendants and non-Defendant co-conspirators, for their Enterprise racketeering, committed various predicate crimes, both federal and state law crimes, that are covered and included in 18 U.S. Code §1961(1).

411.  Federal law predicate offenses are mail and wire fraud, 18 U.S.C. §1341, §1343, deprivation of "honest services" fraud, 18 U.S.C. §1346, and the Hobbs Act, which prohibits extortion that constitutes bribery of state public official, 18 U.S.C. § 1951, and 18 U.S.C. § 1512(c)(1), concealment and alteration of documentary evidence.

412.  On Plaintiffs' 18 U.S.C. §1962(d) claim of conspiracy, 18 U.S. Code §1349, entitled "Attempt and conspiracy" applies.  It states: "Any person who attempts or conspires to commit any offense under this chapter

shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy."

413. 18 U.S. Code §1961(1) "racketeering activity" means and includes any act or threat involving bribery or extortion, which is chargeable under State law and punishable by imprisonment for more than one year;

414. The racketeering and Enterprise operate by violating various California state laws described in 18 U.S. Code §1961(1), including the following.

415. Bribery of a judicial officer, violating California Penal Code §92, is a felony where any person gives or offer to give a judicial officer something of value with a corrupt intent to influence the officer's decision in an official matter.

416. Bribery by a judicial officer, Penal Code §93, is a felony for a judicial officer to ask, receive, or agree to receive something of value with a corrupt intent to influence the officer's decision in an official matter.

417. Penal Code §7(6) states that 'bribe' signifies anything of value or advantage, present or prospective, or any promise or undertaking to give any, asked, given, or accepted. Section 7(3) provides: "The word 'corruptly' imports a wrongful design to acquire or cause some pecuniary or other advantage to the bribed or another person."

418. Involved in the bribery was judge perjury, Penal Code §118, where a person that has taken an oath to tell the truth, states as true any material matter which he or she knows to be false, and Penal Code §118(a), perjury by false affidavit, applicable to Judge Moss' denial of ex parte contact (Exhibit E), and false affirmation that his matters were up to date in order to collect his paychecks, July 2019 – October 2019. (Exhibit F)

419. The racketeering involved extortion, Penal Code §518, where a person obtains property or other consideration from another, with his or her

consent, or the obtaining of an official act of a public officer, induced by a wrongful use of force or fear, or under color of official right, and attempted extortion, Penal Code §524, where anyone "attempts, by means of any threat, . . . to extort property or other consideration from another".

420. Plaintiffs allege that Justice Trotter attempted to extort them, not for himself and JAMS, but as agent for the Defendants Mantelli, Saunders, Coldren, Wood and Thomas and affiliates.

421. Justice Trotter's threat and promise was attempted extortion under Penal Code §518 which became consummated extortion under §524, when the threatened injury occurred upon Plaintiffs losing their homes by final judgment in late 2019.

422. Involved in the bribery was document falsification, where the Enterprise and Defendants made and used false and forged documents, specifically Judge Moss and attorney Defendant Wood alteration and concealment of court documents (Exhibits C, I) and the *Haugen v. PBPA* Register of Action, i.e. "Docket" for which Judge Moss admits error. (Exhibits D, E, pgs. 8-9, ¶6). Applicable are 18 U.S.C. §1512(c)(1), and Penal Code §134, preparing false documentary evidence, Penal Code §135 destroying or concealing documentary evidence, and Government Code §6200-§6201, alteration of court record.

423. Involved in the bribery, perjury, document falsification and extortion was conspiracy, both conspiracy to commit a crime, and conspiracy to obstruct justice, Penal Code §182(a) where two or more persons conspire: (1) To commit any crime or (5) To commit any act . . . to pervert or obstruct justice, or the due administration of the laws.

424. Involved in the bribery were state crimes of conversion, including Saunders, et al. in bribery of the PBPA HOA Board President and directors, Defendants Mantelli and Fiori, and HOA Director Dan Smith,

violations of Penal Code §487, felony grand theft, and by false pretenses, §532 and embezzlement, §503. These fiduciary crimes, involved in the bribery, were instrumental to Enterprise success.

425.   The state law predicate crimes were felonies, punishable by more than a year imprisonment. The crimes Defendants conspired to conduct were themselves felonies, making the conspiracies punishable as felonies.

## XV.   FACTS FOR RICO PREDICATE CRIMES

426. Plaintiffs incorporate by reference all preceding paragraphs.

427. Facts and proof of predicate crimes arise out of various lawsuits (Exhibit Z) and legal proceedings between Plaintiffs and the Defendants and non-Defendant co-conspirators.

### A.   Lawsuits and Litigation Yield Evidence for RICO case

428. Plaintiffs are the plaintiffs in the main Park litigation case *Chodosh, et al., v. Palm Beach Park Association* (filed 2010), and related case, *Chodosh v. JAMS and Justice Trotter*, (filed 2014) and the federal case *Eicherly v. Presiding Justice O'Leary, Justice Bedsworth, Judge Moss, Judge Margines, Saunders, Coldren, Mantelli, et al*. (filed Dec. 2016) Plaintiff Haugen filed *Haugen v. Palm Beach Park Association* on November 12, 2015 to stop the Park sale. (Exhibit B)

429. Plaintiffs also litigated against the CJP and AG, *Eicherly v. CJP*, San Francisco County Superior Court, CGC16555780, A151723, 2016-2018) and *Padilla, Chodosh v. CJP and AG* (Sacramento County Superior Court 34-2018-00242031, on appeal, C091221; 2018-present).

430. These lawsuits yielded substantial documentary evidence and judicial admissions that provide proof or probable cause for the predicate crimes, racketeering and conduct of the Enterprise by and through Defendants and non-defendant co-conspirators JAMS and Justice Trotter, the judges and justices, CJP and its directors, and the attorneys general.

### B.   Defendants' and Co-Conspirators' Scheme

431. Plaintiffs are informed and believe, and thereon allege, that Defendants' and their non-defendant co-conspirators' racketeering scheme was conducted and implemented by use of predicate crimes of mail and wire and deprivation of honest services fraud (18 U.S.C. §1341, §1343, §1346), along with bribery, attempted extortion, extortion, perjury and document falsification (18 U.S.C. §1951; Calif. Penal Code §92, §93, §118, §138, Govt. Code §68210, et al.) and other predicate crimes, as more particularly described and alleged herein.

432. Defendants attempted to extort, and did extort, the Plaintiffs, bribed judges and obstructed justice in the Orange County courts, deceived the Park seniors, and bribed fiduciary HOA Directors, causing Plaintiffs to lose their right in court to an impartial judge and ultimately to be injured in their property by loss of their homes' value to the Park-buyer Defendants.

433. The predicate crimes were committed throughout the conduct of the Enterprise from 2013 to 2019 and are ongoing.

### C.   Judge Margines, Justices O'Leary and Bedsworth Predicates

434. Non-defendant co-conspirators former Presiding Judge Margines and Presiding Justice O'Leary and Associate Justice Bedsworth, engaged and conspired in predicate crimes of deprivation of honest services fraud (§1846), Hobbs Act (§1951) bribery-extortion, and state law crimes of bribery and obstruction of justice (§92, et al., §182(a)(2) and (5)).   They upheld, for pecuniary and personal motives, Judge Moss' fix of the fiduciary fraudulent Park sale.

435. The justices enabled Defendants to take from Plaintiffs their homes' value, and from the Park seniors, the Park and HOA funds.   They did so largely by upholding the actions of a judge that "fixed" the case.

436.  Plaintiffs are informed and believe and thereon allege that from 2013 through 2019, the non-defendant co-conspirator judicial officer members and Defendants and agency officials engaged in conspiracy to defeat and thwart and deny Plaintiffs' their rightful claims to an impartial judge in the state court, in order to take for Defendants Plaintiffs' homes and value thereof and to take from the HOA seniors the mobilehome Park and HOA cash.

437.  The judicial officers conspired and racketeered with predicate crimes to bribe judicial officers (Penal Code §92, §93 et al.) and obstruct justice (§182(a)(5)), all with the objective of denying Plaintiffs an impartial judge (honest services fraud, 18 U.S.C. §1346); Hobbs Act, 18 U.S.C. §1951 (extortion under color of right) in order to wrest from them and the seniors their homes and Park and HOA cash.

## D.   Park Buyers Saunders, Mantelli, et al. Predicates

438.  Between 2013 - 2017, Plaintiffs are informed and believe, Saunders, Coldren and Mantelli acted to bribe PBPA HOA Directors Smith and Fiori so they would participate in the Enterprise and fraudulently direct the HOA members to sell the Park.

439.  The bribes would assure that the HOA Board would conceal from the HOA members the higher and better all-cash, no real estate commission offer (Exhibit M) the Board received in December 2015.

440.  The HOA bribery and HOA breach of fiduciary duty was felony grand theft, Penal Code §487, and grand theft by false pretenses, §532, and by embezzlement, §503.  The self-dealing HOA Board fiduciaries Mantelli and Fiori, and HOA attorneys Salisbury, Thomas, and Wood acted and conspired to impair and deprive and defraud Plaintiffs out of honest services.   18 U.S.C. §1346 The Board and attorneys, all fiduciaries, conspired to commit crimes and obstruct justice.  Penal Code §182(a)(1), (5)

### E.   Justice Trotter Attempted Extortion for Defendants

441.  Non-defendant  co-conspirator  Justice  Trotter  told  and threatened Plaintiffs that he would communicate ex parte to Plaintiffs' trial Judge Stock that Plaintiffs had caused the settlement failure.  This was attempted extortion to benefit Defendants under Penal Code §524, and became  extortion,  §518,  after  Plaintiffs  lost  their  homes'  value  by  the Bedsworth opinion (12/17/18) and thereby suffered the injury threatened in the attempted extortion.

442.  In *Chodosh, et al. v. JAMS and J. Trotter*, the appellate court decided that JAMS did not commit extortion, because JAMS itself did not seek to obtain Plaintiffs' property.  Prompted by the non-published opinion publicity in late 2017, from the public Plaintiffs learned additional facts that allow Plaintiffs to assert, on information and belief, that JAMS attempted to extort and did extort Plaintiffs not for itself, but as agent for its repeat customers the Park-Buyer Defendants and their attorneys.

### F.   JAMS and Judge Stock Predicates

443.  Plaintiffs allege on information and belief, that Judge Stock and Justice Trotter were in communication in the time frame October 2013 to February 2014 about Plaintiffs' case and the mediation.

444.  In October 2013, non-defendant co-conspirator Judge Wieben Stock recommended that the Plaintiffs go back to "mediation" at JAMS with Justice Trotter.   At the second mediation, Justice Trotter stated and threatened he would malign Plaintiffs to Judge Stock.

445.  After Justice Trotter's statement and threat, Judge Stock reversed her procedural rulings to go against Plaintiffs.  About six (6) weeks later, Judge Stock retired from the bench and went to work at JAMS.

446.  Plaintiffs are informed and believe, and thereon allege, that JAMS, through Justice Trotter, offered and held out and assured Judge

Stock of a position at JAMS in exchange for (*quid pro quo*) her agreement to turn her rulings against Plaintiffs before she exited the bench, and that such action was bribery, in contravention of Penal Code §92 and §93, honest services fraud, 18 U.S.C. §1346, and violation of the Hobbs Act, 18 U.S.C. §1951.

### G.    Defendants Request Judge Moss "Call-In" from Vacation

447.  Plaintiffs are informed and believe, and thereon allege, that the Park-buyer Defendants, through their agents, communicated to Judge Moss with request that he call in from vacation to thwart Plaintiffs' TRO and enable the illicit Park sale closing.

448.  Plaintiffs are informed and believe that the Park-buyer Defendants, or those acting with them, offered and provided to Judge Moss one or more items of value in exchange for his call in from vacation just in time to halt the TRO so the park sale could close that same afternoon.

449.  The activity was crime, bribery under Penal Code §92 and §93, denial of the intangible right to honest services fraud 18 U.S.C. §1346, and Hobbs Act violation, 18 U.S.C. §1951.

450.  Plaintiffs are informed and believe, and thereon allege, that at all times 2014 – 2019, the Park-buyer Defendants bribed or conspired to bribe Judge Moss in order that he enter and make his wrongful rulings that intentionally disregarded the law and functioned to deny Plaintiffs' their rights and take their homes and the Park from the other seniors.

451.  Plaintiffs are informed and believe, and thereon allege, that Park-Buyers' bribery of Judge Moss as described and alleged above also constituted the crimes of conspiracy to obstruct justice, Calif. Penal Code §182(a)(5) and of conspiracy to commit crime §182(a)(1).

### H.    JAMS Unethically and Unlawfully Influences Judiciary

452.  Plaintiffs are informed and believe, and thereon allege, that from

2013 through 2017, JAMS obstructed justice by insisting that Orange County justices, including Presiding Justice O'Leary and Justice Bedsworth, not recuse in Plaintiffs' case against JAMS and Justice Trotter.

453.   Contrary to law and ethics, JAMS utilized its connections and influence at the Orange County courts to act and conspire to deprive Plaintiffs of an impartial judicial officer in all their cases and appeals, which is conspiracy to pervert and obstruct justice under Penal Code §182(a)(5)

454.   Plaintiffs are informed and believe, and thereon allege, that Justice Trotter and JAMS obstructed justice by unlawful influencing of former Orange County Superior Court Judge Gail A. Andler, the judge appointed to take over for disqualified Judge Moss.  She was the judge that allowed Judge Moss to "self-re-qualify" and take over the *Haugen* case so it would not stop the Park sale.  Months later, Judge Andler joined JAMS. The events indicate probable cause for JAMS and Judge Andler conspiracy to obstruct justice, Penal Code §182(a)(5), honest services fraud 18 U.S.C. §1346 and for Hobbs Act violation, 18 U.S.C. §1951.

## I.   Judge Moss' Repeated Perjury 2016 and 2019

455.   In April 2016, Judge Moss perjured himself when he stated under oath on affidavit that he had no ex parte contact in the *Haugen* case, breaking Penal Code §118 and §118a.  (Exhibit E) He had to have such communication to know to "call in" just in time to save the Park sale.

456.   On July 31, August 30, September 30 and October 31, 2019, Judge Moss executed the salary affidavit a judge must sign to receive a paycheck.  Under Calif. Const.  Article VI, §19 and Calif. Government Code §68210, a judge cannot be paid if the judge has any matter left undecided for more than ninety (90) days. (Exhibit G)

457.   Under the wording and dates of the affidavits, and the law that Judge Moss had to rule on Plaintiffs' §170.6 peremptory challenge

"instantly," (*Hemingway*, supra) Judge Moss perjured himself on the affidavits he signed in July, August, September and October 2019. (Exhibit F) (Penal Code §118, §118a) He had not ruled "instantly." Ninety (90) days expired August 20, 2019. False salary affidavit was made October 31, 2019. (Exhibit F) Judge Moss perjured himself on salary affidavits at least four (4) times.

## J.    Methods and Patterns of Predicate Crimes

458.   For the RICO objectives, Defendants and the Enterprise utilized three (3) methods and patterns of predicate crimes to achieve the Enterprise's financial and other goals.

459.   First, corrupt court action and dishonest judicial decisions to cause Plaintiffs' loss of their case in court and their homes. (Honest services fraud 18 U.S.C. §1346; Hobbs Act, 18 U.S.C. §1951; bribery, Penal Code §92, et seq.; obstruction of justice, Penal Code §182(a)(5)).

460.   Second, to deliver to Saunders and Coldren and the other Defendants Plaintiffs' homes and the Park for nothing or below market values using fiduciary fraud and self-dealing, and crimes of conversion such as Penal Code §484, §487, §503, §532, which are theft, grand theft, embezzlement and grand theft by false pretenses.

461.   Third, to attempt to extort and ultimately extort (Penal Code §518, §524) Plaintiffs for the JAMS' favored client by threat and action to punish Plaintiffs for their refusal to accept an HOA paper promise to pay settlement offer promoted by Justice Trotter (Ret.).

## K.    Core Predicate Crime – Judicial Bribery and Influence

462.   Throughout the Enterprise and its operation, the members, both Defendants and non-defendant co-conspirators JAMS and Justice Trotter, engaged in soliciting, procuring, and utilizing dishonest services from the non-defendant judicial officer members, Judge R. Moss and Orange County

judges and justices as described herein.

463.  18 U.S. Code §1346. Definition of "scheme or artifice to defraud" means ". . . . a scheme or artifice to deprive another of the intangible right of honest services."   In this case, the scheme was to bribe Judges Stock and Moss and likely Andler, and Plaintiffs are informed and believe, Justices O'Leary and Bedsworth.

464.  The *quid pro quo* was for Judge Moss to thwart the TRO and enable the Park sale in exchange for items of pecuniary value, a bribe and prospect of future JAMS job.   For Judge Stock, the *quid pro quo* was a JAMS job for reversal of her rulings that were for Plaintiffs.   For Judge Andler it was JAMS job for ignoring her duty to report Judge Moss' "fix."   Justices O'Leary and Bedsworth deprived Plaintiffs of due process in their appeals, for which wrongdoing the justices had the bribe of an assured JAMS job.

## L.    CJP and AG Conspiracy– No Consequences to Judge

465.  Plaintiffs are informed and believe and thereon allege that non-defendant co-conspirators Moss, O'Leary, and Bedsworth participated in the Enterprise within the meeting of 18 U.S.C. §1962(c), and conspired to participate under §1962(d) to carry out §1962(c) wrongdoing.

466.  They and the other Defendants and non-party co-conspirators conspired with CJP, Dresser and Henley and AG Becerra in the Enterprise by their agreement not to investigate, pursue or prosecute information or evidence of Judge Moss' crime, thereby conspiring to obstruct justice for Plaintiffs in violation of Penal Code §182(c)(5).

467.  Plaintiffs are informed and believe and thereon allege that non-defendant co-conspirators CJP, Dresser and Henley and AG Becerra and AG Harris conspired to carry out the Enterprise, within the meaning of 18 U.S.C. § 1962(d), and therefore are subject to 18 U.S. Code § 1349, entitled "Attempt and conspiracy" which states:   "Any person who attempts or

conspires to commit any offense under this chapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy. "

### M.   Scheme of Pattern of Predicate Crimes

468.  The motivation for this eight-year-long scheme and cover-up with its pattern of predicate crimes is plausible and demonstrable, and largely proven by the documents attached as exhibits to this Complaint.

469.  Various patterns are discernible.  Judge Moss' wrongful "re-qualification" and Judge Andler inaction to report it to CJP and law enforcement under canon 3D(1) were consistent and complementary.  Twice disqualified Judge Moss stayed on the case and perjured himself to cover it up.  Several times the justices refused to recuse.  Bribes were repeated and universal; made to public officials and private citizen fiduciaries. Coordinated and successive action prevented Judge Moss' testifying.

470.  The Enterprise relies upon a pattern and repeat of predicate crimes; which the actors and conspirators recurrently commit, and have committed on two (2) or more occasions.  Defendants' and the non-party co-conspirators' bribery, extortion, and obstruction of justice, and the continuing use of judge bribery, perjury, and obstruction of justice by the Enterprise participants and conspirators to carry out the scheme, constitutes a pattern and practice of knowing and deceptive conduct that is RICO racketeering.

471.  Plaintiffs are informed and believe that the Enterprise is ongoing, acting to intimidate and deter the Park seniors, and taking place in other cases with other litigants, where JAMS and judicial officers and attorneys act and conspire to take the property of other disfavored litigants for the benefit of the VIP and "repeat" JAMS or ADR business customers.

# XVI.  PLAINTIFFS', DEFENDANTS' AND NON-DEFENDANT CO-CONSPIRATORS' ROLES IN THE ENTERPRISE

472.  Plaintiffs state and allege their status and standing.  They describe and allege the Enterprise members' individual roles, acts, omissions and participation and conspiracy in the Enterprise.

## A.   Plaintiffs

473.  Plaintiffs Floyd Chodosh, Sue Eicherly, Ole Haugen, Myrle Moore, Rodger Kane, Jr. and Todd Peterson are victims of the Enterprise, having suffered injury to their property because of the Defendants' and non-Defendant co-conspirators' predicate crimes, racketeering by and through their Enterprise whereby they illegally converted and seized, without compensation, Plaintiffs' homes and Park and HOA funds.

## B.   Defendants

### 1.   JOHN SAUNDERS, PARK BUYER PRINCIPAL

474.  John Saunders is principal Park-buyer Defendant and majority or major owner-principal of the Park buying entities, the Defendant LLCs. Saunders owns and operates other mobilehome parks where senior residents have protested alleged abusive tactics.

475.  Plaintiffs are informed and believe, and thereon allege, that from early 2013, using the Enterprise, Saunders deliberately acted to incite, implement and assist fiduciary fraud, self-dealing wrongdoing at the Park so as to secure, by corrupt means, his and his accomplices' capability to purchase the senior mobilehome Park at a price millions below its market value, and in a manner that would facilitate ouster of the seniors by forced buy-outs at low values much less than what the seniors paid for their homes.

476. Saunders spoke to the HOA seniors, at meetings and individually, to pitch the sale of the Park.  At no time did he state that Mantelli was receiving financial reward for directing the sale to him, or that

he had promised valuable favors to Directors Fiori and Smith.  He did not disclose that, after sale closing, Mantelli would be Park manager and preferred leasing and sales agent.

477.  Saunders made various false and hollow promises which he had no intention of fulfilling, including post-sale favorable leases for residents, and that he would indemnify and pay the HOA legal expenses.

478.  The members post-closing leases were not as he promised.  The legal fees he was to pay were instead paid out of seller PBPA proceeds from the fraudulent Park sale.

479.  Included in the fiduciary fraud, Saunders and his buyer affiliates received a $2,000,000 credit against the Park purchase price to use to pay Plaintiffs in settlement for their claims.

480.  Instead of settling, Saunders acted and conspired to take the homes by use of the Enterprise and its corrupt judges and justices and the bribery of Judge Moss carried out by his attorney Defendant Susolik, as described and alleged herein.

481.  Plaintiffs are informed and believe, and thereon allege, that Saunders had a central and top role in the Enterprise.  As Park Buyer principal he carried out the illicit acquisition of the Park by and through the Enterprise racketeering and fraud by providing the necessary mechanisms and monetary support.

482.  Plaintiffs are informed and believe and thereon allege that Saunders bribed Defendant PBPA Board President Diana Mantelli and Directors George Fiori and Dan Smith to secure HOA Board approval of the Park sale to him and his accomplices at millions below market value.

483.  Plaintiffs are informed and believe, and thereon allege, that Saunders knew, approved, and allowed the December 21-22, 2015 bribery of Judge Moss in order to save and enable the Park sale, and that he violated

Penal Code §92 and acted to deprive honest services, 18 U.S.C. §1846.

484. Plaintiffs sent Saunders letters on March 23 and 29, 2016 accusing him of participating in the ex parte communication with Judge Moss to arrange the "call in" from vacation to fix the Park sale. (Exhibit I) Saunders did not deny the accusation of criminal wrongdoing.

485. Plaintiffs assert that, by his failure to deny the charges, Saunders adoptively admitted his participation in the ex parte contact with Judge Moss, which included conspiracy to obstruct justice, Penal Code §182(c)(5).

486. On information and belief, Plaintiffs allege that Saunders violated 18 U.S.C. §§1962(c) and (d) by actively participating and conspiring in the Enterprise scheme to extort and carry out and fraudulently conceal judge bribery, perjury, and obstruction of justice, and to bribe fiduciaries and deceive and defraud PBPA and its members, all for the result Saunders intended, the taking of Plaintiffs' homes and the HOA seniors' Park and converting such property to his personal financial benefit.

## 2.   ROBERT COLDREN, PARK BUYER PRINCIPAL

487. Robert Coldren is an attorney that represents mobilehome park owners against park tenants. Coldren is a principal Park Buyer Defendant with interest in the Park buying entities, Defendant LLCs and PCP. The LLC's are Park record owner. PCP owns mobilehome parks. Coldren has been reported as a principal owner or attorney representative for mobilehome parks where seniors have suffered landlord abuse or ouster.

488. Plaintiffs are informed and believe, and thereon allege, that Coldren had a central and top role in the Enterprise. As Park Buyer principal, he carried out the acquisition of the Park through the Enterprise. He rendered the necessary mechanisms and financial support and mobilehome and real estate law attorney expertise.

489.  Plaintiffs are informed and believe, and thereon allege, that from 2013, Coldren deliberately acted to incite, implement and assist fiduciary fraud, self-dealing and wrongdoing at the Park so as to secure, by corrupt means, his and his accomplices' capability to acquire the senior mobilehome Park at some price millions below its market value, and in a manner that would allow ouster of the seniors by forced buy-outs at prices that would be a fraction of what the seniors had paid for their homes.

490.  Coldren and his buyer affiliates received a $2,000,000 credit against the already fraudulently low Park purchase price.  For the credit, the Park buyer was to indemnify PBPA for the Plaintiffs' litigation, and to try and settle Plaintiffs claims.

491.  Instead of settling, Coldren chose to acquire Plaintiffs' homes for nothing through the Enterprise, by its use of corrupt judges and justices and bribery of Judge Moss, carried out by Saunders' attorney Defendant Susolik, and by the work of his own lawyer, Defendant Salisbury, who wrongfully doubled as PBPA attorney, i.e. represented seller and buyer.

492.  Plaintiffs are informed and believe and thereon allege that Coldren bribed Defendant PBPA Board President Diana Mantelli and Directors George Fiori and Dan Smith to assure HOA Board approval of the sale of the Park to him and his accomplices at millions below market value.

493.  Plaintiffs are informed and believe, and thereon allege, that Coldren was part of the December 21-22, 2015 bribery of Judge Moss to save the Park sale, that he violated or conspired to violate Penal Code §92, and to deprive honest services, 18 U.S.C. §1346.

494.  Plaintiffs are informed and believe, and thereon allege, that Coldren directed his attorney Defendant Lisa Salisbury to also act as PBPA legal counsel.  As an attorney, he knew that her representing both sides in the real estate transaction, his side as buyer and PBPA on the seller side,

was an incurable conflict of interest that violated law, ethics and bar rules.

495. Plaintiffs are informed and believe, and thereon allege, that Coldren's corrupt purpose in having Salisbury represent PBPA was to place her where she could direct that PBPA interests were not honored. She would misdirect PBPA to sell the Park to him, her client, and his affiliates, in the fiduciary fraudulent, self-dealing real estate sale.

496. Plaintiffs sent Coldren letters on March 23 and 29, 2016 accusing him of participating in the ex parte communication with Judge Moss to arrange the "call in" from vacation to fix the park sale. (Exhibit I) Coldren did not deny the accusation of his criminal wrongdoing.

497. Plaintiffs asserted that, by his failure to deny the charges, Coldren adoptively admitted his participation in the ex parte contact with Judge Moss, which included conspiracy to obstruct justice, Penal Code §182(c)(5).

498. Plaintiffs are informed and believe, and thereon allege, that Coldren knew of the higher cash offer to purchase the Park which the HOA Board, including Mantelli, Fiori and Smith, had received from Hometown America in early December, 2015, (Exhibit M).

499. Plaintiffs are informed and believe, and thereon allege, that Coldren acted and conspired to conceal the higher offer from the PBPA members and that he threatened Hometown America with retaliation if it pursued its higher and better offer to purchase the Park by going directly to the HOA members and bypassing the self-dealing HOA PBPA President Mantelli and Directors Smith and Fiori whom Coldren and affiliates had bribed.

500. On information and belief, Plaintiffs allege that Coldren violated 18 U.S.C. §§ 1962(c) and (d) by actively participating and conspiring in the Enterprise scheme to extort and carry out and fraudulently conceal judge

bribery, perjury, and obstruction of justice, and to bribe fiduciaries and defraud HOA PBPA and its members, all with the result Coldren intended, the taking of Plaintiffs' homes and the HOA seniors' Park and converting such real property to his personal financial benefit.

### 3.   ICC 35902 LLC AND 3187 REDHILL LLC AND PCP PARK BUYER ENTITIES

501.  ICC 35902 LLC and 3187 Redhill LLC, Plaintiffs are informed and believe, are legal entities established and majority owned or controlled by Saunders and Coldren.   The LLCs hold record title to the Park for Saunders and Coldren and their affiliates.

502.  Plaintiffs are informed and believe, and thereon allege, that Pacific Current Partners ("PCP") is a company majority owned or controlled by Coldren.   It and an entity called Saunders Property Company, that appears to be fictitious name for Saunders personally, acted in the Defendants' fraudulent acquisition of the Park.   (See, PCP press release, 1/29/16; Exhibit V)

503.  On information and belief, Plaintiffs allege that the LLCs and PCP violated 18 U.S.C. §§ 1962(c) and (d) by actively participating and conspiring in the Enterprise scheme to carry out the scheme for the intended result of defrauding Plaintiffs and converting to their principals' financial benefit Plaintiffs' homes and the Park.

504.  Plaintiffs are informed and believe, and thereon allege, that the LLCs and PCP had vital roles in the Enterprise, serving as the holding companies for the Park real estate which the Park Buyer Defendants corruptly acquired by and through Enterprise racketeering and wrongdoing.

### 4.   DIANA MANTELLI, HOA PBPA PRESIDENT AND REAL ESTATE BROKER

505.  Diana Mantelli, Plaintiffs are informed and believe, and thereon

allege, was the architect of the racketeering and Enterprise to steal the Park and embezzle HOA cash.  She invented the scheme to take the Park, Plaintiffs' homes and HOA funds from her fellow seniors, to burden them with more legal fees, connive to foment hatred and strife to distract the HOA members from her self-dealing, and to pursue effectively fiduciary theft.

506.  By fraud and deceit, Mantelli worked tirelessly and efficiently to convince her fellow HOA seniors to follow her self-serving recommendation to sell the Park to her accomplices, while concealing her self-interest and conflict of interest by which she would profit personally from the sale.

507.  Since her election as HOA President in January 2013, Mantelli was and always has been corruptly focused to carry out the huge illicit financial gain she could realize by breaching, as HOA President and a real estate broker, her fiduciary duties to the HOA and its members, and by pursuing a self-dealing sale of the Park to her undisclosed affiliates, Saunders, et al.

508.  Upon information and belief, Plaintiffs allege that from early 2013 through January 2016 (PCP Press Release 1/29/16, Exh. V)  Mantelli was in contact and communication with Saunders, Coldren or their representatives to arrange and conspire on the fiduciary, self-dealing taking of the Park - the key financial Enterprise objective.

509.  Mantelli worked and conspired with Saunders and the other Park Buyer Defendants, including the PBPA attorneys, to take the homes and Park and millions in HOA cash from the senior resident owners, including Plaintiffs, and to do so by fiduciary fraud, self-dealing, extortion by and through agents JAMS and Trotter, bribery of judicial officers, bribery of HOA Directors Defendant George Fiori and non-party HOA Director Dan Smith, and other predicate crimes.

510.  Mantelli was  instrumental  in  carrying  out  the  Enterprise

objective.   She assisted Defendants Saunders and Coldren and their companies to acquire the Palm Beach Park by fiduciary fraud and self-dealing that was enabled by judge bribery and obstruction of justice.

511. Plaintiffs are informed and believe, and thereon allege, that Mantelli, present in court on December 22, 2015, knew and was part of the scheme to bribe disqualified Judge Moss so that he would call in from vacation to thwart the TRO and enable the Park sale.

512. Mantelli authored and gave to PBPA members false and misleading materials promoting the sale of the Park to her accomplices, Saunders and the other park Buyer Defendants. (Exhibit L) Mantelli promised the members certain leases and benefits after the Park sale.   But she had no intention to keep the promises; her intent was to not honor any promises she or Saunders made to the HOA seniors.

513. At all times, Board President and real estate broker and fiduciary Mantelli concealed from the members and falsely denied her fiduciary breaching and self-dealing in the Park sale, plan to embezzle and convert HOA cash, the deliberate failure to account or issue financials, and inaction on settlements available in the litigation with Plaintiffs that would have kept the Park for the seniors.

514. Plaintiffs are informed and believe, and thereon allege, that Mantelli had a central role in the Enterprise, because as Board President she could conceal and falsify, withhold or deliver, as necessary, misleading HOA financial and other information, while misdirecting HOA attorneys to do what profited her, rather than what was best for the HOA and members.

515. As a seasoned real estate broker, Mantelli knew how to manipulate and direct the Park sale for her profit and that of the Enterprise. At all times, her conduct and control in the Enterprise was vital to it.

516.  Under HOA law and its bylaws, PBPA had to conduct a member

vote to approve the sale.  PBPA did not retain an independent elections inspector.  Mantelli conducted the vote, controlled and counted the ballots, after which she announced the members had approved the sale.  Defendant attorneys Wood, Thomas and Salisbury allowed their client PBPA to ignore election monitor requirement.  Mantelli handled the vote for a sale which would reward her, while concealing the reward from the voters.

517.  Mantelli acted for the Enterprise in November 2013 when she called Justice Trotter into the conference room so that he could, and did, threaten and tell Plaintiffs that he would malign them to their trial judge if they refused the HOA offer to settle for its promise to pay.

518.  Plaintiffs are informed and believe, and thereon allege, Mantelli worked with Justice Trotter and PBPA's attorneys, to benefit the Park-buyer Defendants and herself.

519.  Plaintiffs are informed and believe and thereon allege that Saunders and Coldren caused bribes to be paid to HOA PBPA President and real estate broker Mantelli, which she accepted, as *quid pro quo* for deliberate breach of her fiduciary duties, to singularly promote and pursue the give-away sale of the Park to Saunders and affiliates.

520.  Plaintiffs are informed and believe, and thereon allege, that the bribes included Saunders' and Coldren's promise that Mantelli, after the closing, would be awarded a contract to manage the Park that would include preferential privilege to handle the leasing and sale of homes in the Park, transactions that would yield to her substantial real estate commissions.

521.  After the Park sale closed, Plaintiffs are informed and believe, and thereon allege, that Mantelli and Defendant Salisbury formed, owned and operated PMP which managed the Park under a contract with PCP and the LLCs. (Exhibit Y)

522.  Plaintiffs are informed and believe, and allege, that Saunders

and Coldren knew and expected and directed that Mantelli breach her fiduciary duties to the HOA and its members by defrauding and deceiving them into voting for the give-away sale of the Park.

523. Plaintiffs are informed and believe and thereon allege that Mantelli arranged or assisted in the park buyer Defendants' Saunders and accomplices' bribery of Board directors Dan Smith and George Fiori.

524. Plaintiffs are informed and believe and thereon allege that Mantelli purported to have, as HOA PBPA counsel, Thomas and Wood, but she knew that they did not represent PBPA, or do what was best for it as the HOA, but acted at all times to promote and enable her fiduciary fraudulent self-dealing and to assist her in committing the predicate crimes, racketeering and Enterprise operations necessary to achieve the objective of selling the Park at millions under market to the Park buyer Defendants Saunders, Coldren and their accomplices and to take Plaintiffs' homes, as she testified at trial, "for nothing."

525. In January 2014, Mantelli embarked on campaign to pressure and financially wear down the seniors by having Thomas charge the HOA legal fees for which the seniors were assessed an additional $400 per month. For many of the fixed income seniors, the extra $400 was a crushing additional outlay.  With the seniors' money, PBPA paid hundreds of thousands of dollars in legal fees to Thomas and other attorneys.  (Exh. K)

526. Plaintiffs are informed and believe, and thereon allege, that Mantelli enabled attorney Defendant Thomas to charge HOA PBPA excessive and unnecessary legal fees in the litigation, (Exhibit O) because the objective was not to resolve litigation for the HOA and seniors, but to use excessive legal fees as financial lever to convince the seniors to sell off the Park to escape the burden of higher monthly HOA dues for legal fees.

527. At the same time, by misappropriating HOA funds to Thomas'

excessive and unnecessary legal fees, she was rewarding Thomas for breaching his fiduciary duties to PBPA, his supposed client, and instead working for her personal benefit and that of her accomplices.

528.  Mantelli told the members they had to sell the Park because the DBO had stopped sales of individual homes in the Park. (Exhibit J) She and the Defendant attorneys told the members that they faced maturity of the $16,100,000 Thrivent loan, which they said could not be paid without selling the Park.

529.  Nothing Mantelli or the attorneys told the members was true.  A proper HOA Board and counsel working for the HOA and its members would have solved all the problems and kept the Park for the seniors.

530.  Plaintiffs are informed and believe and thereon allege that Mantelli, conspiring with Coldren, caused PBPA to hire as counsel Defendant Lisa Salisbury, who was already attorney for buyer Defendant Coldren, and that Mantelli caused the HOA to use Park sale funds to pay Ms. Salisbury $75,421, (Sch. Atty. Fee Pmts. after Park sale, c. Jan. 2016; Exh. O)  Mantelli brought Salisbury in as purported PBPA counsel to help conduct the racketeering scheme and fraud on the PBPA seniors.

531.  Mantelli knew that attorney Salisbury was intractably conflicted as representing both sides, buyer Coldren and seller HOA PBPA, and that Salisbury was acting in disregard and violation of bar rules and ethics.

532.  Plaintiffs are informed and believe, and thereon allege, that in early December 2015, Mantelli received the cover letter and higher and better offer to purchase the Park from Hometown America.  (Exhibit M)

533.  At all times, Mantelli acted and conspired with Board Directors Fiori and Smith and the PBPA attorneys Wood, Thomas and Salisbury to conceal, from the PBPA membership, the higher and better offer.

534.  After she received the higher and better offer, President Mantelli

presided at the December 21, 2015 Board meeting to hear the offer presented and to take formal Board action on the better offer.

535.  At conclusion of the offer presentation, Mantelli promised that the Board would consider the offer and get back to offeror Hometown. However, Mantelli had no intent to respond to the better offer. She had already signed the deed for the fraudulent sale to Saunders and affiliates. It was scheduled to close the next day, Tuesday, December 22, 2015.

536.  Although it was better for the HOA members, Mantelli would not pursue the higher offer because it would not benefit her; it had no real estate commission.  She self-dealt to chase and gain what was best for her, which was the Saunders sale from which she would receive commissions and a post-closing, contract to manage the Park with lucrative preferential privileges for sales and leases of homes in the Park.

537.  On information and belief, Mantelli violated 18 U.S.C. §§ 1962(c) and (d) by actively participating and conspiring in the Enterprise scheme to recruit, finance and fraudulently conceal judge bribery, extortion, and obstruction of justice, and to bribe HOA Directors and engage in fiduciary fraud and self-dealing, including concealment of material information from the HOA members, all of which had the result she intended of HOA taking of Plaintiffs' homes, as she put it, "for nothing" and thereby causing Plaintiffs injury in their property, and to take the Park and HOA cash from the PBPA seniors at a value millions under market.

### 5.   TREASURER FIORI BREACHES FIDUCIARY DUTY

538.  George Fiori is PBPA Director, serving with President Mantelli and other directors. Fiori has been PBPA treasurer since 2013.

539.  Plaintiffs are informed and believe, and thereon allege, that Fiori accepted a bribe from Saunders and Mantelli to approve the fiduciary fraudulent, self-dealing sale of the Palm Beach Mobilehome Park to the

park buyer Defendants, Saunders, the LLCS, et al.

540.   Plaintiffs are informed and believe, and thereon allege, that Fiori had a vital role in the Enterprise, because as HOA PBPA Treasurer, he could and did conceal and falsify HOA financial information in order to deceive and misinform the HOA members. His acts to betray the HOA members were fundamental to Enterprise success.

541.   Plaintiffs are informed and believe, and thereon allege, that Saunders and affiliates, including Coldren and Mantelli, carried out the bribe by purchasing one of Fiori's homes in Palm Beach Park at an inflated near six figure price, when it was impossible for any other resident to achieve such value after the sale of the Park and corresponding higher rents.

542.   Fiori had two (2) homes in the Park.  Saunders bought one for the artificially high price. Saunders and affiliates also bribed Fiori by promising him the opportunity to buy an ocean view home in the Park.

543.   Plaintiffs are informed and believe, and thereon allege, that Fiori became aware of the bribery of Judge Moss to call in from vacation to thwart the TRO and enable the Park sale, and that Fiori conspired to conceal it.

544.   Plaintiffs are informed and believe, and thereon allege that Fiori, as Board Member and Treasurer, was instrumental in carrying out the fiduciary fraud and self-dealing whereby he assisted Defendants Saunders and Coldren, their companies the LLCs and PCP, to acquire the Palm Beach Park.

545.   Plaintiffs are informed and believe and thereon allege that Fiori approved the HOA hiring of attorney and defendant Lisa Salisbury, and paying to her fees of $75,421 from the Park sale proceeds, and that he authorized the HOA to pay millions in legal fees knowing that the attorneys were working for Mantelli and him and the Enterprise, and not for the HOA

and its senior members. (Exhibit O)

546. Plaintiffs are informed and believe, from 2016 through 2020. Treasurer Fiori did not prepare or provide the members with audited financial statements.

547. Fiori has not provided the HOA members with the Park sale closing statement or any accounting for the sale proceeds. Treasurer Fiori, before, during the Park sale process and after its closing, from 2013 to the present, intentionally failed to provide PBPA members with any meaningful or adequate annual or other HOA or Park sale financial data.

548. Plaintiffs are informed and believe, and allege, that Fiori, Smith and Mantelli acted and conspired to conceal PBPA financial transactions and information from the members because Mantelli and Fiori and others were embezzling HOA funds.

549. Plaintiffs are informed and believe, and thereon allege, that Fiori knew of the higher cash offer to purchase the Park which the HOA Board had received in early December 2015, and that Fiori acted and conspired to conceal the higher offer from the HOA members, because it was not in his personal interest to have the higher offer replace the Saunders, et al. sale for which he would receive valuable bribes.

550. On information and belief, Fiori violated 18 U.S.C. §§ 1962(c) and (d) by actively participating and conspiring in the Enterprise scheme to fraudulently undertake and conceal fiduciary and judge wrongdoing and bribery, and obstruction of justice, which had the result Fiori intended, the HOA taking of Plaintiffs' homes thereby causing them injury to their property, as well as causing loss and damage to PBPA and its members by his self-dealing give-away sale of the Park.

### 6.   LISA SALISBURY, ATTORNEY FOR BOTH SIDES

551. Lisa Salisbury purported to be legal counsel to fiduciary HOA

PBPA when she already was counsel to the Park buyer principal Defendant Robert Coldren. Salisbury made herself counsel for both sides, seller PBPA and the Defendant Park buyers. (Compare, PCP Press Release and Appellate Opinion cover, together reflecting double representation, Exh. Y)

552.  Plaintiffs are informed and believe, and thereon allege, that Salisbury, by purporting to represent both sides in the fiduciary fraudulent real estate sale transaction, which violated her oath and fiduciary and other duties as an attorney and as a real estate broker, for her own self-dealing, allowed and promoted the PBPA Board fiduciary fraud and self-dealing.

553.  Plaintiffs are informed and believe, and thereon allege, that Salisbury had a significant role in the Enterprise to direct and manipulate matters to achieve the Enterprise objectives by misuse and breach of her fiduciary duty to PBPA and its members.

554.  Salisbury's unique role in the Enterprise was that she acted on both sides, as counsel to the fiduciary seller HOA, which she helped to defraud of its real estate, and as counsel to Coldren, principal of the Park buyer that acquired the Park by fiduciary fraud, judge bribery, and other wrongdoing.   Salisbury was instrumental to the Enterprise for her placement to work both sides.

555.  Plaintiffs are informed and believe, and thereon allege, that Salisbury was aware and approved the buyer Defendants' bribery of Judge Moss for his call in from vacation to thwart the TRO and enable the fiduciary fraudulent sale of the Park.

556.  By letters on March 23 and 29 2016, (Exhibit I) Plaintiffs accused Salisbury of participation in the Judge Moss call in to thwart the TRO and obstruct justice under Penal Code §182(a)(5).   She did not deny the accusation, even after Plaintiffs advised her in writing that the failure to deny was and would be considered an adoptive admission.   Plaintiffs

contend that Salisbury adoptively admitted her participation in the bribing of Judge Moss so that he would call in to fix the Park sale.

557.  Plaintiffs are informed and believe and thereon allege, that as a direct result of the fiduciary fraudulent park sale closing, the seller HOA PBPA, in early 2016, paid Salisbury legal fees of $75,421.36.  (Exh. O)

558.  Plaintiffs are informed and believe, and thereon allege, that Salisbury knew that she would not and could not lawfully and legitimately earn those fees because she was purporting to represent both sides of the real estate sale transaction, and that such dual representation was intractably conflicted and prohibited under attorney professional and bar rules and other law.  Salisbury knew the fees were really payment for her fiduciary fraud and self-dealing undertaken to the detriment of her seller client PBPA and its members, but beneficial to her and the Park buyers who were her true clients and with her actors in the Enterprise.

559.  Plaintiffs are informed and believe and thereon allege that Salisbury was aware that in early December 2015, the HOA and its Board had received the higher, all cash offer to purchase the park from major institutional cash buyer Hometown America (Exhibit M).  She knew that the Hometown sale would have put $20,000 more in the pocket of each HOA senior. But it would not yield to her legal fees and the post-closing benefit of a contract to manage the Park and transact its home sales and leases.

560.  Plaintiffs are informed and believe, and thereon allege, that on December 21, 2015, Salisbury met with Hometown America to hear it present its higher offer, knowing that the effort was moot, as Mantelli and Coldren, i.e. the buyer and the seller, and the PBPA Board, would not consider the offer, given the fiduciary fraudulent self-dealing Park sale.

561.  Plaintiffs are informed and believe, and thereon allege, that Salisbury acted and conspired to conceal the offer from the HOA members

because she was acting in the interests of her Park buyer client Coldren and herself.  She would personally gain from the Park sale by payment of legal fees and the promised contract to manage the Park post-closing.

562.  Plaintiffs are informed and believe, and thereon allege, that after closing of the Park sale, Mantelli and Salisbury formed PMP which then obtained a contract from Saunders and affiliates to manage Palm Beach Park, and that PMP has managed the Park from 2016 to the present, including preference to handle sales and leases of homes in the Park. (Exhibit Y)

563. Plaintiffs are informed and believe, and thereon allege, that Saunders and Coldren promised and gave to Mantelli and Salisbury the contract as part of a bribe of them to promote and breach their duties and to engage in wrongdoing to ensure closing of the fiduciary fraudulent Park sale.

564. On information and belief, Plaintiffs allege that Salisbury violated 18 U.S.C. §§1962(c) and (d) by actively participating and conspiring in the Enterprise scheme to carry out and conceal fiduciary deception, fraud and self-dealing, along with bribery, judge bribery, perjury, attorney breach of fiduciary duty and obstruction of justice, for the result Salisbury intended of taking Plaintiffs' homes and converting to her financial benefit cash from the illicit Park sale, all to the harm and detriment of the Park seniors and Plaintiffs, injuring them in their property.

## 7.   THOMAS, ATTORNEY FOR MANTELLI, NOT PBPA

565.  Allen Thomas purported to be PBPA's attorney.  Plaintiffs allege, on information and belief, he was actually, at all times, counsel for Board President Mantelli and the other Defendants and participants in the Enterprise, working for their benefit and not that of PBPA.

566. Plaintiffs are informed and believe, and thereon allege, that

Thomas had a key role in the Enterprise, because by feigning that he was PBPA attorney, when in fact he really worked for Mantelli and the Enterprise, Thomas could be, and was, instrumental in the Enterprise's deception and defrauding of PBPA members.

567. Thomas acted and spoke to make the PBPA seniors think that he represented their interests, advising them they should pay him more legal fees, sell the Park to Saunders and accomplices, or take other action that would not benefit the members, but would profit Mantelli, the Enterprise, and most important, his law firm and himself.

568. At a member meeting on August 3, 2013, Mantelli held up Thomas to the members as their attorneys.  She falsely stated that he represented each of the members.  Thomas did not correct Mantelli by clarifying to the members present that he purported to represent PBPA, or that in truth he really worked for the personal benefit of self-dealing fiduciary Mantelli, but that in no way did he represent them – the members.

569. Plaintiffs are informed and believe, and thereon allege, that Thomas assisted Mantelli to deceive the HOA members that they had to sell the Park, and that Thomas acted to suppress and conceal settlement and purchase offers that were favorable to the HOA and its members, but damaging or harmful to the Enterprise key goal to take and embezzle millions in real estate and cash from the Park seniors and Plaintiffs.

570. PBPA would and did pay to Thomas and his firm substantial fees (Exhibit O) derived from the seniors' monthly dues and sale of the Park, which fees were for legal work that was useless and counterproductive to PBPA, but for Mantelli and the Enterprise, was essential and beneficial.

571. Plaintiffs are informed and believe, and thereon allege, that at all times, Mantelli allowed and directed Thomas to run up excessive legal fees, which he enthusiastically did, without care that it meant the seniors

would have to pay increased HOA dues.  High legal fees would pressure the seniors to make them want to sell the Park and provide the means to embezzle HOA cash, and also serve to reward Thomas for his contributions to the success of the Enterprise.

572.  Plaintiffs are informed and believe, and thereon allege, that in exchange for arranging Thomas to over-charge the seniors for legal fees, Mantelli expected and made bargain with Thomas to act for her personal benefit and that of her accomplices.

573.  Plaintiffs are informed and believe, and thereon allege, that Mantelli allowed Thomas to bill and take HOA funds for unnecessary and duplicative and fraudulent legal work, in order to force members to pay legal fees which would serve to drive the members toward the Enterprise objectives and the goals of the Defendant participants, principally Mantelli.

574.  Plaintiffs are informed and believe, and thereon allege, that while purporting to represent HOA PBPA, Thomas really acted as counsel to and for the personal benefit of President Mantelli, predominantly by assisting her with the illicit Park sale and HOA cash embezzlement, and also by defending her against complaint brought by the California Department of Real Estate.

575.  Plaintiffs are informed and believe and thereon allege that Thomas, either when it occurred or soon thereafter, knew about and acted to conceal disqualified Judge Moss' willful judicial misconduct and obstruction of justice when he called in from vacation to "fix" the fiduciary fraudulent sale of the Park.

576.  By letters on March 23 and 29 2016, (Exhibit I) Plaintiffs accused Thomas of participation in the Judge Moss call in and obstruction of justice under Penal Code §182(a)(5).  Unlike the Park Buyer Defendants, Thomas denied the accusation in letter dated March 25, 2016. (Exhibit I)

577.  Plaintiffs contend that Thomas' denial was untrue; that he knew about and participated in either or both of the bribing of Judge Moss to call in to fix the Park sale or the cover up of the bribery.

578.  Plaintiffs are informed and believe and thereon allege, that as a direct result of the fiduciary fraudulent park sale closing, in early 2016 the seller PBPA paid Thomas and his firm $671,200 for legal fees.  (Exh. O)

579.  Plaintiffs are informed and believe, and thereon allege, that Thomas acted and conspired with President Mantelli and Defendants Fiori and Smith to cause the Park sale to close knowing that he and his firm and colleague lawyers would receive hundreds of thousands of dollars in purported legal fees from the sale proceeds.

580.  On December 28, 2015, at the TRO hearing before Judge Moss, Plaintiffs are informed and believe, and thereon allege, Thomas acted and conspired with Wood, also present, and Judge Moss, to conceal and suppress the fact of the closing of the fiduciary fraudulent and self-dealing sale of the Park; closing by deed four hours after the disqualified Judge Moss "call in" on December 22, 2015.  They knew the TRO hearing had been made moot by the Park sale closing, but did not raise it so as to avoid pointless hearing.

581.  Plaintiffs are informed and believe, and thereon allege, that Thomas knew of the Hometown America higher cash offer (without broker commission) to purchase the Park which the HOA PBPA Board had received in early December 2015. (Exhibit M) Thomas acted and conspired to conceal the higher offer from the HOA members, because it was not in his personal interest to have the higher offer replace the Saunders sale from which, at its closing, he would receive substantial legal fees.

582.  On information and belief, Thomas violated 18 U.S.C. §§ 1962(c) and (d) by actively participating and conspiring in the Enterprise scheme to generate, foster and then fraudulently conceal fiduciary and judge bribery,

obstruction of justice, and embezzlement, for the result Thomas intended, the taking of Plaintiffs' homes, along with the taking of the seniors' Park, and to take the seniors' HOA cash and dues, by the illicit, fiduciary fraudulent, self-dealing activities described and alleged in this Complaint.

## 8.   WOOD ATTORNEY FOR MANTELLI, NOT PBPA

583.   Cary Wood was insurance defense counsel to PBPA starting 2011 and continuing to the present.  At the Phase I trial closing (5/1/13) stating he was a litigator, he confessed he did now know anything about real estate.  He was useless as counsel to PBPA. It confronted serious real estate problems arising from illegal leases, loans and other flawed real property and related transactions.  But it did not matter; he did not work for PBPA.  Wood did what was best for Mantelli and the Defendants and Enterprise.

584.   Mr. Wood is a partner in Lewis Brisbois Bisgaard and Smith LP, a large national multi-branched law firm that has 1,528 lawyers and is the 16th largest law firm in the USA.

585.   Plaintiffs are informed and believe, and thereon allege, that the firm often hires JAMS' services, and Plaintiffs are informed and believe and thereon allege, Wood and his firm are JAMS favored repeat customers.

586.   Plaintiffs are informed and believe, and thereon allege, that Wood knew of the Judge Moss bribe for the "call in" from vacation to thwart the TRO, and that Wood knew Judge Moss was corruptly on the side of PBPA on December 1, 2015 when Wood prepared and filed the invalid and unfounded "Objection" to the §170.6 peremptory challenge (Exh. B)

587.   Wood knew that the "Objection" was ineffective.  It would serve as possible backstop foil should it become necessary for Judge Moss to illegally intervene to save the Park sale, which he did on December 22, 2015.

588.   By letters on March 23 and 29, 2016, Plaintiffs accused Wood of participation in the Judge Moss call in and obstruction of justice under

Penal Code §182(a)(5).  Unlike the Park Buyer Defendants, Wood denied the accusation.  (Exhibit I, 4/6/16 letter)

589.  Plaintiffs contend that Wood's denial was false; that he knew about and participated in either or both of the bribing of Judge Moss to call in to fix the Park sale or the cover up of the bribery.

590.  Plaintiffs are informed and believe and thereon allege that Wood acted to conceal disqualified Judge Moss' willful judicial misconduct in the "fix" of the fiduciary fraudulent sale of the Park.

591.  Wood failed and refused Plaintiffs' demand for the file stamped returned TRO opposition pleadings Wood and his colleagues had submitted 12/21/15, which documents, by or at the direction of Judge Moss, had been altered to cover for the Judge Moss' "fix".  (Exhibits C, I)

592.  The altered documents reflect Judge Moss as the judge on the *Haugen* case on December 21, 2015.  But Judge Moss did not purport to "self-re-qualify" until December 22, 2015, making it impossible for documents filed before December 22 to show him as the judge.  (Filed TRO Opp. caption pages, Exhibit C; compare to altered and filed Opp. caption pages; TRO hearing place and date changed from Judge Andler to Judge Moss; see also, Docket, Exhibit D)

593.  Plaintiffs are informed and believe, and thereon allege, as described in the March 24, 2016 letter (Exhibit I), that Judge Moss' falsified the TRO opposition documents.  In a wrongful ex parte communication with Judge Moss, Wood received the falsified documents from Judge Moss.

594.  Plaintiffs demanded copies of the documents.  Wood ignored the demand.  Instead, he withheld and concealed the phony documents, thereby violating Penal Code §132, §134 and §135 and Government Code §6201 and in the federal case, 18 U.S.C. §1512(c).

595.  The documents, (Exhibit C) altered by or at the direction of

Judge Moss, are further evidence of Judge Moss' "call in" from vacation to fix the Park sale, and the returned documents themselves constituted ex parte communication by Judge Moss to Wood.

596.  Plaintiffs are informed and believe, and thereon allege, that Wood knew at the time, or soon thereafter, that Defendant Park Buyers had ex parte contact with Judge Moss on December 21-22, 2015 to request his "call in" from vacation to fix the Park sale.

597.  On information and belief, Wood violated 18 U.S.C. §§ 1962(c) and (d) by actively participating and conspiring in the Enterprise scheme to carry out and implement and conceal fiduciary fraud and judge bribery, extortion, document falsification, and obstruction of justice, which had the result Wood intended of allowing and causing PBPA to take Plaintiffs' homes and causing them injury to their property, as well as the taking of the Park which injured the Park seniors.

## 9.  SUSOLIK - PARK BUYER ATTORNEY

598.  Edward Susolik was Park Buyer Defendant Saunders' legal counsel at the time disqualified Judge Moss carried out on December 22, 2015 his strategic call in from vacation to first thwart the TRO and then "self-re-qualify."  (Exhibit B)

599.  Plaintiffs are informed and believe, and thereon allege, that Susolik, from before 2015, was personal friends with Judge Moss and Justice Trotter.

600.  Plaintiffs are informed and believe, and thereon allege that Susolik and his law firm Callahan & Blaine, often hire JAMS' services, and Susolik and his firm and its partners are favored JAMS repeat customers.

601.  Representing Saunders, who was not a party in the case, Susolik made a "special" appearance in Judge Moss' court in the morning of December 22, 2015 to be present for disqualified Judge Moss' "call in" from

vacation to fix the Park sale. (Exhibit B).

602.  Judge Moss dictated to his clerk a Minute Order which stated: "Appearances: Edward Susolik/Peter S. Bauman, Callahan & Blaine, specially appearing for John Saunders."  (Exh. B)

603.  Susolik's law firm advertises its prowess in contacting judges after hours outside of court.  The *National Law Journal*, 6/21/04, pg. 55, reported that a name partner in Susolik's firm: "tracked down a judge by phone at a late night private poker party and asked him to show up early to court the next day to block the forfeiture of a client's hotel."  (Exhibit W) Susolik's law partner told the judge, "I need you to come in a half-hour early to issue a restraining order to block the foreclosure of the Canyon Hotel."

604.  Extolling its special, after-hours, out of court judge contact skills, Susolik's firm exclaimed that "[The judge] was so amazed. He said not even his wife knew he was at this party."

605.  The after-hours judge communication was successful.  The grateful client's hotel was saved from foreclosure by Susolik's firm's reaching the judge at the late night poker party to arrange the judge calling the ex parte hearing earlier than scheduled. The article indicated that the firm's special skill and tactic of contacting out of court judges after hours had become "ingrained."

606.  Plaintiffs are informed and believe, and thereon allege, that Saunders and Coldren hired Susolik because of his long-time personal friendship with both Justice Trotter and Judge Moss, and for his firm's advertised capability and skill to provide the service of out of court, after hours, contact with a judge to effectuate special treatment for a client.

607. Plaintiffs are informed and believe and thereon allege that, delivering that advertised service, Susolik either was the person that, in the time frame Dec. 21-22, 2015, communicated to Judge Moss the Park Buyer

Defendants' request that disqualified Judge Moss call in from vacation to save the Park sale by thwarting the TRO, or Susolik participated in such ex parte communication.

608.  By letters sent on March 23 and 29, 2016, (Exhibit I) Plaintiffs accused Susolik of involvement in the Judge Moss call-in and obstruction of justice under Penal Code §182(c)(5).  Susolik did not deny the accusation.

609.  Plaintiffs advised him that his failure to deny was an adoptive admission.  Susolik still did not deny that he participated in the conspiracy to obstruct justice.  Plaintiffs contend that Susolik did not deny because he did participate to arrange and conspire to cause and assist Judge Moss' fix of the Park sale.

610.  Plaintiffs are informed and believe, and thereon allege, that Susolik had a critical role in the Enterprise.  He was hired as Park Buyer attorney for contacts with Judge Moss and Justice Trotter, and as a partner in a law firm that promotes its special dexterity for locating and contacting out of court judges after hours.  Susolik was integral to Enterprise ability to effectively and rapidly contact Judge Moss to call in from vacation.

611.  On information and belief, Susolik violated 18 U.S.C. §§ 1962(c) and (d) by actively participating in the Enterprise scheme to undertake and fraudulently carry out and conceal judge bribery and obstruction of justice, which had the result he intended of his clients taking Plaintiffs' homes and causing them injury to their property, as well as to injure the other Park seniors, all for his clients' financial gain and profit.

## 10.   FIDELITY –INSURANCE FOR ENTERPRISE

612.  Defendant Fidelity National Title Company underwrote and administered the title insurance for the Park sale, both for the Park buyer's lender Jeffries LoanCore LLC and the Park buyer LLC entities. (Exhibit B) The underwriting includes ascertainment of the authority of the company

officers that sign deeds and carry out the sale and transfer of real property.

613.  Plaintiffs are informed and believe, and thereon allege, that Fidelity had an indispensable role in the Enterprise which only it, and no other title company would carry out, that of providing the title insurance needed to close the Park sale and in particular to render such insurance to the lender for the Park sale, on the knowledge and with participation and conspiracy to effectuate judge bribery and fiduciary fraud and self-dealing to back the underwriting.

614.  Defendants relied upon Fidelity's willingness to engage or conspire and to overlook predicate crimes and racketeering, including HOA fiduciary fraud and self-dealing and judge bribery, to "fix" a real estate sale in order to insure title in the lender from the illicit sale.

615.  Plaintiffs are informed and believe, and thereon allege, that in mid-November 2015, because of the *Haugen v. PBPA* lawsuit to stop the Park sale, that Fidelity advised Saunders and accomplices that, for the fraudulent Park sale, Fidelity would have difficulty insuring the title, even were there an exception for the lawsuit in the title policy and an indemnity from Saunders, Coldren and others.

616.  Plaintiffs are informed and believe that, by making the lawsuit an exception to title which Saunders or others would indemnify, Fidelity ultimately made, in or about early December 2015, some arrangement with Saunders and Coldren whereby it would insure the title for the LLCs and the loan for lender Jeffries LoanCore.  As a result, Saunders and the Park Buyer Defendants and Mantelli moved forward to close the fraudulent Park sale, scheduling it for December 22, 2015.

617.  But when Plaintiff Haugen filed, on December 21, 2015, the ex parte application for TRO to enjoin the Park sale, Plaintiffs are informed and believe, and thereon allege, that Fidelity reconsidered insuring the title,

and that Fidelity communicated to Saunders and his accomplices that the December 22, 2015 closing was in jeopardy for lack of Fidelity's willingness to provide title insurance due to the pending TRO application. (Exhibit B)

618. Plaintiffs are informed and believe, and thereon allege, that in response, Saunders, the Park-Buyer Defendants and others embarked on the scheme to bribe disqualified Judge Moss to call in from his vacation to thwart the TRO and "self-re-qualify" back into *Haugen v. PBPA*.

619. As described and alleged and the court documents show, disqualified Judge Moss did call in just in time to thwart the TRO and "self-re-qualify," and the sale deed recorded only four (4) hours later.  (Exhibit B) By his perfectly timed willful judicial misconduct, disqualified Judge Moss neutralized the TRO; he "fixed" the case so the sale would close escrow.

620. Plaintiffs are informed and believe, and thereon allege, that Fidelity agreed to issue title insurance after Saunders or other Defendants informed Fidelity that Judge Moss could and would be bribed to unlawfully fix the Park sale by thwarting the TRO and purporting to take back the case by "self-re-qualification."

621. In March 2016 Plaintiffs wrote Fidelity to accuse it of knowledge and participation in the Judge Moss' fix. (Exhibit I) Fidelity did not deny the charge, and therefore adoptively admitted it.

622. Plaintiffs are informed and believe, and thereon allege, that Fidelity knew Judge Moss was or would be bribed or unlawfully influenced to effectuate the strategic "call in" to thwart the TRO and "self-re-qualify."

623. After Judge Moss called in from vacation and thwarted the TRO the morning of December 22, 2015, that same day, four (4) hours later, the transaction closed by deed which Fidelity, for Mantelli purporting to act for PBPA, caused to be delivered and recorded.  (Exhibit B)

624. Plaintiffs are informed and believe, and thereon allege, that

Fidelity insured title for the sale because Fidelity was confident Judge Moss could and would fix the Park sale and suffer no repercussions for it.

625. Plaintiffs are informed and believe, and thereon allege, that Fidelity would not have insured the title if Judge Moss had not illegally interceded, as he did, to fix the sale, and if Fidelity had concern that Judge Moss, and those that conspired with him on the "fix", including Fidelity, had any risk of criminal prosecution.

626. Plaintiffs believe Fidelity is a JAMS "repeat" customer.

627. On information and belief, Fidelity violated 18 U.S.C. §§ 1962(c) and (d) by actively participating and conspiring in the Enterprise to utilize, finance and fraudulently conceal fiduciary fraud and self-dealing and judge bribery, and by obstruction of justice, which had the intended result of taking Plaintiffs' homes and causing them injury and damage, as well as injuring the Park seniors by the fraudulent Park sale, in order to benefit Fidelity by having the Park seniors pay off the Thrivent loan thereby removing Fidelity exposure and liability for title insurance.

## C. Non Defendant – Co – Conspirators' Roles

### 1. ROBERT MOSS, PLAINTIFFS' TRIAL JUDGE

628. Robert J. Moss, Plaintiffs' trial judge in the main case *Chodosh v. PBPA*, is the principal judicial officer wrongdoer. Disqualified on *Haugen v. PBPA*, the case to stop the Park sale, he called in from vacation, first stifled Plaintiffs' TRO to halt the fraudulent sale, and then "self-re-qualified." The fraudulent sale closed four hours later, yet Judge Moss says nobody contacted him to request the "call in."

629. To cover his "quintessential" judge bad act, disqualified Judge Moss concealed, backdated and altered court documents. He falsified the TRO Opposition papers to state they were filed Dec. 21, 2015 with him as the judge. (Exhibit C) But he did not "self-re-qualify" until December 22,

(Exhibits B, D) making it impossible for him to be the judge the prior day.

630.  Judge Moss admits error (Exhibit E, pgs. 8-9) on the case Register of Actions (i.e. the "Docket") showing the altered TRO opposition documents out of chronological order.  Judge Moss doctored the Docket to conceal his judge bad act "fix."

631.  Judge Moss entered two (2) "self-re-qualification" orders.  His clerk did not serve the first order on Dec. 22, 2015.  The second order, short text and cryptic, was entered Dec. 23 and served.  Judge Moss doubling his illegal orders, and serving one and not the other, shows bad intent.

632.  After appeal, years later in early 2019, Judge Moss was required to rule on Plaintiffs' peremptory challenge "instantly". He sat on it for months, perjuring himself on affidavits to collect his paychecks. (Exhibit F)

633.  When Judge Moss is disqualified, he either "self-re-qualifies" or sits on his disqualification.  By such willful judicial misconduct, disqualified Judge Moss kept himself or placed himself back on a case to rule against Plaintiffs and the law and facts and to thereby delay and impair Plaintiffs' rights and remedies, for the purpose of benefitting the Defendants and the Enterprise, all in exchange for Defendants' bribes and favors.

634.  Biased and disqualified Judge Moss, while on Plaintiffs' cases, from 2014 to 2019, ruled against Plaintiffs and law and fact, except on federal TILA, but only because *Jesinoski v. Countrywide,* supra, (2015) supported Plaintiffs' TILA claims. But after ruling Plaintiffs had real property that had been illegally mortgaged under TILA, Judge Moss ruled that Plaintiffs had no real property.

635.  Judge Moss repeatedly denied Plaintiffs' motions to amend the complaint to describe and allege glaring PBPA illegality that had been uncovered and shown since the Phase I trial before Judge Stock in April 2013.  Judge Moss enforced the leases and loans which Justice Bedsworth

held unenforceable; Plaintiffs owed nothing.  (Op. 12/17/18)

636.  At all times, Judge Moss disregarded that fiduciary PBPA had the duty to act with the utmost good faith in the best interests of Plaintiffs, the HOA, and its members.  He unheeded that the PBPA President, Directors, and attorneys were fiduciaries not discharging, but defiling, their duties to act in the best interests of their beneficiaries.

637.  Judge Moss made PBPA win even when it had lost its corporate good standing for having been suspended.  Judge Moss let PBPA keep a case going despite its breach of the five (5) year rule and failure to bring the case to trial.   In front of Judge Moss, except for TILA, PBPA always won and Plaintiffs lost, no matter the facts and contrary controlling law that meant Plaintiffs had to win.

638.  On information and belief, Judge Moss violated 18 U.S.C. §§ 1962(c) and (d) by, as described and alleged in this Complaint, actively participating in the Enterprise racketeering scheme to engage in willful judicial misconduct, accept bribes, commit perjury, fraudulently conceal his judge misconduct, crime and bribery, defraud Plaintiffs and the public of honest services, and obstruct justice with deliberate wrong rulings, all to thereby achieve the result Judge Moss intended, which was to injure Plaintiffs in their property by causing them loss of their homes, and to cause the Park seniors to lose their Park and HOA cash to the Defendants, all for the financial benefit of the Defendants and himself.

## 2.   FORMER PRESIDING JUDGE MARGINES

639.  Former Orange County Presiding Judge Charles Margines disqualified Judge Moss on November 30, 2015. (Exhibit B) By letter dated April 26, 2016, to him, (Exhibit Q) Plaintiffs reported Judge Moss unlawful "self-re-qualification" which purported to reverse Judge Margines disqualification order.

640. Judge Margines did nothing about disqualified Judge Moss willful judicial misconduct in overruling his Order that disqualified Judge Moss.   By not reporting Judge Moss' misconduct, Judge Margines violated canon of ethics duty to refer a wrongdoer judge to the CJP and to the AG or other prosecuting authorities.

641. The reporting obligation is set forth in Judge Canon of Ethics 3D(1) and "*What Action to Take when [Judges] becomes aware of misconduct by other judges*", *CJC Memo.*, pg. 4, citing *Handbook*, 2nd Ed. (1999), §5.65, p. 153) (Exhibit Q) and the *Handbook*, 4th Ed. 2017, pg. 335-6, §5:68 "[A] judge's duty to take appropriate corrective action, including reporting crimes and misconduct, in regard to other judicial officers and attorneys is an affirmative obligation under canon 3D."

642. On information and belief, Judge Margines violated 18 U.S.C. §§ 1962(c) and (d) by actively participating and conspiring in the Enterprise racketeering scheme to protect and conceal Judge Moss' wrongdoing, bribery and obstruction of justice, and to engage in a scheme to deprive Plaintiffs of honest judicial services, all of which had the intended and eventual result of injuring Plaintiffs in their property by causing loss of their homes.

### 3.   PRESIDING JUSTICE KATHLEEN O' LEARY

643. Presiding Justice Kathleen O'Leary of the California Court of Appeal, Fourth District, Div. 3, starting in 2016, intentionally disregarded the law to rule against Plaintiffs.  She upheld and permitted Judge Moss' willful judicial misconduct and crime of "calling in" from vacation to fix the Park sale by defying his §170.6 disqualification. (Dkt. Writ, G053512, 5/26/16)

644. Justice O'Leary disregarded the law she had expressly reaffirmed by writing in *Hemingway v. Superior Court, supra,* 122

Cal.App.4th at 1159: "Courts must refrain from any tactic or maneuver that has the practical effect of diminishing this important right [§170.6]."

645. Plaintiffs are informed and believe that Presiding Justice O'Leary was infuriated by Plaintiffs' litigation maneuvers that forced her to take down the JAMS promotional plugs on the court's website retired justices' biographies, including Justice Trotter.   Because of Plaintiffs, Justice Trotter could no longer promote JAMS on the court website.

646. Justice O'Leary was a defendant in Plaintiffs' federal lawsuit filed December 2016, dismissed without prejudice in January 2018. (Exhibit Z, caption page) Plaintiffs sued her because, among other things, she had approved Judge Moss' fix.   Plaintiffs sued her and Judge Moss as co-defendants and co-conspirators.

647. Although she was a defendant in the federal action, over Plaintiffs' objection and call for her recusal, Justice O'Leary put herself on Plaintiffs' appeal and then ruled against Plaintiffs, which was contrary to the facts and law, and thereby engaging in the willful judicial misconduct of intentional disregard of the law.

648. Prominent was Justice O'Leary's swift denial of Plaintiffs' motion to take Judge Moss' deposition.   Plaintiffs filed the motion late March; it was docketed April 3, 2018.  Justice O'Leary denied it three (3) hours later.  She violated Court Rule 8.54(b)(1) that decision must wait for expiration of the 15-day deadline for any opposing party response.

649. Plaintiffs are informed and believe, and thereon allege, that Justice O'Leary acted wrongly and rapidly to deny the motion to depose Judge Moss in order to protect Judge Moss and the Enterprise from Plaintiffs' inquiry; that she acted and conspired to obstruct justice in violation of Penal Code §182(a)(5) and to participate in a scheme to deprive Plaintiffs of honest judicial services in violation of 18 U.S.C. §1846, et al.

650.  Justice O'Leary dishonored her duty to report a wrongdoer judge to the CJP and to the AG or other prosecuting authorities, which obligation is set forth in Canon of Ethics 3D(1) and *CJC Memo.* and *Handbook*, 2nd Ed. (1999), and 4th Ed. 2017, pg. 335-6, §5:68, <u>supra</u>.  Denigrating her canon 3D affirmative obligation to report judge crime, Justice O'Leary instead wrongfully acted to uphold, support and sustain Judge Moss' willful judicial misconduct and crime.

651.  On information and belief, Presiding Justice O'Leary violated 18 U.S.C. §§1962(c) and (d) by actively participating and conspiring in the Enterprise scheme to support, protect and conceal Judge Moss' wrongdoing, crime, bribery and obstruction of justice, and to contribute to denial of justice, which had the intended and eventual result of injuring Plaintiffs in their property by causing loss of their homes.

### 4.    DIV. 3, JUSTICE WILLIAM BEDSWORTH

652.  William Bedsworth, associate appellate court justice, was also a defendant in Plaintiffs' federal lawsuit 2016-2018.   Judge Moss, Judge Margines and Justice O'Leary were his co-defendants. Plaintiffs sued Justice Bedsworth because, among other things, he approved Judge Moss' "fix" of the Park sale.  (Dkt. 5/26/16)

653.  A judge sued by litigants should not decide their case.  Justice Bedsworth took on Plaintiffs' appeal knowing he could not. He put himself on Plaintiffs' appeal and then ruled against Plaintiffs.  His plain intentional disregard of the law was willful judicial misconduct and judge crime.

654.  Over their objection and disqualification motions, Justice Bedsworth empaneled himself as Plaintiffs' lead justice in their appeal. He authored the opinion whereby he ruled Plaintiffs never owed their HOA PBPA rent or loan payments. But he did not order PBPA to compensate Plaintiffs for their homes it seized specifically on the grounds of non-

payment of the rent and loans he ruled Plaintiffs never owed.

655.  Justice Bedsworth opined PBPA did not need a securities permit, (Op. 20) countermanding the state agency that declared by consent decree that such permit was required.  (Exhibit J, pg. 4, ¶16, line 11) Overall, the opinion contradicted law and fact, but protected and praised Judge Moss.

656.  Justice Bedsworth attempted to deter Plaintiffs' counsel from investigating Judge Moss' misconduct and offenses and Justice O'Leary and the other Defendants and non-Defendant conspirators by wrongly, without foundation, threatening to hold Plaintiffs' counsel in criminal contempt for his statements in court papers and open court that Judge Moss had "fixed" the Park sale.  Justice Bedsworth knew it was true Judge Moss had "fixed," such that he could not hold Plaintiffs' counsel in contempt. (Exhibit S)

657. Justice Bedsworth deciding Plaintiffs' cases and appeal and writing the opinion in a way to intentionally disregard the law and deny Plaintiffs' their day in court and compensation for their homes was his primary contribution to the Enterprise conspiracy to obstruct justice.

658.  Justice Bedsworth acted and conspired to obstruct justice in violation of Penal Code §182(a)(5) and to participate in a scheme to deprive Plaintiffs of honest judicial services in breach of 18 U.S.C. §1846.

659.  Justice Bedsworth despoiled his duty to report a wrongdoer judge to the CJP and to the AG or other prosecuting authority.  See, Canon of Ethics 3D(1) and *CJC Memo.* and *Handbook*, 2nd Ed. (1999), and 4th Ed. 2017, pg. 335-6, §5:68, <u>supra</u>.   Justice Bedsworth defied his canon 3D affirmative obligation to report judge crime.  Instead, he wrongfully acted to uphold, support and sustain Judge Moss' misconduct and crime which harmed many seniors and veterans, leaving some homeless.

660.  On information and belief, Justice Bedsworth violated 18 U.S.C. §§1962(c) and (d) by actively participating and conspiring in the Enterprise

scheme to protect and uphold Judge Moss' wrongdoing, bribery and obstruction of justice, and the wrongdoing of other judicial officers, including himself, all of which had the intended result of injuring Plaintiffs in their property by causing loss of their homes, and harmed the seniors.

### 5.   JAMS - "WORLD'S LARGEST" ADR VENDOR

661.  JAMS' base role in the Enterprise arises out of its status and advantage as "the world's largest private alternative dispute resolution ("ADR") provider."   JAMS headquarters are in Orange County, California, with offices and facilities in Los Angeles County, and throughout the United States and the world.

662.  JAMS has hired many Orange County judges and justices. Most retired Orange County justices work there.  JAMS reach today is to recruit retired judges and justices from throughout the USA and world.

663.  With the pandemic, JAMS has launched intense advertising to amplify its usual pitch, that litigants should hire JAMS for "private" justice to resolve or adjudicate disputes, and that it will be faster, better, and less expensive than going to court, none of which is necessarily or often true.

664.  JAMS states its mediator practices are "rooted in classic mediation settlement negotiations."  One JAMS "classic" mediation tactic is to tell and threaten mediation participants that JAMS will malign parties to their trial judge if they do not accept the JAMS mediator recommended settlement.   According to JAMS, this tactic is a "classic" settlement technique that is merely a way to put "pressure" on the threatened party in order to achieve settlement. (*Chodosh v. JAMS*, D070952, JAMS' Opp. brief 6/2/16, pgs. 39-40)

665.  At JAMS, mediation may include undisclosed and unauthorized mediator ex parte communication with the parties' trial judge.  According to JAMS, a mediator can "negotiate" with the trial judge, and not tell the

parties about the negotiations. (Ibid. pg. 52) About Plaintiffs' case, JAMS posited: "There is no reason to think that, had Justice Trotter breached mediation confidentiality by making a report to the trial judge, the trial judge's capacity to decide the case would be impugned." (Ibid. pg. 28)

666. JAMS mediators can and do "make a report to the trial judge," but JAMS assures that "is no reason to think" that "the trial judge's capacity to decide the case would be impugned." JAMS admits its practice is to have undisclosed ex parte communication with its mediating customers' trial judges, but declares such secret JAMS conduct is nothing to worry about.

667. On the contrary, there is everything to dread. As it did in this case, JAMS can and will, Plaintiffs are informed and believe and thereon allege, if it suits JAMS' favored customer, obstruct and disrupt an opposing litigant's right to due process before an impartial judicial officer.

668. JAMS mediation practice sells out justice, starting with false representations that JAMS has integrity and is ethical, then with promise and threat to carry out unlawful ex parte communication with the mediating parties' trial judge, which is a JAMS "classic" settlement method.

669. Plaintiffs are informed and believe, and thereon allege, that at times JAMS acts as agent for its favored "repeat business" clients and their counsel, with the specific intent to attempt to extort mediating parties to settle in a way favorable to the repeat customer, and that the mediator extortion that is described and alleged to have occurred against Plaintiffs is an example of a pattern of such attempted extortion. The attempted extortion obstructs justice and is honest services fraud. Penal Code §182(a)(5); 18 U.S.C. § 1346, et al.

670. JAMS asserts that it has no obligation to disclose to parties mediating at JAMS that JAMS is in the process of hiring the parties' trial judge. (Ibid. pg. 31) JAMS conducts mediation without disclosing to the

parties that it has hired or is in discussions to hire their trial judge.

671.  Plaintiffs are informed and believe, and thereon allege, that the non-disclosure in Plaintiffs' case, whereby JAMS and Judge Stock did not disclose to Plaintiffs that JAMS was in the process of hiring Plaintiffs' trial judge Hon. Nancy Wieben Stock (Ret.), was conspiracy to obstruct justice, within the meaning of Penal Code §182(a)(5) and that it effectuated honest services fraud under 18 U.S.C. § 1346.

672.  Plaintiffs' allege on information and belief that JAMS also obstructs justice by unethically advocating that Orange County justices not recuse in cases and for parties where the party has sued JAMS.

673.  Orange County founded and based JAMS wants and advocates for cases in which it is a party or has an interest to be decided by Orange County judges and justices.  JAMS knows and plans that the Orange County judges and justices will recognize that granting the JAMS request to not recuse will inure to the probability of the cooperating judge or justice getting a JAMS sinecure post-bench retirement.

674.  As part of the Enterprise, Justices O'Leary and Bedsworth, conflicted because of JAMS and Justice Trotter ties that mandated their recusal, instead stayed on the Plaintiffs' appeals where they always ruled for PBPA and against Plaintiffs. They did so, Plaintiffs are informed and believe, to improve their opportunities for a JAMS job.

675.  JAMS influenced or bribed or unlawfully directed Plaintiffs' trial judges Stock and Andler to rule against or not act for the benefit of Plaintiffs, in violation of Penal Code §182(a)(2), (5) and 18 U.S.C. §1346 and other laws as described and alleged herein.

676.  On information and belief, JAMS violated 18 U.S.C. §§ 1962(c) and (d) by actively participating and conspiring in the Enterprise scheme to extort Plaintiffs, bribe and influence their trial judges Stock and Andler and

Moss and their appellate justices O'Leary and Bedsworth, all with the intent to deprive Plaintiffs of their due process rights to impartial judicial officers, for the intended and eventual result of injuring Plaintiffs in their property by causing the loss of their homes to Defendants, for their financial gain as the JAMS favored "repeat business" customers.

### 6.   JUSTICE "JACK" TROTTER (RET.) - JAMS HEAD

677. In November 2015, during what he and JAMS called a "mediation", Justice Trotter stated and promised to malign Plaintiffs by ex parte communication to their trial judge Nancy Wieben Stock if they did not take the HOA promissory note settlement offer he recommended.

678. Plaintiffs are informed and believe, and thereon allege, that Justice Trotter, as agent of the Defendant Park buyers Saunders, Coldren, Mantelli and their affiliates, attempted to extort Plaintiffs to accept a non-cash HOA promissory note settlement.

679. Hon. Nancy Wieben Stock had recommended that Plaintiffs go to JAMS mediation with Justice Trotter as mediator. Plaintiffs are informed and believe that Judge Stock joined or was in discussions to join JAMS at the same time that she directed Plaintiffs to attend the JAMS mediation.

680. Plaintiffs are informed and believe and thereon allege that Justice Trotter, as he had promised and threatened, communicated ex parte with the Plaintiffs original trial judge Hon. Nancy Wieben Stock.

681. Plaintiffs are informed and believe, and thereon allege, that after the mediation, because Justice Trotter told her that Plaintiffs had not accepted the settlement he dictated, Judge Stock agreed to rule against Plaintiffs in expectation that helping Justice Trotter retaliate as he requested would enhance her prospects at JAMS.

682. Plaintiffs are informed and believe that such *quid pro quo* – Judge Stock ruling against Plaintiffs to secure JAMS job, was attempted

1  extortion and bribery, honest services fraud, and violation and conspiracy
2  to commit crime and obstruct justice.  Penal Code §92; 18 U.S.C. §1346;
3  Penal Code §182(a)(2), (5)

4  683.  Plaintiffs are informed and believe, and thereon allege, that
5  Justice Trotter acted or communicated to influence and direct that Justices
6  O'Leary and Bedsworth and other Orange County appellate court judges
7  and justices not recuse on Plaintiffs' appeals in order that they sit on the
8  appeals where they could, as JAMS and Justice Trotter desired, rule against
9  Plaintiffs by engaging in the willful judicial misconduct of intentional
10  disregard of the law.

11  684.  On information and belief, Justice Trotter (Ret.) violated 18
12  U.S.C. §§1962(c) and (d) by actively participating and conspiring in the
13  Enterprise scheme to influence, bribe and direct judicial officers to act or
14  not act to the detriment of Plaintiffs, with the specific intended and eventual
15  result of injuring Plaintiffs by causing loss of their homes and property to
16  Defendants, who were JAMS favored "repeat" business customers.

17  **7.  NANCY WIEBEN STOCK (RET.) JAMS "NEUTRAL"**

18  685.  Hon. Nancy Wieben Stock (Ret.) was Plaintiffs' original trial
19  judge in the main case *Chodosh v. PBPA*.  As described and alleged,
20  Plaintiffs are informed and believe that, in or about December 2013, holding
21  out for the *quid pro quo* its lucrative post bench job offer, JAMS bribed or
22  influenced Judge Stock to reverse decision favoring Plaintiffs for her final
23  time on the bench in December 2013 before joining JAMS in January 2014.

24  686.  In October 2013, Judge Stock recommended that Plaintiffs go to
25  JAMS mediation.  Plaintiffs are informed and believe that Judge Stock had
26  joined or was in discussions to join JAMS at that time.  She did not disclose
27  it.  Plaintiffs allege that post-mediation Justice Trotter told her that
28  Plaintiffs had not accepted the settlement he dictated and that he wanted

Plaintiffs punished for rebuking him and JAMS.

687.  Plaintiffs contend that Judge Stock ruled against Plaintiffs in expectation that it would enhance her prospects with JAMS and Justice Trotter.  Plaintiffs are informed and believe that such *quid pro quo* – Judge Stock ruling against Plaintiffs to secure JAMS job, was bribery and other violations, including Penal Code §93, §182(a)(5); 18 U.S.C. §1346, et al.

688.  On information and belief, Judge Stock (Ret.) violated 18 U.S.C. §§ 1962(c) and (d) by actively participating and conspiring in the Enterprise scheme to obstruct justice, which had the intended and eventual result of injuring Plaintiffs by causing loss of their homes and property to Defendants, who were JAMS favored "repeat" business customers.

### 8.   JUDGE GAIL ANDLER (RET.) JAMS "NEUTRAL"

689.  On Nov. 30, 2015, Judge Margines granted Plaintiffs' §170.6 challenge disqualifying Judge Moss and appointing Judge Andler to replace him in *Haugen v. PBPA*.  (Exhibit B) On December 22, 2015, Judge Andler did not appear in court for the TRO.  Instead, Judge Moss stepped in and took the case to thwart the TRO and purport to "self-re-qualify."

690.  The TRO hearing was noticed and scheduled before Judge Andler, but she was not in court.  Her clerk told the parties to go to Judge Moss' courtroom.  There disqualified Judge Moss' made his perfectly timed call in from vacation to first order TRO postponement, then to "self-re-qualify."  Judge Moss purported to remove and replace Judge Andler.

691.  Although Judge Moss unlawfully ousted her from *Haugen v. PBPA* and acted in the case despite his disqualification, Plaintiffs are informed and believe, and thereon allege, that Judge Andler did nothing about such Judge Moss' willful judicial misconduct.

692.  On the fact of Judge Moss' wrongdoing, Judge Andler was obligated to report Judge Moss to the Presiding Judge, the CJP and

prosecuting authorities under Code of Judicial Ethics Canon 3D(1) and other authority (*Handbook*, supra., pg. 335-6, §568).  A judge that knows or has evidence of another judge's willful misconduct or crime committed from the bench must report it to CJP and prosecuting authorities.

693.  Plaintiffs are informed and believe, and thereon allege, that Judge Andler deliberately did not report Judge Moss as a way to enhance her prospect of joining JAMS, which she did a year later, in January 2017.

694.  Plaintiffs are informed and believe, and thereon allege, that JAMS bribed or obstructed justice to cause Judge Andler to not discharge her duty to report Judge Moss, and that she complied with JAMS' request, thereby violating some or all of Penal Code §92, §93, 18 U.S.C. §1346, 18 U.S.C. §1951 and Penal Code §182(a)(2), (5).

695.  On information and belief, Judge Andler (Ret.) violated 18 U.S.C. §§ 1962(c) and (d) by actively participating and conspiring in the Enterprise scheme to allow and protect Judge Moss' willful judicial misconduct and to obstruct justice, which had the intended and eventual result of injuring Plaintiffs by causing loss of their homes and property to Defendants, who were JAMS favored "repeat" business customers.

## 9.    COMMISSION ON JUDICIAL PERFORMANCE

696.  The California Commission on Judicial Performance ("CJP") took no action on Plaintiffs' complaint (4/25/16; Exhibit G) and its proof of Judge Moss' willful judicial misconduct and crime by "calling in" from vacation to "fix" the sale and "self-re-qualify.

697.  More than four (4) years after Plaintiffs filed their complaint against Judge Moss, by letter dated May 14, 2020, CJP informed Plaintiffs that it would not take action on the complaint. (Exhibit G)

698.  By itself the fact CJP took four (4) years to respond to a complaint demonstrates that CJP does not timely carry out its function to

discipline judges.  The inexcusable delay proves that CJP does not discharge its primary function to protect the public from judicial corruption.

699.  In 2016 and 2018, Plaintiffs sued the CJP after it failed and refused to discipline Judge Moss for his willful judicial misconduct and obvious judge crime. *Eicherly v. CJP*, (2016) and *Padilla, Chodosh v. CJP and AG* (2018) The AG represented CJP and itself.  Aligned and together, CJP and AG falsely asserted Judge Moss' misconduct was proper.

700.  CJP and AG Becerra acknowledged Judge Moss "assigning the case back to himself." But a disqualified judge cannot "assign back to himself."  Going against the law, CJP and AG Becerra characterized Judge Moss' willful judicial misconduct as "exercise of judicial discretion" and vilified Plaintiffs' seeking to take Judge Moss' deposition as an "abusive litigation tactic." (*Padilla and Chodosh v. CJP and AG*, Demurrer, 12/20/18, pg. 10 and fn. 2, Exhibit G)

701.  The demurrer, a CJP and AG court pleading, demonstrates the pattern and practice to neither investigate nor refer for prosecution evidence of probable judge crime.  CJP and AG had the Judge Moss' crime evidence, did nothing about it, and falsely declared Judge Moss' acts were proper.

702.  CJP is "the governmental entity charged with the protection of the public from judicial corruption." *Adams v. CJP* (1994) 8 Cal.4th 630, 665.  CJP must report evidence of judge crime to prosecuting authorities, but it deliberately does not do so.

703.  CJP has the duty to ascertain and confirm evidence of probable judge crime. But when it finds it, CJP contends it has no obligation to refer the evidence to prosecuting authorities, such that it can secret and conceal the evidence and not send it to prosecutors for their investigation.

704.  CJP asserts it can, and it does, conceal, suppress, and withhold judge crime evidence it receives from the public.  Research and CJP annual

reports show that CJP has never referred evidence of judge crime to the AG or any District Attorney or other prosecuting authority.  CJP gives a pass to crime committing judges.

705.  As shown by CJP doing nothing on the Judge Moss complaint, CJP actively conceals and fails to act on evidence of judge crime, does not refer it for prosecution, and claims that it has discretion to ignore and sequester evidence of judge crime the public has reported, with result that CJP allows judge crime to go unpunished, which in turn incentivizes more judge crime, because it is the perfect crime – it will never come to light.

706.  CJP proclaims to the public that it has referred judge crime for prosecution "on multiple occasions," (CJP Rule Report, 8/29/17, re: Rule 102(g), pg. 15; Exhibit T) The CJP statement is false.

707.  CJP says its statement of judge crime referral "on multiple occasions" is true, but asserts its privilege of "absolute secrecy" means it can refuse disclosure of statistical information in CJP records that, if it existed, would prove the truth of the statement. CJP declares it has the power to keep confidential such purely statistical information (e.g. no. of judges referred for prosecution per year, etc.) which would prove or disprove its claim of referral on "multiple occasions."  (Exhibit T)

708.  Plaintiffs are informed and believe, and thereon allege, that CJP refuses to provide or allow access to such statistics because the data would prove that CJP has never referred a judge for criminal prosecution, and that CJP routinely and consistently conceals and suppresses evidence of judge crime it receives from the public.  CJP knows the data, once compiled and produced, would show that, after CJP staff attorneys forward judge crime evidence to the commissioners, under CJP Policy Declaration 4.2, the commissioners do not act on it or always vote to not make criminal referral.

709.  On the complaint against Judge Moss, CJP staff requested the

relevant incriminating documents, indicating the staff recognized the serious judge crime shown. (Exhibit G, letter 6/15/16) Complainant Eicherly submitted the documents, but it made no difference.  The commission allows and enables judge crime.  Judge Moss' crime is a proven example.

710.  On information and belief, CJP violated 18 U.S.C. §1962(d) by conspiring in the Enterprise scheme to fraudulently allow, not investigate or refer, and to conceal judge crime and bribery, and to obstruct justice, which had the intended result of injuring Plaintiffs by causing loss of their homes and property.

### 10.   CJP CHIEF DIRECTOR G. DRESSER

711.  At all times after January 2017 that Defendant CJP violated 18 U.S.C. §1962 (d) as described and alleged herein, it was under the direction of non-defendant co-conspirator Gregory Dresser.

712.  Plaintiffs are informed and believe, and thereon allege, that CJP, under control and direction of Director Dresser, allowed and concealed Judge Moss' misconduct and crime.

713.  On information and belief, as CJP Director and Chief, Dresser violated 18 U.S.C. §§ 1962(d) by conspiring in the Enterprise scheme to protect and allow and enable and conceal Judge Moss' wrongdoing, bribery and obstruction of justice, which had the intended and eventual result of injuring Plaintiffs by causing loss of their homes and property.

### 11.   CJP FORMER DIRECTOR V. HENLEY

714.  Victoria Henley was Director and Chief Counsel in charge of CJP in April 2016 when Plaintiffs submitted their complaint about disqualified Judge Moss "call in" from vacation to fix the Park sale.  When Henley retired at end of 2017, CJP had issued no decision, report, or statement, other than to say the Judge Moss judge crime "was under consideration."  Three (3) years later, Plaintiffs received the CJP 5/14/20 letter stating CJP "found no

basis for action against judge [Moss]."  (Exhibit G)

715.  Plaintiffs are informed and believe that Henley administered the CJP in a manner designed and intended to ensure that judges that committed crimes were not identified, acted upon, investigated, or disciplined.  Plaintiffs are informed and believe, and thereon allege, that while she headed CJP, Henley deliberately ignored and did not take action on complaints CJP received about facts and evidence indicating judge crime.

716.  As to Judge Moss specifically, Plaintiffs are informed and believe and thereon allege that Henley, conspiring with the AG, acted to suppress and conceal Judge Moss' crime to allow him, as the Enterprise judge participant, to get away with his judge crime.

717.  Plaintiffs are informed and believe, and thereon allege, that CJP staff attorneys recognized the sequential court documents (Exhibit B) proved Judge Moss' willful judicial misconduct and crime, and that staff forwarded the documents to Henley and the commissioners with statement that the evidence indicated Judge Moss had committed crime.

718.  Plaintiffs are informed and believe that Henley did not urge or cause the commission to review Judge Moss' crime identified by CJP staff attorneys, as CJP practice is <u>not</u> to ascertain and refer judge crime, but to ignore and conceal it, as described and alleged herein.

719. For the Enterprise, Henley made sure that CJP did not investigate or discipline a judge that participated and conspired in the Enterprise, and that any evidence of the judge's criminal wrongdoing would not be referred to prosecuting authorities.  Rather, CJP would shelve it.

720.  On information and belief, former CJP Chief Director Henley violated 18 U.S.C. § 1962(d) by actively conspiring in the Enterprise scheme to protect and allow and enable and conceal Judge Moss' willful judicial misconduct and judge crime, which had the intended and eventual result of

injuring Plaintiffs by causing loss of their homes.

## 12.   ATTORNEY GENERAL ("AG") XAVIER BECERRA

721.  Non-defendant co-conspirator California Attorney General Xavier Becerra ("AG Becerra"), in charge of the Office of the Attorney General in the California Dept. of Justice since 2017, Plaintiffs are informed and believe and allege, administers the office in a manner designed and intended to ensure that judges that commit crimes from the bench are not identified, acted upon, investigated, or prosecuted.  AG Becerra gives a pass to crime-committing judges.

722.  In the case of Judge Moss, AG Becerra did nothing about the disqualified judge "call in" crime, asserting his office "lacked resources" to inquire into it.  (Exhibit H) He refused to investigate judge crime against seniors and veterans that caused loss of their homes and millions of dollars in real estate equity and HOA cash, and made some of them homeless.

723.  Plaintiffs are informed and believe, and thereon allege, that AG Becerra intentionally does not investigate or prosecute judge crime, but that he purposefully allows judges to commit crime, and in exchange CJP helped him to get elected in November 2018 by an unprecedented and unwarranted public *CJP Notice of Formal Proceedings* issued to his Republican rival, former El Dorado County Superior Court Judge Steven Bailey (Ret.).

724.  Plaintiffs are informed and believe, and thereon allege, that the CJP, by proceedings in 2017 that found Judge Bailey engaged in improper action and prejudicial conduct, untimely and unfairly discredited the 2018 Republican party attorney general candidate Judge Bailey (Ret.) in order to give advantage to Democratic candidate AG Becerra.

725. For AG Becerra, CJP agreed to commence its disciplinary proceedings against retired Judge Bailey during the 2018 election, transgressing and offending rule, practice and protocol that candidates

should not be made to face charges for lesser offenses during an election.

726.  Judge Bailey was the first time CJP pursued an already retired judge for lesser misconduct of "improper action" and "prejudicial conduct." On its prior precedent cases, CJP went after already retired judges only for "willful judicial misconduct," the highest and worst level of judge wrongdoing.   (Compare, *Inquiry re Former Judge Bailey, No. 202,* (2/27/2019) to *Inquiry re Former Judge Sullivan, No. 163* (5/17/2002); *Inquiry re Former Judge Simpson, No. 168* (12/9/2002); CJP Website)

727.  Plaintiffs are informed and believe that the CJP – AG Becerra *quid pro quo* was AG Becerra's pledge of no judge crime investigation or prosecution in exchange for CJP support with election by undermining the opponent with an untimely and unwarranted CJP disciplinary action.

728.  Public records and information search show that neither Becerra nor his predecessor, non-defendant co-conspirator Harris, ever investigated or prosecuted judge crime.  By comparison and contrast, attorneys general in New York, Texas, Alabama, and other states have and do prosecute crime committing judges.

729.  California District Attorneys convicted two (2) judges, Judges Danser and Boags, *Inquiry Concerning Judge William R. Danser, No. 172* (6/2/05; CJP website); See also, *Danser v. California Public Employees' Retirement System* (2015) 240 Cal.App.4th 885); *In re Charles D. Boags*, (1990; CJP website) Federal authorities, United States attorneys, convicted Judges G. Dennis Adams (See, *Adams v. CJP* (1994) 8 Cal.4th 630, 665), along with former judges James Malkus, and Michael Greer. See, *U.S. v. Frega*, 179 F.3d 793 (9th Cir. 1999); see, Exhibit T.)

730.  AG Becerra does not and has not prosecuted judge crime. Former California attorney general Harris did not prosecute judges.  Both attorney generals Xavier Becerra and Kamala Harris, allowed and enabled

judge crime and its concealment, as described and alleged in this Complaint.

731.  Plaintiffs are informed and believe, and thereon allege, that in California the CJP and AG Becerra, and before him AG Harris, conspired together, as part of and ancillary to the Enterprise, to not investigate or prosecute judge crime, thereby facilitating and enabling the judge crime of Judge Moss and other judicial officers that participate in the Enterprise.

732.  Plaintiffs are informed and believe, and thereon allege, that California, the most populous state with around 40 million people, has in non-defendant co-conspirator AG Becerra, an attorney general that, conspiring with the CJP, follows a pact and policy of permitting judge crime, and that before AG Becerra, former attorney general Harris engaged in the same practice and conspiracy with CJP.  They both promoted a policy that did not investigate or prosecute, but permitted and hid, judge crime.

733.  On information and belief, AG Becerra violated 18 U.S.C. §§ 1962(d) by conspiring in the Enterprise scheme to protect and conceal Judge Moss' willful judicial misconduct, bribery and obstruction of justice, which had the intended result of injuring Plaintiffs by causing loss of their homes.

### 13.   FORMER ATTORNEY GENERAL SENATOR KAMALA HARRIS

734.  Former California Attorney General Senator Kamala Harris was in charge of the Office of the Attorney General in the California Dept. of Justice 2011 – 2017.

735.  Plaintiffs are informed and believe and allege, that Senator Harris administered the office the same as her successor AG Becerra, which was in a manner designed and intended to ensure that judges that committed crimes from the bench were not identified, acted upon, investigated, or prosecuted.  She did not establish any procedure or protocol to detect judge crime.  She told the public to send judge crime evidence to

the CJP.  While she was California attorney general, Senator Harris gave a pass to crime-committing judges.

736.  Disqualified Judge Moss' "call-in" to save the Park sale occurred during Harris' watch.  His judge crime was reported to CJP April 2016 and to the AG December 2016.   Former AG Harris did nothing about it.

737.  Plaintiffs are informed and believe, and thereon allege, that non-defendant co-conspirator former attorney general Harris, like AG Becerra after her, intentionally did not investigate or prosecute judge crime, that she purposefully allowed judges to commit crime.

738.  Public records and information search show that Harris, during the five (5) plus years she was California attorney general, never prosecuted judge crime.

739. As one example, in 2014, then attorney general Harris was presented with attorney letter and presentation of clear evidence of a judge and court clerk falsifying and backdating court records to deny a single mother child custody and visitation.   The attorney had gathered and prepared detailed information that proved or showed high probability of judge crime.  Rather than investigate the highly probable judge crime, Harris told the attorney to send the complaint to CJP.  (Exhibit U)

740.  Plaintiffs contend that Harris, when she was California attorney general, did not fulfill her duty as attorney general to adequately and uniformly enforce the law.   She omitted entirely the investigation of evidence of judge crime, and evaded the duty by telling the public to send judge crime evidence to CJP (Exhibit U) where she knew CJP would not refer the evidence to law enforcement but would bury it.

741. Plaintiffs are informed and believe that the CJP – former attorney general Harris *quid pro quo* was her pledge of no judge criminal investigation or prosecution in exchange for CJP and judiciary and bar

support for her election to higher office.

742.  On information and belief, non-defendant co-conspirator former California attorney general Senator Kamala Harris violated 18 U.S.C. §§ 1962(d) by conspiring in the Enterprise scheme to allow, protect and conceal judge crime, which contributed to the injury to Plaintiffs' property by loss of their homes, in that her wrongdoing emboldened Judge Moss and racketeering judges to commit crimes from the bench for the Enterprise.

## XVII. THE RICO ENTERPRISE

743.  The Enterprise is an Association in fact within the meaning of 18 U.S.C. §1961(4), consisting of three (3) layers or levels with participants and actors that communicate and interact horizontally within their own layer or level and vertically with racketeering participants in the other Enterprise levels or layers.

744.  JAMS is the main non-defendant actor and co-conspirator for the Enterprise base.  JAMS itself is distinct from the Enterprise, which to function must include actor participants outside JAMS.  At first base with JAMS are the dishonest judges and justices and agency officials that for personal pecuniary motive of a JAMS job or other personal gain rule and act as JAMS dictates or desires.

745.  The Orange County courts are utilized in the Enterprise, but the courts are not, in and of themselves, at this time, actors in the Enterprise.

746.  At the second level are the attorneys that engage in ex parte communication with JAMS and the corrupt judicial officers.

747.  At the third level are the JAMS' customers and attorneys' clients that will ultimately and directly financially benefit from the Enterprise.

### A.    Enterprise Base Layer – JAMS, Judges, CJP and AG

748. At base level JAMS, Justice Trotter (Ret.), and Plaintiffs are informed and believe and allege, other JAMS "neutrals" executives, are

actor participants in the Enterprise, interfacing with the sitting judges and justices that are also Enterprise actor participants.

749. The intersecting organizations at the first level are the California courts, both the Orange County Superior Court and the Orange County based Court of Appeal, and JAMS. The courts and JAMS are involved with the Enterprise, but alone or together do not comprise it.

750. Heading up the base JAMS Enterprise is or was Justice Trotter (Ret.) or his delegate or another JAMS functionary. Plaintiffs are informed and believe, and thereon allege, that in this case, JAMS exercised and extended influence over the judicial officer non-Defendant co-conspirators, Judges Moss, Stock, Andler, and Margines and Justices O'Leary and Bedsworth.

751. The base Enterprise includes the non-defendant co-conspirators the judge oversight agency CJP, its current Chief Counsel and Director Gregory Dresser and prior Chief and Director Victoria Henley, and the Attorney General ("AG") Xavier Becerra and former attorney general and non-defendant co-conspirator Senator Kamala Harris.

752. In accordance with their pact and conspiracy, described and alleged herein, they act and conspire to allow and enable judge crime, as proven by CJP and AG permitting the Judge Moss' "fix" and "self-re-qualification."

753. At the first layer and level, the judge and justice participants, as judicial officers, and CJP, part of the judiciary with judge and justice members, coordinate and conspire to ensure that all and each of them disregard, defy, and denigrate their duty to report judge crime to prosecuting authorities, as required by Canon 3D(1), (See, e.g., *CJC Memo.*, 11/10/06, pg. 4 (Exhibit Q) and *Handbook*, 4th Ed. 2017, pg. 335-6, §5:68; 2nd Ed. §5.65, p. 153)

754. This first level coordinated action to disrupt and prevent lawfully required reporting or referring of judge crime is a pattern and practice essential to Enterprise success. No one can report judge crime.

755. Plaintiffs are informed and believe, and thereon allege, that the Enterprise relies upon the assurance of CJP and AG Becerra (and before Becerra former attorney general Harris) that no judge or justice will be investigated, disciplined or prosecuted for the crimes undertaken for the Enterprise. This assurance is essential to the first and base level.

756. CJP and AG deliver, as with Judge Moss, security that no wrongdoer judicial officer will be questioned, investigated, disciplined, charged or prosecuted for Enterprise misconduct and crime.

**B.    Enterprise Second Level – The Attorneys**

757. At the second Enterprise level, Plaintiffs allege on information and belief, are Defendants Susolik, Thomas, Wood and Salisbury. An attorney like Susolik, that personally knows the JAMS' neutral and the trial judge, in this case Justice Trotter and Judge Moss respectively, and whose firm publicizes (Exhibit W) its capability to procure after-hours, outside of court, communication with judges, is a prototypical pre-qualified and proven skilled second level actor and participant for the Enterprise.

758. At the second layer, as described and alleged herein, Plaintiffs are informed and believe that Susolik was instrumental to make or arrange the vacationing Judge Moss "fix" of the Park sale by the "call in" right on time. (Exhibit B) Thomas and Wood covered up the "fix." Wood sequestered and withheld Judge Moss' falsified court documents. (Exhibits C, I)

**C.    Enterprise Third Level – the Client Beneficiaries**

759. At the third level are the Park-Buyer Defendants, reapers of the multi-million-dollar illicit racketeered real estate gain, the Park Buyer Defendants Saunders, Coldren, the LLCs, PCP and the HOA Defendants

Mantelli, Fiori and other PBPA Directors.  They receive the assistance and participation of attorney Defendants Wood, Thomas, and Salisbury who they compensate with funds embezzled from the HOA seniors.

760.  Mantelli, Saunders and Coldren, with help from Attorneys Wood, Thomas and Salisbury, make decisions for the third level.

761.  The third level attorney and ADR clients pay attorneys' and "private" judge fees which drive the Enterprise actors financially, and in turn provide funds to bribe and corrupt judicial officers and make political donations to agency racketeers AG Becerra and AG Harris.

### D.    Enterprise Function, Horizontal and Vertical Communication

762.  Plaintiffs are informed and believe, and thereon allege that JAMS, through Justice Trotter, within the first layer, communicated with Judge Stock (Ret.), Judge Andler (Ret.), whom joined JAMS, and with Judge Moss and Justices O'Leary and Bedsworth.

763.  At the second level, Saunders and Coldren and Mantelli shared control, with Saunders and Coldren to direct second-level operative Susolik, who communicated or coordinated with Judge Moss and Justice Trotter. Attorneys Susolik and Wood contributed as attorneys whose firms and clients command JAMS "repeat business" favored status.

764.  At the third level, Plaintiffs are informed and believe, and thereon allege, Saunders and Coldren were in control, with Mantelli at the head of the HOA fiduciary breaches and wrongdoing, while Saunders and Coldren directed the Park Buyer Defendants' offenses.  Saunders and Coldren directed Susolik.  He in turn communicated with the judges at the first level.  Mantelli directed Wood and Thomas.

765.  Within the Enterprise, participants communicate horizontally within their own level.  JAMS and Trotter communicated with judges Stock,

Andler, and others.  There was communication or unspoken or tacit agreements among JAMS, the judges, and the CJP and AG.

766.  At the second level, communicating with the Defendants and each other, attorneys Susolik, Wood, Thomas, Salisbury carry out the Enterprise.

767.  At the third level Saunders, Coldren and Mantelli coordinate fiduciary fraud and obstruction of justice for the theft of HOA real estate and cash.  They carry out the Enterprise principal goal of stealing millions in real estate equity from vulnerable seniors.

768.  There was and is communication between the layers and levels, with first level participants JAMS, Justice Trotter and Judge Moss having contact or probable communication with Susolik and other attorneys at the second level.  In turn, these second level attorney participants communicate with the third level client and beneficiary decision-maker participants Saunders and Coldren and Mantelli.

769.  The goal, purpose and function of each level and of each participant within each level is a routine and known constant, which obviates need for extensive contact, facilitates avoidance of incriminating written correspondence and records, and allows Enterprise operation with minimal, mostly verbal, inferred and non-explicit communication.

770.  The Enterprise is and was always distinct from JAMS or the Orange County courts or PBPA or the Attorney Defendants' law firms or PMP.  The Enterprise functions as an associated in fact group of individual and company and institutional or agency participants and players with defined roles and contributions, as described and alleged in this Complaint.

771.  Plaintiffs are informed and believe, and thereon allege, that the Enterprise is ongoing with regard to the other Park seniors. It serves to deter and oppress them from taking any legal action against the fiduciary

fraud and self-dealing that has befallen them.  The Park seniors see and fear that the Orange County judges and justices, like with Plaintiffs, would rule for Saunders and Coldren and Mantelli, disregarding the law to uphold fiduciary misconduct and self-dealing criminal wrongdoing.

772.  Plaintiffs are informed and believe, and thereon allege, that the Enterprise, with the same three levels, some of the same actors and participants or other actors in Orange and other California counties in other cases, is ongoing and operating to secure for JAMS' "repeat business" customers, and their attorneys, by corrupt means, the financial and other goals in litigation they seek and which JAMS and others in the Enterprise strive to deliver by attempted extortion of litigants, bribery of judges, obstruction of justice, honest services fraud, and such wrongdoing, all as this Complaint describes, details, and alleges.

**E.   Enterprise Commencement, Duration and Continuation**

773.  Plaintiffs are informed and believe, and thereon allege, that the Enterprise operation to take the Park and the seniors' homes and their HOA cash and to undermine and injure Plaintiffs in their property started in or about early 2013.

774.  Mantelli was elected Board President January 2013.   The Park side Enterprise at the third level began in 2013 when Mantelli and the Park Buyer Defendants Susolik, Coldren and their affiliates began their scheme to defraud the Park seniors.

775.  JAMS first appeared for Justice Trotter's attempted extortion in November 2013.  Plaintiffs are informed and believe, and thereon allege, that JAMS, Trotter, Mantelli and her co-Defendants communicated and coordinated the Enterprise, all three levels, starting sometime in 2013 and continuing through 2019 and to the present.

776.  Plaintiffs are informed and believe, and thereon allege, that the

JAMS based Enterprise existed before it snared Plaintiffs in 2013, and that it is ongoing and continuing and operating to benefit JAMS preferred clientele.

777. As to PBPA and the Park, the Enterprise continues both to thwart Plaintiffs' remaining foothold in the state court litigation, and to deter and oppress other Park seniors from believing they would have any chance in Orange County courts to prevail, as they should under law and fact, against the Enterprise, Saunders, Coldren, Mantelli and their attorneys.

## XVIII.    CLAIMS FOR RELIEF

### A.    COUNT ONE: VIOLATION OF 18 U.S.C. §1962(c)
### (Plaintiffs against all Defendants)

778. Plaintiffs incorporate by reference all preceding paragraphs.

779. Defendants and the non-defendant co-conspirators and each of them are "persons" within the meaning of 18 U.S.C. §1961(3) and §1964(c).

780. The non-defendant co-conspirators that engaged in the Enterprise racketeering activities in violation of 18 U.S.C. §1962(c) with Defendants were JAMS, Justice Trotter, Judge Wieben Stock (Ret.) Judge Moss, Judge Margines, and Judge Andler (Ret.).

781. At all times, the Defendants and non-defendant co-conspirators formed an association in fact for the purpose of the unlawful taking of real estate equity and cash from Plaintiffs and other seniors, injuring them in their property, by fiduciary fraud and self-dealing and related racketeering activity in and through the Enterprise, principally using denial and defrauding of honest judicial services, as described and alleged herein.

782. The Association in Fact Enterprise includes JAMS, but is distinct from JAMS, as the Enterprise exists as a structured association of actors and conspirators as described and alleged in this Complaint.

Similarly, the Enterprise involves the Orange County courts, CJP, and private companies the LLCS, PMP, and others, none of which, by itself, constitutes the Enterprise, which is an association in fact of all of them and the Defendants and non-defendant co-conspirators.

783. At all relevant times, as described and alleged herein, the Enterprise was engaged in, and its activities affected interstate commerce, within the meaning of 18 U.S.C. §1962(c).

784. At all relevant times, the Defendants and non-defendant co-conspirators conducted the affairs of the Enterprise described and alleged herein through a pattern of racketeering activity in violation of 18 U.S.C. §1962(c) as described and alleged in this Complaint.

785. At all relevant times, Defendants and the indicated non-defendant co-conspirators engaged in "racketeering activity" within the meaning of 18 U.S.C. §1961(1) by undertaking and doing the activity described and alleged in this Complaint, which acts were and involved various repeated violations that were predicate crimes, both federal and state, specified by 18 U.S.C. §1961(1), the federal crimes described and alleged herein, including mail and wire fraud, honest services fraud, Hobbs Act bribery extortion, and document falsification (18 U.S.C. §1341, §1343, §1346, §1951, §1512(c)) and the state law predicate crimes described and alleged herein, including attempted extortion and extortion, bribery, perjury, embezzlement, document falsification, grand theft and conspiracy to commit crime and obstruct justice (Calif. Penal Code §518, §524, §92, §93, §118, §118a, §503, §132, §133 §134, §487 and §182(a)(1), (5); Govt. Code §6200).

786. Plaintiffs are informed and believe, and thereon allege, that each and every Defendant, and indicated non-defendant co-conspirator, within the time frame 2013 – 2019, committed and conspired in the commission of

at least two (2), but for most more, violations of the above and herein described predicate crimes, as stated and alleged in this Complaint.

787. The crimes and acts of racketeering activity, summarized herein and described and alleged in detail in this Complaint, constituted a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).

788. The acts described and alleged were related to each other by virtue of common participants, a common victim (the Plaintiffs and Park seniors) a common method of commission against litigants similarly situated as Plaintiffs, and the common primary purpose and common result, like that in this case, of defrauding and converting and taking from the victims, here the Plaintiffs and Park seniors, their property, in this case millions in real estate equity and cash.

789. The common feature and mechanism of the scheme is to injure the victims in their property, by making the victims, here the Plaintiffs, always lose in court through a pattern of bribed and dishonest judicial officers enlisted and compensated by the Enterprise.

790. As described and alleged in this Complaint, the Enterprise, through Defendants and non-defendant co-conspirators, engaged in racketeering activity against Plaintiffs commencing 2013 and continuing to the present.

791. Plaintiffs sustained injury to their property from the Enterprise in December 2018 and January 2019 when the Enterprise actor judicial officers (Opinion, J. Bedsworth, Op. 12/17/18) purposefully wrongfully adjudicated Plaintiffs were not entitled to their homes unlawfully taken by HOA PBPA or compensation therefor, thereby taking their homes and value thereof, by the carrying out of the Enterprise objective as described and alleged in this Complaint.

792. JAMS and Justice Trotter (Ret.), along with other JAMS officials

not yet identified, Plaintiffs are informed and believe and thereon allege, exerted ongoing and continuous control over the base, first level and layer of the Enterprise, and participated in the operation or management of the base level affairs of the Enterprise, including, but not limited to, the following racketeering actions and predicate crime violations, as described and alleged in this Complaint, summarized and set forth below in approximate chronological order:

a.    Issuing false, deceptive, and misleading information disseminated to the Plaintiffs and public by mail and electronic means that JAMS is ethical, honest, accountable and has integrity, which was not true, as JAMS states and admits, among other unethical practices, that its mediation tactics include promise and threat to communicate ex parte with the mediating parties' trial judge so as to "pressure" one side to settle.

b.    Acting as agent for Defendants Saunders, Coldren and Mantelli to attempt to extort Plaintiffs to settle their case for an HOA promissory note, and if Plaintiffs refused, to engage in unlawful ex parte communication with their trial judge Stock to malign them in her eyes and thereby to undermine Plaintiffs' rights to a fair and impartial judge in the Orange County courts, and assure defeat of Plaintiffs in the Orange County courts by use of the Enterprise's biased judges, which extorted injury, damage and loss did ultimately occur in December 2018 and January 2019 when the JAMS corrupted justices decreed loss of Plaintiffs' homes with no compensation therefor, as described and alleged herein.

c.    To bribe Judge Stock by holding out a JAMS job for *quid pro quo* of reversing her decisions to go against Plaintiffs, as her last judicial acts in the case before joining JAMS, which actions she took and which bribe Plaintiffs are informed and believe and allege she received, the bribe being the assurance of a JAMS job.

d.  To either bribe or influence trial judge Gail Andler by holding out a JAMS job for *quid pro quo* of her abandoning the Park sale case *Haugen v. PBPA* and not discharging her duty to report disqualified Judge Moss' strategic "call in" as willful judicial misconduct and crime to CJP and prosecuting authorities all in order to allow Judge Moss to thwart the TRO and unlawfully "self-re-qualify" and thereby fix the fiduciary fraudulent Park sale for the benefit of JAMS "repeat business" customers Saunders, Coldren, Susolik and Wood.

e.  Exerting influence over the Orange County justices by advocating that they not recuse in Plaintiffs' appeals, including where Plaintiffs had sued JAMS and Justice Trotter.

793. At the Enterprise first level, non-defendant co-conspirator judges and justices rendered base level acts for the Enterprise which were predicate crimes, as described and alleged herein, including, but not limited to, the following actions and predicate crimes as described and alleged herein, on information and belief, summarized and set forth below in approximate chronological order:

a.    Judge Stock (Ret.) accepting bribe to reverse her rulings against Plaintiffs in *Chodosh v. PBPA* in the

time frame December 2013, for the *quid pro quo* of assurance she would be offered a lucrative JAMS job, which position she did secure in or about January 2014.

b.  Judge Moss accepting bribes and being influenced for pecuniary gain, including a future JAMS job, to engage in willful judicial misconduct of intentional disregard of the law to rule against Plaintiffs and deny them impartial judicial decisions.

c.  Judge Moss accepting bribe to call in from vacation on a case not in his court, on which he was disqualified, to "fix" the case to thwart a TRO that would stop the fiduciary fraudulent Park sale.

d.  Judge Andler (Ret.) not reporting or referring Judge Moss' unlawful "re-qualification" on and taking of the Park sale case from her to both the CJP and prosecuting authorities as required by Canon 3D(1) and other legal authority.

e.   Then Presiding Judge Margines not reporting or referring Judge Moss' unlawful "re-qualification" on and taking of the Park sale case from Judge Andler to both the CJP and prosecuting authorities as required by Canon 3D(1), *CJC Memo. to Presiding Judges* (Exh. Q) and other authority.

f.   Presiding Justice O'Leary and Justice Bedsworth upholding Judge Moss' illegal "fix" of the Park sale.

g.  Justice O'Leary and Justice Bedsworth refusing to recuse where Plaintiffs had sued the first presiding justice of their court who was also the former justice

colleague that could get them a JAMS job like that held by most living retired Orange County justices.

h.   Justice O'Leary and Justice Bedsworth deliberately placing themselves on Plaintiffs' appeal after Plaintiffs had sued them in federal court, and acting and ruling in Plaintiffs' appeal against them.

i.  Justice O'Leary immediate denial, in violation of court rules, of Plaintiffs' motion to take the deposition and obtain the sworn testimony of Judge Moss, as specifically permitted by law.

j.  Justice Bedsworth authoring the opinion in Plaintiffs' appeal of *Chodosh v. PBPA* (G073598, 12/17/18) in which he engaged in willful judicial misconduct and intentional disregard of the law.   Justice Bedsworth ruled that Plaintiffs did not owe HOA PBPA for rent or loans. But he allowed PBPA to keep Plaintiffs' homes even though PBPA had taken the homes by illegal strict foreclosure founded on Plaintiffs' failure to pay the rents and loans which Justice Bedsworth ruled they did not owe.

k.   In effort and tactic to dissuade Plaintiffs' from pursuing their rights and claims, Justice Bedsworth threatened Plaintiffs' counsel with contempt for declaring in pleadings and open court that Judge Moss had "fixed" the case, even though Justice Bedsworth, from the court record, could see that Judge Moss had "fixed." Justice Bedsworth backed down from the threat because he knew Judge Moss testifying at the contempt

hearing would reveal and expose the Enterprise.

l. Justice Bedsworth wrongly denied Plaintiffs' attorneys' fees, and contradicted the government agency having jurisdiction's finding that PBPA unlawfully lacked a securities permit for its conversion to ROP.

794. At the Enterprise second level, Attorney Defendant Susolik and the other Defendant Attorneys participated and furthered the operation and management of the second level affairs of the Enterprise, including but not limited to the following actions and predicate crime violations, as described and alleged on information and belief herein, summarized and set forth below in approximate chronological order:

a. Defendant attorneys Wood and Thomas and Mantelli participating or conspiring in the PBPA use of JAMS and Trotter as agent to attempt extortion of Plaintiffs by telling them to accept the HOA PBPA "promise to pay" settlement or suffer Trotter's undermining of Plaintiffs' rights to impartial judicial officers.

b. Defendant Attorney Susolik or his surrogates conducting or coordinating ex parte communication whereby Judge Moss, disqualified on the *Haugen v. PBPA* Park sale case, and on vacation, was contacted and requested to call in from his vacation, thwart the application for TRO to stop the Park sale, and act to protect and assure that the closing of the lucrative fraudulent and self-dealing real estate sale would close that same day as scheduled.

c. Attorneys Wood, Thomas and Salisbury acting and conspiring to carry out, facilitate, aid and conceal

Defendant Park-Buyers' bribery of Judge Moss to rule against Plaintiffs and in particular to call in from vacation, just in time, to fix the Park sale.

d. Attorney Wood and Thomas acting and conspiring to conceal Defendant park-buyers' bribery of Judge Moss to call in from vacation, just in time, to fix the Park sale, by not raising sale closing at the December 28, 2015 TRO hearing and by Wood's concealment of Judge Moss' falsified TRO opposition pleadings.

e. Attorney Wood acting and conspiring to conceal Judge Moss' falsification of court documents by concealing and refusing to disclose and reveal the TRO opposition pleadings returned to Wood (Exhibits C, I) which Judge Moss had caused to be altered and then filed to cover up his fixing of the Park sale by delay of the TRO and "self-re-qualification."

f. Attorney Wood and Thomas participating or conspiring in the failed effort to have Justice Bedsworth hold Plaintiffs' Counsel in contempt for stating in open court the truth that Judge Moss "fixed" the fiduciary fraudulent Park sale and for statements against the Justices.

795. Mantelli and Saunders and Coldren, at times through and with the assistance of the Attorney Defendants Susolik, Salisbury, Thomas and Wood, operated the third level Enterprise for fraudulent acquisition of the Park, exerted ongoing and continuous control over the Enterprise, and participated in the operation or management of the affairs of the Enterprise, including but not limited to the following actions and violations of predicate

crimes, as described and alleged herein, summarized and set forth below in approximate chronological order:

a. Issuing false, deceptive, and misleading information disseminated to the Park residents and HOA members stating the Plaintiffs were to blame for PBPA litigation, the additional $400 / mo. for legal fees, and inability to sell homes brought on by agency finding that PBPA lacked the required securities permit. (Exhibits J, K, L)

b. Deliberately failing and refusing to settle with the Plaintiffs, including not informing the HOA members of Plaintiffs 2013 settlement offer, which provided means to resolve the litigation and retain and preserve the Park for the seniors, but would defeat the Enterprise objective of taking the seniors' Park and homes in fiduciary fraudulent and self-dealing transactions.

c. Conducting and conspiring to carry out, including through JAMS and Justice Trotter, as described and alleged in this Complaint, attempted extortion, extortion, bribery of judges and obstruction of justice to deny Plaintiffs their rights to impartial judicial officers in order to take their homes and property by corrupt and intentionally wrong judicial decisions, as described and alleged herein.

d. Controlling and directing or conspiring in the creation and operation of a cover-up scheme to conceal the extortion, bribery and obstruction of justice undertaken to deny Plaintiffs their rights and take their homes and property as described and alleged herein.

e. Arranging or allowing and not rebutting Judge Moss in court false statements that fiduciary breaching and self-dealing HOA President Mantelli was credible.

f. Bribing fiduciaries, HOA Directors Fiori and Smith and Attorney Salisbury, to breach their duties in order to carry out the Enterprise objective of taking the Park and homes from the seniors.

g. With Mantelli, attorneys Wood, Thomas and Salisbury appearing before, writing to, or otherwise communicating to the PBPA HOA members the false representation that they and each of them acted as attorneys for the HOA and its members and their benefit, when in fact they worked to enable President Mantelli to deceive and defraud the members for her self-dealing sale of the Park and so she could orchestrate embezzlement of millions in HOA member money.

h. In the fraud to persuade Park members to sell the Park, preparing and issuing false, deceptive, and misleading information (Exhibit L) disseminated to the Plaintiffs and park residents and HOA members stating the sale to Saunders was the only option for the Park and a good deal for the seniors; that the Park sale was the best to be had,

i. Concealing and failing and refusing to disclose to the PBPA members the higher and better, no commission, cash offer for the Park that the Board had in hand that would have paid $20,000 more to each senior. (Exhibit M)

j.  Defendants Saunders, Coldren, Mantelli, acting or conspiring with Defendant Attorney Susolik to secure unlawful action whereby Judge Moss, disqualified on the *Haugen v. PBPA* Park sale case, and on vacation, would be contacted ex parte and requested to call in from his vacation, thwart the application for TRO to stop the Park sale, and act to protect and assure that the closing of the lucrative fraudulent and self-dealing real estate sale would close that same day as scheduled.

k. Defendants Saunders, Coldren, Mantelli, acting or conspiring with Attorneys Wood, Thomas and Salisbury to carry out, facilitate, and conceal Defendant Park-buyers' bribery of disqualified Judge Moss to call in from vacation, just in time, to fix the Park sale.

l.  Attorney Wood receiving, as ex parte communication from Judge Moss, falsified court documents, the PBPA TRO opposition (Exhibit C, I) which Wood then deliberately concealed and withheld from Plaintiffs in order to cover up and shield Judge Moss' unlawful "call in" from vacation to fix the Park sale.

m.  Allowing and authorizing attorney Thomas to take HOA PBPA funds for acting at all times as Mantelli's personal attorney to carry out her fraudulent objectives and directives for the fraud and deception to take the Park and homes from the Plaintiffs and seniors.

n.  Allowing and authorizing attorney Salisbury to act in a totally conflicted capacity for being, at the same time, counsel to Park – buyer principal Coldren and

Park seller HOA PBPA, i.e. representing both sides in a real estate purchase and sale transaction, which double representation was impossible without PBPA consent or waiver, which could not be given, if at all, by the conflicted and self-dealing HOA Board.

o. Taking funds from PBPA in payment of Salisbury's legal fees for supposed services to PBPA which were inherently conflicted, contradictory, and detrimental to PBPA and its members.

p.   Embezzling all or part of the $1,000,000 in HOA reserves and another up to estimated $1,000,000 in Park sales proceeds, and using some of the funds to compensate and further Enterprise Defendant attorneys Salisbury and Thomas and converting other funds to the use of Mantelli and Fiori and other PBPA Directors.

q.   Allowing and directing Attorneys Thomas and Salisbury to act and conspire to embezzle and take HOA funds and Park sale proceeds to pay their excessive legal fees for work that did not benefit their supposed clients, the HOA and its members, but enriched their true clients, Mantelli, her HOA director and Park Buyer accomplices, Coldren and associates, and themselves.

r.   For over four and one-half (4.5) years, not providing or sending to the HOA members the Park sale escrow closing statement or any accounting with regard to the Park sale proceeds, and issuing minimal information about the sale proceeds, for the purpose of concealing

Defendants' fiduciary fraud and embezzlement of millions of HOA member money.

s. Mailing and electronically transmitting or disseminating documents containing material misrepresentations and omissions of fact to the Plaintiffs and Park residents and to the State courts and later the DBO, DRE and the California Supreme Court and the United States Supreme Court in the time 2013 to 2019, in which Defendants made materially false statements about the Park sale, PBPA HOA finances, PBPA's legal rights, status, decision making and legality of operation, and the leases and terms by which individual residents would stay and lease space in the Park following the Park sale.

796. The Enterprise non-Defendant co-conspirators CJP, Dresser, Henley, AG Becerra, and former attorney general Senator Harris contributed to the Enterprise by conspiring with its actors to assure non-investigation, no discipline and no prosecution of the Enterprise's crime committing judges and justices, in violation of 18 U.S.C. §1962(d), as described and alleged herein and in the next claim for relief under §1962(d).

797. The Enterprise's members are distinct from the Enterprise and its activity and each exercised and continues to exercise control over various functions of the Enterprise, with their individual roles and participation described and alleged herein.

798. Each Enterprise actor and member, each of the Defendants and non-defendant co-conspirators, was vital to the Enterprise, and conducted or controlled some aspect of the Enterprise critical to its success, as described and alleged herein.

799. For their wrongdoing and wrongful conduct participating in the Enterprise and committing predicate crimes, Defendants are liable to Plaintiffs for injury to their property and losses and damages in amounts to be determined at trial.

800. The foregoing described and alleged participants and pattern of racketeering activity are distinct from the Enterprise itself, which does not solely engage in the above-described acts, but does so through its members and participants.

801. As described and alleged herein, HOA PBPA was and remains a passive instrument of Defendants' racketeering activity, and together with and through Defendants, PBPA constitutes an alternative "enterprise" participant as that term is defined in 18 U.S.C. §1961(4).

802. This Complaint details the ongoing pattern of racketeering based on facts that are known to Plaintiffs and their counsel. It is filed without the benefit of discovery, which will likely uncover more predicate acts and further demonstrate the breadth and scope of the Enterprise's racketeering.

803. Collectively, all these violations alleged and described in this complaint, occurring over eight (8) years, are a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961 (5).

804. Each activity was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiffs and the Park residents.

805. Plaintiffs are informed and believe, and thereon allege, that some Defendants and non-defendant co-conspirators continue to utilize the Enterprise to perpetrate racketeering activity on other litigants and persons in other cases, making the Enterprise an ongoing, continual operation, constantly seeking out new victims and targets like Plaintiffs, who have

valuable property for fraudulent and corrupt taking by JAMS or ADR company favored attorneys and their clients, and whom, like Plaintiffs, will not provide "repeat business" for JAMS or ADR services.

806. Plaintiffs were injured in their property by the Enterprise racketeering and predicate acts and crimes in December 2018 and January 2019, when the appellate court, under non-defendant conspirator Bedsworth's opinion and denial of rehearing petition (12/17/18 and 1/9/19), upheld non-defendant co-conspirator Judge Moss' judgment that allowed HOA PBPA to keep and retain Plaintiffs homes without paying any compensation or damages therefor.

807. Finality of the wrongful judgment was not achieved until denial of Plaintiffs' petitions for discretionary review to the California Supreme Court and the United States Supreme Court in March and November 2019.

808. Because and as a result of Defendants' violations of 18 U.S.C. § 1962(c), Plaintiffs were injured in their property by loss of their homes' value in amounts that aggregate at more than $1,095,000 and the HOA seniors lost their mobilehome park, along with HOA cash.

809. Pursuant to RICO, 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover three-fold (3x) their damages plus costs and attorneys' fees from the Defendants and each of them.

## B.   COUNT TWO: VIOLATION OF 18 U.S.C. §1962(d) BY CONSPIRING TO VIOLATE 18 U.S.C. §1962(c)
### (Plaintiffs against all Defendants)

810. Plaintiffs incorporate by reference all preceding paragraphs.

811. Section 1962(d) of RICO provides that it "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b) or (c) of this section."

812. As described and alleged in this Complaint, Defendants and the

non-defendant co-conspirators, JAMS, Trotter, Stock, Moss, Andler, Margines, O'Leary and Bedsworth violated 18 U.S.C. §1962(c) and also violated §1962(d) by conspiring to violate 18 U.S.C. §1962(c).

813. Non-defendant co-conspirators, CJP, Chief Dresser and former Chief Henley and AG Becerra and former AG Senator Harris, violated §1962(d) by conspiring to violate 18 U.S.C. §1962(c).

814. The object of this conspiracy has been and is to conduct or participate in, directly or indirectly, the conduct of the affairs of the §1962(c) Enterprise described and alleged herein through a pattern of racketeering activity also as described and alleged herein.

815. Defendants and non-defendant co-conspirators agreed to join the conspiracy, agreed to commit and did commit or conspire to commit the acts described herein, and knew that these acts were part of a pattern of racketeering activity.

816. Non-defendant co-conspirator CJP conspired to aid and further the Enterprise by ensuring that it would not investigate or discipline or refer for criminal investigation or prosecution judge crime reported to it by victims of the Enterprise, as described and alleged herein.

817. By deliberate failure and refusal to discipline or refer judge crime, and by acting contrary to law and its duty by advocating to bar Plaintiffs' lawful right to investigate judge crime as permitted by the Evidence Code, (i.e. opposing Plaintiffs' deposition of Judge Moss) CJP conspired in and with the Enterprise and its first level actors.

818. CJP allowed the Enterprise to engage and secure the judge crime it needed and needs to succeed in its objectives because CJP gave assurance that it would not discipline the Enterprise's crime committing judges and would conceal and not refer evidence of their judge crime to prosecuting authorities.

819.   Non-Defendant co-conspirators CJP Director Chiefs Dresser and Henley allowed and directed CJP cover up and enabling of judge crime, and specifically that of Judge Moss, as described and alleged herein.

820.   Non-Defendant co-conspirator AG Becerra, for personal benefit, conducts and directs that the Office of the Attorney General not investigate judge crime; that it not take-in judge crime evidence reported by the public.

821.   AG Becerra directs his office to instruct the public to submit all complaints about judges to the CJP, falsely stating the CJP has "exclusive jurisdiction" over judge complaints.   CJP is a disciplinary agency.   CJP cannot levy criminal charges to enforce the law.

822.   AG Becerra knows that judge crime evidence is dead on arrival at CJP, that CJP will not act on it, but hide and sequester it.

823.   AG Becerra conspires with CJP and the Enterprise to enable and protect judge crime by making sure publicly reported evidence of judge crime never comes to light in his office or at any other law enforcement agency.

824. Within the Enterprise first level, CJP and its current Chief Dresser and former Chief Henley and AG Becerra and before him attorney general Harris exerted ongoing, continuous and shared control over the base level Enterprise component of law enforcement agency neutralization for the Enterprise's judges' crimes.

825.   They conspired to carry out the operation or management of the base level agency affairs for the Enterprise, including, but not limited to, the following racketeering actions and of predicate crime violations, as described and alleged herein, summarized and set forth below in approximate chronological order:

    a. CJP receiving but not acting on Plaintiffs' complaint

    about Judge Moss and his "call in", submitted to CJP in

April 2016, as shown by CJP "no action" letter issued over four (4) years later, dated May 14, 2020 (Exhibit C)

b. CJP not referring Judge Moss' "call in" crime to prosecuting authorities pursuant to canon 3D(1) and *Handbook* authority and pursuant to CJP Rule 102(g) and Policy Declaration 4.2.

c. CJP and AG Becerra asserting and declaring that Judge Moss' "call in" was "exercise of judicial discretion", i.e. legal and proper, which was wholly untrue, as the "call in" was willful judicial misconduct and judge crime under CJP and court precedents in which it has been labeled the "quintessential" judge bad act and because no jurisprudence allows a disqualified judge to "self-re-qualify."

d. CJP commencing public proceedings against already retired Judge Steven Bailey, AG Becerra's Republican candidate opponent in the 2018 election for lesser offenses of "improper action" and "prejudicial conduct" when CJP precedents were to pursue already retired judges only for "willful judicial misconduct," and to commence the charges not for public benefit, but to support and assist AG Becerra in his campaign against Judge Bailey as *quid pro quo* for his bargain to not prosecute crime-committing judges.

e. CJP commencing the public proceedings against Judge Bailey (Ret.) during the 2018 election, which was contrary to rule, policy and protocol of not charging candidate for lesser offenses during the election, but

which CJP violated in order to strategically and timely malign candidate Judge Bailey, the Republican candidate, to benefit candidate AG Becerra, the Democrat.

f.  CJP and AG Becerra opposing Plaintiffs' taking Judge Moss' deposition in order to prevent what was certain to be his damning testimony against the Enterprise, by falsely labeling Plaintiff's deposition subpoena as an "abusive litigation tactic."

g.  CJP and AG Becerra, and before him attorney general Harris, conspiring and cooperating to falsely direct and mislead the public that all complaints about judges, including grievances with evidence of judge crime, must be sent to the CJP and not the attorney general; and that the CJP has "exclusive jurisdiction" over all complaints about judges, for the purpose and having the effect of funneling evidence of judge crime to CJP where, both AG Becerra and AG Harris are informed, CJP will "deep-six" the evidence so that the crime-committing judge would not face discipline or criminal prosecution.

h.  CJP and AG feigning ignorance as to their total lack of bringing disciplinary or prosecutorial charges against a judge that committed crime from the bench that injured litigants, where they know the truth is that they have a conspiracy to not bring such charges.

i. CJP falsely declaring to the public that it has referred judge crime for prosecution on "multiple occasions",

when research reveals it has never done so, and using the mail and electronic transmission to disseminate such materially false information to the public.

j.  CJP assertion of absolute secrecy, refusing to provide raw statistical data to prove CJP public statement that it has referred judges to prosecuting authorities on "multiple occasions." (Exhibit T)

k.  AG Becerra failure and refusal to investigate for prosecution Judge Moss' "call in" crime of "fixing" the Park sale, in contravention of attorney general duty to adequately and uniformly enforce state law, (Calif. Const. Art. V, §13) by asserting as excuse "lack of resources".

826. Defendants and their non-defendant co-conspirators have engaged in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy, including material misrepresentations and omissions designed to defraud Plaintiffs, the courts, the public and Park residents, and to conceal and hide the bribery of judges and justices and to thereby obstruct justice so that Plaintiffs would lose in state court when on facts and law they should have won.

827. The nature of the above-described overt acts, material misrepresentations and omissions in furtherance of the conspiracy gives rise to an inference that Defendants, co-conspirators and Enterprise participants not only agreed to the objective of an 18 U.S.C. § 1962(d) violation of RICO by conspiring to violate 18 U.S.C. § 1962(c), but they were aware that their ongoing fraudulent acts have been and are part of an overall pattern of racketeering activity.

828. As a direct and proximate result of Defendants' and the non-

defendant co-conspirators' overt acts and predicate acts in furtherance of violating 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c), Plaintiffs and the Park residents have been and are continuing to be injured in their property, as set forth more fully above, and Plaintiffs are informed and believe, other persons and litigants in other cases are and will be injured by the described conspiracy to carry out the pattern of predicate crimes for the racketeering Enterprise described and alleged herein.

### C.   COUNT THREE: UNJUST ENRICHMENT
### (Plaintiffs vs. Defendants)

829.  Plaintiffs allege that under the laws of the State of California, the Defendants have acted to unjustly retain a benefit to the Plaintiffs' detriment, and that Defendants' retention of the benefit violates the fundamental principles of justice, equity, and good conscience.

## XIX.  PRAYER

**WHEREFORE**, Plaintiffs demand judgment on each claim for relief, jointly and severally, and other relief, as follows:

1.  Because most of the Plaintiffs are advanced age elders, authorizing the conduct of expedited discovery, starting with deposition of non-defendant co-conspirator Judge Robert Moss;

2. Awarding Plaintiffs their actual damages and treble (three times) their actual damages on their RICO claims, together with costs and reasonable attorneys' fees;

3. Awarding Plaintiffs pre-judgment and post-judgment interest as provided by law;

4. Awarding Plaintiffs their costs and expenses in this litigation, including reasonable attorneys' fees and expert fees;

5. Awarding Plaintiffs appropriate relief for Defendants' unjust enrichment, including compensation for the value of Plaintiffs' homes and

pre-judgment interest on such home value amounts; and

6. Awarding Plaintiffs such other and further relief as may be just and proper under the circumstances.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all claims so triable.


DATED: July 21, 2020                    Respectfully Submitted,

                                        LAW OFFICE OF PATRICK J. EVANS


                                        By: /s/ Patrick J. Evans
                                             Patrick J. Evans
                                             Counsel for Plaintiffs
                                             Floyd Chodosh, Sue Eicherly,
                                             Myrle Moore, Ole Haugen, Todd
                                             Peterson and Rodger Kane, Jr.

1
2
3

# TABLE OF CONTENTS

I.      JURISDICTION ...................................................................2

II.    VENUE AND PERSONAL JURISDICTION ........................2

III.   PREFACE AND NATURE OF ACTION ..............................2

IV.   PARTIES .............................................................................8

     A.   Plaintiffs ....................................................................8

     B.   Defendants.................................................................8

V.     NON – PARTY ENTERPRISE CO-CONSPIRATORS .................9

     A.   Non-Defendant Co-Conspirators in the Enterprise ..........9

     B.   Identity of the Non-Defendant Co-Conspirators .............10

     C.   Non-Defendant HOA Palm Beach Park Association.......12

VI.   BACKGROUND FACTS .......................................................12

     A.   The Palm Beach Mobilehome Park ...................................12

     B.   The JAMS Mediation with Justice Trotter (Ret.)............13

     C.   Attempted Extortion; Judge Stock Goes to JAMS ..........14

     D.   After JAMS, Plaintiffs Always Lose in Court ..................14

     E.   Plaintiffs Sue JAMS and Justice Trotter .........................15

     F.   HOA President Self-Dealing and Fraud to Sell Park......16

     G.   The *Haugen v. PBPA* case for TRO to Stop the Park Sale ..................................................................................19

     H.   Application for TRO to Stop Park Sale .............................20

     I.   "Self-Re-Qualification" and "Fix" – Offense to Justice...21

     J.   Loan More than Purchase Price; HOA Funds Gone .......22

     K.   Plaintiffs Discover and Declare Judge Moss "Fix" .........23

     L.   Park Buyer Defendants Request Judge Moss "Fix" .......24

     M.   Writ to Court of Appeal to Overturn the "Fix" ...............24

**N.**    **Objection to Orange County Appellate Justices** .............25

**O.**    **Plaintiffs sue Judges and Justices in Section 1983 action** ...................................................................................**25**

**P.**    **Justices O'Leary and Bedsworth Refuse to Recuse**........**26**

**Q.**    **Orange County Justices Wrongly Rule Against Plaintiffs** ...................................................................................**27**

**R.**    **HOA Keeps Homes for Non-Payment of Rent and Loan Not Owed**....................................................................**27**

**S.**    **Judge Moss Does Not Recuse; Sits on Remanded Case**..**28**

**T.**    **Judge Moss' Perjury to Collect his Paychecks** .................**29**

**U.**    **CJP "No Action" - Four Years After J. Moss Complaint**.**30**

**V.**    **CJP Does Not Refer Judge Crime Evidence; It Hides It** **31**

**W.**    **AG Becerra – No Action On Judge Moss – Defers to CJP** ...................................................................................**32**

**X.**    **CJP and AG Conspiracy Allows Judge Moss' "Fix" Crime** ...................................................................................**33**

**Y.**    **Judge Moss Example of Pattern of Judge Crime** ............**33**

**VII.**   **BACKGROUND FACTS OF DEFENDANTS' RACKETEERING** ...................................................................................**34**

**A.**    **Defendants Take Millions in Real Estate Equity and HOA Cash**..........................................................................**34**

**B.**    **Defendants Inform HOA Members Sale is only Option**..**36**

**C.**    **Judge Moss and Justices Always Rule for PBPA** ............**38**

**D.**    *Haugen v. PBPA* **– The TRO that Judge Moss "Fixed"**....**39**

**E.**    **Attorney Susolik Allegedly Arranged the "Fix"**...............**39**

**F.**    **Saunders and Coldren Bribe HOA Directors** ...................**40**

**G.**    **Highly Profitable Under Market Park Purchase** ............**41**

**H.**    **Distribution of Park Sale Proceeds; Missing Money** ......**41**

I.     Ouster of Senior Residents – More Racketeering Profit42

VIII.  BACKGROUND FACTS FOR CO-CONSPIRATORS JUSTICE
       TROTTER, JAMS AND JUDICIAL OFFICERS ......................43

       A.   Justice Trotter and JAMS Racketeering ..........................43

       B.   Judge and Justice Racketeering ........................................46

       C.   Justice Bedsworth Wrongful Use of Contempt................48

IX.    BACKGROUND FACTS FOR CJP AND AG CONSPIRACY ...50

       A.   CJP and AG Act to Ensure No Judge Crime Prosecution
            ............................................................................................50

       B.   CJP and AG Conspiracy to Not Investigate Judge Crime
            ............................................................................................52

       C.   AG Becerra and former AG Harris Permit Judge Crime
            ............................................................................................53

       D.   CJP and AG Conspired to Enable Judge Moss' Crime ...53

X.     ENTERPRISE WRONGLY BARS JUDGE MOSS DEPOSITION
       ..................................................................................................54

XI.    PATTERN AND ENTERPRISE EVIDENCE; ITS
       CONCEALMENT; INJURY TO PLAINTIFFS' PROPERTY ....56

XII.   SCHEME, MOTIVES, FRAUDULENT INTENT AND INJURY
       ..................................................................................................58

       A.   The Fraud and Racketeering Scheme ...............................58

       B.   Defendants' Motives – Take Park - Embezzle HOA Cash
            ............................................................................................60

       C.   Defendant Fidelity Title Company's Motive....................61

       D.   Non-Defendant Co-Conspirator JAMS' Motive ...............61

       E.   Co-Conspirator Judges and Justices Motives.................62

       F.   Non-Defendant Conspirator CJP and Directors' Motives
            ............................................................................................62

G.  Non-Defendant Co-conspirator AG Motives .................... 63

XIII.  USE OF THE MAILS AND WIRE AND INTERSTATE COMMERCE IN FURTHERANCE OF THE ENTERPRISE .... 64

A.  JAMS' Use of Mail and Wire to Send False Information 64

B.  Defendants' Use of Mail and Wire to Mislead .................. 66

C.  Judge and Justice Use of Mail and Wire to Mislead ....... 67

D.  CJP and AG Use of Mail and Wire to Mislead ................ 67

E.  Engagement and Use of Interstate Commerce ............... 68

XIV.  PREDICATE CRIMES ................................................ 68

XV.  FACTS FOR RICO PREDICATE CRIMES ............................... 71

A.  Lawsuits and Litigation Yield Evidence for RICO case. 71

B.  Defendants' and Co-Conspirators' Scheme ...................... 72

C.  Judge Margines, Justices O'Leary and Bedsworth Predicates ...................................................... 72

D.  Park Buyers Saunders, Mantelli, et al. Predicates ......... 73

E.  Justice Trotter Attempted Extortion for Defendants .... 74

F.  JAMS and Judge Stock Predicates ................................. 74

G.  Defendants Request Judge Moss "Call-In" from Vacation ...................................................... 75

H.  JAMS Unethically and Unlawfully Influences Judiciary ...................................................... 75

I.  Judge Moss' Repeated Perjury 2016 and 2019 ................ 76

J.  Methods and Patterns of Predicate Crimes ..................... 77

K.  Core Predicate Crime – Judicial Bribery and Influence ...................................................... 77

L.  CJP and AG Conspiracy– No Consequences to Judge ... 78

M.  Scheme of Pattern of Predicate Crimes ......................... 79

XVI.  PLAINTIFFS', DEFENDANTS' AND NON-DEFENDANT CO-

CONSPIRATORS' ROLES IN THE ENTERPRISE .................. 80

   A.    Plaintiffs ................................................................ 80

   B.    Defendants ............................................................. 80

   C.    Non Defendant – Co – Conspirators' Roles .................... 107

XVII. THE RICO ENTERPRISE ............................................. 129

   A.    Enterprise Base Layer – JAMS, Judges, CJP and AG .. 129

   B.    Enterprise Second Level – The Attorneys ...................... 131

   C.    Enterprise Third Level – the Client Beneficiaries ........ 131

   D.    Enterprise Function, Horizontal and Vertical Communication ................................................................ 132

   E.    Enterprise Commencement, Duration and Continuation ................................................................ 134

XVIII.    CLAIMS FOR RELIEF .......................................... 135

      A.    COUNT ONE: VIOLATION OF 18 U.S.C. §1962(c) ...................................................... 135

      B.    COUNT TWO: VIOLATION OF 18 U.S.C. §1962(d) BY CONSPIRING TO VIOLATE 18 U.S.C. §1962(c) .................................................. 150

      C.    COUNT THREE: UNJUST ENRICHMENT ........ 156

XIX.  PRAYER ................................................................. 156

### *F. CHODOSH, et al. v. J. SAUNDERS, et al.*  **COMPLAINT EXHIBITS**

| E X H. | Exhibit Doc. Date | Item / Document Title / Description | Ref. Pg. | Pg. No. |
|---|---|---|---|---|
| A | c. 2015 & earlier | Palm Beach Mobilehome Park, Aerial, Lot Scheme, 2015 Operating Permit, Historic painting "RV" park c. 1950s | 3 | 167 |
| B | 11/12/16 | *Haugen v. PBPA*, (stop sale TRO case), caption / cover pg. | 4 | 173 |
|   | 11/16/15 | Minute Order Judge Sherman Assigning Case to Judge Moss |   |   |
|   | 11/25/15 | Plaintiff's §170.6 Peremptory Challenge to Judge Moss |   |   |
|   | 11/30/15 | Pres. Judge Margines, Order DQ. J. Moss; case – re assigned |   |   |
|   | 12/01/15 | Judge Moss, Transcript, he admits no jurisdiction |   |   |
|   | 12/01/15 | PBPA "Objection" to §170.6 Order Disqualifying J. Moss |   |   |
|   | 12/07/15 | Plaintiff Haugen Opposition to PBPA §170.6 "Objection" |   |   |
|   | 12/09/15 | Notice of Association of Counsel Allen Thomas |   |   |
|   | 12/15/15 | PBPA Notice of Demurrer, by attorney C. Wood |   |   |
|   | 12/15/15 | *Chodosh v. PBPA*, Judge Moss, will be "out for 2 weeks" |   |   |
|   | 12/21/15 | *Haugen v. PBPA*, TRO Application & Decl. - stop park sale |   |   |
|   | 12/21/15 | PBPA Opposition to Ex Parte Application for TRO |   |   |
|   | 12/21/15 | PBPA Request for Judicial Notice to Support Opp. |   |   |
|   | 12/21/15 | PBPA Opposition to Declaration of Harris for TRO |   |   |
|   | 12/21/15 | PBPA Opposition to Declaration of Haugen for TRO |   |   |
|   | 12/21/15 | PBPA Opposition to Declaration of Worthington for TRO |   |   |
|   | 12/21/15 | PBPA Opposition to Declaration of Evans for TRO |   |   |
|   | 12/22/15 | Moss Order, 9:00 a.m. TRO Delayed, sent to Moss courtroom |   |   |
|   | 12/22/15 | Moss Order, Self-Re-Qualify #1, 9:29 a.m., not served |   |   |
|   | 12/22/15 | Grant Deed, PBPA to LLCs, s/ Mantelli, recorded 1:18 p.m. |   |   |
|   | 12/23/15 | Moss Order, Self-Re-Qualify #2, served by clerk |   |   |
|   | 12/28/15 | Moss Order Deny TRO |   |   |
| C | 12/21/15 | TRO Opp. Pleadings – Original and Altered, serial in order | 4 | 208 |
| D | 2015-16 | *Haugen* Reg. of Actions/Docket 2015 – 16 (no chron. order) | 4 | 221 |
| E | 04/29/16 | Judge Moss Answer - Denial of ex parte contact | 4 | 230 |
| F | 03/20/19 | Notice Appeal over, Case Remanded Back to Judge Moss | 4 | 234 |
|   | 05/20/19 | Plaintiffs' Peremptory Challenge, face page |   |   |
|   | 07/31/19 | Judge Moss Salary Affidavit Cut-off 6/2/19; s/    7/31/19 |   |   |
|   | 08/30/19 | Judge Moss Salary Affidavit Cut-off 7/2/19; s/    8/30/19 |   |   |
|   | 09/30/19 | Judge Moss Salary Affidavit Cut-off 8/2/19; s/    9/30/19 |   |   |
|   | 10/31/19 | Judge Moss Salary Affidavit Cut-off 9/1/19; s/    10/31/19 |   |   |
|   | 11/20/19 | Judge Moss MINUTE ORDER Grant §170.6 filed 5/20/19 |   |   |
|   | 12/03/19 | Judge Moss Salary Affidavit Cut-off 10/2/19; s/ 12/3/19 |   |   |
|   | 01/06/20 | Judge Moss Salary Affidavit Cut-off 11/2/19; s/ 01/6/20 |   |   |

| E X H. | Exhibit Doc. Date | Item / Document Title / Description | Ref. Pg. | Pg. No. |
|---|---|---|---|---|
| | 07/02/19 | CJP Order Admonish Judge B. Lamb, re: salary affidavits | | |
| G | 04/25/16 04/26/16 06/15/16 06/20/16 07/26/16 12/20/18 05/14/20 | Letter transmittal Complaint against Judge Moss Comm. on Judicial Perf. ("CJP"), Ltr. rec'd. CJP Staff Letter Requesting court documents Letter to CJP with requested court documents CJP Letter complaint "under consideration" CJP disqualified Judge Moss "judicial discretion" CJP Notice "no basis for action against the judge" | 4 | 250 |
| H | 03/02/17 02/11/17 | AG Public Integrity Unit lack resources for judge crime Plaintiffs' Counsel Letter to AG PI Unit re: Judge Moss | 7 | 260 |
| I | 03/23/16 03/24/16 03/25/16 03/29/16 04/06/16 | Accuse Defendants of Obstruction of Justice Accuse Counsel concealing altered court documents Attorney A. Thomas response and denial Accuse adoptive admissions to Obstruct Justice Attorney C. Wood response and denial | 24 | 273 |
| J | 6/19/16 | Dept. of Business Oversight, PBPA Consent Decree | 13 | 303 |
| K | 01/04/14 | PBPA Ballot Increase Dues $400 / mo. for legal fees | 17 | 310 |
| L | 05/9/15 | Park Sale Promotion Materials for HOA members Saunders Letters to PBPA members | 18 | 312 |
| M | 11/30/15 11/30/15 | Hometown America, cover letter to Mantelli Hometown America, higher offer to buy Park | 19 | 351 |
| N | 04/29/19 | State Auditor, 1st ever Audit of CJP, Ltr. & 2 Pgs. | 32 | 356 |
| O | 01/01/16 '07-2017 | Atty. fee payout grid, end 2015 early 2016, undated Atty. Fees Paid to Thomas, Salisbury, et al. 2007 - 2017 | 17 | 360 |
| P | 10/06/14 | PBPA President Mantelli as Cowgirl Sheriff, Memo. to members: "we won" | 37 | 363 |
| Q | 11/10/06 04/26/16 | CJC Memo re: Presiding Judge Responsibilities Complaint to Presiding Judge Margines re: Judge Moss | 32 | 366 |
| R | 2017 | AG Form Letters, CJP "exclusive jurisdiction"; all judge complaints to CJP | 33 | 379 |
| S | 07/20/18 12/18/18 01/09/19 | *Chodosh v. PBPA*, Appeal Oral Arg. Transcript Opinion, Bedsworth, J., excerpt re: contempt Order Denying Pet. Rehearing, excerpt re: contempt | 48 | 393 |
| T | 1983-2019 | CJP Rule 102(g) and Policy Declaration 4.2, grid data 35,000 complaints against judges 1983 – 2019 | 31 | 405 |

| E X H. | Exhibit Doc. Date | Item / Document Title / Description | Ref. Pg. | Pg. No. |
|---|---|---|---|---|
| | 08/29/17 | CJP Report Judge Crime referred "multiple occasions" | | |
| | 10/22/03 | <u>Daily Journal</u>, CJP "referred J. Danser to DA" | | |
| | 1988 etc. | <u>LA Times</u>, San Diego convicted judges 1988, 1997, 2000 | | |
| U | 06/24/14 | AG Kamala Harris Response re: reported Judge crime | 53 | 418 |
| | 06/09/14 | Atty. B. Kaufman Ltr. to Harris reporting judge crime | | |
| V | 01/29/16 | Pac. Curr. Partners PR (Salisbury rep. seller HOA) | 85 | 435 |
| | 07/13/15 | *Coldren v. Hart* (2015) Salisbury Coldren attorney | | |
| W | 06/21/04 | <u>National Law Journal</u> "Thinking Outside Box" | 40 | 439 |
| | | Susolik Firm contacts Judge after hours at poker party | | |
| X | 2014 | JAMS Mission, Vision, Values (2014) | 66 | 441 |
| | | vs. | | |
| | 2020 | JAMS Purpose, Vision, Values (2020) | | |
| Y | 07/15/16 | Primo Mgmt. Stmnt. Info. Mantelli and Salisbury | 40 | 444 |
| | | Primo Mgmt. Real Estate Sign at Park | | |
| Z | | Palm Beach Park Litigation | 2 | 447 |
| | | <u>Cases' Caption Pages (2010 – 2020)</u> | | |
| | | | | |
| | 04/09/10 | *PBPA v. Eicherly* (unlawful detainer, filed) | | |
| | 06/13/12 | *Chodosh v. PBPA*, main case, G053798 (f: 12/10/10) | | |
| | 12/13/10 | *Haugen v. PBPA* (derivative complaint) | | |
| | 08/10/11 | *PBPA v. Eicherly* ("1 Dog" rule violation) | | |
| | 05/02/14 | *Eicherly v. PBPA* (HOA election challenge) | | |
| | 05/12/14 | *Chodosh v. JAMS, Justice Trotter* | | |
| | 11/12/15 | *Haugen v. PBPA* (stop the Park sale case) | | |
| | 12/09/16 | *Eicherly v. CJP* (for no action on Moss complaint) | | |
| | 12/21/16 | *Eicherly v. O'Leary, Bedsworth, Moss, et al.* (USDC) | | |
| | 10/05/18 | *Chodosh, Padilla v. CJP and AG* (taxpayer suit) | | |

*F. Chodosh, et al. v. John Saunders, et al.*

*[complaint 7/22/20]*


# COMPLAINT EXHIBITS


## "A"


## -through-


## "Z"


**[Attachment to complaint 7/22/20;
starting page is this page 167]**

*F. Chodosh, et al., v. J. Saunders, et al.*

**July 21, 2020**

**COMPLAINT**

**EXHIBIT – A**

| c. 2015 & earlier | Palm Beach Mobilehome Park, Aerial, Lot Scheme, 2015 Operating Permit, Historic painting "RV" park c. 1950s |
|---|---|



EXHIBIT A

168





{Plaintiffs' names shown in their spaces}

EXHIBIT A

170

**2015** ANNUAL PERMIT TO OPERATE

City of San Clemente Building Division

COPY

PERMIT NO. 1
DATED : 12/15/14
AMENDED

ENFORCEMENT AGENCY

| PARK ID NO. | PARK NAME and ADDRESS | INC., or UNC. | MOBILEHOME LOTS WITH DRAINS | RECREATIONAL VEHICLE LOTS WITH DRAINS | LOTS WITHOUT DRAINS | TOTAL LOTS |
|---|---|---|---|---|---|---|
| 30-0053 | Palm Beach Park 35002 Coast Highway San Clemente, CA 92672 | Inc. | 108 | | 18 | 126 |

CONDITIONAL USES:

Only independent mobile homes may be accommodated.  Only vehicles bearing Department of Housing & Community Development insignia of approval may be installed on all lots.  Recreational vehicle lots without traps or vents.

OWNER:  Palm Beach Park Association
101 Palm Drive
San Clemente, CA 92672

THIS PERMIT IS ISSUED IN ACCORDANCE WITH THE PROVISIONS OF THE CALIFORNIA HEALTH AND SAFETY CODE AND IS SUBJECT TO SUSPENSION OR REVOCATION AS PROVIDED THEREIN. THIS PERMIT IS NOT TRANSFERABLE. THE ENFORCEMENT AGENCY SHALL BE NOTIFIED WITHIN 30 DAYS OF ANY CHANGE OF NAME, OWNERSHIP, OR OPERATOR.

POST IN A CONSPICUOUS PLACE
HCD 503B (7/04)   THIS PERMIT EXPIRES DECEMBER 31, 2015

EXHIBIT A
171



*"Palm Beach Park"* sometime between 1945 and 1958

*F. Chodosh, et al., v. J. Saunders, et al.*

**July 21, 2020**

**COMPLAINT**

**EXHIBIT – B**

| | |
|---|---|
| 11/12/16 | *Haugen v. PBPA*, (stop sale TRO case), caption / cover pg. |
| 11/16/15 | Minute Order Judge Sherman Assigning Case to Judge Moss |
| 11/25/15 | Plaintiff's §170.6 Peremptory Challenge to Judge Moss |
| 11/30/15 | Pres. Judge Margines, Order DQ. J. Moss; case – re assigned |
| 12/01/15 | Judge Moss, Transcript, he admits no jurisdiction |
| 12/01/15 | PBPA "Objection" to §170.6 Order Disqualifying J. Moss |
| 12/07/15 | Plaintiff Haugen Opposition to PBPA §170.6 "Objection" |
| 12/09/15 | Notice of Association of Counsel Allen Thomas |
| 12/15/15 | PBPA Notice of Demurrer, by attorney C. Wood |
| 12/15/15 | *Chodosh v. PBPA*, Judge Moss, will be "out for 2 weeks" |
| 12/21/15 | *Haugen v. PBPA*, TRO Application & Decl. - stop park sale |
| 12/21/15 | PBPA Opposition to Ex Parte Application for TRO |
| 12/21/15 | PBPA Request for Judicial Notice to Support Opp. |
| 12/21/15 | PBPA Opposition to Declaration of Harris for TRO |
| 12/21/15 | PBPA Opposition to Declaration of Haugen for TRO |
| 12/21/15 | PBPA Opposition to Declaration of Worthington for TRO |
| 12/21/15 | PBPA Opposition to Declaration of Evans for TRO |
| 12/22/15 | Moss Order, 9:00 a.m. TRO Delayed, sent to Moss courtroom |
| 12/22/15 | Moss Order, Self-Re-Qualify #1, 9:29 a.m., not served |
| 12/22/15 | Grant Deed, PBPA to LLCs, s/ Mantelli, recorded 1:18 p.m. |
| 12/23/15 | Moss Order, Self-Re-Qualify #2, served by clerk |
| 12/28/15 | Moss Order Deny TRO |

**ELECTRONICALLY FILED**
Superior Court of California,
County of Orange

**11/12/2015** at 08:00:00 AM

Clerk of the Superior Court
By Trinity Mai, Deputy Clerk

1  PATRICK J. EVANS - State Bar No. 110535
   LAW OFFICE OF PATRICK J. EVANS
2  16897 Algonquin Street, Suite F
   Huntington Beach, CA 92649
3  Tel.: (714) 594-5722; Fax:  (714) 840-6861
   pevans@pevanslawoffice.com
4  Attorneys for Plaintiff, OLE HAUGEN

5

6

7                **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

8          **FOR THE COUNTY OF ORANGE – CENTRAL JUSTICE CENTER**

9

10  OLE HAUGEN, an individual;                    CASE NO.   30-2015-00819837-CU-BC-CJC
                                                             Judge Randall J. Sherman
11           Plaintiff,                           **VERIFIED COMPLAINT FOR:**

12                                                **1.**    **Breach of Contract - Violation of**
                                                           **Bylaws re:  06/28/15 Membership**
13                                                         **Vote to Sell Park and Dissolve;**

14     *v.*                                       **2.**    **Breach of Statutory Election**
                                                           **Requirements; Corp. Code §7616;**
15                                                         **Civil Code §5145, et al.;**
    PALM BEACH PARK ASSOCIATION, a
16  California non-profit mutual benefit          **3.**    **Breach of Mobilehome Space Lease**
    corporation; and DOES 1 - 20                           **[Contract] – for Bylaw Breaches re:**
17                                                         **06/28/15 Membership Vote;**
             Defendants.
18
                                                  **4.**    **Breach of Fiduciary Duty-**
19                                                         **Conducting Illegal Vote; Board**
                                                           **Directors Conflicted [and Treble**
20                                                         **Damages, Civ. Code §3345];**

21
                                                  **5.**    **Financial Elder Abuse Welf. &**
22                                                         **Inst. Code §15610.30 et al. [and**
                                                           **Treble Damages, Civ. Code §3345];**
23

24                                                **6.**    **Quiet Title;**

25
                                                  **7.**    **Accounting; and**
26

27                                                **8.**    **Declaratory Relief**

28

_____
**VERIFIED COMPLAINT CHALLENGING HOA MEMBERSHIP VOTE AND TO QUIET TITLE**
1

**EXHIBIT B**

**SUPERIOR COURT OF CALIFORNIA,**
**COUNTY OF ORANGE**
**CENTRAL JUSTICE CENTER**

**MINUTE ORDER**

DATE: 11/16/2015                TIME: 02:29:00 PM          DEPT:  C24

JUDICIAL OFFICER PRESIDING: Randall J. Sherman
CLERK:  Delia Sanchez
REPORTER/ERM: None
BAILIFF/COURT ATTENDANT:

CASE NO: **30-2015-00819837-CU-BC-CJC** CASE INIT.DATE: 11/12/2015
CASE TITLE: **Haugen vs. Palm Beach Park Association**
CASE CATEGORY: Civil - Unlimited       CASE TYPE: Breach of Contract/Warranty

EVENT ID/DOCUMENT ID: 72269014
**EVENT TYPE**: Chambers Work

**APPEARANCES**

There are no appearances by any party.

The Court hereby takes notice that the following cases are related to above-entitled matter: 30-2010-00423544 In re: Palm Beach Park Association Cases

This case is removed from the inventory of the Honorable Randall J. Sherman in Department C24 and reassigned to the Honorable Robert J. Moss in Department CX102 for all purposes.

The Court determines that for purposes of exercising C.C.P. 170.6 rights, there are two sides to this matter unless the contrary is brought to the attention of the Court, by Ex-Parte motion. Counsel has 15 days from the date of the enclosed certificate of mailing in which to exercise any rights under C.C.P. 170.6.

Court orders Clerk to give notice.

DATE: 11/16/2015                      MINUTE ORDER                           Page 1
DEPT:  C24                                                              Calendar No.

EXHIBIT B
175

1  **PATRICK J. EVANS, SBN 110535**
   **LAW OFFICE OF PATRICK J. EVANS**
2  **16897 ALGONQUIN STREET, SUITE F**
   **HUNTINGTON BEACH, CALIFORNIA 92649**
3  **Tel:  714\ 594-5722; Fax: 714\ 840-6861**
   pevans@pevanslawoffice.com
4  **Attorneys for Plaintiff OLE HAUGEN**

**ELECTRONICALLY FILED**
Superior Court of California,
County of Orange
**11/25/2015** at 08:58:00 PM
Clerk of the Superior Court
By Sarah Loose, Deputy Clerk

7              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9          **FOR THE COUNTY OF ORANGE – CIVIL COMPLEX CENTER**

| | |
|---|---|
| OLE HAUGEN, an individual; | CASE NO. 30-2015-00819837-CU-CO-CJC |
| Plaintiff, | [Assigned to Dept. CX102 |
| *v.* | Hon. Robert J. Moss, Judge Presiding] |
| PALM BEACH PARK ASSOCIATION, a California non- profit mutual benefit corporation; and DOES 1 - 20 | **PEREMPTORY CHALLENGE UNDER CODE OF CIVIL PROCEDURE SECTION 170.6; MOTION RE: DISQUALIFICATION OF JUDICIAL OFFICER; DECLARATION OF PLAINTIFF'S COUNSEL IN SUPPORT** |
| Defendants. | Action Filed: Nov. 12, 2015 |

**TO THE HONORABLE COURT, DEFENDANT AND INTERESTED PERSONS:**

I, Patrick J. Evans, hereby declare:

I am the attorney for Plaintiff, Ole Haugen ("Plaintiff") in this action.

Pursuant to Code Civil Procedure sec. 170.6, Plaintiff hereby moves and requests that the assigned Judge, Honorable Robert J. Moss, be disqualified to hear the case and cause and that the case and cause be re-assigned to another judicial officer.

1

PEREMPTORY CHALLENGE – MOTION AND DECLARATION – CODE CIV. PROC. §170.6

EXHIBIT B
176

1    This judicial officer has not presided over a hearing, motion or other proceeding in
2 this case.
3    Plaintiff's counsel, the undersigned, under penalty of perjury, deposes and says that
4 Judge Robert J. Moss, the judge before whom the trial or hearing in the aforesaid action is
5
6 assigned, is prejudiced against Plaintiff and/or his attorney, or the interest of the Plaintiff
7 and/or his attorney so that declarant cannot, or believes that he cannot, have a fair and
8 impartial trial or hearing before the judge.
9
10    I declare under penalty of perjury under the laws of the State of California that the
11 foregoing is true and correct.
12    Executed this 25th day of November, 2015 at Huntington Beach, California.
13
14
15                                    Respectfully submitted,
16 DATED: Nov. 25, 2015          LAW OFFICE OF PATRICK J. EVANS
17
18                         By:_____
19                               PATRICK J. EVANS
                              Attorney for Plaintiff, Ole Haugen
20
21
22
23
24
25
26
27
28

2
**PEREMPTORY CHALLENGE – MOTION AND DECLARATION – CODE CIV. PROC. §170.6**

EXHIBIT B
177

**SUPERIOR COURT OF CALIFORNIA,**
**COUNTY OF ORANGE**
**CENTRAL JUSTICE CENTER**

**MINUTE ORDER**

DATE: 11/30/2015                TIME: 03:03:00 PM        DEPT: C01

JUDICIAL OFFICER PRESIDING: Supervising Judge Charles Margines
CLERK: L. Labrador
REPORTER/ERM: None
BAILIFF/COURT ATTENDANT:

CASE NO: **30-2015-00819837-CU-BC-CXC** CASE INIT.DATE: 11/12/2015
CASE TITLE: **Haugen vs. Palm Beach Park Association**
CASE CATEGORY: Civil - Unlimited        CASE TYPE: Breach of Contract/Warranty

EVENT ID/DOCUMENT ID: 72275651
**EVENT TYPE**: Chambers Work

---

**APPEARANCES**

---

There are no appearances by any party.

A Peremptory Challenge under C.C.P.§170.6 as to the Honorable Robert J. Moss having been filed on 11/25/15, by Plaintiff, and this matter having been transferred to C1 for reassignment, the Court now rules as follows:

This case is reassigned to the Honorable Gail A. Andler in Department CX101 for all purposes.

Counsel to contact clerk in Department CX101 within 15 days of receipt of this order to reschedule any pending hearings.

The Court determines that for purposes of exercising C.C.P.§170.6 rights, there are two sides to this matter unless the contrary is brought to the attention of the Court, by Ex-Parte motion. Counsel has 15 days from the date of the enclosed certificate of mailing in which to exercise any rights under C.C.P.§170.6.

Court orders Clerk to give notice. Plaintiff to give notice to any parties not listed and to file proof of service with the court within 10 days.

---

EXHIBIT B

1

```
 1              SUPERIOR COURT OF CALIFORNIA

 2          COUNTY OF ORANGE, CENTRAL JUSTICE CENTER

 3                    DEPARTMENT CX102

 4

 5    IN RE:                      ) LEAD CASE NO.
                                  ) 30-2010-00423544
 6    PALM BEACH PARK ASSOCIATION )
      CASES:                      ) CONSOLIDATED WITH:
 7                                ) 30-2010-00423807
      LEAD CASE:                  ) 30-2010-00425213
 8                                ) 30-2010-00423173
      FLOYD M. CHODOSH, ETC., ET AL., ) 30-2010-00425206
 9                                ) 30-2010-00425291
                    PLAINTIFFS,   ) 30-2010-00425323
10                                ) 30-2010-00435331
         VS.                      ) 30-2010-00432261
11                                )
      PALM BEACH PARK ASSOCIATION, )
12    ET AL.,                     )
                                  )
13                   DEFENDANTS.  )
      ────────────────────────────)
14

15        HONORABLE ROBERT J. MOSS, JUDGE PRESIDING

16                  REPORTER'S TRANSCRIPT

17                   DECEMBER 1, 2015

18

19    APPEARANCES OF COUNSEL:

20

21       FOR PLAINTIFFS:        LAW OFFICE OF PATRICK J. EVANS
                                BY:  PATRICK J. EVANS
22
         FOR CROSS-COMPLAINANT:  ALLAN B. WEISS & ASSOCIATES
23                               BY:  ALLEN L. THOMAS

24               KATHY D. HOFFMAN, CSR #5787
                  COURT REPORTER PRO TEMPORE
25

26
```

EXHIBIT B

2

```
 1              SANTA ANA, CALIFORNIA - TUESDAY, DECEMBER 1, 2015

 2                          MORNING SESSION

 3                  (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN

 4      COURT:)

 5          THE COURT:  LAST BUT NOT LEAST IS THE PALM BEACH PARK

 6      ASSOCIATION CASES.

 7          MR. EVANS:  GOOD MORNING, YOUR HONOR.  PATRICK EVANS

 8      FOR THE PLAINTIFFS, EXCEPT CHRIS MC LAUGHLIN.

 9          MR. THOMAS:  ALLEN THOMAS FOR CROSS-COMPLAINANT, PALM

10      BEACH PARK ASSOCIATION, AND THE PARTY THAT BROUGHT THE

11      EX PARTE.

12          THE COURT:  THIS IS THE DEFENDANT'S EX PARTE TO

13      EXPUNGE THE LIS PENDENS THAT WAS RECENTLY RECORDED.  I

14      BELIEVE THIS LIS PENDENS WAS RECORDED IN THE NEW CASE THAT

15      WAS FILED JUST THIS LAST MONTH; CORRECT?

16          MR. EVANS:  THAT'S RIGHT, YOUR HONOR.  IT'S A NEW

17      CASE, DEALS WITH ENTIRELY NEW FACTS.

18          THE COURT:  MR. EVANS HAS FILED A 170.6, SO I DON'T

19      HAVE JURISDICTION TO RULE ON THIS MOTION.

20          MR. THOMAS:  WE'RE IN THIS COURT TO SEEK THE COURT TO

21      ENFORCE ITS PREVIOUS ORDER.  WE FILED THIS EX PARTE IN THE

22      CURRENT CASE BEING HEARD BY THIS COURT, AND WE BELIEVE THAT

23      THE COURT ON NOVEMBER 13TH, 2015, GRANTED PALM BEACH PARK'S

24      MOTION TO EXPUNGE A LIS PENDENS FILED BY ALL THE

25      PLAINTIFFS, INCLUDING OLE HAUGEN, AND MR. EVANS AT THAT

26      TIME ON BEHALF OF OLE HAUGEN SOUGHT TO CARVE OUT MR. HAUGEN
```

EXHIBIT B

1    FROM THE COURT'S RULING, AND THE COURT SAID NO.

2            WE BELIEVE THAT THIS COURT UNDER THE AUTHORITIES

3    WE CITED IN THE EX PARTE, I THINK IT'S 125 OF THE CODE OF

4    CIVIL PROCEDURE, HAS THE INHERENT POWER TO ENFORCE ITS

5    ORDERS.

6            AND MR. EVANS RAN OUT THE MONDAY AFTER THAT

7    FRIDAY, AND FILED -- OR RECORDED ANOTHER LIS PENDENS

8    AGAINST THE SAME PROPERTY.  THE COURT FOUND ON THAT FRIDAY

9    THAT MR. HAUGEN HAS NO INTEREST, PROPERTY RIGHT, TITLE TO

10   THE REAL PROPERTY.  THE COURT ENGAGED MR. EVANS IN ORAL

11   ARGUMENT OVER THE FACT THAT, EVEN ASSUMING WHATEVER HE

12   CLAIMS IS TRUE, IT DOES NOT AFFECT MR. HAUGEN'S TITLE,

13   POSSESSION, RIGHT TO REAL PROPERTY.

14           WE ATTACHED THE COMPLAINT FILED BY OLE HAUGEN AS

15   AN EXHIBIT, AND CONTRARY TO MR. HAUGEN'S COUNSEL'S

16   ARGUMENT, WE'RE NOT ADMITTING ANYTHING IN THERE IS TRUE,

17   BUT WE POINTED OUT TO THE COURT IN THIS CASE, IN THE CASE

18   BEFORE YOU, THAT, IN FACT, NOTHING THAT MR. HAUGEN ALLEGES

19   HAS ANY RIGHT, TITLE, OR INTEREST TO THE PROPERTY.  IT'S

20   ALL RELATING TO THIS ELECTION VOTE THAT THEY HAD TO SELL

21   THE PROPERTY.  THERE'S NO CAUSES OF ACTION THAT PERTAIN TO

22   RIGHT, TITLE, INTEREST IN THE PROPERTY.

23           THE COURT:  LET ME STOP YOU, MR. THOMAS.  I AGREE WITH

24   ALL THAT.  MY ONLY HANG-UP IS THIS NEW ACTION HE FILED A

25   170.6 AGAINST ME.  THAT MEANS I DON'T HAVE JURISDICTION TO

26   RULE ON THE NEW ACTION.  ALL THESE ARGUMENTS COULD BE MADE

4

1    TO THE JUDGE TO WHICH THIS CASE IS ASSIGNED, BUT I DON'T

2    HAVE JURISDICTION IF THEY FILE A 170.6.

3        MR. THOMAS:  WELL, YOU DO HAVE JURISDICTION IN THE

4    CURRENT CASE.  WE'RE GOING TO CHALLENGE THAT 170.6 ANYWAY,

5    BECAUSE MR. HAUGEN HAS ALREADY ATTEMPTED TO DISQUALIFY YOU,

6    AND THERE'S A UNITY OF INTEREST, SO THAT'S DOWN THE ROAD

7    TOO, BUT MY POINT IS THAT YOU, YOUR HONOR, HAVE THE

8    AUTHORITY TO ENFORCE YOUR ORDERS AND ADHERE TO THE FACT, OR

9    AT LEAST ALLOW MY CLIENT TO ADHERE TO A SENSE OF JUSTICE IN

10   THE CASE YOU ARE PRESIDING OVER, AND THAT THIS IS A DIRECT

11   CHALLENGE, IN OUR OPINION, TO THE COURT'S AUTHORITY TO

12   EXPUNGE A LIS PENDENS.

13       WE'RE SEEKING TO EXPUNGE IT THROUGH THE COURT'S

14   INHERENT POWER.

15       THE COURT:  I UNDERSTAND THAT.

16       MR. THOMAS:  ALL RIGHT.  AND ALSO, YOUR HONOR, EACH

17   DAY THAT THAT LIS PENDENS IS RECORDED, CONTRARY TO WHAT

18   MR. HAUGEN WOULD ARGUE, EACH DAY IT CLOUDS TITLE, IF PALM

19   BEACH WANTED TO GO OUT AND GET A LOAN TODAY, THE LENDER,

20   THEY DON'T HAVE NOTICE OF ANYTHING.  AND HE SHOULD AT LEAST

21   HAVE TO POST AN UNDERTAKING WHILE THIS THING WORKS ITS WAY

22   THROUGH THE COURT.

23       THE COURT:  I UNDERSTAND THAT TOO, BUT WITHOUT

24   JURISDICTION, YOU HAVE TO FILE THIS MOTION IN THE

25   DEPARTMENT TO WHICH THE NEW CASE IS ASSIGNED.

26       MR. THOMAS:  DO WE HAVE ANY IDEA WHEN THAT MIGHT

EXHIBIT B

1 **LEWIS BRISBOIS BISGAARD & SMITH** LLP
CARY L. WOOD, SB# 146598

2   E-Mail: Cary.Wood@lewisbrisbois.com
DOMINEH FAZEL, SB# 256491

3   E-Mail: Domineh.Fazel@lewisbrisbois.com
633 West 5th Street, Suite 4000

4 Los Angeles, California 90071
Telephone: 213.250.1800

5 Facsimile: 213.250.7900

6 Attorneys for Defendant
PALM BEACH PARK ASSOCIATION

7

**ELECTRONICALLY FILED**
Superior Court of California,
County of Orange

**12/01/2015** at 05:21:00 PM

Clerk of the Superior Court
By Sarah Loose, Deputy Clerk

8 SUPERIOR COURT OF THE STATE OF CALIFORNIA

9 COUNTY OF ORANGE, CIVIL COMPLEX CENTER

10

11 OLE HAUGEN, an individual

12        Plaintiff,

13 v.

14 PALM BEACH PARK ASSOCIATION, a
California non-profit mutual benefit

15 corporation; and DOES 1-20

16        Defendants.

17

18

19

20

21

CASE NO. 30-2015-00819837-CU-BC-CXC

**DEFENDANT PALM BEACH PARK
ASSOCIATION'S OBJECTION TO
PLAINTIFFS' CODE OF CIVIL
PROCEDURE §170.6 PEREMPTORY
CHALLENGE**

Judge:   Hon. Gail A. Andler
Dept.:   CX-101

Consolidated with: 30-2010-00423807;30-
2010-00425213; 30-2010-00425173; 30-2010-
00425206; 30-2010-00425291; 30-2010-
00425323; 30-2010-00425331; 30-2010-
00432261

Action Filed:      November 12, 2015
Trial Date:

22 TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:

23    Defendant PALM BEACH PARK ASSOCIATION hereby objects to plaintiffs' Code of

24 Civil Procedure §170.6 peremptory challenge to the Honorable Robert J. Moss on the ground that

25 it is procedurally improper and defective.

26

27

28

4814-5422-3403.1                                          1

DEFENDANT PALM BEACH PARK ASSOCIATION'S OBJECTION TO PLAINTIFFS' CODE OF CIVIL
PROCEDURE §170.6 PEREMPTORY CHALLENGE

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1  **PATRICK J. EVANS, SBN 110535**
   **LAW OFFICE OF PATRICK J. EVANS**
2  **16897 ALGONQUIN ST., SUITE F**
   **HUNTINGTON BEACH, CALIFORNIA 92649**
3  **Tel:  714\ 594-5722; Fax: 714\ 840-6861**
   pevans@pevanslawoffice.com
4  **Attorney for Plaintiff,**
   **Ole Haugen.**
5

**ELECTRONICALLY FILED**
Superior Court of California,
County of Orange
**12/07/2015** at 08:00:00 AM
Clerk of the Superior Court
By e Clerk, Deputy Clerk

6

7                    **SUPERIOR COURT OF CALIFORNIA**

8            **COUNTY OF ORANGE - CIVIL COMPLEX CENTER**

9  | OLE HAUGEN, an individual | CASE NO.: 30-2015-000819837-CU-BC-CJC |
10 | Plaintiff, | [Assigned to Dept. CX101; Hon. Gail A. Andler, Judge Presiding] |
11 | v. | |
12 | PALM BEACH PARK ASSOCIATION, a California non-profit mutual benefit corporation, and DOES 1-20; | **PLAINTIFF'S OPPOSITION TO DEFENDANT PALM BEACH PARK ASSOCIATION'S OBJECTION TO  CODE OF CIVIL PROCEDURE  §170.6 PEREMPTORY CHALLANGE** |
13 | | |
14 | Defendants. | Complaint Filed:  Nov.  12, 2015 |
15

16       **TO THE HONORABLE COURT AND DEFENDANT THROUH COUNSEL:**

17          **PLEASE TAKE NOTICE** that Plaintiff Ole Haugen files this Opposition to Defendant
18
   Palm Beach Park Association's  ("PBPA") Objection ("Objection") to Plaintiff's §170.6
19
   peremptory challenge (the "Challenge") of the Hon. Judge Robert J. Moss.
20
          The Challenge was proper and effective.  PBPA did not object to it by ex parte
21
22 application as specified in Hon. Randall Sherman's Minute Order, entered 11/16.  Two weeks
23
   later, on 11/30, when Hon. Judge Moss honored the 170.6 Challenge, PBPA did not protest.
24
          After two courts ruled the Challenge effective, PBPA objected.  The Objection is
25
26 untimely; it is too late.   PBPA waived objection.  Regardless, this case is not a "continuation" of
27
   a prior case.  PBPA has consistently insisted that nothing new can come into the existing case.
28

                                        1
                  **PLAINTIFFS' OPPOSITION TO PBPA 170.6 OBJECTION**

1  **Allan B. Weiss, Esq. (Bar No. 043774)**
   **Allen L. Thomas, Esq. (Bar No. 102924)**
2  **ALLAN B. WEISS & ASSOCIATES**
   **5001 Airport Plaza Drive, Suite 240**
3  **Long Beach, CA 90815-1280**
   **Telephone: (562) 421-6333**
4  **Facsimile: (562) 421-6903**
   **allan@weisslawassociates.com**
5
   Attorneys for defendant, Palm Beach Park Association
6

ELECTRONICALLY FILED
Superior Court of California,
County of Orange
12/09/2015 at 03:30:00 PM
Clerk of the Superior Court
By e-Clerk, Beauty Clerk

7

8              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9                   **FOR THE COUNTY OF ORANGE**

10                       **CIVIL COMPLEX CENTER**

11

12  OLE HAUGEN, an individual          )   **CASE NO: 30-2015-00819837-CU-BC-CXC**
                                       )
13              Plaintiff,             )   **[Deemed related to 30-2010-00423544-CU-CX-**
                                       )   **CXC]**
14  VS.                                )
                                       )   **NOTICE OF ASSOCIATION OF COUNSEL**
15  PALM BEACH PARK ASSOCIATION, a )
    California non-profit mutual benefit )   [Lead Complaint filed: November 12, 2015]
16  corporation; and DOES 1-20         )   [Assigned to Judge Gail A. Andler; Dept. CX-101]
                                       )
17              Defendants.            )
                                       )
18

19          **TO ALL INTERESTED PARTIES AND THEIR ATTORNEYS OF RECORD:**

20          **NOTICE IS HEREBY GIVEN** that the law firm of Allan B. Weiss & Associates hereby

21  associates in the defense of defendant, Palm Beach Park Association, in the above referenced

22  action with Lewis, Brisbois, Bisgaard & Smith, LLP.  All further notices should *also* include

23  the law firm of Allan B. Weiss & Associates at 5001 Airport Plaza Drive, Suite 240, Long

24  Beach, California 90815 (562) 421-6333, allan@weisslawassociates.com.

25  **DATED: December 9, 2015**              ALLAN B. WEISS & ASSOCIATES

26
                                       By: _____
27                                          Allen L. Thomas, Esq.
                                            **Attorneys for Defendant,**
28                                          **Palm Beach Park Association**

_____

                              Notice of Association of Counsel
                                           1

                              EXHIBIT  B
                                  185

**ELECTRONICALLY FILED**
Superior Court of California,
County of Orange

**12/15/2015** at 12:21:00 PM
Clerk of the Superior Court
By Olga Lopez, Deputy Clerk

1 | **LEWIS BRISBOIS BISGAARD & SMITH** LLP
CARY L. WOOD, SB# 146598
2 |   E-Mail: Cary.Wood@lewisbrisbois.com
DOMINEH FAZEL, SB# 256491
3 |   E-Mail: Domineh.Fazel@lewisbrisbois.com
633 West 5th Street, Suite 4000
4 | Los Angeles, California 90071
Telephone: 213.250.1800
5 | Facsimile: 213.250.7900

6 | Attorneys for Defendant, PALM BEACH PARK
ASSOCIATION

7 |

8 | SUPERIOR COURT OF THE STATE OF CALIFORNIA

9 | COUNTY OF ORANGE, CENTRAL JUSTICE CENTER

10 |

11 | OLE HAUGEN, an individual, | CASE NO. 30-2015-00819837-CU-BC-CJC

12 | Plaintiff, | **DEFENDANT PALM BEACH PARK ASSOCIATION'S DEMURRER TO PLAINTIFF OLE HAUGEN'S VERIFIED COMPLAINT**

13 | vs. |

14 | PALM BEACH PARK ASSOCIATION, a
California non-profit mutual benefit
15 | corporation; and DOES 1-20, | Judge:  Hon. Gail A. Andler

16 | Defendant. | *[Filed concurrently with the Request for Judicial Notice]*

17 | | Date:  March 7, 2016
Time:  1:30 p.m.
18 | | Dept.:  CX-101

19 | | Action Filed:  November 12, 2015
20 | | Trial Date:  None Set

21 |

22 | TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

23 | PLEASE TAKE NOTICE that on March 7, 2016, at 1:30 p.m., or as soon thereafter as the

24 | matter may be heard in Department "CX-101" of the above-entitled Courthouse located at the

25 | Orange County Superior Court located at 751 West Santa Ana Boulevard, Santa Ana, California,

26 | Defendant PALM BEACH PARK ASSOCIATION ("PBPA") will and hereby does demur to

27 | Plaintiff OLE HAUGEN'S  ("Plaintiff") Verified Complaint on the following grounds:

28 | / / /

4823-3579-4476.1

**LEWIS
BRISBOIS
BISGAARD
& SMITH LLP**
ATTORNEYS AT LAW

1
DEFENDANT PALM BEACH PARK ASSOCIATION'S DEMURRER TO PLAINTIFF OLE HAUGEN'S
VERIFIED COMPLAINT

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF ORANGE

COMPLEX JUSTICE CENTER

DEPARTMENT CX-102


IN RE:                                    )
                                          )
PALM BEACH PARK ASSOCIATION CASES         )
                                          )
                                          )
LEAD CASE:                                )
                                          )   NO. 30-2010-
CHODOSH V. PALM BEACH PARK ASSOCIATION,)       00423544
ET AL.,                                   )
                                          )
                                          )
                                          )
_____  )


THE HONORABLE ROBERT J. MOSS, JUDGE PRESIDING

REPORTER'S DAILY TRANSCRIPT OF PROCEEDINGS

DECEMBER 15, 2015

APPEARANCES OF COUNSEL:

  FOR PLAINTIFFS       PATRICK J. EVANS, ESQ.
                       LAW OFFICE OF PATRICK J. EVANS

  FOR DEFENDANTS       CARY L. WOOD, ESQ.
                       DOMINEH FAZEL, ESQ.
                       LEWIS BRISBOIS BIGAARD & SMITH, LLP


                       ALLEN L. THOMAS, ESQ.
                       ALLAN B. WEISS & ASSOCIATES




            STEPHANIE A. KLINGAMAN, CSR# 12391
                 OFFICIAL COURT REPORTER

EXHIBIT B
187

632

1        AS FOR EJECTMENT, THIS COURT RULED ON

2   MARCH 21, 2014 THAT THE CROSS-COMPLAINT DID NOT STATE

3   ALL OF THE NECESSARY ELEMENTS FOR EJECTMENT.  AND IT'S

4   HARD TO BELIEVE, ARE THEY SERIOUS, THESE PLAINTIFFS

5   SHOULD PAY MONEY AND BE EJECTED?

6        NO CHALLENGE TO THE MARKET VALUE SO-CALLED.

7   WELL, IT SEEMS TO ME THE SINGULAR INDICATION OF MARKET

8   VALUE WOULD BE 102 SANDY THAT MR. COOK RENTS FOR $1200 A

9   MONTH.  THAT'S A NEW MODERN UNIT MUCH BETTER THAN THE

10  PLAINTIFFS' UNIT.  WE HEARD TESTIMONY ABOUT THAT.  BUT

11  OF COURSE IT'S ILLEGAL.  AND MR. COOK COULD LIVE THERE

12  FOR THE NEXT 90 DAYS AND NOT PAY RENT.  AND IF THE PARK

13  WENT AT HIM, HE COULD THUMB HIS NOSE AT THEM BECAUSE

14  IT'S ILLEGAL.  THAT'S THE LAW.

15        THE SITUATION PREDICAMENT, IT IS CHAOS, AND

16  IT'S A TRAGEDY.  THESE FOLKS HAD AN OPPORTUNITY TO BUY

17  THIS PARK, AND NOW WE'RE TOLD THEY'RE GOING TO HAVE TO

18  SELL IT OFF.  THAT'S ANOTHER CHAPTER OF THIS SORDID TALE

19  COMING UP.

20        AGAIN, YOUR HONOR, I URGE THE COURT, JUST CUT

21  TO THE QUICK, IT'S ALL ILLEGAL.  LET'S BE DONE WITH IT.

22      THE COURT:  THANK YOU, MR. EVANS.

23        LADIES AND GENTLEMEN, I'LL TAKE THE MATTER

24  UNDER SUBMISSION, AND IT WILL BE A WHILE BEFORE YOU GET

25  MY DECISION, BECAUSE AFTER THIS WEEK, I'LL BE OFF FOR

26  TWO WEEKS AND THEN COME BACK, SO BE PATIENT, AND I'LL

DO NOT DUPLICATE PURUSANT TO CGC 69954(D)

EXHIBIT B

1  **PATRICK J. EVANS, SBN 110535**
   **LAW OFFICE OF PATRICK J. EVANS**
2  **16897 ALGONQUIN ST., SUITE F**
   **HUNTINGTON BEACH, CALIFORNIA 92649**
3  **Tel:  714\ 594-5722; Fax: 714\ 840-6861**
   pevans@pevanslawoffice.com
4  **Attorney for Plaintiff, Ole Haugen**

ELECTRONICALLY RECEIVED
Superior Court of California,
County of Orange
12/21/2015 at 11:02:36 AM
Clerk of the Superior Court
By Olga Lopez,Deputy Clerk

5

6

7  ### SUPERIOR COURT OF CALIFORNIA

   ### COUNTY OF ORANGE - CIVIL COMPLEX CENTER
8

| | |
|---|---|
| 9  OLE HAUGEN, an individual; | CASE NO. 30-2015-00819837-CU-BC-CJC |
| 10  Plaintiff, | [Hon. Gail A. Andler; Dept. CX-101] |
| 11 | **APPLICATION FOR ORDER TO SHOW** |
| 12 | **CAUSE AND TEMPORARY** |
|   v. | **RESTRAINING ORDER TO ENJOIN SALE** |
| 13 | **OF PALM BEACH MOBILEHOME PARK** |
|   | **TO SAUNDERS PROPERTY CO.;** |
| 14  PALM BEACH PARK ASSOCIATION, a | **MEMORANDUM OF POINTS AND** |
|   California non-profit mutual benefit | **AUTHORITIES AND  DECLARATIONS OF** |
| 15  corporation; and DOES 1 - 20 | **OLE HAUGEN, PATRICK EVANS,** |
|   | **PATRICIA M. WORTHINGTON AND** |
| 16 | **BONNIE P. HARRIS IN SUPPORT [CODE** |
|   | **CIV. PROC. §526, 527]** |
| 17 | |
|   | **[Notice and Declaration Re: Notice and** |
| 18 | **Request for Judicial Notice, Notice of** |
|   | **Lodgment of Transcript and (Proposed)** |
| 19 | **Order Filed and Lodged Separately]** |
| 20 | Hearing Date December 22. 2015 |
|   | Hearing Time: 9:00 a.m. |
| 21  Defendants. | Complaint Filed:  Nov.  12,  2015 |
| 22 | |

23  **TO THE HONORABLE COURT AND DEFENDANT THROUGH COUNSEL:**

24      Plaintiff Ole Haugen applies for a temporary restraining order and for an Order to Show

25  Cause requiring Defendant Palm Beach Park Association ("PBPA") to show why a preliminary

26  injunction should not issue pending trial in this action, enjoining PBPA and its Board of Directors,

27  attorneys and agents acting with it, from taking any action to sell the Palm Beach Park to John

28

i

**APPLICATION FOR TRO AND MOTION FOR PRELIM. INJ. AGAINST SAUNDERS SALE**

**ELECTRONICALLY FILED**
Superior Court of California,
County of Orange

**12/21/2015** at 04:55:00 PM
Clerk of the Superior Court
By Olga Lopez, Deputy Clerk

1 | **LEWIS BRISBOIS BISGAARD & SMITH** LLP
CARY L. WOOD, SB# 146598
2 |   E-Mail: Cary.Wood@lewisbrisbois.com
DOMINEH FAZEL, SB# 256491
3 |   E-Mail: Domineh.Fazel@lewisbrisbois.com
633 West 5th Street, Suite 4000
4 | Los Angeles, California 90071
Telephone: 213.250.1800
5 | Facsimile: 213.250.7900

6 | Attorneys for Defendant, PALM BEACH PARK
ASSOCIATION

7 |

8 | SUPERIOR COURT OF THE STATE OF CALIFORNIA

9 | COUNTY OF ORANGE, CENTRAL JUSTICE CENTER

10 | OLE HAUGEN, an individual,  |  CASE NO. 30-2015-00819837-CU-BC-CJC

11 | Plaintiff,  |  **DEFENDANT PALM BEACH PARK**

12 | vs.  |  **ASSOCIATION'S OPPOSITION TO PLAINTIFFS' APPLICATION FOR ORDER TO SHOW CAUSE AND**

13 | PALM BEACH PARK ASSOCIATION, a |  **TEMPORARY RESTRAINING ORDER**
California non-profit mutual benefit |  **TO ENJOIN SALE OF PARK LAND;**
14 | corporation; and DOES 1-20,  |  **MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF**

15 | Defendant.  |  **ALLEN THOMAS**

16 |  |  [*Filed concurrently with the Request for*
17 |  |  *Judicial Notice; Evidentiary Objections to Declarations of Ole Haugen, Bonnie Harris, Patrick J. Evans, Esq., and Patricia*
18 |  |  *Worthington* ]

19 |  |  Date:    December 22, 2015 (28 above 22)
20 |  |  Time:    9:00 a.m.
Dept.:   CX-101  CX-102

21 |  |  The Hon. Gail A. Andler - Dept. CX-101

22 |  |  Action Filed:    November 12, 2015
Trial Date:      None Set
23 |

24 | TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

25 | Defendant, PALM BEACH PARK ASSOCIATION ("PBPA") hereby submits its

26 | Opposition to Plaintiff's Application for a Order to Show Cause and Temporary Restraining Order

27 | To Enjoin Sal of Palm Beach Mobilehome Park to Saunders Property Co. as follows:

28 |

**LEWIS**
**BRISBOIS**
**BISGAARD**
**& SMITH** LLP
ATTORNEYS AT LAW

4815-6097-3100.1

1

**EXHIBIT B**
**190**

ELECTRONICALLY FILED
Superior Court of California,
County of Orange
**12/21/2015** at 04:55:00 PM
Clerk of the Superior Court
By Olga Lopez, Deputy Clerk

1 | **LEWIS BRISBOIS BISGAARD & SMITH** LLP
CARY L. WOOD, SB# 146598

2 |  E-Mail: Cary.Wood@lewisbrisbois.com
DOMINEH FAZEL, SB# 256491

3 |  E-Mail: Domineh.Fazel@lewisbrisbois.com
633 West 5th Street, Suite 4000

4 | Los Angeles, California 90071
Telephone: 213.250.1800

5 | Facsimile: 213.250.7900f

6 | Attorneys for Defendant, PALM BEACH PARK
ASSOCIATION

7 |

8 | SUPERIOR COURT OF THE STATE OF CALIFORNIA

9 | COUNTY OF ORANGE, CENTRAL JUSTICE CENTER

10 |

11 | OLE HAUGEN, an individual,     CASE NO. 30-2015-00819837-CU-BC-CJC

12 |       Plaintiff,     **REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF PALM BEACH PARK**

13 |     vs.     **ASSOCIATION'S OPPOSITION TO PLAINTIFF OLE  HAUGEN'S EX PARTE**

14 | PALM BEACH PARK ASSOCIATION, a     **APPLICATION**
California non-profit mutual benefit

15 | corporation; and DOES 1-20,     *[Filed concurrently with Opposition to Plaintiff's Ex Parte Application and*

16 |       Defendant.     *Evidentiary Objections]*

17 |     Judge:    Hon. Gail A. Andler

18 |     Date:      December 22, 2015    28
    Time:      9:00 a.m.

19 |     Dept.:     ~~CX-101~~  CX-102

20 |     Action Filed:    November 12, 2015
    Trial Date:     None Set

21 |

22 |     TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD:

23 |

24 |     Pursuant to *California Evidence Code* sections 450 *et seq.*, with specific reference to

25 | sections 452(d)(1), along with *California Rules of Court,* Rules 3.1113(l) and 3.1306(c),

26 | Defendant PALM BEACH PARK ASSOCIATION ("PBPA"),  respectfully requests that in

27 | support of the concurrently filed Opposition to Plaintiff OLE HAUGEN'S Ex Parte Application

28 | for Order to Show Cause and Temporary Restraining Order , that this Court take Judicial Notice of

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4823-7178-4748.1         1
REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF PALM BEACH PARK ASSOCIATION'S OPPOSITION



**ELECTRONICALLY FILED**
Superior Court of California,
County of Orange

**12/21/2015** at 04:55:00 PM
Clerk of the Superior Court
By Olga Lopez, Deputy Clerk

1  **LEWIS BRISBOIS BISGAARD & SMITH** LLP
CARY L. WOOD, SB# 146598
2    E-Mail: Cary.Wood@lewisbrisbois.com
DOMINEH FAZEL, SB# 256491
3    E-Mail: Domineh.Fazel@lewisbrisbois.com
633 West 5th Street, Suite 4000
4  Los Angeles, California 90071
Telephone: 213.250.1800
5  Facsimile: 213.250.7900

6  Attorneys for Defendant, PALM BEACH PARK
ASSOCIATION

7

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9              COUNTY OF ORANGE, CENTRAL JUSTICE CENTER

10

11  OLE HAUGEN, an individual,                CASE NO. 30-2015-00819837-CU-BC-CJC

12              Plaintiff,                    **OBJECTION TO DECLARATION OF
                                              BONNIE HARRIS IN SUPPORT OF
13       vs.                                  PLAINTIFF OLE HAUGEN'S EX PARTE
                                              APPLICATION FOR ORDER TO SHOW
14  PALM BEACH PARK ASSOCIATION, a            CAUSE AND PRELIMINARY
California non-profit mutual benefit          INJUNCTION**
15  corporation; and DOES 1-20,
                                              [*Filed concurrently with the Opposition to
16              Defendant.                    Plaintiff's Ex Parte Application; Request for
                                              Judicial Notice; Evidentiary Objections to
17                                            Declarations of Ole Haugen, Patrick J. Evans,
                                              Esq., and Patricia Worthington* ]
18
                                                        28
                                              Date:    December ~~22~~, 2014
19                                            Time:    9:00 a.m.
                                              Dept.:   ~~CXXXXX~~   CX-102
20
                                              ~~The Honorable Alexander~~
21                                            ~~Dept. CX-101~~

22                                            Action Filed:    November 12, 2015
                                              Trial Date:      None Set
23

24       Defendant Palm Beach Park Association ("PBPA") hereby objects to the declaration of

25  Bonnie Harris submitted in support of Plaintiff's Application for a Order to Show Cause and

26  Temporary Restraining Order To Enjoin Sal of Palm Beach Mobilehome Park to Saunders

27  Property Co. as follows:

28  //

4847-8246-0972.1                                    1
OBJECTION TO DECLARATION OF BONNIE HARRIS IN SUPPORT OF PLAINTIFF OLE HAUGEN'S EX
PARTE APPLICATION FOR ORDER TO SHOW CAUSE AND PRELIMINARY INJUNCTION

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

**ELECTRONICALLY FILED**
Superior Court of California,
County of Orange

**12/21/2015** at 04:55:00 PM
Clerk of the Superior Court
By Olga Lopez,Deputy Clerk

1  **LEWIS BRISBOIS BISGAARD & SMITH LLP**
CARY L. WOOD, SB# 146598
2     E-Mail: Cary.Wood@lewisbrisbois.com
DOMINEH FAZEL, SB# 256491
3     E-Mail: Domineh.Fazel@lewisbrisbois.com
633 West 5th Street, Suite 4000
4  Los Angeles, California 90071
Telephone: 213.250.1800
5  Facsimile: 213.250.7900

6  Attorneys for Defendant, PALM BEACH PARK
ASSOCIATION
7

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9              COUNTY OF ORANGE, CENTRAL JUSTICE CENTER

10

11  OLE HAUGEN, an individual,                CASE NO. 30-2015-00819837-CU-BC-CJC

12          Plaintiff,                        **OBJECTION TO DECLARATION OF**
**OLE HAUGEN IN SUPPORT OF**
13      vs.                                   **PLAINTIFF OLE HAUGEN'S EX PARTE**
**APPLICATION FOR ORDER TO SHOW**
14  PALM BEACH PARK ASSOCIATION, a            **CAUSE AND PRELIMINARY**
California non-profit mutual benefit         **INJUNCTION**
15  corporation; and DOES 1-20,
                                             *[Filed concurrently with the Opposition to*
16          Defendant.                       *Plaintiff's Ex Parte Application; Request for*
*Judicial Notice; Evidentiary Objections to*
17                                           *Declarations of Bonnie Harris, Patrick J.*
*Evans, Esq., and Patricia Worthington ]*
18
                                             Date:     December 28, 2015
19                                           Time:     9:00 a.m.
                                             Dept.:    ~~CXXxkXl~~ cx-102
20
                                             ~~The Hon. Gail Andler~~
21                                           ~~[Dept. CX-101]~~

22                                           Action Filed:   November 12, 2015
                                             Trial Date:     None Set
23

24          Defendant Palm Beach Park Association ("PBPA") hereby objects to the declaration of

25  Ole Haugen submitted in support of Plaintiff's Application for a Order to Show Cause and

26  Temporary Restraining Order To Enjoin Sal of Palm Beach Mobilehome Park to Saunders

27  Property Co. as follows:

28  / / /

4815-2669-8028.1                                1
OBJECTION TO DECLARATION OF OLE HAUGEN IN SUPPORT OF PLAINTIFF OLE HAUGEN'S EX PARTE
APPLICATION FOR ORDER TO SHOW CAUSE AND PRELIMINARY INJUNCTION

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

EXHIBIT B
193

**ELECTRONICALLY FILED**
Superior Court of California,
County of Orange

**12/21/2015** at 04:55:00 PM
Clerk of the Superior Court
By Olga Lopez,Deputy Clerk

1  **LEWIS BRISBOIS BISGAARD & SMITH** LLP
   CARY L. WOOD, SB# 146598
2    E-Mail: Cary.Wood@lewisbrisbois.com
   DOMINEH FAZEL, SB# 256491
3    E-Mail: Domineh.Fazel@lewisbrisbois.com
   633 West 5th Street, Suite 4000
4  Los Angeles, California 90071
   Telephone: 213.250.1800
5  Facsimile: 213.250.7900

6  Attorneys for Defendant, PALM BEACH PARK
   ASSOCIATION
7

8           SUPERIOR COURT OF THE STATE OF CALIFORNIA

9           COUNTY OF ORANGE, CENTRAL JUSTICE CENTER

10

11 OLE HAUGEN, an individual,            CASE NO. 30-2015-00819837-CU-BC-CJC

12            Plaintiff,                 **OBJECTION TO DECLARATION OF
                                         PATRICIA M. WORTHINGTON IN**
13       vs.                             **SUPPORT OF PLAINTIFF OLE
                                         HAUGEN'S EX PARTE APPLICATION**
14 PALM BEACH PARK ASSOCIATION, a        **FOR ORDER TO SHOW CAUSE AND**
   California non-profit mutual benefit  **PRELIMINARY INJUNCTION**
15 corporation; and DOES 1-20,
                                         [*Filed concurrently with the Opposition to*
16            Defendant.                 *Plaintiff's Ex Parte Application; Request for
                                         Judicial Notice; Evidentiary Objections to*
17                                       *Declarations of Bonnie Harris, Patrick J.
                                         Evans, Esq., and Ole Haugen* ]
18
                                         Date:    December 22, 2015
19                                       Time:    9:00 a.m.
                                         Dept.:   CXX-101   CX-102
20
                                         ~~The Honorable Gail Andler~~
21                                       ~~Dept. CX-101~~

22                                       Action Filed:   November 12, 2015
                                         Trial Date:     None Set
23

24        Defendant Palm Beach Park Association ("PBPA") hereby objects to the declaration of

25 Patricia M. Worthington submitted in support of Plaintiff's Application for a Order to Show Cause

26 and Temporary Restraining Order To Enjoin Sal of Palm Beach Mobilehome Park to Saunders

27 Property Co. as follows:

28 / / /
   4814-2636-2412.1
                                         1
   OBJECTION TO DECLARATION OF PATRICIA M. WORTHINGTON IN SUPPORT OF PLAINTIFF OLE
   HAUGEN 'S EX PARTE APPLICATION FOR ORDER TO SHOW CAUSE AND PRELIMINARY INJUNCTION

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

**LEWIS BRISBOIS BISGAARD & SMITH LLP**
CARY L. WOOD, SB# 146598
   E-Mail: Cary.Wood@lewisbrisbois.com
DOMINEH FAZEL, SB# 256491
   E-Mail: Domineh.Fazel@lewisbrisbois.com
633 West 5th Street, Suite 4000
Los Angeles, California 90071
Telephone: 213.250.1800
Facsimile: 213.250.7900

Attorneys for Defendant, PALM BEACH PARK
ASSOCIATION

**ELECTRONICALLY FILED**
Superior Court of California,
County of Orange
**12/21/2015** at 04:55:00 PM
Clerk of the Superior Court
By Olga Lopez, Deputy Clerk

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF ORANGE, CENTRAL JUSTICE CENTER

| | |
|---|---|
| OLE HAUGEN, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>PALM BEACH PARK ASSOCIATION, a California non-profit mutual benefit corporation; and DOES 1-20,<br><br>Defendant. | CASE NO. 30-2015-00819837-CU-BC-CJC<br><br>**OBJECTION TO DECLARATION OF PATRICK J EVANS' IN SUPPORT OF PLAINTIFF OLE HAUGEN'S EX PARTE APPLICATION FOR ORDER TO SHOW CAUSE AND PRELIMINARY INJUNCTION**<br><br>[*Filed concurrently with the Opposition to Plaintiff's Ex Parte Application; Request for Judicial Notice; Evidentiary Objections to Declarations of Bonnie Harris, Ole Haugen,, and Patricia Worthington* ]<br><br>Date:     December 28, 2015<br>Time:     9:00 a.m.<br>Dept.:    ~~CXXXXX01~~ CX-102<br><br>~~The Hon. Gail A. Andler~~<br>~~xDept. CX-xk0kk~~xxxx<br><br>Action Filed:     November 12, 2015<br>Trial Date:       None Set |

Defendant Palm Beach Park Association ("PBPA") hereby objects to the declaration of

Patrick J. Evans submitted in support of Plaintiff's Application for a Order to Show Cause and

Temporary Restraining Order To Enjoin Sal of Palm Beach Mobilehome Park to Saunders

Property Co. as follows:

/ / /

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

**EXHIBIT B**
**195**

**SUPERIOR COURT OF CALIFORNIA,
COUNTY OF ORANGE
CIVIL COMPLEX CENTER**

**MINUTE ORDER**

DATE: 12/22/2015                 TIME: 09:00:00 AM        DEPT:  CX102

JUDICIAL OFFICER PRESIDING: Under the direction of Honorable Robert J. Moss
CLERK:  Betsy Zuanich
REPORTER/ERM: None
BAILIFF/COURT ATTENDANT:  None

CASE NO: **30-2015-00819837-CU-BC-CXC** CASE INIT.DATE: 11/12/2015
CASE TITLE: **Haugen vs. Palm Beach Park Association**
CASE CATEGORY: Civil - Unlimited        CASE TYPE: Breach of Contract/Warranty

---

EVENT ID/DOCUMENT ID: 72288945
**EVENT TYPE**: Ex Parte

---

**APPEARANCES**
Patrick J. Evans, from Law Office of Patrick J. Evans, present for Plaintiff(s).
Cary L. Wood/Domineh Fazel, from Lewis Brisbois Bisgaard & Smith LLP, present for Defendant(s).
 Allen L. Thomas present for defendant Palm Beach Park Association
Edward Susolik/Peter S. Bauman, Callahan & Blaine, specially appeared for John Saunders

**Application for Order to Show Cause and Temporary Restraining Order to Enjoin Sale of Palm Beach Mobilehome Park to Saunders Property Co.**

Ex Parte Application is continued to 12/28/2015, at 08:30 AM in this department.

Counsel for Palm Beach Park Association will give notice.

---

EXHIBIT B

# SUPERIOR COURT OF CALIFORNIA,
## COUNTY OF ORANGE
## CIVIL COMPLEX CENTER

### MINUTE ORDER

DATE: 12/22/2015                TIME: 09:29:00 AM        DEPT:  CX102

JUDICIAL OFFICER PRESIDING: Robert J. Moss
CLERK:  Betsy Zuanich
REPORTER/ERM: None
BAILIFF/COURT ATTENDANT:  None

CASE NO: **30-2015-00819837-CU-BC-CXC** CASE INIT.DATE: 11/12/2015
CASE TITLE: **Haugen vs. Palm Beach Park Association**
CASE CATEGORY: Civil - Unlimited        CASE TYPE: Breach of Contract/Warranty

EVENT ID/DOCUMENT ID: 72288789
**EVENT TYPE**: Chambers Work

### APPEARANCES

There are no appearances by any party.

Peremptory Challenge pursuant to C.C.P. §170.6 was filed by Plaintiff on 11/25/15, as to the Hon. Robert J. Moss.

Matter was referred to Dept. C1 and case was reassigned to the Hon. Gail A. Andler in Department CX101.

Defendant's Objection to the 170.6 against Judge Moss was filed on 12/01/15.

The Court, having read and considered the objection, now rules as follows:

Defendant's objection is granted.

Peremptory challenge is stricken.

Clerk to give e-Service notice to counsel.

EXHIBIT B
197

---

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF ORANGE**
Civil Complex Center
751 W. Santa Ana Blvd
Santa Ana, CA 92701

**SHORT TITLE:** Haugen vs. Palm Beach Park Association

| **CLERK'S CERTIFICATE OF MAILING/ELECTRONIC SERVICE** | CASE NUMBER: **30-2015-00819837-CU-BC-CXC** |
|---|---|

I certify that I am not a party to this cause. I certify that the following document(s), Minute Order dated 12/22/15, have been transmitted electronically by Orange County Superior Court at Santa Ana, CA. The transmission originated from email address on December 22, 2015, at 9:36:20 AM PST. The electronically transmitted document(s) is in accordance with rule 2.251 of the California Rules of Court, addressed as shown above. The list of electronically served recipients are listed below:

---

**CLERK'S CERTIFICATE OF MAILING/ELECTRONIC SERVICE**

**V3 1013a (June 2004)**                                                    Code of Civ. Procedure , § CCP1013(a)

EXHIBIT B

Branch :A14,User :BHAR                    Comment:                                    Station Id :RWF1

Recorded in Official Records, Orange County
Hugh Nguyen, Clerk-Recorder

18.00

* $ R 0 0 0 8 0 4 2 6 9 6 $ *
**2015000644197 1:18 pm 12/22/15**
65 405 G02   5 10
20350.00 20350.00 0.00 0.00 12.00 0.00 0.00 0.00

**RECORDING REQUESTED BY**

**AND WHEN RECORDED MAIL TO:**

ICC 35902 LLC and 3187 Redhill LLC
4040 MacArthur Boulevard, Suite 300
Newport Beach, CA 92660

Title and Escrow No. 23057972
Parcel No.(s):
**691-311-14, 691-341-02, 691-341-03**

SPACE ABOVE THIS LINE FOR RECORDER'S USE

## GRANT DEED

THE UNDERSIGNED GRANTOR(s) DECLARE(s)          Documentary Transfer Tax is $40,700.00
☐ unincorporated area                          ☒ computed on full value of interest or property  conveyed, or
☒ the city of San Clemente                     ☐ full value less value of liens or encumbrances  remaining at the
                                                    time of sale

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged,

**PALM BEACH PARK ASSOCIATION, a California Nonprofit Mutual Benefit Corporation**

hereby GRANT(s) to

**ICC 35902 LLC, a Delaware limited liability company, as to an undivided 26% tenancy-in-common interest, and**

**3187 Redhill LLC, a Delaware limited liability company, as to an undivided 74% tenancy-in-common interest**

the following real property in the County of Orange, State of California:

**Legal Description attached hereto as Exhibit "A" and made a part hereof.**

MAIL TAX STATEMENTS AS DIRECTED ABOVE

Page 1 of 2
gGRANTDEE (DSI Rev. 11/03/14)

EXHIBIT B
199

Branch :A14,User :BHAR                    Comment:                              Station Id :RWF1

Title and Escrow No. 23057972

Dated: December 22, 2015

SELLER:

PALM BEACH PARK ASSOCIATION, a California
Nonprofit Mutual Benefit Corporation

By: Diana Mantelli, President

A notary public or other officer completing this
certificate verifies only the identity of the
individual who signed the document to which this
certificate is attached, and not the truthfulness,
accuracy, or validity of that document.

STATE OF CALIFORNIA
COUNTY OF Orange                          } SS:

On December 18, 2015                                before me, Jordan Kelly                          ,
a Notary Public, personally appeared Diana Mantelli                who proved to me on the basis of satisfactory evidence to
be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same
in his/her/their authorized capacity(ies) and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf
of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature Jordan T. Kelly

JORDAN T. KELLY
Commission # 2121095
Notary Public - California
Orange County
My Comm. Expires Jul 27, 2019

EXHIBIT B
200

Branch :A14,User :BHAR                    Comment:                    Station Id :RWF1

Recorded in Official Records, Orange County
Hugh Nguyen, Clerk-Recorder

123.00

2015000644199 1:18 pm 12/22/15
65 405 D11 A36 A34 S02 F16   30
0.00 0.00 0.00 0.00 87.00 0.00 0.00 0.00

*230579 72-JV*

PREPARED BY AND WHEN RECORDED,
RETURN TO:

Kaye Scholer LLP
250 West 55th Street
New York, New York 10019-9710
Attention: Stephen Gliatta, Esq.

### ICC 35902 LLC
### And
### 3187 REDHILL LLC
(Trustor)

To

### FIDELITY NATIONAL TITLE COMPANY
(Trustee)

for the Benefit of

### JEFFERIES LOANCORE LLC
(Beneficiary)

### DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS AND SECURITY AGREEMENT

Dated:     As of  December 22, 2015

Location:  101 Palm Drive, San Clemente, California

County    Orange

APN:      891-341-02

THIS DEED OF TRUST SECURES OBLIGATIONS WHICH MAY CONTAIN PROVISIONS FOR ADJUSTMENTS IN THE INTEREST RATE AND PAYMENT AMOUNTS AND/OR A BALLOON PAYMENT.

THIS DEED OF TRUST CONSTITUTES A SECURITY AGREEMENT AS THAT TERM IS DEFINED IN THE CALIFORNIA UNIFORM COMMERCIAL CODE. PORTIONS OF THE COLLATERAL ARE GOODS THAT ARE OR ARE TO BECOME FIXTURES ON THE LAND DESCRIBED IN EXHIBIT A HERETO. THIS INSTRUMENT IS INTENDED TO SERVE AS A FIXTURE FILING AND IS TO BE RECORDED IN THE REAL ESTATE RECORDS OF EACH COUNTY IN WHICH SAID LAND OR ANY PORTION THEREOF IS LOCATED AND INDEXED AS BOTH A DEED OF TRUST AND A FIXTURE FILING.  TRUSTORS ARE THE OWNER OF A RECORD INTEREST IN THE LAND DESCRIBED IN EXHIBIT A HERETO. THE

63217290

EXHIBIT  B
201

Branch :A14,User :BHAR                    Comment:                                    Station Id :RWF1

ADDRESS OF TRUSTORS (DEBTORS) AND BENEFICIARY (SECURED PARTY) ARE SET FORTH ON THE FIRST PAGE OF THIS DEED OF TRUST.

This **DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS AND SECURITY AGREEMENT** (this "*Deed of Trust*"), made as of December 22, 2015, by **ICC 35902 LLC** and **3187 REDHILL LLC**, each a Delaware limited liability company, each having an office at c/o Saunders Property Company, 4040 MacArthur Blvd., Suite 300, Newport Beach, California 92660 (individually or collectively (as tenants-in-common), in each case as the context requires "*Trustor*"), to **FIDELITY NATIONAL TITLE COMPANY**, a California corporation, having an address at 1300 Dove Street, Suite 310, Newport Beach, California 92660 ("*Trustee*"), as Trustee, for the benefit of **JEFFERIES LOANCORE LLC**, a Delaware limited liability company (together with its successors and assigns, hereinafter referred to as "*Beneficiary*"), having an address c/o LoanCore Capital, 55 Railroad Avenue, Suite 100, Greenwich, Connecticut 06830.

Trustor and Beneficiary have entered into a Loan Agreement dated as of the date hereof (as amended, modified, restated, consolidated or supplemented from time to time, the "*Loan Agreement*") pursuant to which Beneficiary is making a secured loan to Trustor in the aggregate original principal amount of $35,797,500 (the "*Loan*"). Capitalized terms used herein without definition are used as defined in the Loan Agreement. The Loan is evidenced by a Note dated the date hereof made by Trustor to Beneficiary in such principal amount (as the same may be amended, modified, restated, severed, consolidated, renewed, replaced, or supplemented from time to time, the "*Note*").

To secure the payment of the Note and all sums which may or shall become due thereunder or under any of the other documents evidencing, securing or executed in connection with the Loan (the Note, this Deed of Trust, the Loan Agreement and such other documents, as any of the same may, from time to time, be modified, amended or supplemented, being hereinafter collectively referred to as the "*Loan Documents*"), including (i) the payment of interest and other amounts which would accrue and become due but for the filing of a petition in bankruptcy (whether or not a claim is allowed against Trustor for such interest or other amounts in any such bankruptcy proceeding) or the operation of the automatic stay under Section 362(a) of Title 11 of the United States Code (the "*Bankruptcy Code*"), and (ii) the costs and expenses of enforcing any provision of any Loan Document (all such sums being hereinafter collectively referred to as the "*Debt*"), Trustor has given, granted, bargained, sold, alienated, enfeoffed, conveyed, confirmed, warranted, pledged, assigned and hypothecated and by these presents does hereby give, grant, bargain, sell, alien, enfeoff, convey, confirm, warrant, pledge, assign and hypothecate unto Trustee, in trust for the benefit of Beneficiary, **WITH POWER OF SALE**, the land described in Exhibit A (the "*Premises*"), the Owned Mobile Homes, and the buildings, structures, fixtures and other improvements now or hereafter located thereon (the "*Improvements*");

**TOGETHER WITH:** all right, title, interest and estate of Trustor now owned, or hereafter acquired, in and to the following property, rights, interests and estates (the Premises, the Owned Mobile Homes, the Improvements, and the property, rights, interests and estates hereinafter described are collectively referred to herein as the "*Trust Property*"):

63217290

2

EXHIBIT B
202

Branch :A14,User :BHAR                    Comment:                          Station Id :RWF1

**IN WITNESS WHEREOF,** Trustor has executed this instrument as of the day and year first above written.

TRUSTOR:

**ICC 35902 LLC,**
a Delaware limited liability company

By: _____
John R. Saunders, its Manager

**3187 REDHILL LLC,**
a Delaware limited liability company

By: _____
John R. Saunders, its Manager

6321.7290

EXHIBIT _B_
203

## SUPERIOR COURT OF CALIFORNIA,
## COUNTY OF ORANGE
## CIVIL COMPLEX CENTER

### MINUTE ORDER

DATE: 12/23/2015          TIME: 02:25:00 PM          DEPT:  CX102

JUDICIAL OFFICER PRESIDING: Under the direction of Honorable Robert J. Moss
CLERK:  Betsy Zuanich
REPORTER/ERM: None
BAILIFF/COURT ATTENDANT:  None

CASE NO: **30-2015-00819837-CU-BC-CXC** CASE INIT.DATE: 11/12/2015
CASE TITLE: **Haugen vs. Palm Beach Park Association**
CASE CATEGORY: Civil - Unlimited          CASE TYPE: Breach of Contract/Warranty

EVENT ID/DOCUMENT ID: 72289750
**EVENT TYPE**: Chambers Work

### APPEARANCES

There are no appearances by any party.

Defendant's objection having been granted and peremptory challenge stricken, this case is reassigned to the Honorable Robert J. Moss for all purposes.

Clerk to give notice.

EXHIBIT B
204

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF ORANGE**
Civil Complex Center
751 W. Santa Ana Blvd
Santa Ana, CA 92701

**SHORT TITLE:** Haugen vs. Palm Beach Park Association

| **CLERK'S CERTIFICATE OF MAILING/ELECTRONIC SERVICE** | CASE NUMBER: **30-2015-00819837-CU-BC-CXC** |
|---|---|

I certify that I am not a party to this cause. I certify that the following document(s), Minute Order dated 12/23/15, have been transmitted electronically by Orange County Superior Court at Santa Ana, CA. The transmission originated from email address on December 23, 2015, at 2:40:45 PM PST. The electronically transmitted document(s) is in accordance with rule 2.251 of the California Rules of Court, addressed as shown above. The list of electronically served recipients are listed below:

ALLEN L. THOMAS
ALLAN@WEISSLAWASSOCIATES.COM

LAW OFFICE OF PATRICK J. EVANS
PEVANS@PEVANSLAWOFFICE.COM

LEWIS BRISBOIS BISGAARD & SMITH LLP
CARY.WOOD@LEWISBRISBOIS.COM

LEWIS BRISBOIS BISGAARD & SMITH LLP
DOMINEH.FAZEL@LEWISBRISBOIS.COM

Clerk of the Court, by: _____, Deputy

---

**CLERK'S CERTIFICATE OF MAILING/ELECTRONIC SERVICE**

EXHIBIT B

## SUPERIOR COURT OF CALIFORNIA,
## COUNTY OF ORANGE
## CIVIL COMPLEX CENTER

### MINUTE ORDER

DATE: 12/28/2015          TIME: 08:30:00 AM        DEPT:  CX102

JUDICIAL OFFICER PRESIDING: Robert J. Moss
CLERK:  Betsy Zuanich
REPORTER/ERM: Michelle Lott-Meyerhofer CSR# 8226
BAILIFF/COURT ATTENDANT:  Angelina Bernal

CASE NO: **30-2015-00819837-CU-BC-CXC** CASE INIT.DATE: 11/12/2015
CASE TITLE: **Haugen vs. Palm Beach Park Association**
CASE CATEGORY: Civil - Unlimited        CASE TYPE: Breach of Contract/Warranty

---

EVENT ID/DOCUMENT ID: 72288988
**EVENT TYPE**: Ex Parte

---

**APPEARANCES**
Patrick J. Evans, from Law Office of Patrick J. Evans, present for Plaintiff(s).
Cary L. Wood, specially appearing for Lewis Brisbois Bisgaard & Smith LLP, present for Defendant(s).
 Allen L. Thomas present for defendant Palm Beach Park Association

*Lead Case No.  30-2010-00423544   Chodosh  vs  Palm Beach Park Association*

*Deemed Related to:*

*Case No.  30-2010-00432259    Haugen  vs  Palm Beach Park Association*
*Case No.  30-2011-00498722   Palm Beach Park Association  vs  Eicherly*

*Consolidated with:*

| | |
|---|---|
| *30-2010-00423807* | *Eicherly  vs  Palm Beach Park Association* |
| *30-2010-00425173* | *Schowalter  vs  Palm Beach Park Association* |
| *30-2010-00425213* | *Harris  vs  Palm Beach Park Association* |
| *30-2010-00425206* | *Moore  vs  Palm Beach Park Association* |
| *30-2010-00425291* | *Haugen  vs  Palm Beach Park Association* |
| *30-2010-00425323* | *Peterson  vs  Palm Beach Park Association* |
| *30-2010-00425331* | *Kane  vs  Palm Beach Park Association* |
| *30-2010-00432261* | *McLaughlin  vs  Palm Beach Park Association* |

**Plaintiff Ole Haugen's Application for Order to Show Cause and Temporary Restraining Order to Enjoin Sale of Palm Beach Mobilehome Park to Saunders Property Co.**

---

EXHIBIT B
206

CASE TITLE: Haugen vs. Palm Beach Park Association       CASE NO: **30-2015-00819837-CU-BC-CXC**

The Court having fully considered the arguments of all parties, both written and oral, as well as the evidence presented, now rules as follows: Ex Parte Application is ***denied.***

All objections are sustained.

Lodged transcript of Ole Haugen returned to plaintiff's counsel, (Patrick Evans),  this date.

DATE: 12/28/2015                              MINUTE ORDER                              Page 2
DEPT:  CX102                                                                         Calendar No.

EXHIBIT B
207

*F. Chodosh, et al., v. J. Saunders, et al.*

**July 21, 2020**

**COMPLAINT**

**EXHIBIT – C**

| 12/21/15 | TRO Opp. Pleadings – Original and Altered, serial in order |
|----------|-----------------------------------------------------------|

EXHIBIT C
208

1  **LEWIS BRISBOIS BISGAARD & SMITH** LLP
   CARY L. WOOD, SB# 146598
2      E-Mail: Cary.Wood@lewisbrisbois.com
   DOMINEH FAZEL, SB# 256491
3      E-Mail: Domineh.Fazel@lewisbrisbois.com
   633 West 5th Street, Suite 4000
4  Los Angeles, California 90071
   Telephone: 213.250.1800
5  Facsimile: 213.250.7900

6  Attorneys for Defendant, PALM BEACH PARK
   ASSOCIATION
7

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9              COUNTY OF ORANGE, CENTRAL JUSTICE CENTER

10 OLE HAUGEN, an individual,              CASE NO. 30-2015-00819837-CU-BC-CJC

11         Plaintiff,                      **DEFENDANT PALM BEACH PARK
                                           ASSOCIATION'S OPPOSITION TO
12      vs.                                PLAINTIFFS' APPLICATION FOR
                                           ORDER TO SHOW CAUSE AND
13 PALM BEACH PARK ASSOCIATION, a          TEMPORARY RESTRAINING ORDER
   California non-profit mutual benefit    TO ENJOIN SALE OF PARK LAND;
14 corporation; and DOES 1-20,             MEMORANDUM OF POINTS AND
                                           AUTHORITIES; DECLARATION OF
15         Defendant.                      ALLEN THOMAS**

16                                         *[Filed concurrently with the Request for
                                           Judicial Notice; Evidentiary Objections to
17                                         Declarations of Ole Haugen, Bonnie Harris,
                                           Patrick J. Evans, Esq., and Patricia
18                                         Worthington ]*

19                                         Date:    December 22, 2015
                                           Time:    9:00 a.m.
20                                         Dept.:   CX-101

21                                         The Hon. Gail A. Andler - Dept. CX-101

22                                         Action Filed:    November 12, 2015
                                           Trial Date:      None Set
23

24      TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

25      Defendant, PALM BEACH PARK ASSOCIATION ("PBPA") hereby submits its

26 Opposition to Plaintiff's Application for a Order to Show Cause and Temporary Restraining Order

27 To Enjoin Sal of Palm Beach Mobilehome Park to Saunders Property Co. as follows:

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
- ATTORNEYS AT LAW

SAC080

EXHIBIT _C
209

**ELECTRONICALLY FILED**
Superior Court of California,
County of Orange
**12/21/2015** at 04:55:00 PM
Clerk of the Superior Court
By Olga Lopez,Deputy Clerk

1  **LEWIS BRISBOIS BISGAARD & SMITH** LLP
CARY L. WOOD, SB# 146598
2   E-Mail: Cary.Wood@lewisbrisbois.com
DOMINEH FAZEL, SB# 256491
3   E-Mail: Domineh.Fazel@lewisbrisbois.com
633 West 5th Street, Suite 4000
4  Los Angeles, California 90071
Telephone: 213.250.1800
5  Facsimile: 213.250.7900

6  Attorneys for Defendant, PALM BEACH PARK
ASSOCIATION
7

8            SUPERIOR COURT OF THE STATE OF CALIFORNIA

9            COUNTY OF ORANGE, CENTRAL JUSTICE CENTER

10  OLE HAUGEN, an individual,            CASE NO. 30-2015-00819837-CU-BC-CJC

11            Plaintiff,            **DEFENDANT PALM BEACH PARK
ASSOCIATION'S OPPOSITION TO**
12       vs.            **PLAINTIFFS' APPLICATION FOR
ORDER TO SHOW CAUSE AND**
13  PALM BEACH PARK ASSOCIATION, a            **TEMPORARY RESTRAINING ORDER
TO ENJOIN SALE OF PARK LAND;**
California non-profit mutual benefit
14  corporation; and DOES 1-20,            **MEMORANDUM OF POINTS AND
AUTHORITIES; DECLARATION OF**
15            Defendant.            **ALLEN THOMAS**

16            *[Filed concurrently with the Request for
Judicial Notice; Evidentiary Objections to*
17            *Declarations of Ole Haugen, Bonnie Harris,
Patrick J. Evans, Esq., and Patricia*
18            *Worthington ]*

19            Date:    December 22, 2015
Time:    9:00 a.m.
20            Dept.:   ~~CX-101~~  CX-102

21            The Hon. Gail A. Andler - Dept. CX-101

22            Action Filed:    November 12, 2015
Trial Date:      None Set
23

24       TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

25       Defendant, PALM BEACH PARK ASSOCIATION ("PBPA") hereby submits its

26  Opposition to Plaintiff's Application for a Order to Show Cause and Temporary Restraining Order

27  To Enjoin Sal of Palm Beach Mobilehome Park to Saunders Property Co. as follows:

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
- ATTORNEYS AT LAW

4815-6097-3100.1            1
DEFENDANT PALM BEACH PARK ASSOCIATION'S OPPOSITION TO PLAINTIFFS' APPLICATION FOR ORDER TO SHOW CAUSE AND TEMPORARY
RESTRAINING ORDER TO ENJOIN SALE OF PARK LAND; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATIONS OF ALLEN THOMAS

SAC081

EXHIBIT C
210

1 | **LEWIS BRISBOIS BISGAARD & SMITH** LLP
CARY L. WOOD, SB# 146598
2 |   E-Mail: Cary.Wood@lewisbrisbois.com
DOMINEH FAZEL, SB# 256491
3 |   E-Mail: Domineh.Fazel@lewisbrisbois.com
633 West 5ᵗʰ Street, Suite 4000
4 | Los Angeles, California 90071
Telephone: 213.250.1800
5 | Facsimile: 213.250.7900f

6 | Attorneys for Defendant, PALM BEACH PARK
ASSOCIATION
7 |

8 | SUPERIOR COURT OF THE STATE OF CALIFORNIA

9 | COUNTY OF ORANGE, CENTRAL JUSTICE CENTER

10 |

| 11 | OLE HAUGEN, an individual, | CASE NO. 30-2015-00819837-CU-BC-CJC |
|---|---|---|
| 12 | Plaintiff, | **REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF PALM BEACH PARK** |
| 13 | vs. | **ASSOCIATION'S OPPOSITION TO PLAINTIFF OLE HAUGEN'S EX PARTE** |
| 14 | PALM BEACH PARK ASSOCIATION, a California non-profit mutual benefit | **APPLICATION** |
| 15 | corporation; and DOES 1-20, | *[Filed concurrently with Opposition to Plaintiff's Ex Parte Application and* |
| 16 | Defendant. | *Evidentiary Objections]* |
| 17 | | Judge: Hon. Gail A. Andler |
| 18 | | Date: December 22, 2015 |
| 19 | | Time: 9:00 a.m. Dept.: CX-101 |
| 20 | | Action Filed: November 12, 2015 Trial Date: None Set |
| 21 | | |

22 |

23 | TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD:

24 |     Pursuant to *California Evidence Code* sections 450 *et seq.*, with specific reference to

25 | sections 452(d)(1), along with *California Rules of Court*, Rules 3.1113(l) and 3.1306(c),

26 | Defendant PALM BEACH PARK ASSOCIATION ("PBPA"),  respectfully requests that in

27 | support of the concurrently filed Opposition to Plaintiff OLE HAUGEN'S Ex Parte Application

28 | for Order to Show Cause and Temporary Restraining Order , that this Court take Judicial Notice of

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP

4823-7178-1748.1

REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF PALM BEACH PARK ASSOCIATION'S OPPOSITION

1  **LEWIS BRISBOIS BISGAARD & SMITH LLP**
   CARY L. WOOD, SB# 146598
2    E-Mail: Cary.Wood@lewisbrisbois.com
   DOMINEH FAZEL, SB# 256491
3    E-Mail: Domineh.Fazel@lewisbrisbois.com
   633 West 5ᵗʰ Street, Suite 4000
4  Los Angeles, California 90071
   Telephone: 213.250.1800
5  Facsimile: 213.250.7900f

6  Attorneys for Defendant, PALM BEACH PARK
   ASSOCIATION
7

**ELECTRONICALLY FILED**
Superior Court of California,
County of Orange
**12/21/2015** at 04:55:00 PM
Clerk of the Superior Court
By Olga Lopez,Deputy Clerk

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9              COUNTY OF ORANGE, CENTRAL JUSTICE CENTER

10

11  OLE HAUGEN, an individual,            CASE NO. 30-2015-00819837-CU-BC-CJC

12              Plaintiff,               **REQUEST FOR JUDICIAL NOTICE IN**
                                         **SUPPORT OF PALM BEACH PARK**
13         vs.                           **ASSOCIATION'S OPPOSITION TO**
                                         **PLAINTIFF OLE HAUGEN'S EX PARTE**
14  PALM BEACH PARK ASSOCIATION, a       **APPLICATION**
   California non-profit mutual benefit
15  corporation; and DOES 1-20,          *[Filed concurrently with Opposition to*
                                         *Plaintiff's Ex Parte Application and*
16              Defendant.               *Evidentiary Objections]*

17                                       Judge:   Hon. Gail A. Andler

18                                       Date:    December ~~22,~~ 28 2015
                                         Time:    9:00 a.m.
19                                       Dept.:   ~~CX-101~~ CX-102

20                                       Action Filed:    November 12, 2015
                                         Trial Date:      None Set
21

22
       TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD:
23
          Pursuant to *California Evidence Code* sections 450 *et seq.*, with specific reference to
24
   sections 452(d)(1), along with *California Rules of Court*. Rules 3.1113(l) and 3.1306(c),
25
   Defendant PALM BEACH PARK ASSOCIATION ("PBPA"), respectfully requests that in
26
   support of the concurrently filed Opposition to Plaintiff OLE HAUGEN'S Ex Parte Application
27
   for Order to Show Cause and Temporary Restraining Order , that this Court take Judicial Notice of
28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4823-7178-4748.1

1
REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF PALM BEACH PARK ASSOCIATION'S OPPOSITION

1  **LEWIS BRISBOIS BISGAARD & SMITH** LLP
   CARY L. WOOD, SB# 146598
2    E-Mail: Cary.Wood@lewisbrisbois.com
   DOMINEH FAZEL, SB# 256491
3    E-Mail: Domineh.Fazel@lewisbrisbois.com
   633 West 5th Street, Suite 4000
4  Los Angeles, California 90071
   Telephone: 213.250.1800
5  Facsimile: 213.250.7900

6  Attorneys for Defendant, PALM BEACH PARK
   ASSOCIATION
7

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9              COUNTY OF ORANGE, CENTRAL JUSTICE CENTER

10

| 11  OLE HAUGEN, an individual, | CASE NO. 30-2015-00819837-CU-BC-CJC |
|---|---|
| 12  Plaintiff, | **OBJECTION TO DECLARATION OF BONNIE HARRIS IN SUPPORT OF PLAINTIFF OLE HAUGEN'S EX PARTE APPLICATION FOR ORDER TO SHOW CAUSE AND PRELIMINARY INJUNCTION** |
| 13  vs. | |
| 14  PALM BEACH PARK ASSOCIATION, a California non-profit mutual benefit corporation; and DOES 1-20, | |
| 15 | |
| 16  Defendant. | *[Filed concurrently with the Opposition to Plaintiff's Ex Parte Application; Request for Judicial Notice; Evidentiary Objections to Declarations of Ole Haugen, Patrick J. Evans, Esq., and Patricia Worthington]* |
| 17 | |
| 18 | |
| 19 | Date:    December 22, 2014 |
|  | Time:    9:00 a.m. |
|  | Dept.:   CX-101 |
| 20 | |
| 21 | The Hon. Gail A. Andler |
|  | [Dept. CX-101] |
| 22 | Action Filed:    November 12, 2015 |
|  | Trial Date:      None Set |
| 23 | |

24       Defendant Palm Beach Park Association ("PBPA") hereby objects to the declaration of

25  Bonnie Harris submitted in support of Plaintiff's Application for a Order to Show Cause and

26  Temporary Restraining Order To Enjoin Sal of Palm Beach Mobilehome Park to Saunders

27  Property Co. as follows:

28  //

4847-8246-0972.1

1

OBJECTION TO DECLARATION OF BONNIE HARRIS IN SUPPORT OF PLAINTIFF OLE HAUGEN'S EX
PARTE APPLICATION FOR ORDER TO SHOW CAUSE AND PRELIMINARY INJUNCTION

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

ELECTRONICALLY FILED
Superior Court of California,
County of Orange

12/21/2015 at 04:55:00 PM
Clerk of the Superior Court
By Olga Lopez, Deputy Clerk

1 | **LEWIS BRISBOIS BISGAARD & SMITH** LLP
CARY L. WOOD, SB# 146598
2 |    E-Mail: Cary.Wood@lewisbrisbois.com
DOMINEH FAZEL, SB# 256491
3 |    E-Mail: Domineh.Fazel@lewisbrisbois.com
633 West 5th Street, Suite 4000
4 | Los Angeles, California 90071
Telephone: 213.250.1800
5 | Facsimile: 213.250.7900

6 | Attorneys for Defendant, PALM BEACH PARK
ASSOCIATION

7 |

8 | SUPERIOR COURT OF THE STATE OF CALIFORNIA

9 | COUNTY OF ORANGE, CENTRAL JUSTICE CENTER

10 |

11 | OLE HAUGEN, an individual,        | CASE NO. 30-2015-00819837-CU-BC-CJC

12 |          Plaintiff,               | **OBJECTION TO DECLARATION OF BONNIE HARRIS IN SUPPORT OF**
13 |     vs.                          | **PLAINTIFF OLE HAUGEN'S EX PARTE APPLICATION FOR ORDER TO SHOW**
14 | PALM BEACH PARK ASSOCIATION, a    | **CAUSE AND PRELIMINARY INJUNCTION**
California non-profit mutual benefit
15 | corporation; and DOES 1-20,       |
                                     | [*Filed concurrently with the Opposition to*
16 |          Defendant.              | *Plaintiff's Ex Parte Application; Request for*
                                     | *Judicial Notice; Evidentiary Objections to*
17 |                                  | *Declarations of Ole Haugen, Patrick J. Evans,*
                                     | *Esq., and Patricia Worthington* ]
18 |                                  |                                28
                                     | Date:    December ~~22~~, 2014
19 |                                  | Time:    9:00 a.m.
                                     | Dept.:   ~~CXX-10X~~   CX-102
20 |                                  |
21 |                                  | ~~The Honorable Clerk for Another~~
                                     | ~~Dept. CX-101~~
22 |                                  | Action Filed:    November 12, 2015
                                     | Trial Date:      None Set
23 |

24 |          Defendant Palm Beach Park Association ("PBPA") hereby objects to the declaration of

25 | Bonnie Harris submitted in support of Plaintiff's Application for a Order to Show Cause and

26 | Temporary Restraining Order To Enjoin Sal of Palm Beach Mobilehome Park to Saunders

27 | Property Co. as follows:

28 | //
4847-8246-0972.1                                              1

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

OBJECTION TO DECLARATION OF BONNIE HARRIS IN SUPPORT OF PLAINTIFF OLE HAUGEN'S EX
PARTE APPLICATION FOR ORDER TO SHOW CAUSE AND PRELIMINARY INJUNCTION

EXHIBIT  C
214

1  **LEWIS BRISBOIS BISGAARD & SMITH** LLP
   CARY L. WOOD, SB# 146598
2    E-Mail: Cary.Wood@lewisbrisbois.com
   DOMINEH FAZEL, SB# 256491
3    E-Mail: Domineh.Fazel@lewisbrisbois.com
   633 West 5th Street, Suite 4000
4  Los Angeles, California 90071
   Telephone: 213.250.1800
5  Facsimile: 213.250.7900

6  Attorneys for Defendant, PALM BEACH PARK
   ASSOCIATION
7

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9              COUNTY OF ORANGE, CENTRAL JUSTICE CENTER

10

| 11 | OLE HAUGEN, an individual, | CASE NO. 30-2015-00819837-CU-BC-CJC |
|---|---|---|
| 12 | Plaintiff, | **OBJECTION TO DECLARATION OF OLE HAUGEN IN SUPPORT OF** |
| 13 | vs. | **PLAINTIFF OLE HAUGEN'S EX PARTE APPLICATION FOR ORDER TO SHOW** |
| 14 | PALM BEACH PARK ASSOCIATION, a | **CAUSE AND PRELIMINARY** |
| 15 | California non-profit mutual benefit corporation; and DOES 1-20, | **INJUNCTION** |
| 16 | Defendant. | *[Filed concurrently with the Opposition to Plaintiff's Ex Parte Application; Request for* |
| 17 | | *Judicial Notice: Evidentiary Objections to Declarations of Bonnie Harris, Patrick J. Evans, Esq., and Patricia Worthington]* |
| 18 | | |
| 19 | | Date:    December 22, 2015 Time:   9:00 a.m. |
| 20 | | Dept.:   CX-101 |
| 21 | | The Hon. Gail A. Andler [Dept. CX-101] |
| 22 | | Action Filed:   November 12, 2015 |
| 23 | | Trial Date:    None Set |

24         Defendant Palm Beach Park Association ("PBPA") hereby objects to the declaration of

25  Ole Haugen submitted in support of Plaintiff's Application for a Order to Show Cause and

26  Temporary Restraining Order To Enjoin Sal of Palm Beach Mobilehome Park to Saunders

27  Property Co. as follows:

28  / / /

4815-2669-8028.1

OBJECTION TO DECLARATION OF OLE HAUGEN IN SUPPORT OF PLAINTIFF OLE HAUGEN'S EX PARTE
APPLICATION FOR ORDER TO SHOW CAUSE AND PRELIMINARY INJUNCTION

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP

ELECTRONICALLY FILED
Superior Court of California,
County of Orange

**12/21/2015** at 04:55:00 PM

Clerk of the Superior Court
By Olga Lopez, Deputy Clerk

1  LEWIS BRISBOIS BISGAARD & SMITH LLP
   CARY L. WOOD, SB# 146598
2    E-Mail: Cary.Wood@lewisbrisbois.com
   DOMINEH FAZEL, SB# 256491
3    E-Mail: Domineh.Fazel@lewisbrisbois.com
   633 West 5th Street, Suite 4000
4  Los Angeles, California 90071
   Telephone: 213.250.1800
5  Facsimile: 213.250.7900

6  Attorneys for Defendant, PALM BEACH PARK
   ASSOCIATION
7

8           SUPERIOR COURT OF THE STATE OF CALIFORNIA

9           COUNTY OF ORANGE, CENTRAL JUSTICE CENTER

10

| | |
|---|---|
| 11  OLE HAUGEN, an individual, | CASE NO. 30-2015-00819837-CU-BC-CJC |
| 12          Plaintiff, | **OBJECTION TO DECLARATION OF OLE HAUGEN IN SUPPORT OF** |
| 13     vs. | **PLAINTIFF OLE HAUGEN'S EX PARTE APPLICATION FOR ORDER TO SHOW** |
| 14  PALM BEACH PARK ASSOCIATION, a California non-profit mutual benefit | **CAUSE AND PRELIMINARY INJUNCTION** |
| 15  corporation; and DOES 1-20, | |
| 16          Defendant. | *[Filed concurrently with the Opposition to Plaintiff's Ex Parte Application; Request for* |
| 17 | *Judicial Notice; Evidentiary Objections to Declarations of Bonnie Harris, Patrick J.* |
| 18 | *Evans, Esq., and Patricia Worthington ]* |
| 19 | Date:    December ~~xx~~ 28, 2015 |
| 20 | Time:    9:00 a.m. |
| 21 | Dept.:   ~~C2XxxX01~~ cx-102 |
| 22 | ~~The Hon. Gail A. Andler~~ ~~[Dept. CX-101]~~ |
| 23 | Action Filed:   November 12, 2015 |
|  | Trial Date:   None Set |

24         Defendant Palm Beach Park Association ("PBPA") hereby objects to the declaration of

25  Ole Haugen submitted in support of Plaintiff's Application for a Order to Show Cause and

26  Temporary Restraining Order To Enjoin Sal of Palm Beach Mobilehome Park to Saunders

27  Property Co. as follows:

28  ///

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4815-2669-8028.1

OBJECTION TO DECLARATION OF OLE HAUGEN IN SUPPORT OF PLAINTIFF OLE HAUGEN'S EX PARTE
APPLICATION FOR ORDER TO SHOW CAUSE AND PRELIMINARY INJUNCTION

EXHIBIT _C_
216

1 | **LEWIS BRISBOIS BISGAARD & SMITH** LLP
CARY L. WOOD, SB# 146598
2 |   E-Mail: Cary.Wood@lewisbrisbois.com
DOMINEH FAZEL, SB# 256491
3 |   E-Mail: Domineh.Fazel@lewisbrisbois.com
633 West 5th Street, Suite 4000
4 | Los Angeles, California 90071
Telephone: 213.250.1800
5 | Facsimile: 213.250.7900

6 | Attorneys for Defendant, PALM BEACH PARK
ASSOCIATION

7 |

8 | SUPERIOR COURT OF THE STATE OF CALIFORNIA

9 | COUNTY OF ORANGE, CENTRAL JUSTICE CENTER

10 |

11 | OLE HAUGEN, an individual,

CASE NO. 30-2015-00819837-CU-BC-CJC

12 | Plaintiff,

**OBJECTION TO DECLARATION OF PATRICIA M. WORTHINGTON IN SUPPORT OF PLAINTIFF OLE HAUGEN'S EX PARTE APPLICATION FOR ORDER TO SHOW CAUSE AND PRELIMINARY INJUNCTION**

13 | vs.

14 | PALM BEACH PARK ASSOCIATION, a
California non-profit mutual benefit
15 | corporation; and DOES 1-20,

16 | Defendant.

[*Filed concurrently with the Opposition to Plaintiff's Ex Parte Application; Request for Judicial Notice; Evidentiary Objections to Declarations of Bonnie Harris, Patrick J. Evans, Esq., and Ole Haugen*]

17 |

18 |

19 | Date:     December 22, 2015
Time:     9:00 a.m.
Dept.:    CX-101

20 |

21 | The Hon. Gail A. Andler
[Dept. CX-101]

22 | Action Filed:    November 12, 2015
Trial Date:      None Set

23 |

24 | Defendant Palm Beach Park Association ("PBPA") hereby objects to the declaration of

25 | Patricia M. Worthington submitted in support of Plaintiff's Application for a Order to Show Cause

26 | and Temporary Restraining Order To Enjoin Sal of Palm Beach Mobilehome Park to Saunders

27 | Property Co. as follows:

28 | ///

4814-2636-2412.1

1

OBJECTION TO DECLARATION OF PATRICIA M. WORTHINGTON IN SUPPORT OF PLAINTIFF OLE
HAUGEN 'S EX PARTE APPLICATION FOR ORDER TO SHOW CAUSE AND PRELIMINARY INJUNCTION

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

ELECTRONICALLY FILED
Superior Court of California,
County of Orange

12/21/2015 at 04:55:00 PM
Clerk of the Superior Court
By Olga Lopez, Deputy Clerk

1   LEWIS BRISBOIS BISGAARD & SMITH LLP
    CARY L. WOOD, SB# 146598
2     E-Mail: Cary.Wood@lewisbrisbois.com
    DOMINEH FAZEL, SB# 256491
3     E-Mail: Domineh.Fazel@lewisbrisbois.com
    633 West 5th Street, Suite 4000
4   Los Angeles, California 90071
    Telephone: 213.250.1800
5   Facsimile: 213.250.7900

6   Attorneys for Defendant, PALM BEACH PARK
    ASSOCIATION
7

8           SUPERIOR COURT OF THE STATE OF CALIFORNIA

9           COUNTY OF ORANGE, CENTRAL JUSTICE CENTER

10

11   OLE HAUGEN, an individual,        |  CASE NO. 30-2015-00819837-CU-BC-CJC

12         Plaintiff,          |  **OBJECTION TO DECLARATION OF**
                                |  **PATRICIA M. WORTHINGTON IN**
13         vs.               |  **SUPPORT OF PLAINTIFF OLE**
                                |  **HAUGEN'S EX PARTE APPLICATION**
14   PALM BEACH PARK ASSOCIATION, a  |  **FOR ORDER TO SHOW CAUSE AND**
    California non-profit mutual benefit    |  **PRELIMINARY INJUNCTION**
15   corporation; and DOES 1-20,

16         Defendant.       |  *[Filed concurrently with the Opposition to*
                                |  *Plaintiff's Ex Parte Application; Request for*
17                           |  *Judicial Notice; Evidentiary Objections to*
                                |  *Declarations of Bonnie Harris, Patrick J.*
18                          |  *Evans, Esq., and Ole Haugen* ]

19                    |  Date:    December 22, 2015
                                |  Time:    9:00 a.m.
20                    |  Dept.:   ~~CX-101~~ CX-102

21                    |  ~~Reservation Number~~
                                |  ~~[Dept. CX-101]~~

22                    |  Action Filed:   November 12, 2015
                                |  Trial Date:     None Set
23

24        Defendant Palm Beach Park Association ("PBPA") hereby objects to the declaration of

25   Patricia M. Worthington submitted in support of Plaintiff's Application for a Order to Show Cause

26   and Temporary Restraining Order To Enjoin Sal of Palm Beach Mobilehome Park to Saunders

27   Property Co. as follows:

28   ///

    4814-2636-2412.1                             1

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

OBJECTION TO DECLARATION OF PATRICIA M. WORTHINGTON IN SUPPORT OF PLAINTIFF OLE
HAUGEN 'S EX PARTE APPLICATION FOR ORDER TO SHOW CAUSE AND PRELIMINARY INJUNCTION

EXHIBIT C
218

1 | **LEWIS BRISBOIS BISGAARD & SMITH** LLP
CARY L. WOOD, SB# 146598
2 |   E-Mail: Cary.Wood@lewisbrisbois.com
DOMINEH FAZEL, SB# 256491
3 |   E-Mail: Domineh.Fazel@lewisbrisbois.com
633 West 5th Street, Suite 4000
4 | Los Angeles, California 90071
Telephone: 213.250.1800
5 | Facsimile: 213.250.7900

6 | Attorneys for Defendant, PALM BEACH PARK
ASSOCIATION
7 |

8 | SUPERIOR COURT OF THE STATE OF CALIFORNIA

9 | COUNTY OF ORANGE, CENTRAL JUSTICE CENTER

10 |

| | |
|---|---|
| 11   OLE HAUGEN, an individual, | CASE NO. 30-2015-00819837-CU-BC-CJC |
| 12       Plaintiff, | **OBJECTION TO DECLARATION OF PATRICK J EVANS' IN SUPPORT OF** |
| 13     vs. | **PLAINTIFF OLE HAUGEN'S EX PARTE APPLICATION FOR ORDER TO SHOW** |
| 14   PALM BEACH PARK ASSOCIATION, a California non-profit mutual benefit | **CAUSE AND PRELIMINARY INJUNCTION** |
| 15   corporation; and DOES 1-20, | |
| 16       Defendant. | *[Filed concurrently with the Opposition to Plaintiff's Ex Parte Application; Request for Judicial Notice; Evidentiary Objections to* |
| 17 | *Declarations of Bonnie Harris, Ole Haugen,, and Patricia Worthington* ] |
| 18 | |
| 19 | Date:     December 22. 2015<br>Time:     9:00 a.m. |
| 20 | Dept.:     CX-101 |
| 21 | The Hon. Gail A. Andler<br>[Dept. CX-101] |
| 22 | Action Filed:     November 12. 2015 |
| 23 | Trial Date:     None Set |

24 |      Defendant Palm Beach Park Association ("PBPA") hereby objects to the declaration of

25 | Patrick J. Evans submitted in support of Plaintiff's Application for a Order to Show Cause and

26 | Temporary Restraining Order To Enjoin Sal of Palm Beach Mobilehome Park to Saunders

27 | Property Co. as follows:

28 | ///

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4842-6610-2828.1

1

OBJECTION TO DECLARATION OF PATRICK J. EVANS' IN SUPPORT OF PLAINTIFF OLE HAUGEN'S EX
PARTE APPLICATION FOR ORDER TO SHOW CAUSE AND PRELIMINARY INJUNCTION

ELECTRONICALLY FILED
Superior Court of California,
County of Orange

**12/21/2015** at 04:56:00 PM
Clerk of the Superior Court
By Olga Lopez, Deputy Clerk

1  LEWIS BRISBOIS BISGAARD & SMITH LLP
   CARY L. WOOD, SB# 146598
2    E-Mail: Cary.Wood@lewisbrisbois.com
   DOMINEH FAZEL, SB# 256491
3    E-Mail: Domineh.Fazel@lewisbrisbois.com
   633 West 5th Street, Suite 4000
4  Los Angeles, California 90071
   Telephone: 213.250.1800
5  Facsimile: 213.250.7900

6  Attorneys for Defendant, PALM BEACH PARK
   ASSOCIATION
7

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9              COUNTY OF ORANGE, CENTRAL JUSTICE CENTER

10

11 OLE HAUGEN, an individual,              CASE NO. 30-2015-00819837-CU-BC-CJC

12            Plaintiff,                   **OBJECTION TO DECLARATION OF
                                           PATRICK J EVANS' IN SUPPORT OF
13     vs.                                 PLAINTIFF OLE HAUGEN'S EX PARTE
                                           APPLICATION FOR ORDER TO SHOW
14 PALM BEACH PARK ASSOCIATION, a          CAUSE AND PRELIMINARY
   California non-profit mutual benefit    INJUNCTION**
15 corporation; and DOES 1-20,
                                           [*Filed concurrently with the Opposition to
16            Defendant.                    Plaintiff's Ex Parte Application; Request for
                                           Judicial Notice; Evidentiary Objections to
17                                         Declarations of Bonnie Harris, Ole Haugen,.
                                           and Patricia Worthington* ]
18
                                           Date:     December ~~22~~ 28, 2015
19                                         Time:     9:00 a.m.
                                           Dept.:    ~~XXXXXXX~~ CX-102
20
                                           ~~The Honorable Gail Andler~~
21                                         ~~xxxxxxxxxxxxxxx~~

22                                         Action Filed:   November 12, 2015
                                           Trial Date:     None Set
23

24     Defendant Palm Beach Park Association ("PBPA") hereby objects to the declaration of

25 Patrick J. Evans submitted in support of Plaintiff's Application for a Order to Show Cause and

26 Temporary Restraining Order To Enjoin Sal of Palm Beach Mobilehome Park to Saunders

27 Property Co. as follows:

28 ///

4842-6610-2828.1                                1
OBJECTION TO DECLARATION OF PATRICK J. EVANS' IN SUPPORT OF PLAINTIFF OLE HAUGEN'S EX
PARTE APPLICATION FOR ORDER TO SHOW CAUSE AND PRELIMINARY INJUNCTION

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP

*F. Chodosh, et al., v. J. Saunders, et al.*

**July 21, 2020**

**COMPLAINT**

**EXHIBIT – D**

| 2015-16 | *Haugen v. PBPA* |
| | |
| | Register of Actions ("ROA"), also called: |
| | |
| | "Docket" |
| | |
| | 2015 – 2016 |
| | |
| | (out of chronological order) |

Case Summary:

| | |
|---|---|
| Case Id: | 30-2015-00819837-CU-BC-CXC |
| Case Title: | OLE HAUGEN VS. PALM BEACH PARK ASSOCIATION |
| Case Type: | BREACH OF CONTRACT/WARRANTY |
| Filing Date: | 11/12/2015 |
| Category: | CIVIL - UNLIMITED |

Register Of Actions:

| ROA | Docket | Filing Date | Filing Party | Document | Select |
|---|---|---|---|---|---|
| 1 | E-FILING TRANSACTION 4463255 RECEIVED ON 11/11/2015 10:15:18 PM. | 11/13/2015 | | *NV* | |
| 2 | COMPLAINT FILED BY HAUGEN, OLE ON 11/12/2015 | 11/12/2015 | | 388 pages | ☐ |
| 3 | CIVIL CASE COVER SHEET FILED BY HAUGEN, OLE ON 11/12/2015 | 11/12/2015 | | 1 pages | ☐ |
| 4 | NOTICE OF RELATED CASE FILED BY HAUGEN, OLE ON 11/12/2015 | 11/12/2015 | | 3 pages | ☐ |
| 5 | PAYMENT RECEIVED BY FOR 194 - COMPLAINT OR OTHER 1ST PAPER IN THE AMOUNT OF 435.00, TRANSACTION NUMBER 11877743 AND RECEIPT NUMBER 11701934. | 11/13/2015 | | 1 pages | ☐ |
| 6 | CASE ASSIGNED TO JUDICIAL OFFICER SHERMAN, RANDALL ON 11/12/2015. | 11/12/2015 | | 1 pages | ☐ |
| 7 | E-FILING TRANSACTION 2422563 RECEIVED ON 11/13/2015 02:00:18 PM. | 11/13/2015 | | *NV* | |
| 8 | SUMMONS ISSUED AND FILED FILED BY HAUGEN, OLE ON 11/13/2015 | 11/13/2015 | | 1 pages | ☐ |
| 9 | CASE REASSIGNED TO ROBERT MOSS EFFECTIVE 11/16/2015. | 11/16/2015 | | *NV* | |
| 10 | RELATED CASES INCLUDE: 30-2010-00423544 IN RE: PALM BEACH PARK ASSOCIATION CASES. | 11/16/2015 | | *NV* | |
| 11 | THIS CASE IS REASSIGNED TO THE HONORABLE ROBERT J. MOSS FOR ALL PURPOSES. | 11/16/2015 | | *NV* | |
| 12 | MINUTES FINALIZED FOR CHAMBERS WORK 11/16/2015 02:39:00 PM. | 11/16/2015 | | 1 pages | ☐ |
| 13 | CLERK'S CERTIFICATE OF SERVICE BY MAIL OC GENERATED | 11/16/2015 | | 1 pages | |
| 14 | E-FILING TRANSACTION 3354580 RECEIVED ON 11/23/2015 12:00:32 PM. | 11/24/2015 | | *NV* | |
| 15 | NOTICE OF PENDENCY OF ACTION FILED BY HAUGEN, OLE ON 11/23/2015 | 11/23/2015 | | 7 pages | ☐ |
| 16 | PROOF OF PERSONAL SERVICE FILED BY HAUGEN, OLE ON 11/23/2015 | 11/23/2015 | | 2 pages | ☐ |
| 17 | E-FILING TRANSACTION 3355872 RECEIVED ON 11/25/2015 08:58:11 PM. | 11/30/2015 | | *NV* | |
| 18 | PEREMPTORY CHALLENGE PURSUANT TO 170.6 CCP (JUDGE ROBERT J. MOSS) FILED BY HAUGEN, OLE ON 11/25/2015 | 11/25/2015 | | 3 pages | ☐ |
| 19 | CASE REASSIGNED TO GAIL ANDLER EFFECTIVE 11/30/2015. | 11/30/2015 | | *NV* | |
| 20 | PEREMPTORY CHALLENGE UNDER C.C.P. 170.6 AS TO THE HONORABLE ROBERT J. MOSS FILED. | 11/30/2015 | | *NV* | |
| 21 | THIS CASE IS REASSIGNED TO THE HONORABLE GAIL A. ANDLER FOR ALL PURPOSES. | 11/30/2015 | | *NV* | |

**EXHIBIT D**

| ROA | Docket | Filing Date | Filing Party | Document | Select |
|---|---|---|---|---|---|
| 22 | MINUTES FINALIZED FOR CHAMBERS WORK 11/30/2015 03:03:00 PM. | 11/30/2015 | | 1 pages | ☐ |
| 23 | E-FILING TRANSACTION 4471094 RECEIVED ON 12/01/2015 05:21:25 PM. | 12/02/2015 | | *NV* | |
| 25 | PAYMENT RECEIVED BY FOR 195 - ANSWER OR OTHER 1ST PAPER IN THE AMOUNT OF 435.00, TRANSACTION NUMBER 11885676 AND RECEIPT NUMBER 11709869. | 12/02/2015 | | 1 pages | ☐ |
| 26 | OBJECTION (OBJECTION TO CODE OF CIVIL PROCEDURE 170.6 PEREMPTORY CHALLANGE) FILED BY PALM BEACH PARK ASSOCIATION ON 12/01/2015 | 12/01/2015 | | 28 pages | ☐ |
| 27 | E-FILING TRANSACTION 4473079 RECEIVED ON 12/07/2015 06:53:46 AM. | 12/07/2015 | | *NV* | |
| 28 | OPPOSITION FILED BY HAUGEN, OLE ON 12/07/2015 | 12/07/2015 | | 6 pages | ☐ |
| 29 | E-FILING TRANSACTION 4474587 RECEIVED ON 12/09/2015 02:03:40 PM. | 12/09/2015 | | *NV* | |
| 30 | NOTICE - OTHER FILED BY PALM BEACH PARK ASSOCIATION ON 12/09/2015 | 12/09/2015 | | 2 pages | ☐ |
| 31 | PROPOSED ORDER RECEIVED ON 12/15/2015 | 12/15/2015 | | 3 pages | ☐ |
| 32 | E-FILING TRANSACTION 1295221 RECEIVED ON 12/15/2015 12:21:33 PM. | 12/15/2015 | | *NV* | |
| 33 | DEMURRER TO COMPLAINT FILED BY PALM BEACH PARK ASSOCIATION ON 12/15/2015 | 12/15/2015 | | 17 pages | ☐ |
| 34 | REQUEST FOR JUDICIAL NOTICE FILED BY PALM BEACH PARK ASSOCIATION ON 12/15/2015 | 12/15/2015 | | 53 pages | ☐ |
| 35 | PAYMENT RECEIVED BY FOR 36 - MOTION OR OTHER (NOT 1ST) PAPER REQUIRING A HEARING IN THE AMOUNT OF 60.00, TRANSACTION NUMBER 11892748 AND RECEIPT NUMBER 11716941. | 12/15/2015 | | 1 pages | ☐ |
| 36 | DEMURRER TO COMPLAINT SCHEDULED FOR 03/07/2016 AT 01:30:00 PM IN CX101 AT CIVIL COMPLEX CENTER. | 12/15/2015 | | *NV* | |
| 37 | PROPOSED ORDER RECEIVED ON 12/21/2015 | 12/21/2015 | | 3 pages | ☐ |
| 38 | E-FILING TRANSACTION 4479843 RECEIVED ON 12/21/2015 11:02:36 AM. | 12/21/2015 | | *NV* | |
| 39 | EX PARTE APPLICATION - OTHER RECEIVED ON 12/21/2015. | 12/21/2015 | | 58 pages | ☐ |
| 40 | NOTICE OF HEARING RECEIVED ON 12/21/2015. | 12/21/2015 | | 7 pages | ☐ |
| 41 | REQUEST FOR JUDICIAL NOTICE RECEIVED ON 12/21/2015. | 12/21/2015 | | 210 pages | ☐ |
| 42 | NOTICE OF LODGING RECEIVED ON 12/21/2015. | 12/21/2015 | | 2 pages | ☐ |
| 43 | PROPOSED ORDER (COVER SHEET) (ELECTRONIC FILING) FILED BY HAUGEN, OLE ON 12/21/2015 | 12/21/2015 | | 2 pages | ☐ |
| 44 | PAYMENT RECEIVED BY FOR 36 - MOTION OR OTHER (NOT 1ST) PAPER REQUIRING A HEARING IN THE AMOUNT OF 60.00, TRANSACTION NUMBER 11895490 AND RECEIPT NUMBER 11719701. | 12/21/2015 | | 1 pages | ☐ |
| 45 | PROPOSED ORDER RECEIVED ON 12/21/2015 | 12/21/2015 | | 3 pages | ☐ |
| 46 | MINUTES FINALIZED FOR CHAMBERS WORK 12/22/2015 09:29:00 AM. | 12/22/2015 | | 1 pages | ☐ |
| 47 | CLERK'S CERTIFICATE OF MAILING/ELECTRONIC SERVICE | 12/22/2015 | | 2 pages | ☐ |

| ROA | Docket | Filing Date | Filing Party | Document | Select |
|---|---|---|---|---|---|
| 48 | E-FILING TRANSACTION NUMBER 1295222 REJECTED. | 12/22/2015 | | 1 pages | ☐ |
| 49 | EX PARTE SCHEDULED FOR 12/22/2015 AT 09:00:00 AM IN CX102 AT CIVIL COMPLEX CENTER. | 12/22/2015 | | *NV* | |
| 50 | EX PARTE SCHEDULED FOR 12/28/2015 AT 08:30:00 AM IN CX102 AT CIVIL COMPLEX CENTER. | 12/22/2015 | | *NV* | |
| 51 | EX PARTE CONTINUED TO 12/28/2015 AT 08:30 AM IN THIS DEPARTMENT. | 12/22/2015 | | *NV* | |
| 52 | MINUTES FINALIZED FOR EX PARTE 12/22/2015 09:00:00 AM. | 12/22/2015 | | 1 pages | ☐ |
| 53 | E-FILING TRANSACTION NUMBER 4480146 REJECTED. | 12/22/2015 | | 1 pages | ☐ |
| 54 | E-FILING TRANSACTION NUMBER 4479844 REJECTED. | 12/22/2015 | | 1 pages | ☐ |
| 55 | E-FILING TRANSACTION 3363470 RECEIVED ON 12/21/2015 04:55:54 PM. | 12/22/2015 | | *NV* | |
| 56 | OPPOSITION FILED BY PALM BEACH PARK ASSOCIATION ON 12/21/2015 | 12/21/2015 | | 105 pages | ☐ |
| 57 | REQUEST FOR JUDICIAL NOTICE FILED BY PALM BEACH PARK ASSOCIATION ON 12/21/2015 | 12/21/2015 | | 75 pages | ☐ |
| 58 | OBJECTION (TO DECLARATION OF BONNIE HARRIS IN SUPPORT) FILED BY PALM BEACH PARK ASSOCIATION ON 12/21/2015 | 12/21/2015 | | 4 pages | ☐ |
| 59 | OBJECTION (TO DECLARATION OF OLE HAGUEN IN SUPPORT) FILED BY PALM BEACH PARK ASSOCIATION ON 12/21/2015 | 12/21/2015 | | 6 pages | ☐ |
| 60 | OBJECTION (TO DECLARATION OF PATRICIA M. WORTHINGTON IN SUPPORT) FILED BY PALM BEACH PARK ASSOCIATION ON 12/21/2015 | 12/21/2015 | | 4 pages | ☐ |
| 61 | OBJECTION (TO DECLARATION OF PATRICK J. EVANS' IN SUPPORT) FILED BY PALM BEACH PARK ASSOCIATION ON 12/21/2015 | 12/21/2015 | | 13 pages | ☐ |
| 62 | E-FILING TRANSACTION NUMBER 4480145 REJECTED. | 12/22/2015 | | 1 pages | ☐ |
| 63 | E-FILING TRANSACTION 2431244 RECEIVED ON 12/22/2015 02:32:42 PM. | 12/23/2015 | | *NV* | |
| 64 | NOTICE OF CONTINUANCE FILED BY PALM BEACH PARK ASSOCIATION ON 12/22/2015 | 12/22/2015 | | 3 pages | ☐ |
| 65 | CASE REASSIGNED TO ROBERT MOSS EFFECTIVE 12/22/2015. | 12/23/2015 | | *NV* | |
| 66 | THIS CASE IS REASSIGNED TO THE HONORABLE ROBERT J. MOSS FOR ALL PURPOSES. | 12/23/2015 | | *NV* | |
| 67 | MINUTES FINALIZED FOR CHAMBERS WORK 12/23/2015 02:25:00 PM. | 12/23/2015 | | 1 pages | ☐ |
| 68 | CLERK'S CERTIFICATE OF MAILING/ELECTRONIC SERVICE | 12/23/2015 | | 2 pages | ☐ |
| 69 | DEMURRER TO COMPLAINT REASSIGNED TO CX102 AT CIVIL COMPLEX CENTER ON 03/07/2016 AT 01:30:00 PM. | 12/23/2015 | | *NV* | |
| 70 | PROPOSED ORDER RECEIVED ON 12/24/2015 | 12/24/2015 | | 3 pages | ☐ |
| 71 | E-FILING TRANSACTION 4481999 RECEIVED ON 12/28/2015 05:44:47 AM. | 12/28/2015 | | *NV* | |
| 72 | REPLY TO OPPOSITION FILED BY HAUGEN, OLE ON 12/28/2015 | 12/28/2015 | | 7 pages | ☐ |
| 73 | MINUTES FINALIZED FOR EX PARTE 12/28/2015 08:30:00 AM. | 12/28/2015 | | 2 pages | ☐ |

EXHIBIT D

| ROA | Docket | Filing Date | Filing Party | Document | Select |
|---|---|---|---|---|---|
| 74 | E-FILING TRANSACTION 3364712 RECEIVED ON 12/24/2015 02:22:10 PM. | 12/28/2015 | | *NV* | |
| 75 | MOTION TO EXPUNGE LIS PENDENS FILED BY PALM BEACH PARK ASSOCIATION ON 12/24/2015 | 12/24/2015 | | 147 pages | ☐ |
| 76 | PROPOSED ORDER (COVER SHEET) (ELECTRONIC FILING) FILED BY PALM BEACH PARK ASSOCIATION ON 12/24/2015 | 12/24/2015 | | 1 pages | ☐ |
| 77 | NOTICE OF LODGING FILED BY PALM BEACH PARK ASSOCIATION ON 12/24/2015 | 12/24/2015 | | 9 pages | ☐ |
| 78 | PAYMENT RECEIVED BY FOR 36 - MOTION OR OTHER (NOT 1ST) PAPER REQUIRING A HEARING IN THE AMOUNT OF 60.00, TRANSACTION NUMBER 11897744 AND RECEIPT NUMBER 11721936. | 12/28/2015 | | 1 pages | ☐ |
| 79 | MOTION TO EXPUNGE LIS PENDENS SCHEDULED FOR 02/26/2016 AT 09:00:00 AM IN CX102 AT CIVIL COMPLEX CENTER. | 12/28/2015 | | *NV* | |
| 80 | E-FILING TRANSACTION 2434753 RECEIVED ON 01/08/2016 04:04:20 PM. | 01/08/2016 | | *NV* | |
| 81 | NOTICE OF ERRATA FILED BY PALM BEACH PARK ASSOCIATION ON 01/08/2016 | 01/08/2016 | | 3 pages | ☐ |
| 82 | E-FILING TRANSACTION 3368904 RECEIVED ON 01/11/2016 08:39:23 AM. | 01/11/2016 | | *NV* | |
| 83 | REQUEST FOR JUDICIAL NOTICE FILED BY PALM BEACH PARK ASSOCIATION ON 01/11/2016 | 01/11/2016 | | 17 pages | ☐ |
| 84 | DEMURRER TO COMPLAINT REASSIGNED TO C14 AT CENTRAL JUSTICE CENTER ON 03/11/2016 AT 09:00:00 AM. | 01/11/2016 | | *NV* | |
| 85 | DEMURRER TO COMPLAINT SCHEDULED FOR 03/11/2016 AT 09:00:00 AM IN C14 AT CENTRAL JUSTICE CENTER. | 01/11/2016 | | *NV* | |
| 86 | MOTION TO EXPUNGE LIS PENDENS REASSIGNED TO C14 AT CENTRAL JUSTICE CENTER ON 03/11/2016 AT 09:00:00 AM. | 01/11/2016 | | *NV* | |
| 87 | MOTION TO EXPUNGE LIS PENDENS SCHEDULED FOR 03/11/2016 AT 09:00:00 AM IN C14 AT CENTRAL JUSTICE CENTER. | 01/11/2016 | | *NV* | |
| 88 | DEMURRER TO COMPLAINT CONTINUED TO 03/11/2016 AT 09:00 AM IN THIS DEPARTMENT. | 01/11/2016 | | *NV* | |
| 89 | MOTION TO EXPUNGE LIS PENDENS CONTINUED TO 03/11/2016 AT 09:00 AM IN THIS DEPARTMENT. | 01/11/2016 | | *NV* | |
| 90 | MINUTES FINALIZED FOR CHAMBERS WORK 01/11/2016 03:36:00 PM. | 01/11/2016 | | 1 pages | ☐ |
| 91 | CLERK'S CERTIFICATE OF MAILING/ELECTRONIC SERVICE | 01/11/2016 | | 2 pages | ☐ |
| 92 | E-FILING TRANSACTION 3371757 RECEIVED ON 01/19/2016 08:56:39 AM. | 01/19/2016 | | *NV* | |
| 93 | NOTICE - OTHER (CHANGE OF DEPARTMENT, LOCATION AND DATE RE: MOTION) FILED BY PALM BEACH PARK ASSOCIATION ON 01/19/2016 | 01/19/2016 | | 3 pages | ☐ |
| 94 | E-FILING TRANSACTION 4491863 RECEIVED ON 01/19/2016 03:56:36 PM. | 01/20/2016 | | *NV* | |
| 95 | NOTICE - OTHER FILED BY PALM BEACH PARK ASSOCIATION ON 01/19/2016 | 01/19/2016 | | 3 pages | ☐ |

EXHIBIT D

| ROA | Docket | Filing Date | Filing Party | Document | Select |
|---|---|---|---|---|---|
| 96 | E-FILING TRANSACTION 3374660 RECEIVED ON 01/26/2016 04:29:14 PM. | 01/27/2016 | | *NV* | |
| 97 | NOTICE OF CONTINUANCE FILED BY PALM BEACH PARK ASSOCIATION ON 01/26/2016 | 01/26/2016 | | 6 pages | ☐ |
| 98 | E-FILING TRANSACTION NUMBER 3364713 REJECTED. | 02/26/2016 | | 1 pages | ☐ |
| 99 | E-FILING TRANSACTION 1307430 RECEIVED ON 02/29/2016 06:00:14 PM. | 02/29/2016 | | *NV* | |
| 100 | OPPOSITION FILED BY HAUGEN, OLE ON 02/29/2016 | 02/29/2016 | | 6 pages | ☐ |
| 101 | OPPOSITION FILED BY HAUGEN, OLE ON 02/29/2016 | 02/29/2016 | | 6 pages | ☐ |
| 102 | REQUEST FOR JUDICIAL NOTICE FILED BY HAUGEN, OLE ON 02/29/2016 | 02/29/2016 | | 7 pages | ☐ |
| 103 | E-FILING TRANSACTION 2446695 RECEIVED ON 02/26/2016 12:58:21 PM. | 03/01/2016 | | *NV* | |
| 104 | MOTION TO COMPEL ANSWERS TO INTERROGATORIES FILED BY PALM BEACH PARK ASSOCIATION ON 02/26/2016 | 02/26/2016 | | 18 pages | ☐ |
| 105 | MOTION TO COMPEL ANSWERS TO INTERROGATORIES FILED BY PALM BEACH PARK ASSOCIATION ON 02/26/2016 | 02/26/2016 | | 40 pages | ☐ |
| 106 | PAYMENT RECEIVED BY ONELEGAL FOR 36 - MOTION OR OTHER (NOT 1ST) PAPER REQUIRING A HEARING, 36 - MOTION OR OTHER (NOT 1ST) PAPER REQUIRING A HEARING IN THE AMOUNT OF 120.00, TRANSACTION NUMBER 11928765 AND RECEIPT NUMBER 11752983. | 03/01/2016 | | 1 pages | ☐ |
| 107 | MOTION TO COMPEL ANSWERS TO FORM INTERROGATORIES SCHEDULED FOR 04/22/2016 AT 09:00:00 AM IN C14 AT . | 03/01/2016 | | *NV* | |
| 108 | MOTION TO COMPEL ANSWERS TO SPECIAL INTERROGATORIES SCHEDULED FOR 04/22/2016 AT 09:00:00 AM IN C14 AT . | 03/01/2016 | | *NV* | |
| 109 | E-FILING TRANSACTION 2448191 RECEIVED ON 03/03/2016 02:00:50 PM. | 03/04/2016 | | *NV* | |
| 110 | REQUEST FOR DISMISSAL WITHOUT PREJUDICE - ENTIRE ACTION FILED BY HAUGEN, OLE ON 03/03/2016 | 03/03/2016 | | 1 pages | ☐ |
| 111 | COMPLAINT DISPOSED WITH DISPOSITION OF REQUEST FOR DISMISSAL. | 03/03/2016 | | *NV* | |
| 112 | CASE DISMISSED WITH DISPOSITION OF REQUEST FOR DISMISSAL | 03/03/2016 | | *NV* | |
| 113 | E-FILING TRANSACTION 3389103 RECEIVED ON 03/08/2016 05:48:11 PM. | 03/08/2016 | | *NV* | |
| 114 | REPLY - OTHER FILED BY PALM BEACH PARK ASSOCIATION ON 03/08/2016 | 03/08/2016 | | 10 pages | ☐ |
| 115 | E-FILING TRANSACTION 4514790 RECEIVED ON 03/09/2016 08:31:46 AM. | 03/09/2016 | | *NV* | |
| 116 | REQUEST FOR JUDICIAL NOTICE FILED BY PALM BEACH PARK ASSOCIATION ON 03/09/2016 | 03/09/2016 | | 6 pages | ☐ |
| 117 | E-FILING TRANSACTION 4515211 RECEIVED ON 03/09/2016 03:38:54 PM. | 03/09/2016 | | *NV* | |
| 118 | NOTICE OF ENTRY OF DISMISSAL AND PROOF OF SERVICE FILED BY HAUGEN, OLE ON 03/09/2016 | 03/09/2016 | | 3 pages | ☐ |

EXHIBIT D

| ROA | Docket | Filing Date | Filing Party | Document | Select |
|---|---|---|---|---|---|
| 119 | NOTICE OF ENTRY OF DISMISSAL AND PROOF OF SERVICE FILED BY HAUGEN, OLE ON 03/09/2016 | 03/09/2016 | | 9 pages | ☐ |
| 120 | E-FILING TRANSACTION 3390052 RECEIVED ON 03/10/2016 04:00:39 PM. | 03/10/2016 | | NV | |
| 121 | NOTICE OF RULING FILED BY PALM BEACH PARK ASSOCIATION ON 03/10/2016 | 03/10/2016 | | 4 pages | ☐ |
| 122 | E-FILING TRANSACTION 1309359 RECEIVED ON 03/10/2016 05:02:54 PM. | 03/10/2016 | | NV | |
| 123 | PROPOSED ORDER (COVER SHEET) (ELECTRONIC FILING) FILED BY PALM BEACH PARK ASSOCIATION ON 03/10/2016 | 03/10/2016 | | 4 pages | ☐ |
| 124 | MINUTES FINALIZED FOR MULTIPLE EVENTS 03/11/2016 09:00:00 AM. | 03/11/2016 | | 1 pages | ☐ |
| 125 | E-FILING TRANSACTION 1309360 RECEIVED ON 03/10/2016 05:02:56 PM. | 03/15/2016 | | NV | |
| 126 | ORDER - OTHER (EXPUNGING LIS PENDENS) FILED BY PALM BEACH PARK ASSOCIATION ON 03/14/2016 | 03/14/2016 | | 2 pages | ☐ |
| 127 | PROPOSED ORDER RECEIVED ON 03/16/2016 | 03/16/2016 | | 10 pages | ☐ |
| 128 | E-FILING TRANSACTION 2451714 RECEIVED ON 03/16/2016 05:05:31 PM. | 03/17/2016 | | NV | |
| 129 | OBJECTION FILED BY HAUGEN, OLE ON 03/16/2016 | 03/16/2016 | | 46 pages | ☐ |
| 130 | PROPOSED ORDER (COVER SHEET) (ELECTRONIC FILING) FILED BY HAUGEN, OLE ON 03/16/2016 | 03/16/2016 | | 10 pages | ☐ |
| 131 | E-FILING TRANSACTION 4518934 RECEIVED ON 03/17/2016 01:53:15 PM. | 03/17/2016 | | NV | |
| 132 | NOTICE OF ERRATA FILED BY HAUGEN, OLE ON 03/17/2016 | 03/17/2016 | | 6 pages | ☐ |
| 133 | PROPOSED ORDER RECEIVED ON 03/30/2016 | 03/30/2016 | | 2 pages | ☐ |
| 134 | E-FILING TRANSACTION 1313344 RECEIVED ON 03/29/2016 01:07:19 PM. | 03/30/2016 | | NV | |
| 135 | NOTICE - OTHER (OF ORDER) FILED BY PALM BEACH PARK ASSOCIATION ON 03/29/2016 | 03/29/2016 | | 4 pages | ☐ |
| 136 | E-FILING TRANSACTION 1313623 RECEIVED ON 03/30/2016 10:09:23 AM. | 04/01/2016 | | NV | |
| 137 | MOTION FOR ATTORNEY FEES FILED BY PALM BEACH PARK ASSOCIATION ON 03/30/2016 | 03/30/2016 | | 86 pages | ☐ |
| 138 | PROPOSED ORDER (COVER SHEET) (ELECTRONIC FILING) FILED BY PALM BEACH PARK ASSOCIATION ON 03/30/2016 | 03/30/2016 | | 2 pages | ☐ |
| 139 | PAYMENT RECEIVED BY ONELEGAL FOR 36 - MOTION OR OTHER (NOT 1ST) PAPER REQUIRING A HEARING IN THE AMOUNT OF 60.00, TRANSACTION NUMBER 11944809 AND RECEIPT NUMBER 11768983. | 04/01/2016 | | 1 pages | ☐ |
| 140 | MOTION FOR ATTORNEY FEES SCHEDULED FOR 06/03/2016 AT 09:00:00 AM IN C14 AT . | 04/01/2016 | | NV | |
| 141 | E-FILING TRANSACTION NUMBER 2451715 REJECTED. | 04/04/2016 | | 1 pages | ☐ |
| 142 | E-FILING TRANSACTION 2454509 RECEIVED ON 04/12/2016 02:04:26 PM. | 04/12/2016 | | NV | |
| 143 | NOTICE OF WITHDRAWAL OF MOTION FILED BY PALM BEACH PARK ASSOCIATION ON 04/12/2016 | 04/12/2016 | | 3 pages | ☐ |

EXHIBIT D
227

| ROA | Docket | Filing Date | Filing Party | Document | Select |
|---|---|---|---|---|---|
| 144 | NOTICE OF WITHDRAWAL OF MOTION FILED BY PALM BEACH PARK ASSOCIATION ON 04/12/2016 | 04/12/2016 | | 3 pages | ☐ |
| 145 | MINUTES FINALIZED FOR MULTIPLE EVENTS 04/22/2016 09:00:00 AM. | 04/22/2016 | | 1 pages | ☐ |
| 146 | E-FILING TRANSACTION 3408746 RECEIVED ON 04/29/2016 02:39:50 PM. | 05/02/2016 | | *NV* | |
| 147 | MEMORANDUM OF COSTS (SUMMARY) FILED BY PALM BEACH PARK ASSOCIATION ON 04/29/2016 | 04/29/2016 | | 6 pages | ☐ |
| 148 | PROPOSED ORDER RECEIVED ON 05/16/2016 | 05/16/2016 | | 3 pages | ☐ |
| 149 | E-FILING TRANSACTION 4548312 RECEIVED ON 05/16/2016 07:55:06 PM. | 05/18/2016 | | *NV* | |
| 150 | MOTION TO STRIKE OR TAX COSTS FILED BY HAUGEN, OLE ON 05/16/2016 | 05/16/2016 | | 4 pages | ☐ |
| 151 | PROPOSED ORDER (COVER SHEET) (ELECTRONIC FILING) FILED BY HAUGEN, OLE ON 05/16/2016 | 05/16/2016 | | 4 pages | ☐ |
| 152 | PAYMENT RECEIVED BY ONELEGAL FOR 36 - MOTION OR OTHER (NOT 1ST) PAPER REQUIRING A HEARING IN THE AMOUNT OF 60.00, TRANSACTION NUMBER 11969548 AND RECEIPT NUMBER 11793704. | 05/18/2016 | | 1 pages | ☐ |
| 153 | MOTION TO TAX COSTS SCHEDULED FOR 08/05/2016 AT 09:00:00 AM IN C14 AT . | 05/18/2016 | | *NV* | |
| 154 | E-FILING TRANSACTION 4550397 RECEIVED ON 05/19/2016 07:51:26 PM. | 05/19/2016 | | *NV* | |
| 155 | OPPOSITION FILED BY HAUGEN, OLE ON 05/19/2016 | 05/19/2016 | | 4 pages | ☐ |
| 156 | E-FILING TRANSACTION 3417721 RECEIVED ON 05/25/2016 11:06:35 AM. | 05/25/2016 | | *NV* | |
| 157 | REPLY - OTHER FILED BY PALM BEACH PARK ASSOCIATION ON 05/25/2016 | 05/25/2016 | | 3 pages | ☐ |
| 158 | E-FILING TRANSACTION 4554963 RECEIVED ON 05/31/2016 02:34:52 PM. | 05/31/2016 | | *NV* | |
| 159 | REQUEST FOR JUDICIAL NOTICE FILED BY PALM BEACH PARK ASSOCIATION ON 05/31/2016 | 05/31/2016 | | 5 pages | ☐ |
| 160 | MINUTES FINALIZED FOR MOTION FOR ATTORNEY FEES 06/03/2016 09:00:00 AM. | 06/03/2016 | | 1 pages | ☐ |
| 161 | E-FILING TRANSACTION 3420919 RECEIVED ON 06/03/2016 12:33:37 PM. | 06/03/2016 | | *NV* | |
| 162 | NOTICE OF RULING FILED BY PALM BEACH PARK ASSOCIATION ON 06/03/2016 | 06/03/2016 | | 3 pages | ☐ |
| 163 | E-FILING TRANSACTION 1313624 RECEIVED ON 03/30/2016 10:09:28 AM. | 06/13/2016 | | *NV* | |
| 164 | ORDER - OTHER (ATTORNEYS' FEES) FILED BY PALM BEACH PARK ASSOCIATION ON 06/03/2016 | 06/03/2016 | | *NV* | |
| 165 | E-FILING TRANSACTION 3438791 RECEIVED ON 07/25/2016 03:33:13 PM. | 07/25/2016 | | *NV* | |
| 166 | OPPOSITION FILED BY PALM BEACH PARK ASSOCIATION ON 07/25/2016 | 07/25/2016 | | 6 pages | ☐ |
| 167 | MINUTES FINALIZED FOR MOTION TO TAX COSTS 08/05/2016 09:00:00 AM. | 08/05/2016 | | 2 pages | ☐ |

EXHIBIT D

| ROA | Docket | Filing Date | Filing Party | Document | Select |
|-----|--------|-------------|--------------|----------|--------|
| 168 | E-FILING TRANSACTION NUMBER 4548373 REJECTED. | 08/05/2016 | | 1 pages | ☐ |
| 169 | E-FILING TRANSACTION 4588342 RECEIVED ON 08/09/2016 12:18:51 PM. | 08/09/2016 | | *NV* | |
| 170 | NOTICE OF RULING FILED BY PALM BEACH PARK ASSOCIATION ON 08/09/2016 | 08/09/2016 | | 5 pages | ☐ |
| 171 | E-FILING TRANSACTION 2485638 RECEIVED ON 08/15/2016 11:05:39 AM. | 08/16/2016 | | *NV* | |
| 172 | PROPOSED JUDGMENT RECEIVED ON 08/15/2016. | 08/15/2016 | | 3 pages | ☐ |
| 173 | E-FILING TRANSACTION 4592159 RECEIVED ON 08/16/2016 07:18:46 PM. | 08/17/2016 | | *NV* | |
| 174 | OBJECTION FILED BY HAUGEN, OLE ON 08/16/2016 | 08/16/2016 | | 6 pages | ☐ |
| 175 | JUDGMENT (FOR COSTS OF THE SUIT) FILED BY THE SUPERIOR COURT OF ORANGE ON 08/30/2016 | 08/30/2016 | | 3 pages | ☐ |

Participants:

| Name | Type | Assoc | Start Date | End Date |
|------|------|-------|------------|----------|
| OLE HAUGEN | PLAINTIFF | | 11/13/2015 | |
| LEWIS BRISBOIS BISGAARD & SMITH LLP | ATTORNEY | | 12/15/2015 | |
| PALM BEACH PARK ASSOCIATION | DEFENDANT | | 11/13/2015 | |
| LAW OFFICE OF PATRICK J. EVANS | ATTORNEY | | 11/13/2015 | |

Hearings:

| Description | Date | Time | Department | Judge |
|-------------|------|------|------------|-------|

Print this page

EXHIBIT D
229

***F. Chodosh, et al., v. J. Saunders, et al.***

**July 21, 2020**

**COMPLAINT**

**EXHIBIT – E**

| 04/29/16 | Judge Moss Verified Answer – <br><br> Denial of ex parte contact in *Haugen v. PBPA* (See, Answer, pg. 8, ¶6, lines 22-23) |
|---|---|

EXHIBIT E
230

**VERIFIED ANSWER OF JUDGE ROBERT J. MOSS**

I, Robert J. Moss, declare as follows:

1. I am a Judge of the Superior Court of California, County of Orange. If called upon as a witness, I could and would competently testify to the matters stated herein.

2. The judicially noticeable case file reflects that the lead case, *Chodosh vs. Palm Beach Park Association* (OCSC Case No. 30-2010-00423544 ) was filed on December 13, 2010. In early 2011 it was consolidated with the other Palm Beach Cases including:

    a. *Eicherly vs. Palm Beach Park Association* 30-2010-00423807

    b. *Harris vs. Palm Beach Park Association* 30-2010-00425213

    c. *Schowalter vs. Palm Beach Park Association*   30-2010-00425173

    d. *Moore vs. Palm Beach Park Association* 30-2010-00425206

    e. *McLaughlin vs. Palm Beach Park Association* 30-2010-00432261

    f. *Peterson vs. Palm Beach Park Association* 30-2010-00425323

    g. *Kane vs. Palm Beach Park Association* 30-2010-00425331

    h. *Haugen vs. Palm Beach Park Association* 30-2010-00425291

3. These consolidated cases were tried in four phases. Phase I was tried as a bench trial before the Honorable Nancy Wieben Stock in 2013. Judge Stock subsequently retired, and these consolidated cases were assigned to me on January 6, 2014. Since then, I have presided over the final three phases. I presided over Phase II commencing on September 22, 2014, and Phase III commencing on April 13, 2015. I presided over a bench trial of Phase IV between December 7, 2015 and December 15, 2015. I took the matter under submission and issued a tentative ruling on February 18, 2016. I issued a written statement of decision on March 30, 2016. Judgment was entered on the consolidated cases

-7-

ORDER STRIKING STATEMENT OF DISQUALIFICATION
AND, IN THE ALTERNATIVE, VERIFIED ANSWER

12 AA 2663

EXHIBIT E
231

1   on April 14, 2016.

2       4.     On April 25, 2016, Attorney for Plaintiffs filed a Statement of Disqualification

3   contending that I should be disqualified based on the following allegations:

4           a.   On December 22, 2015, I reassumed jurisdiction of a related case,

5

6             *Haugen v. Palm Beach Park Association* (OCSC Case No. 30-2015-

7             00819837), by sustaining Defendant's objection to Plaintiff's peremptory

8             challenge;

9           b.  My rulings and decisions in these consolidated proceedings have been

10             based on bias or a person aware of the facts might reasonably entertain a

11             doubt that I am biased;

12

13           c.  I criticized Plaintiffs' counsel in a tentative ruling, and commented on

14             Plaintiffs' possibility of success on an issue or possibility of settlement.

15       5.     I specifically deny that I am biased or prejudiced for or against any attorney or

16   party in these consolidated proceedings or in *Haugen*. I specifically deny that any of my rulings

17   have been based on bias or prejudice. I am not prejudiced or biased against or in favor of

18   any attorney party in these proceeding actions, nor am I unable to act impartially. I have no

19   personal interest in these proceedings and know of no reason why I cannot be fair and

20   impartial.

21

22       6.     Plaintiff dismissed the *Haugen* case on March 9, 2016. I specifically deny that I

23   engaged in any *ex parte* contacts in the *Haugen* case. I further deny that I interjected myself

24   into that suit or took any unauthorized action in that proceeding in order to frustrate plaintiffs'

25   success. Rather, I reassumed jurisdiction in *Haugen* after sustaining the defendant's

26   objection to plaintiff's peremptory challenge. The objection established that the peremptory

27   challenge had been untimely asserted. The numbering of the Register of Actions reflects the

28                                 -8-

ORDER STRIKING STATEMENT OF DISQUALIFICATION
AND, IN THE ALTERNATIVE, VERIFIED ANSWER

**12 AA 2664**

EXHIBIT E
232

1    correct order in which documents were filed in the *Haugen* case. With respect to the filing

2    times listed in the Register of Actions, I do not believe all of them are accurate. As far as I

3    am aware, no issue concerning my jurisdiction or the propriety of my presiding over the

4    proceedings in *Haugen* was raised until after plaintiff dismissed the case.

5

6       7.    I specifically deny that I have acted improperly in *Haugen* or in these

7    proceedings. All statements made, all actions taken, and all of my rulings have been based

8    on my understanding of the facts and law, and have been in furtherance of what I believe to be

9    my judicial duties.

10      8.    I do not believe that my recusal would serve the interests of justice.

11      9.    I know of no facts or circumstances which would require my disqualification or

12   recusal in this case.

13      I declare under penalty of perjury that the foregoing is true and correct. Executed on

14   April 29 , 2016, at Santa Ana, California.

15

16

17                                                    _____
                                                      Judge Robert J. Moss

18

19

20

21

22

23

24

25

26

27

28

-9-

ORDER STRIKING STATEMENT OF DISQUALIFICATION
AND, IN THE ALTERNATIVE, VERIFIED ANSWER

**12 AA 2665**

EXHIBIT E
233

*F. Chodosh, et al., v. J. Saunders, et al.*

**July 21, 2020**

**COMPLAINT**

**EXHIBIT – F**

| | |
|---|---|
| 03/20/19 | Notice Appeal over, Case Remanded Back to Judge Moss |
| 05/20/19 | Plaintiffs' Peremptory Challenge, face page |
| 07/31/19 | Judge Moss Salary Affidavit Cut-off 6/2/19; s/   7/31/19 |
| 08/30/19 | Judge Moss Salary Affidavit Cut-off 7/2/19; s/   8/30/19 |
| 09/30/19 | Judge Moss Salary Affidavit Cut-off 8/2/19; s/   9/30/19 |
| 10/31/19 | Judge Moss Salary Affidavit Cut-off 9/1/19; s/   10/31/19 |
| 11/20/19 | Judge Moss MINUTE ORDER Grant §170.6 filed 5/20/19 |
| 12/03/19 | Judge Moss Salary Affidavit Cut-off 10/2/19; s/ 12/3/19 |
| 01/06/20 | Judge Moss Salary Affidavit Cut-off 11/2/19; s/ 01/6/20 |
| 07/02/19 | CJP Order Public Admonishment, Judge B. Lamb |

**SUPERIOR COURT OF CALIFORNIA,
COUNTY OF ORANGE
CENTRAL JUSTICE CENTER**

**MINUTE ORDER**

DATE: 03/20/2019          TIME: 03:48:00 PM          DEPT: C01

JUDICIAL OFFICER PRESIDING: Presiding Judge Kirk H. Nakamura
CLERK: L. Labrador
REPORTER/ERM: None
BAILIFF/COURT ATTENDANT:

CASE NO: **30-2010-00423544-CU-BC-CJC**  CASE INIT.DATE: 11/08/2010
CASE TITLE: **In Re Palm Beach Park Association Cases (Chodosh)**
CASE CATEGORY: Civil - Unlimited          CASE TYPE: Breach of Contract/Warranty

EVENT ID/DOCUMENT ID: 72140196
**EVENT TYPE**: Chambers Work

**APPEARANCES**

There are no appearances by any party.

This matter having been returned from the Court of Appeal, State of California, Fourth Appellate District, Division Three, with the judgment affirmed in part, reversed in part and remanded with directions, this Court now orders the following:

This case is reassigned to the Honorable Robert J. Moss in Department C14 for the purpose of addressing the reversal of the judgement, as reasons stated on the Remittitur.

Court orders Clerk to give notice. Plaintiff to give notice to any parties not listed and to file proof of service with the court within 10 days.

---

DATE: 03/20/2019                    MINUTE ORDER                    Page 1
DEPT: C01                                                    Calendar No.

EXHIBIT F
235

ELECTRONICALLY FILED
Superior Court of California,
County of Orange

05/20/2019 at 08:00:00 AM

Clerk of the Superior Court
By Skeeter Berry, Deputy Clerk

1  **PATRICK J. EVANS, SBN 110535**
   **LAW OFFICE OF PATRICK J. EVANS**
2  **16897 ALGONQUIN STREET, SUITE F**
   **HUNTINGTON BEACH, CALIFORNIA 92649**
3  **Tel:  714\ 594-5722; Fax: 714\ 840-6861**
   pevans@pevanslawoffice.com
4  **Attorneys for all Plaintiffs,**
   **Floyd M. Chodosh, et al.**
5

6

7           **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

8       **FOR THE COUNTY OF ORANGE – CENTRAL JUSTICE CENTER**

9
   | In Re PALM BEACH PARK | CASE NO. 30-2010-00423544-CU-BC-CJC |
10 | ASSOCIATION CASES (Chodosh) | |

11                                          [Assigned to Dept. C-14
                                             Hon. Robert J. Moss]
12

13 FLOYD M. CHODOSH, et al. individuals,   **MOTION AND CHALLENGE FOR**
                                            **DISQUALIFICATION OF JUDGE**
14          Plaintiffs,                     **ROBERT J. MOSS;**
                                            **CODE OF CIVIL PROCEDURE**
15      v.                                  **§170.6(a)(2); MOTION TO DISQUALIFY**
                                            **JUDICIAL OFFICER AFTER PARTIAL**
16                                          **REVERSAL ON APPEAL;**
   PALM BEACH PARK ASSOCIATION, a          **DECLARATION OF PLAINTIFF'S**
17 California non- profit mutual benefit    **COUNSEL IN SUPPORT**
   corporation,
18                                          **[NO HEARING REQUIRED;**
          Defendant.                        **NO NOTICE REQUIRED]**
19
                                            Action Filed: Nov. 10, 2010
20

21 **TO THE HONORABLE COURT, DEFENDANT AND INTERESTED PERSONS:**

22
        I, Patrick J. Evans, hereby declare:
23
        I am counsel for all Plaintiffs, Floyd M. Chodosh, et al. ("Plaintiffs") in this action.
24

25      Pursuant to Code Civil Procedure sec. 170.6(a)(2), Plaintiffs hereby move and request

26 that the assigned Judge, Honorable Robert J. Moss, be disqualified to hear the case and cause

27 and that the case and cause be re-assigned to another judicial officer.

28
                                            1
   **MOTION TO DISQUALIFY – MOTION AND DECLARATION – CODE CIV. PROC. §170.6(a)(2)**

EXHIBIT F
236

**STATE OF CALIFORNIA**
County of Orange

## AFFIDAVIT (Government Code 68210)

I, _____ MOSS, ROBERT J. _____ , Judge of the Superior Court of the State of California, County of Orange, declare that for the pay period ending August 31, 2019, I have no pending, undetermined matters that were submitted for decision before June 2, 2019.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

_____
Signature

_____ 7/31/19 _____
Date

AUGUST 2019

**83**

EXHIBIT F
237

# STATE OF CALIFORNIA
County of Orange

## AFFIDAVIT (Government Code 68210)

I, _____ MOSS, ROBERT J. _____ , Judge of the Superior Court of the State of California, County of Orange, declare that for the pay period ending September 30, 2019, I have no pending, undetermined matters that were submitted for decision before July 2, 2019.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

_____          _____
Signature                                                                Date   8/30/19

SEPTEMBER 2019                                                                                    83

**STATE OF CALIFORNIA**
County of Orange

## AFFIDAVIT (Government Code 68210)

I, _____ MOSS, ROBERT J. _____ , Judge of the Superior Court of the State of California, County of Orange, declare that for the pay period ending October 31, 2019, I have no pending, undetermined matters that were submitted for decision before August 2, 2019.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

_____
Signature

_____
Date

OCTOBER 2019

83

EXHIBIT F
239

**STATE OF CALIFORNIA**
County of Orange

## AFFIDAVIT (Government Code 68210)

I, _____ MOSS, ROBERT J. _____ , Judge of the Superior Court of the State of California, County of Orange, declare that for the pay period ending November 30, 2019, I have no pending, undetermined matters that were submitted for decision before September 1, 2019.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

_____                    _____
            Signature                                                    Date

NOVEMBER 2019                                                                                83

--------------------------------------------------------------------------------

EXHIBIT _F_
240

**SUPERIOR COURT OF CALIFORNIA,**
**COUNTY OF ORANGE**
**CENTRAL JUSTICE CENTER**

**MINUTE ORDER**

DATE: 11/20/2019                TIME: 01:50:00 PM          DEPT:  C14

JUDICIAL OFFICER PRESIDING: Robert J. Moss
CLERK: Joanne M Schwartz
REPORTER/ERM: None
BAILIFF/COURT ATTENDANT: Kosal Thach

CASE NO: **30-2010-00423544-CU-BC-CJC**  CASE INIT.DATE: 11/08/2010
CASE TITLE: **In Re Palm Beach Park Association Cases (Chodosh)**
CASE CATEGORY: Civil - Unlimited      CASE TYPE: Breach of Contract/Warranty

EVENT ID/DOCUMENT ID: 73172294
**EVENT TYPE:** Chambers Work

**APPEARANCES**

There are no appearances by any party.

Motion and Challenge for Disqualfication of Judge Robert J. Moss pursuant to Code of Civil Procedure 170.6 (a)(2) is filed by plaintiffs, Floyd M. Chodoshe, et al on 05/20/22019.

Peremptory challenge was filed as Declaration-Other. Court was unaware of filing until this date.

Challenge made by plaintiffs is granted.

Case is transferred to the Presiding Judge in Department C01 for reassignment.

Court orders clerk to give notice.

EXHIBIT F

241

**STATE OF CALIFORNIA**
County of Orange

## AFFIDAVIT (Government Code 68210)

I, _____ MOSS, ROBERT J. _____ , Judge of the Superior Court of the State of California, County of Orange, declare that for the pay period ending December 31, 2019, I have no pending, undetermined matters that were submitted for decision before October 2, 2019.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

_____          _____
              Signature                                          Date

DECEMBER 2019                                                                                      **83**

--------------------------------------------------------------------------------

EXHIBIT F
242

**STATE OF CALIFORNIA**
County of Orange

## AFFIDAVIT (Government Code 68210)

I, _____ MOSS, ROBERT J. _____ , Judge of the Superior Court of the State of California, County of Orange, declare that for the pay period ending January 31, 2020, I have no pending, undetermined matters that were submitted for decision before November 2, 2019.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

_____
Signature

_____ 1/6/20 _____
Date

JANUARY 2020

83

EXHIBIT F
243

**STATE OF CALIFORNIA**
**BEFORE THE COMMISSION ON JUDICIAL PERFORMANCE**

| | |
|---|---|
| **IN THE MATTER CONCERNING JUDGE BRIAN LAMB** | **DECISION AND ORDER IMPOSING PUBLIC ADMONISHMENT** |

This disciplinary matter concerns Judge Brian Lamb, a judge of the Inyo County Superior Court since 2003.  His current term began in 2015.  Pursuant to rule 116 of the Rules of the Commission on Judicial Performance, Judge Lamb and his attorney, Daniel S. Agle, appeared before the commission on June 26, 2019, to contest the imposition of a proposed public admonishment issued on March 29, 2019.  Judge Lamb has waived his right to formal proceedings under rule 118 and to review by the Supreme Court.  Having considered the written and oral objections and argument submitted by Judge Lamb and his counsel, and good cause appearing, the Commission on Judicial Performance issues this public admonishment pursuant to article VI, section 18(d) of the California Constitution, based upon the following statement of facts and reasons.

STATEMENT OF FACTS AND REASONS

Judge Lamb engaged in improper conduct by failing to timely act in three family law cases and by signing two false salary affidavits.  His prior discipline for similar misconduct—an advisory letter in 2006 and a private admonishment in 2015—were significant aggravating factors.

Canon 3B(8) of the Code of Judicial Ethics requires judges to dispose of all judicial matters promptly and efficiently.  Canon 3 requires judges to perform their judicial duties competently and diligently.  Canon 2A requires judges to act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.

1

EXHIBIT F

Under California law, judges are expected to decide matters submitted to them within 90 days of submission, and are prohibited from receiving their salaries when they have undecided matters under submission for more than 90 days.  (Cal. Const., art. VI, § 19; *Mardikian v. Commission on Judicial Performance* (1985) 40 Cal.3d 473, 477, fn. 4.)  Government Code section 68210 requires judges to execute affidavits declaring that they are in compliance with the law.

1. *In Regard to the Marriage of Richardson* (SICVFL15-57764).  Judge Lamb delayed more than 14 months—from January 3, 2017 until March 6, 2018—in issuing a final judgment and statement of decision in this matter.  Trial concluded on August 23, 2016.  The matter was submitted for decision on September 2, 2016.  Judge Lamb issued a judgment on December 2, 2016.  The petitioner filed an ex parte application for relief from the judgment, requesting a statement of decision.  Judge Lamb issued an order vacating the judgment, converting it to a proposed statement of decision, and inviting objections from the parties.  Both parties timely filed objections on January 3, 2017.  On February 10, 2018, Judge Lamb set a hearing on the objections for February 26, 2018.  He did not issue the dissolution judgment or the statement of decision until March 6, 2018, more than 14 months after the parties filed their January 3, 2017 objections.

Judge Lamb recognized that a "considerable amount of time" passed between his receipt of objections on January 3, 2017 and his setting the hearing on February 10, 2018, and apologized for the delay.  He said he "lost track" of the matter, but this is inconsistent with the fact that he ruled on a motion in the case in the intervening period.  Judge Lamb's "lost track" explanation is the same one he offered in connection with his 2006 advisory letter and his 2015 private admonishment.

2

EXHIBIT F

The 14-month delay between the January 3, 2017 objections and the March 6, 2018 final judgment and statement of decision was unreasonable. (*Mardikian,* 40 Cal.3d at p. 477, fn. 4.)  Delay in dissolution proceedings "necessarily prejudices the parties who are unable to remarry, utilize assets, or establish stable homes for the children of the marriage." (*Id.* at p. 483, fn. 9.) Judge Lamb's conduct violated canon 3B(8) and canon 3.

2. *In Regard to the Marriage of Faldowski* (SICVFL12-53648/15-58551). Judge Lamb delayed more than 12 months—from August 25, 2016 until September 5, 2017—before issuing a final statement of decision in this matter.  A post-judgment request for order regarding child support, attorney fees, and support arrearages was submitted for decision on May 27, 2016.  Judge Lamb issued a tentative decision 90 days later, on August 25, 2016.  On September 15, 2016, the respondent filed a request for a statement of decision.  Due to a clerical error, this request was not brought to Judge Lamb's attention until six weeks later, on October 27, 2016.  Judge Lamb granted himself a 40-day extension of time to December 5, 2016 to issue the statement of decision.  The day before this extension ran out, Judge Lamb ordered the petitioner to draft the proposed statement of decision.  The petitioner filed the proposed statement of decision on December 12, 2016, followed by timely objections and a reply, closing the pleadings on December 27, 2016.  Judge Lamb did not issue the final statement of decision until September 5, 2017, more than 12 months after he had issued his tentative decision.

Judge Lamb contended that there is no deadline for the issuance of a final statement of decision.  Judge Lamb was, however, still required by canon 3B(8) to resolve the matter fairly, promptly, and efficiently.  Judge Lamb admitted that he was reminded of the outstanding final statement of decision on June 6, 2017, when he held a hearing on petitioner's March 28, 2017 request for order, which stated that the parties were still waiting for the statement of decision and final judgment, and described the negative impact of the delay on the petitioner.

3

EXHIBIT  F
246

Judge Lamb nevertheless delayed an additional three months before issuing the final statement of decision.  Issuing the final statement of decision more than 12 months after the tentative decision was unreasonable and violated canon 3B(8).

3.  *In Regard to the Marriage of Kruse* (SICVFL16-59777).  Judge Lamb ruled on a request for an order for support and attorney fees 63 days late in this matter.  He presided over a hearing on the request on September 1, 2016.  The matter was submitted for decision on October 4, 2016.  Judge Lamb did not issue an order on the request until March 7, 2017, 63 days after the 90th day after submission.  This delay was unreasonable and violated canon 3B(8).

Further, on December 6, 2016, the respondent filed a request for a ruling regarding attorney fees and costs, pursuant to Family Code section 2031, subdivision (a)(2), which requires that a ruling on fees must issue within 15 days of the hearing.  Judge Lamb did not issue an order within 15 days.  This also violated canon 3B(8).

Judge Lamb apologized for these delays and told the commission that he did not know how he "lost track" of this matter.  He admitted, however, that a court operations manager sent him emails on November 30, 2016 and December 19, 2016, both of which attached a submitted matter list showing that the ruling in *Kruse* was due by January 3, 2017.  He also admitted that the presiding judge sent him an email on December 20, 2016 reminding him of his upcoming submitted matter deadlines, including *Kruse*.

In addition, in January 2017 and February 2017, while *Kruse* remained pending and undecided in excess of 90 days, Judge Lamb signed and submitted salary affidavits pursuant to Government Code section 68210 in which he falsely declared that no cause remained pending and undetermined that had been submitted to him for decision in excess of 90 days.  Judge Lamb stated that he did not know the January and February 2017 salary affidavits were false when he signed them, but the fact that a judge may be unaware that he or she has matters that have been under submission for more than 90 days is not a defense

4

to a charge of filing false salary affidavits.  "A judge who executes a salary affidavit affirming he or she has no overdue ruling should take care to ensure that the statement is true when it is made." (*Inquiry Concerning Freedman* (2007) 49 Cal.4th CJP Supp. 223, 246; *Public Admonishment of Judge John D. Kirihara* (2012), p. 3.)  Lamb's false salary affidavits violated his duty to respect and comply with the law and to act at all times in a manner that promotes public confidence in the integrity of the judiciary (canon 2A).

Judge Lamb's conduct was, at a minimum, improper action.

In determining to issue this public admonishment, the commission considered Judge Lamb's prior discipline to be a significant aggravating factor. Judge Lamb received an advisory letter in 2006 for issuing a decision in a family law case 22 days after the 90th day after the matter had been submitted for decision.  Judge Lamb stated that the matter "slipped between the cracks" and "dropped from his radar screen."  Judge Lamb told the commission he had conferred with his presiding judge and that they "redesigned their current practices for tracking submitted cases," and "put in place parallel and redundant systems for calendaring of submitted matters, and for alerting judges to the pendency and status of those cases," said he would meet with his presiding judge "on a regular basis to assure himself that matters are decided on a timely basis, and that [he] has the time and other resources he needs to file timely decisions on submitted matters," and said that these changes were "to ensure nothing like this occurs again in Inyo County."  The commission considered Judge Lamb's apology and remedial steps mitigating, but also warned him that the failure to promptly decide family law matters is particularly egregious in light of the harm to the parties.

Judge Lamb then received a private admonishment in 2015 for failing to issue a decision in a submitted matter until six months after he stated he would. Judge Lamb was reminded about the need to issue the decision approximately four months after the matter was submitted and obtained the file to determine

which judge was responsible for the matter, but failed to promptly review the file (and it was his case all along).  During that time, another judge expressed concern to Judge Lamb about the submitted matter and the 90-day rule.  A month later, Judge Lamb was provided definitive notice that it was his decision that was overdue, but he did not issue the decision until another month had passed.  While the underlying matter remained pending and undecided in excess of 90 days, Judge Lamb also signed false salary affidavits declaring that no cause remained pending and undetermined that had been submitted to him for decision in excess of 90 days.  Judge Lamb recognized that he should not have allowed the matter to "fall off his radar," said he regretted the delay, and asserted that he did not knowingly sign the false salary affidavits.  The private admonishment referred to the 2006 advisory letter, and the further delay in ruling after it became clear that Judge Lamb was responsible for the outstanding ruling, as aggravating factors.

The commission recognizes that Judge Lamb is a hard-working judge, but it did not consider his assertions about his workload or his apologies mitigating in this matter because he has been previously disciplined twice for similar misconduct.

Commission members Nanci E. Nishimura, Esq.; Hon. Michael B. Harper; Anthony P. Capozzi, Esq.; Ms. Sarah Kruer Jager; Ms. Kay Cooperman Jue; Hon. Lisa B. Lench; Dr. Michael A. Moodian; and Mr. Adam N. Torres voted for the public admonishment.  Hon. William S. Dato, Mr. Eduardo De La Riva, and Mr. Richard Simpson did not participate.

Dated:  July 2, 2019

_____
Nanci E. Nishimura
Chairperson

6

EXHIBIT F

*F. Chodosh, et al., v. J. Saunders, et al.*

**July 21, 2020**

**COMPLAINT**

**EXHIBIT – G**

| | |
|---|---|
| 04/25/16 | Letter transmittal Complaint against Judge Robert J. Moss |
| 04/26/16 | Comm. on Judicial Perf. ("CJP"), Complaint Letter received |
| 06/15/16 | CJP Staff Letter Requesting Dec. 21-22, 2015 Court Documents |
| 06/20/16 | Letter to CJP providing requested court documents |
| 07/26/16 | CJP Letter complaint "under consideration" |
| 12/20/18 | CJP / AG Demurrer disqualified Judge Moss "judicial discretion" |
| 05/14/20 | CJP Notice "no basis for action against the judge" |

# Law Office Of Patrick J. Evans

**16897 Algonquin Street, Suite F**
**Huntington Beach, CA 92649**
**Tel.: (714) 594 – 5722; Fax: (714) 840 – 6861**
**E-mail: pevans@pevanslawoffice.com**

April 25, 2016

**BY COURIER**

**Commission on Judicial Performance**
455 Golden Gate Avenue, Suite 14400
San Francisco, California 94102

Re:  **COMPLAINT AGAINST ORANGE COUNTY SUPERIOR COURT JUDGE**
**THE HONORABLE ROBERT J. MOSS, ARISING IN THE CASE:**
*Ole Haugen  vs. Palm Beach Park Association,*  **#30-2015-00819837 and in related cases**
**WILLFUL JUDICIAL MISCONDUCT - TAKING BACK CASE ON WHICH JUDGE HAD**
**BEEN DISQUALIFIED BY 170.6 CHALLENGE GRANTED BY SUPERVISING JUDGE**

Dear Commissioners and Staff:

My clients and I hereby lodge complaint against Orange County Superior Court Judge the
Honorable Robert J. Moss.  My clients are Floyd Chodosh, et al., identified in the enclosures.

Judge Moss called in from vacation to take back a case on which he had been disqualified by my
client's 170.6 peremptory challenge.  The case concerned the sale of a seniors only mobilehome
park situated on rare and valuable coastal property in Orange County.

Judge Moss, acting through his clerk, took back the case and delayed our TRO hearing.  Four
hours later, the Park was sold in the sale we alleged involved fiduciary breach and self-dealing.

The basis for our complaint is presented in detail through Statements of Disqualification,
Appendix of Exhibits, Memorandum of Points and Authorities, and Requests for Judicial Notice.
The documents are included in the enclosed four (4) binders.   For convenience, a flash drive
with the materials in pdf file format is also enclosed.

For review it may be best to start with Appendix Exhibit A, read it and other Appendix exhibits,
then the Statements of Disqualification and the Memorandum, which make reference to case
pleadings and other documents in the Requests for Judicial Notice.

Please let us know any question or follow up.  Thank you for your attention and service.

Sincerely,

PATRICK J. EVANS

Encls.:  Four (4) 3 ring binders, one flash drive

# EXHIBIT G



State of California
### Commission on Judicial Performance
455 Golden Gate Avenue, Suite 14400
San Francisco, CA 94102-3660
(415) 557-1200
FAX (415) 557-1266
Web Site: http://cjp.ca.gov

April 26, 2016

Patrick J. Evans, Esq.
Law Office of Patrick J. Evans
16897 Algonquin St., Suite F
Huntington Beach, CA 92649

Dear Mr. Evans:

    This letter is to acknowledge receipt of your complaint about a California judge(s). We are presently reviewing this information and you will be advised in writing, at a later date, of the commission's action in this matter.

Very truly yours,

Mary Harvey
Secretary to Staff Counsel

Confidential under California Constitution,
Article VI, Section 18, and Commission Rule 102

289
EXHIBIT G
252



State of California
## Commission on Judicial Performance
455 Golden Gate Avenue, Suite 14400
San Francisco, CA 94102-3660
(415) 557-1200
FAX (415) 557-1266
Web Site: http://cjp.ca.gov

June 15, 2016

Patrick J. Evans, Esq.
Law Office of Patrick J. Evans
16987 Algonquin Street, Suite F
Huntington Beach, CA 92649

Dear Mr. Evans:

This letter concerns the correspondence you submitted to the Commission on Judicial Performance on April 25, 2016. In order to proceed further with your complaint, please provide the following documents from case number 30-2015-00819837 at your earliest convenience:

1. A copy of the CCP 170.6 peremptory challenge you filed on November 25, 2015;
2. A copy of the written order or minute order, if any, reassigning the case on November 30, 2015, based on your 170.6 challenge;
3. A copy of the defendant's objection filed on December 1, 2015;
4. A copy of your opposition to the objection filed on December 7, 2015;
5. A copy of the written order or minute order, if any, reassigning the case back to the judge on December 22 or 23, 2015

The additional information and documents you provide will be reviewed upon receipt. Without further details, we cannot determine whether there may be grounds for a judicial investigation. Please provide the above information by July 6, 2016. If we do not hear from you by that date, your complaint will be processed based on the information in the file.

Please note that this commission does not have the authority to provide legal advice, reverse or re-litigate legal rulings, move your case to another department or court, or otherwise intervene in your case. Our work is limited to handling complaints involving allegations of misconduct by California state court judges.

Thank you for your prompt attention to this matter.

Very truly yours,

Anne M. Hunter
Staff Counsel

AH:as/L06142016 Evans

EXHIBIT G
253

# Law Office Of Patrick J. Evans

**16897 Algonquin Street, Suite F**
**Huntington Beach, CA 92649**
**Tel.: (714) 594 – 5722; Fax: (714) 840 – 6861**
**E-mail: pevans@pevanslawoffice.com**

June 20, 2016

Commission on Judicial Performance
455 Golden Gate Avenue, Suite 14400
San Francisco, California 94102
Attention: Anne M. Hunter, Staff Counsel

Re:   **RESPONSE TO DOCUMENT REQUEST RE: HONORABLE ROBERT J. MOSS**

Dear Ms. Hunter:

Responding to your June 15, 2016 letter, enclosed are copies of the documents requested. For reference and convenience, attached to this letter is a copy of your June 15 letter marked to show the enclosures and the corresponding "Register of Action" ("ROA") number for each document.

Please note there are two (2) documents responsive to your request #5, a Minute Order entered 12/22/15 and another entered 12/23/15. Please also note that the 12/22 and 12/23 Minute Orders are also provided separately with their court clerk proofs of service attached. The Minute Orders appear on the ROA both as Minute Orders only and separately with their respective proofs of service. The individual Minute Orders and their respective Proofs of Service (which include copy of the Minute Order) have different ROA numbers.

Also enclosed are copies of purchase information and document lists received when I downloaded the requested documents from the Orange County Superior Court website. Please be advised that I purchased and downloaded the requested documents from the OCSC website on Saturday, June 18, 2016. I declare under penalty of perjury under the laws of the State of California that I obtained the enclosed documents from the Orange County Superior Court website as indicated.

Please note that document #4, Opposition, incorrectly refers to court hearing, etc. on Nov. 30, 2015. The hearing (at which Judge Moss acknowledged his disqualification, etc.) was Dec. 1, 2015, not Nov. 30. Also, defendants Objection, #3, prints out as "light" copy text as downloaded from the court website.

Separately, and so as to complete the chronological sequence of documents, while it was not requested, I have enclosed a complete copy of the Notice of Lodging (filed 12/24/15) of the Grant Deed (recorded 12/22/15) by which defendant in the case, the Palm Beach Park Association, purported to convey the mobilehome park property to the buyers. This was not downloaded; it is a copy of the service copy; ROA #77.

Please let us know any other question or follow up. Thank you for your attention to this matter.

Sincerely,

PATRICK J. EVANS

Encls.

EXHIBIT G
254



*PJE*
*6/20/2016*

State of California
**Commission on Judicial Performance**
455 Golden Gate Avenue, Suite 14400
San Francisco, CA  94102-3660
(415) 557-1200
FAX (415) 557-1266
Web Site: http://cjp.ca.gov

June 15, 2016

Patrick J. Evans, Esq.
Law Office of Patrick J. Evans
16987 Algonquin Street, Suite F
Huntington Beach, CA 92649

Dear Mr. Evans:

This letter concerns the correspondence you submitted to the Commission on Judicial Performance on April 25, 2016. In order to proceed further with your complaint, please provide the following documents from case number 30-2015-00819837 at your earliest convenience:

*ROA #*

*18*   1. A copy of the CCP 170.6 peremptory challenge you filed on November 25, 2015;

*22*   2. A copy of the written order or minute order, if any, reassigning the case on November 30, 2015, based on your 170.6 challenge;

*26*   3. A copy of the defendant's objection filed on December 1, 2015;

*28*   4. A copy of your opposition to the objection filed on December 7, 2015;

*12/22*  *46  MO*
*47  POS*
*12/23*  *67  MO*
*68  POS*

    5. A copy of the written order or minute order, if any, reassigning the case back to the judge on December 22 or 23, 2015

The additional information and documents you provide will be reviewed upon receipt. Without further details, we cannot determine whether there may be grounds for a judicial investigation. Please provide the above information by July 6, 2016. If we do not hear from you by that date, your complaint will be processed based on the information in the file.

Please note that this commission does not have the authority to provide legal advice, reverse or re-litigate legal rulings, move your case to another department or court, or otherwise intervene in your case. Our work is limited to handling complaints involving allegations of misconduct by California state court judges.

Thank you for your prompt attention to this matter.

Very truly yours,

Anne M. Hunter
Staff Counsel

AH:as/L06142016 Evans

EXHIBIT G
255



State of California
Commission on Judicial Performance
455 Golden Gate Avenue, Suite 14400
San Francisco, CA 94102-3660
(415) 557-1200
FAX (415) 557-1266
Web Site: http://cjp.ca.gov

July 26, 2016

Patrick J. Evans, Esq.
Law Office of Patrick J. Evans
16987 Algonquin Street, Suite F
Huntington Beach, CA 92649

Dear Mr. Evans:

Thank you for your correspondence dated June 20, 2016. This matter is still under consideration. We will be in touch with you after the commission has reached a decision regarding your complaint.

Very truly yours,

Anne M. Hunter
Staff Counsel

AH:as/L0726Evans

Confidential under California Constitution,
Article VI, Section 18, and Commission Rule 102

EXHIBIT G
256

1   XAVIER BECERRA
    Attorney General of California
2   ANTHONY R. HAKL
    Supervising Deputy Attorney General
3   MAUREEN C. ONYEAGBAKO
    Deputy Attorney General
4   State Bar No. 238419
    1300 I Street, Suite 125
5     P.O. Box 944255
    Sacramento, CA 94244-2550
6     Telephone: (916) 210-7324
    Fax: (916) 324-8835
7     E-mail: Maureen.Onyeagbako@doj.ca.gov
  *Attorneys for Commission on Judicial Performance,*
8   *Commission Director and Chief Counsel Gregory*
  *Dresser, California Department of Justice, and*
9   *Attorney General Xavier Becerra*

**Exempt from Filing Fees,
Gov. Code § 6103**

FILED
ENDORSED
2018 DEC 20 PM 0: 46
SUPERIOR COURT OF CALIFORNIA
COUNTY OF SACRAMENTO

12/20/2018

10           SUPERIOR COURT OF THE STATE OF CALIFORNIA

11                 COUNTY OF SACRAMENTO

12

13

14

15   **DINA PADILLA, and FLOYD CHODOSH,**
  **California residents and taxpayers,**

16                 Plaintiffs,

17          v.

18   **COMMISSION ON JUDICIAL**
19   **PERFORMANCE, an agency of the judicial**
  **branch, and its Director and Chief Counsel,**
20   **GREGORY DRESSER, in his official**
  **capacity and not individually; THE**
21   **CALIFORNIA DEPARTMENT OF**
  **JUSTICE, OFFICE OF THE ATTORNEY**
22   **GENERAL, an agency of the executive**
  **branch; and XAVIER BECERRA, in his**
23   **official capacity as Attorney General, and**
  **not individually, and DOES 1-10,**

24                 Defendants.
25

Case No. 34-2018-00242031

**DEFENDANTS' NOTICE OF
DEMURRER AND DEMURRER
TO COMPLAINT; MEMORANDUM OF
POINTS AND AUTHORITIES**

Date:      January 25, 2019
Time:     2:00 p.m.
Dept:      53
Judge:    The Honorable David I. Brown
Trial Date:  N/A
Action Filed: October 5, 2018

**Reservation No. 2387889**

26

27

28

1

Defendants' Notice of Demurrer & Demurrer; Memorandum of Points and Authorities (34-2018-00242031)

## II.    COMPLAINT ALLEGATIONS

Plaintiffs filed the instant complaint on October 5, 2018, alleging nine causes of action. (Compl. ¶¶ 106–354.) The claims largely arise from Plaintiffs' belief that the commission has not taken action on an alleged complaint about Orange County Superior Court Judge Richard J. Moss, who presided over litigation seeking to stop the sale of the mobile home park where Plaintiff Chodosh owned a home.

According to the complaint, the residents in the underlying litigation filed a peremptory challenge to disqualify Judge Moss on November 25, 2015. (Compl. ¶¶ 19(7), 62 & Exh. J.) The case was temporarily reassigned to another judge and all relevant parties were given an opportunity to object to the challenge. (Compl. ¶ 19(7) & Exh. J.) On December 21, the residents filed an emergency application to enjoin the sale of the mobile home park. (*Ibid.*) On December 22, 2015, Judge Moss issued an order striking the peremptory challenge and assigning the case back to himself. (*Ibid.*) He also continued the hearing for emergency injunctive relief to December 28, 2015. (*Ibid.*) Hours after the December 22 order, the deed for the sale of the mobile home park was recorded. (Compl. ¶ 19(7).)

The residents allegedly complained about Judge Moss to the commission in a letter dated April 2016. (Compl., Exh. H.) Since responding to a request by the commission for additional information, in June 2016, the residents claim that they have not been informed about the status of their complaint and believe the commission has not reported the matter to prosecuting authorities. (*Ibid.*) Plaintiffs contend they should be able to obtain information about the status of the commission's investigation into the alleged complaint, and to have the commission refer the complaint about Judge Moss to prosecuting authorities. (*Id.* ¶¶ 107–171, 188–201.)[2]

With respect to the Attorney General, Plaintiffs allege that he has "abdicated [his] duty and role to investigate and prosecute judge crime." (Compl. ¶ 178) Plaintiffs point to information on the Attorney General's website and "form letters" advising the public to direct complaints about

---

[2] Plaintiffs recently noticed the deposition of Judge Moss in this case. The attempt to depose a sitting judge over the exercise of judicial discretion is an improper and abusive litigation tactic. It, in combination with the fact that Judge Moss was also a target in *Eicherly*, highlights the need to dismiss this action outright.

10



State of California
Commission on Judicial Performance
455 Golden Gate Avenue, Suite 14400
San Francisco, CA 94102-3660
(415) 557-1200
Fax (415) 557-1266
Website: http://cjp.ca.gov
May 14, 2020

Patrick J. Evans, Esq.
Law Offices of Patrick J. Evans
16897 Algonquin Street, Suite F
Huntington Beach, CA 92649

Dear Mr. Evans:

I am writing to inform you about the commission's action with respect to your complaint dated April 25, 2016, and further submissions.

At its May 2020 meeting, after considering all of the information before it about this matter, the commission found no basis for action against the judge or determined not to proceed further in this matter. Commission member Ms. Kay Cooperman Jue was recused from this matter, pursuant to commission policy declaration 6.1. (See Rules of the Commission on Judicial Performance, rule 102(e)(1).)

We do appreciate your time and effort in bringing this matter to the commission's attention.

Very truly yours,

Mariah Baird/gd

Mariah Baird
Staff Counsel

MB:jr/L051420Evans

Confidential under California Constitution,
Article VI, Section 18, and Commission Rule 102

*F. Chodosh, et al., v. J. Saunders, et al.*

**July 21, 2020**

**COMPLAINT**

**EXHIBIT – H**

| | |
|---|---|
| 03/02/17 | AG Public Integrity Unit lack resources for judge crime |
| 02/11/17 | Plaintiffs' Counsel Letter to AG PI Unit re: Judge Moss |



**XAVIER BECERRA**
*Attorney General*

*State of California*
**DEPARTMENT OF JUSTICE**

1300 I STREET, SUITE 125
P.O. BOX 944255
SACRAMENTO, CA 94244-2550

Public: (916) 445-9555

March 3, 2017

Patrick J. Evans
Law Office of Patrick J. Evans
16897 Algonquin Street, Suite F
Huntington Beach, CA 92649

RE:    Complaint for Judicial Misconduct Against Hon. Robert J. Moss, Orange County
Superior Court Judge

Dear Mr. Evans:

Thank you for your letter, received on or around February 14, 2017, in which you asked
the Attorney General to investigate allegations of "criminal wrongdoing" by Judge Robert J.
Moss, of Orange County Superior Court.

Unfortunately, we cannot assist you in this matter. The Department of Justice is
committed to upholding and enforcing state law, but it lacks the resources necessary to review all
matters in which improper activities are alleged. Ordinarily, local law enforcement authorities
have primary responsibility for investigating violations of law within their jurisdictions.
Therefore, you may wish to contact your local District Attorney.

We regret that we cannot be of further assistance to you, but hope that the information we
have provided clarifies our limits in regard to your request. Thank you again for contacting our
office.

Sincerely,

CATHERINE H. BROWN
Deputy Attorney General

For    XAVIER BECERRA
Attorney General

SA2010101057
12608694.doc

**EXHIBIT H**
261

# Law Office of Patrick J. Evans

**16897 Algonquin Street, Suite F**
**Huntington Beach, CA 92649**
**Tel.: (714) 594 – 5722; Fax: (714) 840 – 6861**
**E-mail: pevans@pevanslawoffice.com**

February 11, 2017

<u>By U.S. Mail</u>

State of California, Office of the Attorney General
California Department of Justice
Attn: Public Inquiry Unit
P.O. Box 944255
Sacramento, CA 94244-2550

Re:  **COMPLAINT FOR JUDICIAL MISCONDUCT AGAINST**
**HON. ROBERT J. MOSS, ORANGE COUNTY SUPERIOR COURT JUDGE;**
**REQUEST THAT ATTORNEY GENERAL INITIATE INVESTIGATION**
**BASED ON ALLEGATIONS AND EVIDENCE SET FORTH IN:**
***SUE EICHERLY, et al. vs. HON. ROBERT J. MOSS*, et al.**
**<u>USDC Central District, Case No. 8:16-cv-CJC-KES (filed 12/21/2016)</u>**

To the California Department of Justice, Office of the Attorney General:

California residents Sue Eicherly, et al., filed a lawsuit in federal court for loss of their homes and loss of their ocean front Palm Beach Park mobilehome park, which they own with 120 other seniors.  The loss of their homes and ocean front mobilehome park, they contend, was the direct result of willful, purposeful judicial misconduct and wrongdoing on the part of Orange County Superior Court Judge Robert J. Moss.  Ms. Eicherly and her fellow victims believe the evidence demonstrates Judge Moss' judicial misconduct was also criminal wrongdoing.  The evidence against Judge Moss is overwhelming.  The enclosed federal complaint reviews the facts, events and evidence in detail.  This letter and attached grid provide an overview.  Plaintiffs request investigation of Judge Moss.

## <u>Evidence Proving Judge Moss's Illegal Actions – Abetting Real Estate Theft</u>

Judge Moss' wrongdoing is most prominently demonstrated by his strategic call in from his vacation to take over a case not in his courtroom and on which he had been disqualified, just in time to enter an order to stop the TRO that threatened the fiduciary fraudulent sale of the park.  Judge Moss thwarted the TRO at 9:00 a.m.  The fraudulent sale, by which 120 seniors were swindled of millions in real estate, closed at 1:18 p.m.

EXHIBIT H
262

State of California, Office of the Attorney General
California Department of Justice; Attn: Public Inquiry Unit
RE:  Criminal Complaint against Hon. Robert J. Moss, OC Superior Court Judge
Feb. 11, 2017
<u>Page 2</u>

Judge Moss was, as he admitted in open court, disqualified from the case brought to stop the fiduciary fraudulent sale of the Palm Beach Park mobilehome park, Haugen *v. PBPA*, [OCSC filed Nov. 12, 2015].

The base wrongdoing is that disqualified Judge Moss called in from vacation to enter orders putting himself back on that case in order to foil an application for temporary restraining order ("TRO").   Judge Moss' first order continued the TRO hearing.  He neutralized the TRO threat to the fraudulent, corrupt sale.  Four (4) hours after Judge Moss called in from vacation to intervene and quash the TRO, the deed for the fraudulent sale recorded.   As a direct result of Judge Moss' actions, the valuable mobilehome park property was "sold" to the buyer for millions of dollars under market value.  The buyer fixed the sale with the HOA President and Board; Judge Moss was there to help out.

Additionally, as the evidence proves, prior to his illegal intervention in the TRO case, Judge Moss acted to silence and punish the HOA members who dared to oppose the HOA perpetrated fiduciary fraud and real estate thievery occurring at their seniors only "resident owned" mobilehome park.

Judge Moss entered illegal orders against the Plaintiffs that allowed the HOA, by a mere vote of the board of directors, to take away their homes for no consideration.  Judge Moss' enforced illegal contracts and leases for what the evidence before him proved were unlawful "bootleg" residential structures, built without permits that had dangerous, substandard electric wiring, faulty plumbing, inadequate water and sewer, and frequent power outages and raw sewage spills.

Based on HOA representations, Plaintiff Eicherly paid $185,000 for one such illegal home with bootleg plumbing and endured the health hazard of raw sewage overflow. Judge Moss stripped her of the home, and gave it to the HOA for nothing.  Judge Moss entered $250,000 in judgments against her.

Judge Moss did the same to other elderly Plaintiffs who dared to contest and fight the Palm Beach Park HOA's illegal activities and practices.  The evidence, court orders, documents, transcripts, prove Judge Moss acted unlawfully to uphold and support illegality and illegal contracts, the end result of which was to facilitate the give-away sale of the senior owned park.

Judge Moss' illegal actions have harmed not just Ms. Eicherly and her fellow plaintiffs, but all of the approximately 120 Palm Beach seniors that had homes in the "senior" park, which is a "resident owned park" [Civ. Code sec. 799(c)] i.e. the residents own the park.

EXHIBIT H
263

State of California, Office of the Attorney General
California Department of Justice; Attn: Public Inquiry Unit
RE:  Criminal Complaint against Hon. Robert J. Moss, OC Superior Court Judge
Feb. 11, 2017
Page 3

## Accompanying Grid and Documents; The Federal Lawsuit Detail.

Accompanying this letter is a grid that lists and describes key court filed documents, Judge Moss' Minute Orders, transcripts, and the deed for the sale.  The grid presents the documents in sequence, proof that Judge Moss, disqualified in the case, intervened in a wrongful and illegal manner to assure the fraudulent fiduciary sale would close escrow and seniors would lose millions of dollars in equity in their homes and the Park.  The grid references the federal lawsuit page numbers.

The federal complaint describes in detail, with reference to exhibits consisting of court records, transcripts and other documents, the evidence that, Plaintiffs believe, proves beyond a reasonable doubt that Judge Moss committed crimes in order to harm Plaintiffs and favor their opponents, allowing the opponents to steal Palm Beach Mobilehome Park, one of the last large ocean side parcels in South Orange County.

The capstone evidence, which should be straightforwardly obtained, would be Judge Moss' answer to the question as to who alerted him about the TRO and asked him to call in from vacation, put himself back on the *Haugen* case (on which case he had been disqualified) and intercede on behalf of the HOA Board members and the "buyer" to facilitate the fiduciary fraudulent and self-dealing mobilehome park sale.

The deed for the fraudulent sale recorded four (4) hours after Judge Moss called in from vacation to illegally intervene and quash the TRO.  Thus, it is clear his answer can only be that he had unlawful ex parte communication with someone for the purpose of expediting the dirty real estate sale which stripped 120 senior citizens of the millions of dollars in real estate equity they held in their "resident owned park."

## Judge Moss Intervention to Cause Fiduciary Fraudulent Sale of Mobilehome Park

Judge Moss' intervened in the case *Haugen v. PBPA*.  Judge Moss', when he stepped in to make sure the self-dealing HOA Directors, led by their Board President, a real estate broker, would close the fiduciary fraudulent and self-dealing sale of the mobilehome park, caused 120 seniors to be robbed of their homes and the $13,000,000 in real estate equity (minimum) they held in their homes and their "resident owned" mobilehome park. (Such lost equity is calculated using the lender's value placed on the park; see federal complaint pg. 77 ¶308)

Plaintiff Haugen, for himself and others, filed the lawsuit in November 2015 with the specific design to expose the fiduciary fraudulent sale, an insider, self-dealing transaction

State of California, Office of the Attorney General
California Department of Justice; Attn: Public Inquiry Unit
RE:  Criminal Complaint against Hon. Robert J. Moss, OC Superior Court Judge
Feb. 11, 2017
<u>Page 4</u>

rigged by the HOA's Board President and real estate broker.  Ample evidence of the scam was before Judge Moss in the related *Chodosh* case.  On Nov. 30, 2015, Judge Moss was disqualified on the *Haugen* case.

Evidence of the scam is ample, including that the HOA President and Board failed to advise and hid from the HOA members a higher and better purchase offer for the Park. (Fed. Comp. Exh. I, pg. 56 ¶225) The HOA Board President hired, as counsel to the HOA for the sale, the attorney that represented the seller!  Thus, in the fiduciary fraudulent deal, there was an attorney that represented both sides.  (Id. Exh. J, pg. 78, ¶310) The evidence of fiduciary fraud and self – dealing is overwhelming.  Judge Moss ignored it all.  On the contrary, Judge Moss acted quickly to intervene and make happen the fiduciary fraudulent self-dealing park sale.

Around mid-December, 2015, Plaintiffs were alerted that the Board President and her insider, real estate cronies planned to close their fraudulent deal on Dec. 22, 2015.  On Dec. 21, 2015, Plaintiffs brought a temporary restraining order ("TRO") to stop the sale. With Judge Moss disqualified, the *Haugen* case had been assigned to Judge Andler.  The TRO hearing was scheduled in her courtroom.

*Haugen* was not Judge Moss' case.  On Nov. 30, 2015, Judge Moss had been disqualified in *Haugen*, which disqualification Judge Moss admitted on the record Dec. 1, 2015.  He also stated on the record that he would be on vacation and out of the courthouse the last two weeks of December 2015.

On Dec 15, 2015 Judge Moss stated that December 21-22, he would be out of the courthouse.  Yet, suddenly, on the morning of Dec. 22, 2015, Judge Moss called in from outside the court to thwart Plaintiff Haugen's application for a temporary restraining order ("TRO") to halt the unlawful park sale.  First, at 9 a.m. Judge Moss issued an order continuing the TRO.  Then at 9:29 a.m. he entered an order placing himself back on the *Haugen* case where, as the court documents show and he admitted on the record, he had been disqualified.  Judge Moss purported to illegally override his own disqualification, **after** taking action to stop the TRO.

The sequence and time gap prove the coordination of Judge Moss' intervention and the fraudulent real estate closing.  On Dec. 22, 2015, at 9 a.m., Judge Moss entered the orders blocking the TRO and placing himself back on the *Haugen* case. With the TRO halted, four (4) hours later, the deed for the fraudulent give away sale of the seniors' park was recorded.

EXHIBIT H
265

State of California, Office of the Attorney General
California Department of Justice; Attn: Public Inquiry Unit
RE:  Criminal Complaint against Hon. Robert J. Moss, OC Superior Court Judge
Feb. 11, 2017
<u>Page 5</u>

It is not coincidence or chance that Judge Moss called in from vacation to take back a case on which he had been disqualified so that he could enter Minute Orders that assured a TRO would not block the fiduciary fraudulent sale scheduled to close that same day. Judge Moss' opportune intervention and obstruction of justice was designed to assure closing of the fraudulent sale, all to the detriment of 120 seniors lied to by their HOA Directors and their real estate cohorts who together stole at least $13,000,000 from them, based on the market value ascribed by the lender on the sham sale.  (See federal complaint pg. 77, ¶308)

**<u>Who contacted Judge Moss about intervention to Save the Fraudulent Park Sale?</u>**

Since the documents establish Judge Moss' wrongdoing, the only remaining and key question to Judge Moss would be, on Dec. 21 and/or 22, 2015, who contacted him and directed him to call in from his vacation to thwart the TRO?    In his declaration opposing Plaintiffs' move to oust him, Judge Moss denied ex parte communication. (Fed. complaint Exh. G, pg. 189, lines 22-23)

It is inconceivable that, <u>without being contacted</u>, Judge Moss suddenly and precipitously while on vacation, called into the court about a case not in his courtroom and on which he had been disqualified, proceeded to have his clerk enter orders to quash the TRO with the deed for the fraudulent sale recording four (4) hours later.  It was not happenstance the Judge Moss "phoned in" the critical and timely minute orders.

Oddly, the court record for his order continuing the TRO includes an "appearance" by counsel for buyer's individual principal, John Saunders, in the sham sale. (Fed. Complaint pg. C 128) The buyer was not a party in the litigation: buyer's counsel had never appeared.  The buyer had no right or basis to appear in the case; yet it did. Appearance of the buyer's counsel is noted on Judge Moss' order that postponed the TRO, clearing the way for theft of the seniors' real estate at a rigged price that was millions below fair market value.

Investigation of Judge Moss' probable crime entails two easily conducted tasks: (1) review of the court filings, transcripts and other documents that prove the foregoing, which documents are provided herein: and (2) question to Judge Moss and answer from him as to *who told him to intervene*.  Ample evidence, as described in the federal complaint, leads to the inescapable conclusion that Judge Moss had an ex parte communication whereby he agreed to intervene to assist with the sham sale.  As an example of more evidence, the TRO opposition papers, as served on Plaintiff, bear the courtroom number of and name of Judge Andler.  However, the opposition papers filed

<u>EXHIBIT H</u>

State of California, Office of the Attorney General
California Department of Justice; Attn: Public Inquiry Unit
RE:  Criminal Complaint against Hon. Robert J. Moss, OC Superior Court Judge
Feb. 11, 2017
<u>Page 6</u>

with the court had been altered and list disqualified Judge Moss and his courtroom as the forum for the TRO hearing.

## **Judge Moss Takes Plaintiffs Homes Without Legal Process; More Real Estate Theft**

Judge Moss entered orders to the effect that the PBPA HOA Board of Directors, by a mere vote of the Board of Directors, could "terminate" the Plaintiffs' homeowner rights. Judge Moss ruled and adjudged that an HOA, by a vote of its Board, could "take" a member's home.

Absurd as it sounds and was, these were Judge Moss "rulings".  It is common knowledge that a homeowner can lose a home by foreclosure or eviction, but not by an HOA Board "vote", i.e. a contract of forfeiture.  An HOA Board cannot just "take" a member's home.

In entering his orders, Plaintiffs believe that Judge Moss engaged in crime, as the effect was to transfer real estate from the Plaintiffs to their HOA for nothing.  Plaintiffs had paid hundreds of thousands of dollars for their homes.  Judge Moss purported to authorize the HOA to take Plaintiffs' homes for nothing, merely by a board vote.

## **Ongoing "Bootleg" Mobilehome Park; Judge Moss Upholds Unlawful Housing**

Meanwhile, with the Park "sold," dozens of seniors continue to live there in homes that are illegal, substandard, and unpermitted, units with substandard water, electric and sewer service.   The Attorney General must be aware of the tragedy of the Oakland Ghostship fire, where 36 people died because of dangerous substandard "bootleg" housing.  As an example, Plaintiff Eicherly's home had substandard bootleg electrical wiring, and jury rigged water and sewage, with regular back up and expulsion of raw sewage.  Judge Moss heard ample evidence of these unlawful, unsafe housing conditions at Palm Beach Park - at one-point commenting that he had "heard enough" about sewage.  Yet, Judge Moss upheld and enforced the illegal leases and contracts.

## **Request That Attorney General Initiate Investigation of Judge Moss**

Plaintiff Sue Eicherly, and the other Plaintiffs, are in urgent need of protection from Judge Moss.  He continues to take action against them in order to cause them further personal injury and financial loss.  Judge Moss' wrongdoing has and continues to harm not only Plaintiffs, but the 120 other Park residents and HOA members as well who have or stand to lose their homes and millions in real estate equity.

EXHIBIT H

267

State of California, Office of the Attorney General
California Department of Justice; Attn: Public Inquiry Unit
RE:  Criminal Complaint against Hon. Robert J. Moss, OC Superior Court Judge
Feb. 11, 2017
Page 7

Plaintiffs, victims of Judge crimes, assert their rights under Marsy's Law, Calif.
Constitution Article I, sec. 28, [Described on the Attorney General's website
[https://oag.ca.gov/victimservices/content/bill_of_rights]

Judge Moss' willful judicial misconduct, which the evidence shows was also crime, has
caused three (3) serious and far reaching harms:

(1)  120 Seniors have lost millions in real estate value in their mobilehome park;

(2)   Plaintiffs have lost their homes and had judgments entered against them all based on
     illegal leases and contracts; and

(3)   Dozens of seniors are made to live in substandard, "bootleg" dangerous housing that
     threatens them and is a hazard to their families and everyone.  A judge cannot be
     allowed to uphold dangerous illegal housing.

Based on all the above information and proof, Plaintiffs, United States Citizens and
California residents, request that the Attorney General initiate an investigation of Judge
Moss' illegal actions and wrongdoing.  Complainants contend the evidence will readily
reveal judge crime whereby homes and real estate equity worth millions of dollars have
been unlawfully taken from 120 California elders and seniors.

Sincerely,

PATRICK J. EVANS
For Plaintiffs Sue Eicherly, et al.

Attachment: Grid for Court and other Documents
Enclosures:
 • File Stamped copy – *Complaint* [hard copy] *SUE EICHERLY, et al. vs. HON.
   ROBERT J. MOSS*, et al., C. D. So. Div., No. 8:16-cv-CJC-KES (filed 12/21/16);
 • *Notice of Errata*, filed Dec. 26, 2016 (note complaint page 113A inserted) and;
 • Flash drive with this letter and attachment, Federal complaint and Errata Notice

EXHIBIT H
268

**COURT FILED ORDERS, DOCUMENTS, PLEADINGS, TRANSCRIPTS,
DEED AND DEED OF TRUST AND JUDGE MOSS DENIAL – IN SEQUENCE
TO SHOW PROBABLE JUDGE MOSS CRIME
BY INTERVENTION TO ASSURE FRAUDULENT SELF-DEALING SALE OF
PALM BEACH MOBILEHOME PARK – A VALUABLE COASTAL PARCEL**

*Ole Haugen v. Palm Beach Park Association* ("PBPA") OCSC #30-2015-00819837 (filed 11/12/15)
<u>**Case Pleadings Orders Filed, Transcripts Chronology, (date and time if same day)**</u>
<u>**Nov. – Dec. 2015**</u>

| <u>Fed. Comp. Page No.</u> | <u>Date Filed:</u> <u>*Haugen* ROA #</u> | <u>Judicial Officer Presiding</u> | <u>Filer Court or Party</u> | <u>Document Title, Description, Content</u><br><br>[Note that if the document is more than one page, only the first page of the document is provided, or if transcript, cover page and excerpted pages with text are provided] |
|---|---|---|---|---|
| C 105 | 11/12/15 ROA 2 | Sherman | Plaintiff Haugen | Verified Complaint (caption, first page only) |
| C 106 | 11/16/15 ROA 12-13 | Sherman | Court | Minute Order Reassigning Case to Judge Moss; Notice of Parties Right to file 170.6 |
| C 107 | 11/25/15 ROA 18 | Moss | Haugen | 170.6 challenge and affidavit against Judge Moss |
| C 108 | 11/30/15 ROA 22 | Margines | Court | Minute Order: "A Peremptory Challenge under C.C.P. §170.6 as to the Hon. Robert J. Moss having been filed on 11/25/15 by Plaintiff, and this matter having been transferred to C1 for reassignment, the Court now rules as follows:  **This case is reassigned to the Honorable Gail A. Andler in Dept. CX 101 for all purposes.**" |
| C 109<br><br>To<br><br>C 112 | 12/1/15 No ROA n/a as to *Haugen* case; Hearing not in *Haugen* case but in | Moss 9:00 hearing, conduced not in *Haugen* case, in *Chodosh* case | Moss In the case: *Chodosh v. Palm Beach Park Assoc.* | Transcript of Hearing to Expunge this case's Lis Pendens by *ex parte* PBPA filed in *Chodosh* case. Judge Moss acknowledges he is disqualified and has no jurisdiction in *Haugen* case because of 170.6 and that case has been assigned to another judge.  Judge Moss states: "**Mr. Evans has filed a 170.6, so I don't have jurisdiction to rule on this motion.**" [Page C110 lines 18-19."  - and – "**My only hang-up is this new action he [Evans] filed a 170.6 against** |

**EXHIBIT H**

| | | | | |
|---|---|---|---|---|
| | *Chodosh* case | | ("PBPA") NOT in the *Haugen* case | me.  **That means I don't have jurisdiction to rule on the new action. All these arguments could be made to the judge to which this case [*Haugen*] is assigned, but I don't have jurisdiction if they file a 170.6.**"  (Page C111, line 24 – page C112, line 2] -and- "**But without jurisdiction, you have to file this motion in the department to which the new case is assigned.**" (Id. pg. C112 lines 23-25) |
| C 113 | 12/1/2015 5:21 p.m. ROA 26 | Andler | PBPA | Objection to Plaintiff's 170.6 challenge filed by PBPA in courtroom of **Judge Andler, CX101**, Judge to whom *Haugen* case was assigned in granting of 170.6 on Nov. 30, 2015 (See above, pg. C 108) |
| C 113A | 12/7/2015 ROA 28 | Andler | Haugen | Opposition to PBPA Objection to 170.6 challenge. Mr. Haugen opposes the Objection, matter of objection to be decided by Judge Andler. |
| C 114 | 12/9/2015 ROA 30 | Andler | PBPA | PBPA Notice of Association of Counsel, caption cover page correctly reflects that *Haugen* case "Assigned to Judge Gail A. Andler, Dept. CX – 101." |
| C 115 | 12/15 ROA 33 | Andler | PBPA | Demurrer, (ROA 53); filed and noticed for hearing before Judge Andler. |
| C 116 To C 118 | 12/15/15 No ROA n/a as to *Haugen* case; Transcript from *Chodosh* case | Moss Trial Transcript, Last Day of Trial of *Chodosh v. PBPA* | Moss In the case - *Chodosh v. PBPA* Not in the *Haugen* case | Transcript of Hearing final day of trial in the case *Chodosh v. PBPA*, Tuesday, Dec. 15, 2015.  Judge Moss states he will be out of the court the following two weeks, i.e. Dec. 21 – 31, 2015.  Judge Moss states: "**Ladies and Gentlemen, I'll take the matter under submission, and it will be a while before you get my decision, because after this week, I'll be off for two weeks and then come back, so be patient and I'll get it off to you as soon as I can.**" [Page C117 lines 23-28 and page C 118, line 1] |
| C 119 To C 121 | 12/21 11 a.m. ROA 39-41 | Andler | Haugen | Plaintiff Haugen files his notice and Ex Parte application, including declarations in support and request for judicial notice, to obtain from Judge Andler a temporary restraining order ("TRO") to stop the fiduciary fraudulent and HOA Director / Board President self-dealing sale of the Palm Beach Mobilehome Park. |

2

**EXHIBIT H**

| D 139 (orig. as filed opp., see page C 122<br><br>D139 | 12/21 4:54 p.m. ROA 56 | Andler | PBPA | PBPA files Opposition and Objections to application for TRO<br>Note that Opposition papers, as served, have cover and caption pages that show the TRO hearing and matter will be heard by Judge Andler. (e.g. Page D 139) However, filed copies of the caption / cover pages were altered to change the Judge to Judge Moss and the hearing to his courtroom and for new hearing date of Dec. 28, 2015. (See page C 122, See Federal Complaint, Exhibit D, for juxtaposition of the original as filed opposition paper cover / caption pages compared to the "as filed" altered opp. papers cover / caption pages.) |
| --- | --- | --- | --- | --- |
| C 128 | 12/22 9 a.m. ROA 52 | Judge Moss' Clerk, "Under the Direction of Hon. Robert J. Moss" | Clerk of Judge Moss | Minute Order "Ex Parte Application is continued to 12/28/2015, at 08:30 AM in this department. Counsel for PBPA will give notice."<br>Appearances of Plaintiff and Defendant notes as is standard.<br><br>Order notes "special" appearance for the Buyer's principal, John Saunders; Order states: "Edward Susolik / Peter S. Bauman, Callahan & Blaine, specially appearing for John Saunders." |
| C 129<br><br>For Proof of Service See pg.<br><br>C 130 | 12/22 9:29 a.m. ROA 46-47 | Moss Note: unlike other orders, does not say "under direction of Judge Moss" It says he was the judicial officer | Court | Minute Order (46) "There are no appearances by any party. Peremptory Challenge pursuant to C.C.P. §170.6 was filed by Plaintiff on 11/25/15, as to the Hon. Robert J. Moss. Matter was referred to Dept. C1 and case was reassigned to the Hon. Gail A. Andler in Department CX101. Defendant's Objection to the 170.6 against Judge Moss was filed on 12/01/15. The Court, having read and considered the objection, now rules as follows: Defendant's objection is granted. Peremptory challenge is stricken. Clerk to give e-Service notice to counsel."<br>Clerk Cert. of Service (ROA 47)   Note that Clerk did not serve the Minute Order; the Proof of Service addresses are blank, See pg. C 130. |

3

EXHIBIT H
271

| C 131<br>C 132<br>N 218<br>N 219<br>N220 | 12/22<br>1:18 p.m. | Saunders<br>PBPA | n/a<br>Recorded<br>Deed for<br>fraudulent<br>Park sale;<br>Deed of<br>Trust<br>pages | Excerpts of Grant Deed and Deed of Trust for the Park Sale.  The Park Sale closes, PBPA Grant Deed, signed by Mantelli, purporting to convey Park to Saunders' entities, is recorded.<br><br>[Fraudulent Sale closed less than four (4) hours after Judge Moss called in from vacation and issued his Orders at 9 a.m. [to continue TRO hearing] and 9:29 a.m. placing himself back on the case.] |
|---|---|---|---|---|
| C 133 | 12/22<br>2:35 p.m.<br>ROA 64 | Moss | PBPA | Following Judge Moss' taking back the *Haugen* case, PBPA gives Notice of Continuance of Ex parte hearing |
| C 134<br><br>C 135<br>Clerk's<br>proof<br>of<br>service | 12/23<br>ROA 67-68 | Clerk,<br>"Under<br>the<br>Direction<br>of Hon.<br>Robert J.<br>Moss" | Court | Judge Moss' *second* Minute Order, placing himself back on *Haugen* case: "There are no appearances by any party. Defendant's objection having been granted and peremptory challenge stricken, this case is reassigned to the Honorable Robert J. Moss for all purposes. Clerk to give notice."<br>Clerk's Proof of Service (C 135) shows document sent to counsel, unlike first Minute Order in which Judge Moss took back the *Haugen* case.  (See C 129-130 above)  There was no reason for Judge Moss to enter two (2) Minute Orders placing himself back on the case.  The clerk did not serve the first order but did serve the second order.<br>The first order gave detail as to Judge Moss' take-over of a case on which he had been disqualified.  The second order gave no such detail. |
| C 136 -<br>C 137 | 12/28/2015<br>ROA **73** | Moss | Court | Judge Moss' Minute Order - Ex parte hearing result, TRO denied, etc. |
| G 189 | 4/29/2016 | Moss | Moss | Judge Moss' Verified Answer to Statement of Disqualification, re *Haugen* case and his calling in to continue the TRO hearing, Judge Moss declares under oath: "I specifically deny that I engaged in any ex parte contacts in the *Haugen* case." |

Prepared by P. J. Evans 2/11/2017

4

*F. Chodosh, et al., v. J. Saunders, et al.*

**July 21, 2020**

**COMPLAINT**

**EXHIBIT – I**

| | |
|---|---|
| 03/23/16 | Plaintiffs' Letter Accusing Defendants of Obstruction of Justice |
| 03/24/16 | Letter Accusing Counsel of concealing altered court documents |
| 03/25/16 | Letter from Attorney A. Thomas; his response and denial |
| 03/29/16 | Letter asserting adoptive admissions of accusations to Obstruct Justice |
| 04/06/16 | Letter from Attorney C. Wood response and denial |

EXHIBIT I

# Law Office Of Patrick J. Evans

**16897 Algonquin Street, Suite F**
**Huntington Beach, CA 92649**
**Tel.: (714) 594 – 5722; Fax: (714) 840 – 6861**
**E-mail: pevans@pevanslawoffice.com**

March 23, 2016

**JOHN R. SAUNDERS**                                    *BY EMAIL [Addresses]*
**SAUNDERS PROPERTY COMPANY**
**ICC 35902 LLC AND 3197 REDHILL LLC**
c/o Attorneys Indicated as their Counsel at relevant time period July 2015 – January 2016:
(Current counsel for Mr. Saunders [post events] copied as "cc", see last page)

| | | |
|---|---|---|
| Edward Susolik | Robert S. Coldren | Lisa G. Salisbury |
| Peter S. Bauman | Coldren Law Offices, APLC | Salisbury Law Group, APLC |
| Callahan & Blaine | 3 Hutton Centre Dr. Ste. 900 | 3720 S Susan St. Ste. 110 |
| 3 Hutton Centre Drive, 9th Fl. | Santa Ana, CA 92707 | Santa Ana, CA 92704 |
| Santa Ana, CA  92707 | [rcoldren@coldrenlawoffices.com] | [lsalisbury@slg.tc] |
| [ES@callahan-law.com] | | |
| [pbauman@callahan-law.com] | | |

**PALM BEACH PARK ASSOCIATION** c/o its counsel

| | |
|---|---|
| Cary L. Wood and Domineh Fazel | J. John Anderholt III |
| Lewis Brisbois Bisgaard & Smith, LLP | Anderholt Whittaker |
| 633 West 5th St., Suite 4000 | 73-525 El Paseo Drive, Suite E2516 |
| Los Angeles, CA 90071 | Palm Desert, CA 92260 |
| [woodc@lbbslaw.com] | [john@anderholtwhittaker.com] |
| [domineh.fazel@lewisbrisbois.com] | |
| | |
| Allen L. Thomas, Allan B. Weiss and Sivi Pederson, | Jeffry A. Miller and Arezoo Jamshidi |
| Thomas Law Firm Inc. & Allan B. Weiss & Assoc. | Lewis Brisbois Bisgaard & Smith, LLP |
| 5001 Airport Plaza Drive, Suite 240 | 701 B.  St., Suite 1900 |
| Long Beach, CA 90815 | San Diego, CA 92101 |
| [thomaslawfirm@aol.com; allan@weisslawassociates.com | [Jeff.Miller@lewisbrisbois.com] |
| sivi@weisslawassociates.com] | [Arezoo.Jamshidi@lewisbrisbois.com] |

**CHICAGO TITLE COMPANY AND FIDELITY NATIONAL TITLE COMPANY** c/o counsel

Thomas E. Dias
Fidelity National Law Group
915 Wilshire Blvd., Ste. 2100
Los Angeles, CA  90017
[Tom.Dias@fnf.com]

Re:  *Ole Haugen  vs. Palm Beach Park Association,*   **#30-2015-00819837; NOTICE OF PROBABLE CAUSE FOR ACCUSATION OF OBSTRUCTION OF JUSTICE, PENAL CODE §182**

Dear Counsel:

EXHIBIT I
274

Saunders, PBPA and Fidelity, c/o counsel
Re: Accusation of Obstruction of Justice, Penal Code sec. 182
March 23, 2016
Page 2

## LETTER AND NOTICE AND REQUEST TO ADDRESSEES, c/o COUNSEL

This letter and its notices and request, directed in care of counsel, are to:

**John R. Saunders, Saunders Property Company, ICC 35902 LLC, and 3197 Redhill LLC**, in care of attorneys who indicated they represented one or more of these parties (collectively "Saunders") in the time frame July 2015 – January 2016.   [Please note that this letter is copied to Mr. Saunders' current attorney, Mark B. Wilson.  We are informed that Mr. Wilson started Ms. Saunders' representation after the facts and events giving rise to the accusation herein.]

**Palm Beach Park Association** ("PBPA"), in care of its counsel of record in pending litigation.

**Chicago Title Insurance Company and Fidelity National Title Insurance Co.** (collectively "Fidelity"), in care of its in-house attorney.

This letter addresses obstruction of justice, violations of Penal Code sec. 182, arising from probable improper ex parte contact with Hon. Robert J. Moss resulting in Judge Moss having purported to grant a PBPA objection to Plaintiff Ole Haugen's C.C.P. 170.6 challenge in the captioned case, *Ole Haugen v. PBPA* 30-2015-00819837 (Filed 11/12/15; dismissed without prejudice 3/3/16).

Judge Moss was disqualified, which disqualification he acknowledged in open court on Dec. 1, 2015. However, on Dec. 21-22, 2015, while on vacation and from outside the court, Judge Moss issued orders striking Plaintiff Haugen's 170.6 challenge and reinstating himself back on the *Haugen v. PBPA*.

Plaintiffs contend there is probable cause to believe that someone, on behalf of Saunders, PBPA and Fidelity, improperly contacted Judge Moss *ex parte* for the specific purpose of requesting that Judge Moss take over *Haugen v. PBPA* by reinstating himself as the judge on the case.  This would place him in the position to continue and then deny Plaintiff's *ex parte* application for temporary restraining order ("TRO").  The TRO threatened to stop and restrain the fiduciary fraudulent sale of the Palm Beach Mobilehome Park ("Park") to Saunders, which sale would financially benefit Saunders, those in control of PBPA and Fidelity.

## PROBABLE CAUSE TO BELIEVE THERE WAS OBSTRUCTION OF JUSTICE

Please be advised I am counsel to Plaintiff Ole Haugen in this case *Haugen v. PBPA* (filed 11/12/15; dismissed without prejudice 3/3/16) to Plaintiffs in the *Chodosh* action (filed 2010), and to other interested parties.

In my capacity as Officer of the Court, it is my opinion, following a thorough investigation and fact and evidence analysis, that probable cause exists to believe that Saunders, PBPA and Fidelity engaged in conspiracy to obstruct justice within the meaning of California Penal Code §182.

EXHIBIT I

Saunders, PBPA and Fidelity, c/o counsel
Re: Accusation of Obstruction of Justice, Penal Code sec. 182
March 23, 2016
Page 3

The "probable cause" standard has been met, such that a reasonable person, apprised of the facts and evidence, would believe the crime of Obstruction of Justice was committed by those accused herein. Black's Law Dictionary defines "probable cause":

> **PROBABLE CAUSE**. "Probable Cause" may be defined to be an apparent state of facts found to exist upon reasonable inquiry, (that is, such inquiry as the given case renders convenient and proper) which would induce a reasonably intelligent man to believe, in a criminal case, that the accused person had committed the crime charged, or, in a civil case, that a cause of action existed.  (Citations omitted)

A Dictionary of Law, Henry Campbell Black, West Pub. Co. 1891, pg. 60.

## GRANTING OF OBJECTION TO 170.6 IMPROPER

Facts and events substantiating probable cause largely begin on Nov. 25, 2015 – and continue through Dec. 28, 2015 in this case.  The key facts and events occurred in the time period Dec. 21 – 22 when a filed but unserved 12/22/15 Minute Order, purported to grant the PBPA 170.6 objection and "take back" the *Ole Haugen* case, i.e. the disqualified judge overrules the 170.6 challenge that disqualified him.   A judge disqualified by 170.6 cannot "overrule" the 170.6 and keep himself or herself on the case, i.e. ignore a proper 170.6 challenge.  See, e.g., Code Civ. Proc. §170.6(a)(1), §170.3(c)(5); *Davcon v. Roberts & Morgan* (2003) 110 Cal. App. 4th 1355.  Accompanying this letter are a document list / matrix and documents which support probable cause. [1]

## CHRONOLOGY OF EVENTS AND DOCUMENTS; COURT'S STATEMENTS

The case was filed Nov. 12, 2015.  Hon. Randall Sherman was assigned to the case. (Matrix Doc. #1)

On Nov. 16, 2015, based on Notice of Related Case, Judge Sherman reassigned the case to Judge Moss by order making the reassignment and granting the right to a 170.6 challenge.  (#2)

On November 25, 2016, Plaintiff filed 170.6 challenge.  (#3)

---

[1] For convenience and information, attached is a matrix listing the documents, orders and transcripts that support probable cause.  Attached to the matrix are face sheets or the entire document showing filing dates for pleadings and orders in *Haugen v PBPA*, along with transcripts for hearings Dec. 1 and Dec. 28, 2015 and excerpts from the Grant Deed recorded 12/22/15 at 1:18 p.m. signed by Diana Mantelli, PBPA Board President.   Also attached or provided are the Objection to PBPA [Proposed] Order and [Proposed] Alternative Order with facts and conclusions of law, along with Notice of Errata, filed in the Ole Haugen case on March 16 and 17.  (Note these pleadings may be sent by separate second email).

EXHIBIT I
276

Saunders, PBPA and Fidelity, c/o counsel
Re: Accusation of Obstruction of Justice, Penal Code sec. 182
March 23, 2016
Page 4

Presiding Judge C. Margines, on Nov. 30, 2015 reassigned the case to Dept. CX 101, Hon. Gail
Andler.  (#4)

On Dec. 1, 2015 Judge Moss conducted a hearing in the *Chodosh* case in which PBPA sought to
expunge the *lis pendens* in this case.  [See Hearing Transcript, (#5)]

At the hearing, Judge Moss first clarified that the *lis pendens* PBPA was challenging was the *lis
pendens* in this case, i.e. *Haugen v. PBPA*.

> THE COURT:  This is the defendant's ex parte to expunge the *lis pendens* that was recently
> recorded. I believe this *lis pendens* was recorded in the new case that was filed just this last
> month; correct?

> MR. EVANS:  That's right,  your Honor. It's a new case, deals with entirely new facts.

(*Chodosh*, Transcript 12/1/15, pg. 2, lines 12-17)

Judge Moss then stated and acknowledged:

THE COURT: Mr. Evans has filed a 170.6 so I don't have jurisdiction to rule on this motion.

(*Chodosh*, Transcript 12/1/15, pg. 2, lines 18-19)

Although Judge Moss stated that he had been disqualified and had no jurisdiction in this case, PBPA
counsel Allen Thomas was persistent.  He argued that Judge Moss had authority to expunge the *lis
pendens* in the *Haugen v. PBPA* case in the ex parte application PBPA had brought in *Chodosh*:

> MR. THOMAS:  Nothing that Mr. Haugen alleges has any right, title, or interest to the
> property. It's all relating to this election vote that they had to sell the property. There's no causes
> of action that pertain to right, title, interest in the property.

(Id. pg. 3, lines 18-22)   In response, Judge Moss stated:

> THE COURT: Let me stop you, Mr. Thomas. I agree with all that. My only hang-up is this new
> action he filed a 170.6 against me. That means I don't have jurisdiction to rule on the new
> action.  All these arguments could be made to the judge to which this case is assigned, but I
> don't have jurisdiction if they file a 170.6.

(Id. pg. 3, lines 23-26, pg. 4, lines 1-3)

EXHIBIT I
277

Saunders, PBPA and Fidelity, c/o counsel
Re: Accusation of Obstruction of Justice, Penal Code sec. 182
March 23, 2016
<u>Page 5</u>

That same day, on Dec. 1, 2015, late in the afternoon, at 5:20 p.m., PBPA filed an Objection to Plaintiff's 170.6 challenge.  The objection was filed in Dept. CX 101, Judge Andler.  (#6)

On Dec. 7, 2015, Plaintiff filed an Opposition to the PBPA Objection. The Opposition was filed in Dept. CX 101, Judge Andler.  (#7)

On Dec. 15, 2015, PBPA filed a demurrer for review and hearing before Judge Andler.  (#8)

Thus, upon and from Judge Margines' Nov. 30, 2015 reassignment of the case to Dept. CX 101, Judge Andler, the case remained in CX 101 until December 22, 2015, when Judge Moss, calling in from vacation, purported to strike Plaintiff's 170.6 and put himself back in the case.

On December 21-22, 2015, Judge Moss was on vacation and not in the courthouse.[2]  The *Haugen* case was not assigned to Judge Moss, but had been reassigned to Judge Andler.  It appears that Judge Andler was not in the court on Dec. 21-22.  In any event, the ex parte for TRO was set to be heard in her courtroom, CX 101.  In her absence, it would have been transferred to another judge, but not Judge Moss, as Plaintiff and moving party had disqualified him as ruled by Supervising Judge Margines. (#4)

On Dec. 21, 2015, Plaintiff gave PBPA notice of the *ex parte* application for TRO at 9:45 a.m. At 11:02 a.m. Plaintiff filed and served his ex parte application and related papers. (#9) They were filed and hearing set for the next day, Dec. 22, in Dept. CX 101, Hon. Gail Andler.  On Dec. 21, 2015, at 4:54 p.m.  PBPA filed an opposition to the TRO application, request for judicial notice and evidentiary objections. (#10) The opposition and accompanying pleadings were filed with cover / caption pages showing the court as Dept. CX 101, Hon. Gail Andler.

On the morning of Dec. 22, 2015, I was present for Plaintiff, Saunders and PBPA were present in court through counsel, with Ed Susolik and Peter Bauman there for John Saunders, and PBPA having in attendance three attorneys, Cary Wood, Allen Thomas and Domineh Fazel, along with PBPA President Diana Mantelli, and the PBPA Secretary and Treasurer.  (#11)  Fidelity was not present.   All parties were informed that the case and hearing on the TRO had been transferred back to Judge Moss.   The parties were directed to appear in Judge Moss' courtroom, Dept. CX 102.

On Dec. 22 at or around 9:00 a.m. Judge Moss, who was not in the courthouse, communicated with his Clerk, "directing" her to issue a Minute Order (12/22 9:00 a.m.) which continued the hearing on

---

[2]   In the Phase IV *Chodosh* case, on the last day, Dec. 15, 2015, Judge Moss stated: "Ladies and Gentlemen, I'll take the matter under submission, and it will be a while before you get my decision, because after this week, I'll be off for two weeks and then come back, so be patient, and I'll get it to you as soon as I can." (*Chodosh* Phase IV Trial Transcript, 12/15/15, page 632, lines 23-26 and page 633, line 1)  On Dec. 22, 2015 in the morning at court, Judge Moss' Clerk in Dept. CX 102 confirmed that Judge Moss was not in the courthouse on Dec. 21-22 and that he was on vacation.

EXHIBIT I
278

Saunders, PBPA and Fidelity, c/o counsel
Re: Accusation of Obstruction of Justice, Penal Code sec. 182
March 23, 2016
Page 6

Plaintiff's ex parte application for TRO to 12/28 and changed the court from Dept. CX 101, Judge Andler, to Dept. CX 102, Judge Moss. (#11)

Then at 9:29 a.m., Judge Moss issued a Minute Order striking the 170.6 and placing himself back on the case.  (#12)

Neither of Judge Moss' Minute Orders (12/22 9:00 a.m. and 12/22 9:29 a.m.) were served.  The Minute Orders were in reverse order, with Judge Moss taking action in the case to continue the ex parte hearing (9:00 a.m.) before he purported to place himself back on the case (9:29 a.m.)

Judge Andler did not grant PBPA's objection to Plaintiff's 170.6 objection.  CX 101 did not send the case back to Judge Moss in CX 102.   The record is that Judge Moss re-appointed himself, which was improper, unauthorized, and a void act. (See Objection filed 3/16/16 for authorities and discussion.)

After the morning session and with Judge Moss having placed himself back on the case, that afternoon, barely four (4) hours after the parties were told that Judge Moss had taken back the case, PBPA and Saunders closed the Palm Beach Park sale.  They recorded a Deed 12/22/15 at 1:18 p.m. (copy of excerpts of the Deed are included in matrix and in Plaintiff's Objection to Order filed 3/16/16, see #13)

On Dec. 22, 2015, at 2:35 p.m., even though the sale had already closed, PBPA counsel Cary Wood filed and served Notice of Continuance of the hearing on the TRO, continuing the matter from 12/22 to 12/28.  (#14)   There was no reason to continue the TRO hearing, as the sale had closed 12/22.

On Dec. 23, 2015 Judge Moss issued another Minute Order.  It stated minimally that "There are no appearances by any party. Defendant's objection having been granted and peremptory challenge stricken, this case is reassigned to the Honorable Robert J. Moss for all purposes. Clerk to give notice." Judge Moss' clerk served this Minute Order.  (#15) [3]

As noted, the clerk had not served the 12/22/15 9:29 Minute Order, (#12) which gave *the critically important detail that Judge Moss himself had stricken the 170.6 against him and placed himself back on the case* from which he had acknowledged (on 12/1) he was disqualified.

_____

[3] With the case back in Judge Moss' courtroom, on 12/24/2015 PBPA filed a motion to expunge the *lis pendens*. (#16) However, that same day the Secretary of State had suspended PBPA for failure to comply with filing requirements.  As a result, stripped of its corporate powers, PBPA had no standing to file the motion.  On Dec. 28, 2015, Judge Moss denied Plaintiff's TRO.  (Transcript of Hearing #17, Minute Order denying TRO, #18) Aside from lack of jurisdiction for Judge Moss having been disqualified, which disqualification he could not, himself, reverse, the 12/28 TRO denial was void as PBPA, having been suspended, had no right or power to be in court that day.  Note that neither Mr. Wood nor Mr. Thomas, on 12/28, informed the court that *the sale had closed*, such that there could be no TRO to stop it.  Failure in their duty to prevent a pointless hearing is telling.  Why did they conceal the closing from the court and Plaintiff?

EXHIBIT I

Saunders, PBPA and Fidelity, c/o counsel
Re: Accusation of Obstruction of Justice, Penal Code sec. 182
March 23, 2016
<u>Page 7</u>

The unserved 12/22 9:20 a.m. Minute Order provides: "There are no appearances by any party. Peremptory Challenge pursuant to C.C.P. §170.6 was filed by Plaintiff on 11/25/15, as to the Hon. Robert J. Moss. Matter was referred to Dept. C1 and case was reassigned to the Hon. Gail A. Andler in Department CX101. Defendant's Objection to the 170.6 against Judge Moss was filed on 12/01/15. The Court, having read and considered the objection, now rules as follows:  Defendant's objection is granted.  Peremptory challenge is stricken. Clerk to give e-Service notice to counsel."

The 12/23 Minute Order, (#15) which the Clerk served, for lack of detail, could be viewed to suggest that Judge Andler had stricken the 170.6.   Judge Moss' 12/22 9:29 Minute Order (#12), not served, states that Judge Moss himself struck the 170.6 against him, i.e. he ignored and quashed the 170.6 challenge already ruled effective on 11/30/15 by Minute Order of Supervising Chief Judge Charles Margines. (#4)  Judge Moss purported to override the 11/30 Order of Supervising Judge Margines.

## <u>PROBABLE CAUSE TO INFER IMPROPER EX PARTE COMMUNICATION</u>

Plaintiffs contend that a reasonable person, apprised of the documents and facts, would conclude it was not coincidence that Judge Moss, out on vacation, called in to his Clerk to involve himself in *Ole Haugen v PBPA*, a case not in his court.  Informed of the facts, events and provided the Minute Orders and other documents, a person would infer and believe that Saunders, PBPA or Fidelity, or some or all of them, contacted Judge Moss *ex parte* about the TRO to request that he intervene to make sure Plaintiff Haugen's TRO did not stop the scheduled Park sale.

Because of Judge Moss' statements on Dec. 1 (#5), as of Dec. 21-22 Saunders, PBPA and Fidelity knew that Judge Moss would rule in their favor and deny the TRO.   Thus, as of Dec. 21-22, they had motive to get the case back before Judge Moss as he was on record that he would deny the TRO.

The narrow time frame, and that Judge Moss was out on vacation, further support probable cause to believe that, sometime between Dec. 21 around 10 a.m. up until Dec. 22 at 9:00 a.m., Judge Moss received an *ex parte* communication about the TRO and an improper request that he take back the case in order to deny the TRO so the Park sale could go forward as scheduled on Dec. 22.

## <u>QUESTIONS AND INQUIRY REGARDING JUDGE MOSS ORDERS DEC. 21-22, 2015</u>

Questions arise, as to which Plaintiffs believe they know the answers, based on information in this letter and other evidence they have obtained, including:

1. How did Judge Moss, who was on vacation and not in the court, learn of the 12/21/15 TRO application, which was not filed in a case in his court?

2. Between 12/21 10 a.m. (time of ex parte notice) and 9:00 a.m. on 12/22 (first Judge Moss Order continuing TRO hearing #11), when did Judge Moss learn of the application for TRO?

EXHIBIT I

Saunders, PBPA and Fidelity, c/o counsel
Re: Accusation of Obstruction of Justice, Penal Code sec. 182
March 23, 2016
Page 8

3. Who contacted him and told him about the TRO?    What did the person(s) say to Judge Moss?

4. Once apprised of the TRO, how and why did Judge Moss suddenly issue a Minute Order (#12) placing himself back on the case, i.e. striking the 170.6 challenge that had disqualified him?

5. How could Judge Moss suddenly grant the PBPA Objection to the 170.6 three (3) weeks after the objection had been filed during which time it was in another court and not granted?

6. Why was there a second Minute Order, dated and served 12/23/15 (#15), which stated only that the PBPA objection to Plaintiff's 170.6 had been granted and that Judge Moss was back on the case?

7. Why did the 12/23 Minute Order (#15) provide scant information and not state which court had stricken the 170.6, while the 12/22 9:29 a.m. Minute Order (#12) recited the 170.6 history and indicated Judge Moss had stricken Plaintiff's 170.6 and put himself back on the case?

8. Why did the Court Clerk not serve the 12/22 9:29 a.m. Minute Order (#12) stating Judge Moss had ruled on the objection, but did serve the 12/23 Minute Order (#15) with its minimal information not including that Judge Moss himself had placed himself back on the case?

We believe there is probable cause to assume that the answers to these and similar questions are that Saunders, PBPA or Fidelity acted to have ex parte communication with Judge Moss and that whomever of the three had the ex parte communication it was with the knowledge and consent of the others.   We believe it is most probable that Saunders communicated wrongfully with Judge Moss, with PBPA's and Fidelity's knowledge, support and complicity.   We make these conclusions based on the court record, communications, events and interactions on Dec. 21 – 22, and other investigation and information, only part of which is revealed in this letter.

## CONSPIRACY TO OBSTRUCT JUSTICE – VIOLATION OF PENAL CODE §182

Penal Code sec. 182, establishes the crime of conspiracy to obstruct justice.  It states in relevant part: "(a) If two or more persons conspire:  (5) To commit any act injurious to the public health, to public morals, or to pervert or obstruct justice, or the due administration of the laws."   (Emphasis added)

It is probable that only one (1) of Saunders, PBPA or Fidelity wrongfully communicated *ex parte* with Judge Moss on 12/21 or 12/22 to inform him that the TRO could obstruct the scheduled sale and making the request that he intervene to take over the case as he had already stated his view (Transcript in *Chodosh*, 12/1) that he would deny Plaintiff Ole Haugen's TRO and that he believed Ole Haugen had no rights at the Park.   We have probable cause to suspect that Saunders made the *ex parte* communication, with the knowledge and consent and support of PBPA and Fidelity.

EXHIBIT I
281

Saunders, PBPA and Fidelity, c/o counsel
Re: Accusation of Obstruction of Justice, Penal Code sec. 182
March 23, 2016
Page 9

There is probable cause to believe that all and each of Saunders, PBPA and Fidelity sought and wanted Judge Moss to be placed back on the case, as he already indicated he would rule against Plaintiff and deny the TRO, so that Plaintiff would lose, and that all and each of them communicated with each other about the communication made and action taken by or more of them to contact and communicate *ex parte* to request and have Judge Moss put himself back on the case.

Saunders, PBPA and Fidelity each had financial motive to close the sale.  For Saunders, the sale would yield many millions of dollars in real estate equity taken from PBPA members by use of fiduciary breaches, fraud and self-dealing perpetrated largely by PBPA President Diana Mantelli.

The sale was not in PBPA's interest, but its interests were cast aside by its Board President Diana Mantelli and its attorneys Allen Thomas and Allan Weiss.  They used PBPA to achieve their personal interests. Ms. Mantelli wanted the below market sale to go through to benefit buyer Saunders and his broker Hensley Realty Corp., with whom she had a prior relationship, and we are informed and believe, to earn an undisclosed commission.  PBPA was to pay PBPA attorneys Messrs. Thomas and Weiss $300,000 in outstanding legal fees upon closing.  For Fidelity the sale would cause its insured lender Thrivent Financial for Lutherans to have its loan paid off, thereby relieving Fidelity of liability and exposure on the lender's title insurance policy it had issued to Thrivent for its $16,100,000 loan.[4]

Saunders, PBPA and Fidelity were all provided and given notice of the ex parte papers on Dec. 21, 2015.   They all knew about the TRO application on Dec. 21. Probable cause is supported by the timing, as after receiving Plaintiff's TRO ex parte papers, there was ample time to wrongfully communicate with Judge Moss in order to request that he intervene to prevent the TRO from stopping the sale.   Further, there is probable cause to assume that whomever communicated ex parte with Judge Moss, after the ex parte communication, such person advised the others that the ex parte contact with Judge Moss had occurred.  There is probable cause to believe that Saunders, PBPA and Fidelity were all informed and involved in the wrongful effort to make ex parte contact with Judge Moss for the purpose of unfairly denying Plaintiff Haugen his right to a hearing on his TRO before the judge assigned to the case and to avoid, as was his right, the judge he had disqualified for prejudice.

## ACCUSATION OF OBSTRUCTION OF JUSTICE BASED ON PROBABLE CAUSE

In summary, please be advised that it is our position and view that there is probable cause to believe that Saunders, PBPA and Fidelity, and each of them, engaged in conspiracy to obstruct justice within the meaning of Penal Code §182.

---

[4] The Chicago Title Co. Insurance policy held by Thrivent insured enforceability of the deed of trust for its loan, which deed of trust was invalid and void because of violation of the Subdivided Lands Law and other real estate laws.  (The violations and reasons the Deed of Trust was void were set forth in numerous pleadings provided to Chicago / Fidelity, e.g. the [Proposed] Fifth Amended Consolidated Complaint in *Chodosh* lodged December 2013.)

EXHIBIT I

Saunders, PBPA and Fidelity, c/o counsel
Re: Accusation of Obstruction of Justice, Penal Code sec. 182
March 23, 2016
Page 10

**REQUEST FOR RESPONSE**

Plaintiffs request that each of Saunders, PBPA and Fidelity respond to the accusation (a) individually as to each of them; and (b) provide any explanation or facts that they believe indicate they did not conspire as accused herein and that they did not violate Penal Code §182.

We would appreciate any and all explanation or clarification or denial or documents that Saunders, PBPA, Fidelity or any of them provide.  If there are facts or documents that they or any of them believe would diminish or counter the probable cause we reasonably perceive, please apprise and provide us with such information and documents.

Plaintiffs request the courtesy of any response within five (5) days, i.e. on or before Monday, March 28, 2016 at 5:00 p.m.

Sincerely,

PATRICK J. EVANS

Attachments:

- Matrix / Grid showing pleadings and Orders filed in *Haugen v. PBPA*, Nov. – Dec. 2015  Attached to Matrix: face / caption pages for pleadings in *Ole Haugen v. PBPA*, showing filing dates and times, 12/1/15 transcript from *Chodosh v. PBPA*, 12/28 transcript in this case; and excerpts of Grant Deed and Deed of Trust for the Park sale, Deed recorded 12/22/15 1:18 p.m.

- Objection to [Prop.] Order, [Alt. Prop.] Order and Notice of Errata filed 3/16-17/2016 (Note these will be emailed separately in second email)

cc.  (With attachments)

Current Counsel to John R. Saunders. Counsel that we are informed were retained after conspiracy and obstruction of justice alleged herein):  (copied by email)

Mark B. Wilson
Klein Wilson
4770 Von Karman Avenue
Newport Beach, CA 90071
[wilson@kleinandwilson.com]

*Chodosh* Plaintiffs (w/ attachments), including Ole Haugen

EXHIBIT I
283

**COURT DOCUMENTS, PLEADINGS AND ORDERS FILED, TRANSCRIPTS AND DEED**
*Ole Haugen v. Palm Beach Park Association* ("PBPA") OCSC #30-2015-00819837 (filed 11/12/15)
**Case Pleadings Orders Filed, Transcripts Chronology, (date and time if same day) Nov. – Dec. 2015**

| # | Date Filed: ROA # | Judicial Officer Presiding | Filer Court or Party | Document Title, Description, Content |
|---|---|---|---|---|
| 1 | 11/12/15 ROA 2 | Sherman, Plaintiff | Haugen | Verified Complaint  (caption, first page only) |
| 2 | 11/16/15 ROA 12-13 | Sherman | Court | Minute Order Reassigning Case to Judge Moss; Notice of Parties Right to file 170.6 |
| 3 | 11/25/15 ROA 18 | Moss | Haugen | 170.6 challenge and affidavit against Judge Moss |
| 4 | 11/30/15 ROA 22 | Margines | Court | Minute Order:  "A Peremptory Challenge under C.C.P. §170.6 as to the Hon. Robert J. Moss having been filed on 11/25/15 by Plaintiff, and this matter having been transferred to C1 for reassignment, the Court now rules as follows:  This case is reassigned to the Honorable Gail A.  Andler in Dept. CX 101 for all purposes." |
| 5 | 12/1/15 No ROA n/a . | Moss 9:00 hearing | Haugen | Transcript of Hearing to Expunge this case's Lis Pendens by *ex parte* PBPA filed in *Chodosh* case.   Judge Moss acknowledges he is disqualified and has no jurisdiction in this case, *Ole Haugen v. PBPA* and that case has been assigned to another judge.  Judge Moss also indicates he "agrees" with PBPA counsel Allen Thomas that Plaintiff Ole Haugen's *lis pendens* should be expunged. |
| 6 | 12/1 5:21 p.m. ROA 26 | Andler | PBPA | Objection to Plaintiff's 170.6 challenge |
| 7 | 12/7 ROA 28 | Andler | Haugen | Opposition to PBPA Objection to 170.6 challenge |
| 8 | 12/15 ROA 33 | Andler | PBPA | Demurrer, (ROA 53) RJN (34) & Evidentiary Objections |
| 9 | 12/21 11 a.m. ROA 39-41 | Andler | Haugen | Ex Parte application for TRO to stop Park Sale (RJN 39) RJN (41) and [Prop.] Order (45) |

1

**EXHIBIT I**

| 10 | 12/21<br>4:54 p.m.<br>ROA 56 | Andler | PBPA | Opposition and Objections to application for TRO |
|---|---|---|---|---|
| 11 | 12/22<br>9 a.m.<br>ROA 52 | Clerk,<br>"Under the<br>Direction<br>of Hon.<br>Robert J.<br>Moss" | Court | Minute Order "Ex Parte Application is continued to 12/28/2015, at 08:30 AM in this department.<br>Counsel for PBPA will give notice."<br><br>Note: Clerk did not serve the Minute Order.  PBPA did not serve it with its "Notice of Continuance of Ex Parte, #14 below. |
| 12 | 12/22<br>9:29 a.m.<br>ROA 46-47 | Moss | Court | Minute Order (46) "There are no appearances by any party. Peremptory Challenge pursuant to C.C.P. §170.6 was filed by Plaintiff on 11/25/15, as to the Hon. Robert J. Moss. Matter was referred to Dept. C1 and case was reassigned to the Hon. Gail A. Andler in Department CX101. Defendant's Objection to the 170.6 against Judge Moss was filed on 12/01/15. The Court, having read and considered the objection, now rules as follows:  Defendant's objection is granted. Peremptory challenge is stricken. Clerk to give e-Service notice to counsel."<br>Clerk Cert. of Service (ROA 47) |
| 13 | 12/22<br>1:18 p.m. | Saunders<br>PBPA | n/1 | Excerpts of Grant Deed and Deed of Trust for the Park Sale.  The Park Sale closes, PBPA Grant Deed, signed by Mantelli, purporting to convey Park to Saunders' entities, is recorded. |
| 14 | 12/22<br>2:35 p.m.<br>ROA 64 | Moss | PBPA | Notice of Continuance of Ex parte hearing |
| 15 | 12/23<br>ROA 67-68 | Clerk,<br>"Under the<br>Direction<br>of Hon.<br>Robert J.<br>Moss" | Court | Minute Order   "There are no appearances by any party. Defendant's objection having been granted and peremptory challenge stricken, this case is reassigned to the Honorable Robert J. Moss for all purposes. Clerk to give notice." |
| 16 | 12/24/15 | Moss | PBPA | Notice and Motion to Expunge Plaintiff's *lis pendens* |
| 17 | 12/28/15<br>No ROA<br>n/a | Moss<br>8:30<br>hearing | Haugen | Transcript of Hearing on Plaintiff's Application for TRO.  Judge Moss denies the TRO. |
| 18 | 12/28<br>ROA **73** | Moss | Court | Minute Order - Ex parte hearing result, TRO denied, etc. |

Prepared by P. J. Evans 3/23/2016

EXHIBIT I

# Law Office Of Patrick J. Evans

**16897 Algonquin Street, Suite F**
**Huntington Beach, CA 92649**
**Tel.: (714) 594 – 5722; Fax: (714) 840 – 6861**
**E-mail: pevans@pevanslawoffice.com**

March 24, 2016

**PALM BEACH PARK ASSOCIATION** c/o its counsel:

Cary S. Wood                                          *By email*
Domineh Fazel
Lewis Brisbois Bisgaard & Smith, LLP        [woodc@lbbslaw.com]
633 West 5th St., Suite 4000                   [domineh.fazel@lewisbrisbois.com]
Los Angeles, CA 90071

Re: ***Ole Haugen  vs. Palm Beach Park Association***, **#30-2015-00819837; FOLLOW UP ON NOTICE OF PROBABLE CAUSE FOR ACCUSATION OF OBSTRUCTION OF JUSTICE, PENAL CODE §182; 12/21/22 EX PARTE COMMUNICATION THROUGH COURT ALTERED TRO OPPOSITION FILED BY PBPA**

Dear Mr. Wood and Ms. Fazel:

This letter is directed to Palm Beach Park Association ("PBPA") counsel Mr. Cary Wood and Ms. Domineh Fazel, and is copied to PBPA's other counsel and counsel for John R. Saunders, Saunders Property Company, ICC 35902 LLC, and 3197 Redhill LLC, (collectively "Saunders") and Chicago Title Insurance Company and Fidelity National Title Insurance Co. (collectively "Fidelity"), in care of its in-house attorney.   This letter follows up on our letter of yesterday regarding probable cause to find obstruction of justice, violations of Penal Code sec. 182, arising from what we contend are probable improper ex parte contacts with Hon. Robert J. Moss.

On Dec. 21, 2015, at 9:45 a.m. Plaintiff Ole Haugen gave notice of his application for temporary restraining order "(TRO") to stop the sale of the Park to Saunders on the basis that PBPA Board President Diana Mantelli had an undisclosed relationship with Saunders and given the overall complete breach of fiduciary duties (e.g. selling the Park without marketing or listing it for sale, use of 2 year old appraisal, ignoring other offers, etc.)   At 11:00 a.m. Mr. Haugen filed and served his ex parte papers for the TRO.

That same day, Dec. 21, 2015, at 4:54 a.m., we received service copies of the PBPA opposition to Plaintiff Ole Haugen's ex parte application for TRO.  Accompanying the Opposition were a Request for Judicial Notice ("RJN") and four (4) objections to the declarations in support of the TRO, i.e. objections to the TRO application supporting declarations of Bonnie Harris, Ole Haugen, Patricia M. Worthington, and Patrick Evans.

EXHIBIT I
286

PBPA Counsel C. Wood and D. Fazel
Re: Follow Up On Accusation of Obstruction of Justice, Penal Code sec. 182
March 24, 2016
<u>Page 2</u>

A true and correct copy of the caption / face page of each of these pleadings, received by 12/21/15 electronic service, are attached hereto.  Appended to the back of the six (6) caption / face pages are the electronic service email from One Legal.

Earlier this week we downloaded the filed TRO Opposition documents from the court website.   A true and correct copy of the caption / face pages of each of these pleadings, received by download from the court "case access" web site earlier this week, on March 21-22, 2016, are attached hereto.  Appended to the back of the six (6) caption / face pages are the payment confirmation and document download screens from the OCSC website.

Please compare the <u>served</u> documents' face pages with those for the <u>filed</u>, i.e. downloaded copies.  Obviously the filed copies have the court stamp in the upper right hand corner, showing the filing date and time of 12/21/15 at 4:55 p.m. (one minute after the time on the served copies email transmittal).   Normally the court stamp on the filed document would be the only difference when compared to the served document.   When filed, usually the Clerk does nothing to the document except to stamp it "filed".

However, as the attachments reveal, as of 12/21/15 at 4:55 p.m., the filed TRO Opposition documents had been altered to change the judicial officer and courtroom for the hearing from Hon. Gail A. Andler in Dept. CX 101 to Hon. Robert J. Moss in CX 102 and to change the hearing date from 12/22/15 before Judge Andler to 12/28/15 before Judge Moss.   The filed Opposition and RJN have the hearing courtroom and dates changed, but no striking of Judge Andler's name.  The four (4) filed objections to the four (4) declarations have the courtroom and hearing date changed, and Judge Andler's name is crossed out.  None of the documents have a change inserting Judge Moss' name.

We reviewed this matter with the Clerk's office.  We are advised that the Clerk, on instruction from the court, changed the judicial officer and court and the hearing date and that the Clerk made such changes <u>before filing the documents</u>.  Once documents are filed, they are court records and cannot be altered.

However, it is possible for the clerk, in this case we are told the E-filing clerk, to change hearing places, dates and times on the face of a document before filing it, where the hearing place, date has changed <u>and the clerk has received instructions from the court to make the changes</u> on the submitted document before filing it.  Therefore, in this situation, the Clerk, based on instructions from the court, changed the court hearing the matter and continued the hearing date by making changes to the document face pages, then filed the altered documents.

EXHIBIT I
287

PBPA Counsel C. Wood and D. Fazel
Re: Follow Up On Accusation of Obstruction of Justice, Penal Code sec. 182
March 24, 2016
Page 3

The filed documents, compared to the served documents, provide probable cause to believe that, on 12/21/15, Judge Moss or someone acting at his direction, told the E filing Clerk to make the change of judicial officer, courtroom and hearing date. Thus, it appears and there is probable cause to believe that on Dec. 21 one or more of Saunders, PBPA or Fidelity (using the names and definitions from yesterday's letter 3/23/15) engaged in the unlawful ex parte communication with Judge Moss to request that he take back the case and continue the 12/22 a.m. TRO hearing, so as to prevent the TRO from affecting the already scheduled 12/22 closing of the Park sale to Saunders.

As the attorneys' filing and serving the documents, you received confirmation that the court filed the documents. Through the One Legal filing facility, you received an email stating that the documents were "accepted" and a Notice of Confirmation of the filing.

Further, after the clerk filed the documents, copies of the documents as filed were transmitted to One Legal and made available to the filing party, in this case Lewis Brisbois, Bisgaard & Smith LLP, its attorneys Mr. Cary Wood and Ms. Domineh Fazel. It appears that you received confirmation of the filed "accepted" documents, and the filed documents themselves sometime in the evening of Dec. 21, 2015, along with the "Notice of Confirmation of Filing".

In this highly unusual situation, you did not get back the same documents you filed with just a court file stamp added. You received from the court documents that were not identical to those you filed and served, and which had the critical and basic information that the judicial officer and court hearing the matter had changed and that the hearing date had been continued. What you served was not what was filed. As of 12/21 you know what you served was not what was filed.

There is probable cause to believe that your receipt of these altered filed documents, with the information from the alternation, exhibits an improper ex parte communication with the court and in particular Judge Moss. In fact, your receipt of the altered documents appears to have constituted an ex parte communication from Judge Moss to PBPA. You received altered documents indicating a changed court and hearing date, which documents were not simultaneously served on Plaintiff.

Perhaps you could have obviated the ex parte communication somewhat by immediately serving Plaintiff with the changed documents, or at least the cover pages. However, at no time did you serve the altered filed documents on Plaintiff so that Plaintiff had the same information as Defendant about the changed courtroom and hearing date.

Rather, after the Clerk had already, on the morning of 12/22, informed the parties of the changed court and continuance, you then, at 2:35 p.m., gave notice of the change in court from Judge Andler to Judge Moss and the continued hearing date. You knew the previous day on 12/21 of the courtroom change and the continuance, but you did not communicate what you had learned ex parte from the court to the Plaintiff. Moreover, your "notice" came after the sale closed.

EXHIBIT I

PBPA Counsel C. Wood and D. Fazel
Re: Follow Up On Accusation of Obstruction of Justice, Penal Code sec. 182
March 24, 2016
Page 4


Also telling is that the clerk filed your Opposition Documents with changed judicial officer, court and hearing date, on Dec. 21, 2015, before there had been any order purporting to place Judge Moss back on the case.  Judge Moss did not put himself back on the case until the next day, Dec. 22, when he entered the Order (albeit void) at 9:29 a.m. stating he had granted the three (3) week old (filed 12/1) PBPA Objection to Plaintiff's 170.6 disqualification of him.  (Yesterday's letter provided you detail about that order and had an attachment that included a copy of the order).

Your TRO Opposition documents were filed with changed court and hearing date BEFORE Judge Moss' invalid Orders transferring the case from Judge Andler to himself and continuing the hearing. (12/22/15 Orders, 9:00 and 9:29 a.m.; see letter of yesterday and attachments for copies of the Orders.)

The Clerk's alteration and sending back to you the changed Opposition documents provide probable cause to believe that:

> (1) The initial unlawful ex parte communication(s) with Judge Moss, requesting that he intervene to prevent the TRO from stopping the Park sale scheduled for 12/22, occurred on 12/21;

> (2) On 12/21, through the altered Opposition, Judge Moss communicated to PBPA, (and through it with Saunders and Fidelity, as all were alleged conspirators) that he had taken back the case and continued the hearing;

> (3) Saunders, PBPA and Fidelity had full knowledge, as of 12/21, that the objective of their alleged conspiracy had been and would be met, i.e. that the fiduciary fraudulent sale of the Park would not be impeded by the threatened TRO hearing on 12/22;

> (4) On 12/21 they knew that Plaintiff had been denied the information that Judge Moss had taken back the case and continued the TRO hearing.

LBBS associate attorney Ms. Fazel prepared and signed the PBPA TRO Opposition documents with Mr. Wood as the supervising partner.  You received the filed and altered documents from the court.   There is probable cause to believe that both of you, Mr. Wood and Ms. Fazel, as PBPA attorneys and agents, engaged in conspiracy to obstruct justice.  Based on current investigation and information, it does not appear that either of you initiated the unlawful ex parte communications.  However, it is our view that the altered filed Opposition documents, which you received back through One Legal on 12/21, along with other facts, provide ample evidence of probable cause to believe that each of you, for PBPA, engaged in conspiracy in violation of Penal Code sec. 182.


EXHIBIT I
289

PBPA Counsel C. Wood and D. Fazel
Re: Follow Up On Accusation of Obstruction of Justice, Penal Code sec. 182
March 24, 2016
Page 5


Keep in mind that we have requested a response from Saunders, PBPA and Fidelity by 5:00 p.m. Monday, 3/28/16.  If you have a response, comment, explanation, denial or other information that you contend helps to absolve you of our charges herein that there is probable cause to believe you, as PBPA attorneys and agents,  personally engaged in conspiracy to obstruct justice, please provide it by that deadline.

Meanwhile, we request that by noon 12:00 p.m. tomorrow, March 25, 2016, that you provide the date and time that you received the Notice of Confirmation of filing for the PBPA TRO Opposition from the Clerk, i.e. the date and time that the court "accepted" the TRO opposition documents.

There is nothing privileged about the date and time that counsel received confirmation of a court document filing.  Again, please provide the information and a copy of the "Notice of Confirmation" of filing from One Legal by Noon tomorrow.

Be advised that our investigation into these serious matters continues.  Therefore, our views and statements are subject to change based on new information.  Nothing herein or in any correspondence shall be viewed or construed as a waiver or concession of any right or remedy.

Sincerely,

PATRICK J. EVANS


Attachments:

- PBPA Opposition to TRO application in *Haugen v. PBPA*, served 12/21/15, 4:54 p.m.

- PBPA Opp. to TRO application as filed in the court, with changes, 12/21/15, 4:55 p.m.

cc.  (with attachments, by email; see next page)


EXHIBIT I
290

PBPA Counsel C. Wood and D. Fazel
Re: Follow Up On Accusation of Obstruction of Justice, Penal Code sec. 182
March 24, 2016
Page 6


cc:

JOHN R. SAUNDERS, SAUNDERS PROPERTY COMPANY,
ICC 35902 LLC AND 3197 REDHILL LLC  (collectively "Saunders")

c/o attorneys indicated as their Counsel at relevant time period July 2015 – January 2016:
(Current counsel for Mr. Saunders [post events] copied as "cc", see below)

| | | |
|---|---|---|
| Edward Susolik | Robert S. Coldren | Lisa G. Salisbury |
| Peter S. Bauman | Coldren Law Offices, APLC | Salisbury Law Group, APLC |
| Callahan & Blaine | [rcoldren@coldrenlawoffices.com] | [lsalisbury@slg.tc] |
|  [ES@callahan-law.com] | | |
| [pbauman@callahan-law.com] | | |

Current Counsel to John R. Saunders:

Mark B. Wilson
Klein Wilson
[wilson@kleinandwilson.com]


PALM BEACH PARK ASSOCIATION, OTHER COUNSEL:

| | |
|---|---|
| Allen L. Thomas, Allan B. Weiss and Sivi Pederson, | Jeffry A. Miller and Arezoo Jamshidi |
| Thomas Law Firm Inc. & Allan B. Weiss & Assoc. | Lewis Brisbois Bisgaard & Smith, LLP |
| [thomaslawfirm@aol.com; | [Jeff.Miller@lewisbrisbois.com] |
| allan@weisslawassociates.com | [Arezoo.Jamshidi@lewisbrisbois.com] |
| sivi@weisslawassociates.com] | |

J. John Anderholt III
 [john@anderholtwhittaker.com]

CHICAGO TITLE COMPANY AND FIDELITY NATIONAL TITLE COMPANY c/o counsel

Thomas E. Dias
Fidelity National Law Group
[Tom.Dias@fnf.com]

*Chodosh* Plaintiffs (w/ attachments), including Ole Haugen

EXHIBIT I

LAW OFFICES

# ALLAN B. WEISS
## AND ASSOCIATES

ALLAN B. WEISS
PROFESSIONAL LAW CORPORATION

SIVI G. PEDERSON
ATTORNEY AT LAW

ALLEN L. THOMAS
ATTORNEY AT LAW
OF COUNSEL

5001 AIRPORT PLAZA DRIVE,

SUITE 240

LONG BEACH, CALIFORNIA  90815-1270

TELEPHONE  (562) 421- 6333
FACSIMILE   (562) 421- 6903

In reply refer to Allen L. Thomas

March 25, 2016

Patrick J. Evans
Law Office of Patrick J. Evans
16897 Algonquin Street, Suite F
Huntington Beach, California 92649

**VIA E-MAIL & CERTIFIED MAIL**
**pevans@pevanslawoffice.com**
**7008281000024332846**

### RE: FLOYD CHODOSH,  ETC. VS. PALM BEACH PARK ASSOCIATION

Dear Mr. Evans:

You are being provided a response to your letter dated March 23, 2016, concerning your libelous accusations that I made an *ex parte* communication with the Honorable Robert J. Moss, judge then presiding in Department CX-102 or was informed by someone else that he or she made such a communication.  Before specifically addressing your libelous accusations, let me at the onset categorically deny each and every accusation in your letter.  The accusations against me are false and constitute libel per se.  You have communicated anger and hostility toward me and my client including Diana Mantelli over several years of litigation.  Such conduct and behavior has manifested itself in pursuing and/or condoning complaints to state agencies consisting of the Bureau of Real Estate, the Department of Business Oversight, the State Attorney General, the Secretary of State, the California Coastal Commission, the City of San Clemente, and the Department of Housing and Community Development.  This conduct and behavior establishes actual malice on your part that impacts both your ability to objectively discern the truth or falsity of the accusations contained in your letter.

To fully appreciate the seriousness of your false accusations that you have apparently fabricated out of thin air by making a deliberate decision to ignore the probable falsity of your accusations, I want to summarize the various accusations in your letter so we are very clear about what you claim to avoid any ambiguity about your letter's defamation.

**1.** In your letter, you assert that "[p]laintiffs contend there is probable cause to believe that someone, on behalf of Saunders, PBPA and Fidelity, improperly contacted Judge Moss *ex parte* for the specific purpose of requesting that Judge Moss take over *Haugen v. PBPA* by reinstating himself as the judge on the case."  You go on to write "[i]n my capacity as Officer of the Court, it is my opinion, following a thorough investigation and fact and evidence analysis, that probable cause exists

EXHIBIT I
292

Patrick J. Evans, Esq.
March 25, 2016
Page 2

to believe that Saunders, PBPA and Fidelity engaged in conspiracy to obstruct justice within the meaning of California Penal Code § 182."

**2.** You claim that "[t]he 'probable cause' standard has been met, such that a reasonable person, apprised of the facts and evidence, would believe the crime of Obstruction of Justice was committed by those accused herein." You then present an inaccurate chronology of events and documents and comments made by Judge Moss with the obvious intent to use those "documents and facts" to make the bold contention that "a reasonable person . . . would infer and believe that Saunders, PBPA or Fidelity, or some or all of them, contacted Judge Moss *ex parte* about the TRO to request that he intervene to make sure Plaintiff Haugen's TRO did not stop the scheduled Park sale."

**3.** You assert that because of Judge Moss's comments on December 1, 2015, concerning the motion to expunge the *lis pendens* recorded by Ole Haugen, Saunders, PBPA and Fidelity "had motive to get the case back before Judge Moss as he was on record that he would deny the TRO." You further claim that the "narrow time frame, and that Judge Moss was out on vacation, further support probable cause to believe that, sometime between Dec. 21 around 10 a.m. up until Dec. 22 at 9:00 a.m., Judge Moss received an *ex parte* communication about the TRO and an improper request that he take back the case in order to deny the TRO so the Park sale could go forward as scheduled on Dec. 22."

**4.** You poise a series of questions that you proceed to self answer by claiming "Saunders, PBPA or Fidelity acted to have ex parte communication with Judge Moss and that whomever of the three had the ex parte communication it was with the knowledge and consent of the others." You assert the belief that "it is most probable that Saunders communicated wrongfully with Judge Moss, with PBPA's and Fidelity's knowledge, support and complicity." You claim the basis for your assertions are "the court record, communications, events and interactions on Dec. 21 - 22, and other investigation and information, only part of which is revealed in this letter."

**5.** In your roundup about what you claim constitutes a violation of Penal Code section 182, you claim that "[i]t is probable that only one (1) of Saunders, PBAP or Fidelity wrongfully communicated *ex parte* with Judge Moss . . . ." You further repeat the allegations referenced above that you "have probable cause to suspect that Saunders made the *ex parte* communication, with the knowledge and consent and support of PBPA and Fidelity." You further claim that Saunders, PBPA, and Fidelity "all and each of them communicated with each other about the communication made and action taken by or more of them to contact and communicate *ex parte* to request and have Judge Moss put himself back on the case."

**6.** You further assert that Allan Weiss and myself "used PBPA to achieve their personal interests" by having PBPA pay legal bills that you claim were outstanding.

**EXHIBIT I**

293

Patrick J. Evans, Esq.
March 25, 2016
Page 3

    **7.** Notwithstanding the fact that you believe Saunders was the person who communicated with Judge Moss, you express uncertainty about who communicated with Judge Moss by writing, "there is probably cause to assume that whomever communicated *ex parte* with Judge Moss, after the ex parte communication, such person advised the others that the *ex parte* contact with Judge Moss had occurred.  There is probable cause to believe that Saunders, PBPA and Fidelity were all informed and involved in the wrongful effort to make ex parte contact with Judge Moss . . .."

California law recognizes the charge of a commission of a crime as libel per se.  "Libel is a false and unprivileged publication by writing, printing, picture, effigy, or other fixed representation to the eye, which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned avoided, or which has a tendency to injure him in his occupation."  (Cal. Civ. Code, § 45.)  "[F]alse statements charging the commission of crime, or tending directly to injure a plaintiff in respect to his or her profession by imputing dishonesty or questionable professional conduct are defamatory per se."  (*Burrill v. Nair* (2013) 217 Cal.App.4th 357, 383; Cal. Civ. Code, § 45a.)  Clearly, your accusations made against me that I exchanged in *ex parte* communications with Judge Moss or exchanged in a conspiracy with others to communicate with Judge Moss is libel per se particularly because you make the very serious accusation that such a communication constitutes "obstruction of justice".  Although not directly asserted, such a communication would also obviously violate the California Professional Rules of Conduct applicable to attorneys.

You have obviously couched your letter in such a manner to hope that California's litigation privilege protects you from a lawsuit for libel.  However, under the facts and law applicable to the litigation privilege, you will not be able to hide beyond the privilege in a defamation lawsuit.  The accusations in your letter have no relationship to the lawsuit in which the TRO was filed because you dismissed the lawsuit on behalf of Ole Haugen.  The litigation privilege is qualified with regards to prospective litigation, but only if contemplated in good faith and under serious consideration.  (*Laffer v. Levinson, Miller, Jacobs & Phillips* (1995) 34 Cal.App.4th 117.)  You are not acting in good faith and no reasonable attorney would give serious consideration to a lawsuit without any scintilla of evidence to support the bald face claim that I or others engaged in *ex parte* communications with Judge Moss –accusations that by implication malign not just the reputations of the attorneys and persons against whom they are made, but the integrity and reputation of Judge Moss.

Rather you are making an extra judicial statement, consistent without other threats you have made in other communications, with the intent to intimidate Palm Beach Park Association or others to obtain an advantage over them without any litigation purpose or to create a communication that you will submit to the court at some point in time to attempt to pervert justice in this case while Judge Moss has under consideration Floyd Chodosh's, etc. motion for a new trial, the proposed statement of decision, and the proposed judgment.  Your letter evidences a pattern of nasty, vindictiveness on your part engaged in throughout this litigation.  Now that you and your clients have lost the final Phase IV trial after you led them down a path that was not promontory, but purgatory, you are engaging in one final effort to threaten  criminal charges to obtain an advantage in a civil dispute.

**EXHIBIT I**
294

Patrick J. Evans, Esq.
March 25, 2016
Page 4

You are not acting in good faith and engaging in another tactical ploy to negotiate some type of resolution of the sizable judgments against your clients who walked away from a $4.7M offer some time ago apparently on your advice.

I would note that any report of your false accusations against me or others to a government agency would constitute a criminal act. (Pen. Code, § 148.5.) I would also note that the litigation privilege does not extend to an attorney who "[i]s guilty of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party." (Busi. & Prof. Code, § 6128, subd. (a).) Thus, a person may be prosecuted for a misdemeanor for reporting to a peace officer, deputy attorney general, district attorney, or other specified official "that a felony or misdemeanor has been committed, knowing the report to be false." (Pen. Code, § 148.5, subd. (a).)  Further, the litigation privilege will not shield you from a malicious prosecution action that would be immediately filed upon successful conclusion of any lawsuit against me or others based upon the false accusations that I made an *ex parte* communication to Judge Moss.

Be that as it may, **you are hereby being placed on notice** that your letter clearly establishes that you do not have reasonable, probable cause to believe the accusations are true.  The accusations contained in your letter are not in good faith, there is no logical connection with what transpired and the almost paranoid belief that an *ex parte* communication occurred with Judge Moss, and your accusations are nothing other than another attempt to extract money from Palm Beach Park Association to settle meritless claims made by you.

Lest there be any misunderstanding about what I am telling you, you well know that Palm Beach Park Association can only appear in court through counsel. Thus, even though you couch your letter with accusations against "Saunders, PBPA and Fidelity", it is quite clear that you are accusing Cary Wood and myself of making an *ex parte* communication or we are the persons who you claim were informed of such a communication.  Your accusations are false:  *I have never had an ex parte communication with Judge Moss as you describe in your letter or at any other time during the pendency of the lawsuits filed by you and your clients.*  Let me repeat myself.  *I did not contact, communicate, or otherwise have any ex parte communications with Judge Moss during the time described in your letter or at any other time.  I also have never been informed by anyone, be it an attorney, party, officer, or third party that they had any such ex parte communications with Judge Moss.*  In short, the accusations made by you in your letter dated March 23, 2016, are false.  They are libelous per se because they accuse me and others of a crime and unethical conduct.

In your letter, you make reference to your "thorough investigation", "fact and evidence analysis", and "other investigation and information" to apparently support your accusations.  You are requested within 72 hours to provide me with the documents, facts, and evidence to support your accusations. I will consider any refusal or failure on your part to furnish me with said evidence a gross admission by you and your clients that you have no evidence to prove any of your accusations.

EXHIBIT I

Patrick J. Evans, Esq.
March 25, 2016
Page 5

Your letter was obviously written to send to government agencies no doubt to attempt to gain an unfair civil advantage in the ongoing litigation between our clients. Even if you could claim a litigation privilege as to communicating your letter to the persons to whom it is addressed, the litigation privilege does not afford you any protection for republication to nonparticipants of the litigation. As such, I am requesting that you immediately identify to me the agencies and/or governmental entities to whom you have transmitted your letter. I am further requesting that you inform your clients that they are not to publish your letter to any agency, governmental entity, or person as the statements in your letter are false and malicious.

Lastly, I am requesting a retraction within five days of the false accusations contained in your letter. I also expect the retraction to be communicated to all parties, agencies, and/or third parties to whom you have published your March 23, 2016, letter and provide me with written verification of such. Even though you have engaged in mean spirited, bombastic letters in the past, this time you have out done yourself and gone too far. You have exceeded all bounds of common decency. You are now on notice that any lawsuit filed naming me, my firm, Allan Weiss's firm, Palm Beach Park Association, Diana Mantelli, John Saunders, or anyone else under the claim that we conspired to make an *ex parte* communication to Judge Moss will be met with a counter suit against you and your clients for libel and we will further assert various other causes of action including civil rights violations and a RICO claim.

Very truly yours,

Allen L. Thomas

ALT:dh

cc: Cary Wood, Esq.
    J. John Anderholt, Esq.
    Tom Dias, Esq.
    Mark B. Wilson, Esq.

EXHIBIT I
296

# Law Office Of Patrick J. Evans

**16897 Algonquin Street, Suite F**
**Huntington Beach, CA 92649**
**Tel.: (714) 594 – 5722; Fax: (714) 840 – 6861**
**E-mail: pevans@pevanslawoffice.com**

March 29, 2016

**JOHN R. SAUNDERS**                                        *BY EMAIL [Addresses]*
**SAUNDERS PROPERTY COMPANY**
**ICC 35902 LLC AND 3197 REDHILL LLC**
c/o Attorneys Indicated as their Counsel at relevant time period July 2015 – January 2016:
(Current counsel for Mr. Saunders [post events] copied as "cc", see last page)

| | | |
|---|---|---|
| Edward Susolik | Robert S. Coldren | Lisa G. Salisbury |
| Peter S. Bauman | Coldren Law Offices, APLC | Salisbury Law Group, APLC |
| Callahan & Blaine | 3 Hutton Centre Dr. Ste. 900 | 3720 S Susan St. Ste. 110 |
| 3 Hutton Centre Drive, 9th Fl. | Santa Ana, CA 92707 | Santa Ana, CA 92704 |
| Santa Ana, CA  92707 | [rcoldren@coldrenlawoffices.com] | [lsalisbury@slg.tc] |
| [ES@callahan-law.com] | | |
| [pbauman@callahan-law.com] | | |

**PALM BEACH PARK ASSOCIATION** c/o its counsel

| | |
|---|---|
| Cary L. Wood and Domineh Fazel | J. John Anderholt III |
| Lewis Brisbois Bisgaard & Smith, LLP | Anderholt Whittaker |
| 633 West 5th St., Suite 4000 | 73-525 El Paseo Drive, Suite E2516 |
| Los Angeles, CA 90071 | Palm Desert, CA 92260 |
| [woodc@lbbslaw.com] | [john@anderholtwhittaker.com] |
| [domineh.fazel@lewisbrisbois.com] | |
| | |
| Allen L. Thomas, Allan B. Weiss and Sivi Pederson, | Jeffry A. Miller and Arezoo Jamshidi |
| Thomas Law Firm Inc. & Allan B. Weiss & Assoc. | Lewis Brisbois Bisgaard & Smith, LLP |
| 5001 Airport Plaza Drive, Suite 240 | 701 B. St., Suite 1900 |
| Long Beach, CA 90815 | San Diego, CA 92101 |
| [thomaslawfirm@aol.com; allan@weisslawassociates.com | [Jeff.Miller@lewisbrisbois.com] |
| sivi@weisslawassociates.com] | [Arezoo.Jamshidi@lewisbrisbois.com] |

**CHICAGO TITLE COMPANY AND FIDELITY NATIONAL TITLE COMPANY** c/o counsel

Thomas E. Dias
Fidelity National Law Group
915 Wilshire Blvd., Ste. 2100
Los Angeles, CA  90017
[Tom.Dias@fnf.com]

Re: ***Ole Haugen  vs. Palm Beach Park Association,***  #30-2015-00819837; NOTICE OF SAUNDERS,
**PBPA AND FIDELITY ADOPTIVE ADMISSION TO ACCUSATION OF OBSTRUCTION
OF JUSTICE, PENAL CODE §182; REQUEST FOR RESPONSE FROM THEIR COUNSEL**

Dear Counsel:

EXHIBIT I
297

Saunders, PBPA and Fidelity and their counsel (counsel specified on first page)
Re: Saunders, PBPA and Fidelity Adoptive Admission of Accusation of Obstruction of Justice, P. C. §182;
Request for Response from their Counsel
March 29, 2016
<u>Page 2</u>

This letter and its notices and request, are directed to the following entities and counsel for the following entities, with such counsel being specifically identified on the first page hereof:

    **John R. Saunders, Saunders Property Company, ICC 35902 LLC, and 3197 Redhill LLC**, in care of attorneys who indicated they represented one or more of these parties (collectively "Saunders") in the time frame July 2015 – January 2016.   [Please note that this letter is copied to Mr. Saunders' current attorney, Mark B. Wilson.  We are informed that Mr. Wilson started Ms. Saunders' representation recently, weeks after the facts and events at issue.]

    **Palm Beach Park Association** ("PBPA"), in care of its counsel of record in pending litigation.

    **Chicago Title Insurance Company and Fidelity National Title Insurance Co.** (collectively "Fidelity"), in care of its in-house attorney.

Please be reminded that I am counsel to Plaintiff Ole Haugen in this case *Haugen v. PBPA* 30-2015-00819837 (filed 11/12/15; dismissed without prejudice 3/3/16) to Plaintiffs in the consolidated action *Chodosh v. PBPA* 30-2010-00423544 (filed 2010), and to other interested parties.

On March 23, 2016 Saunders, PBPA and Fidelity received our letter and its attachments concerning Plaintiffs' assertion of probable cause to allege obstruction of justice, violations of Penal Code §182, arising from alleged improper ex parte contact with Hon. Robert J. Moss resulting in Judge Moss having purported to grant a PBPA objection to Plaintiff Ole Haugen's C.C.P. 170.6 challenge in *Ole Haugen v. PBPA*.

The March 23 letter requested that the Saunders, PBPA and Fidelity entities respond, including any denial or refutation, by 5:00 p.m. on Monday, March 28, 2016.   They did not respond.

Please be advised that, for failure to deny the serious accusation of probable cause to believe they committed the crime of conspiracy to obstruct justice, that Plaintiffs contend each and all of <u>Saunders, PBPA and Fidelity, the legal entities as defined herein, have adoptively admitted their commission of the crime of conspiracy to obstruct justice</u>.

In the context of accusations of crime or probable cause to believe the accused committed a crime, the failure of the accused to deny can be an adoptive admission. Evid. Code §413.  See, *Salinas v. Texas* 570 U.S. __, 133 S. Ct. 2174 (2013), *People v. Tom* (2014) 59 Cal. 4th 1210 (Defendant's silence as evidence of guilt).  In *People v. Riel* (2000) 22 Cal. 4th 1153, 1187-1189, the California Supreme Court held that a failure to deny when a "reasonable person would speak out" is an adoptive admission.   By not denying the charge of probable cause to believe they committed and conspired to commit conspiracy to obstruct justice, we contend the specified legal entities defined above as Saunders, PBPA and Fidelity, have adoptively admitted to conspiracy to obstruct justice, violation of P.C. §182.

EXHIBIT I
298

Saunders, PBPA and Fidelity and their counsel (counsel specified on first page)
Re: Saunders, PBPA and Fidelity Adoptive Admission of Accusation of Obstruction of Justice, P. C. §182;
Request for Response from their Counsel
March 29, 2016
<u>Page 3</u>

While the legal entities Saunders, PBPA and Fidelity did not deny the charge of probable cause to believe they committed the crime, and we contend therefore have adoptively admitted to the charges, purported PBPA attorney Allen Thomas[1] sent a letter dated March 25, 2016 in which he denied the accusation as to himself personally and no one else.   (Copy of letter attached)[2]

Mr. Thomas correctly points out that PBPA, as a corporation, can only appear in court through counsel.[3]  However, his denial is not made for or on behalf of PBPA, but only as to himself personally. In any event, Plaintiffs contend that he and his colleagues never had and do not have any authority or right to act for PBPA.  (See footnote 1)

In that Mr. Thomas, for himself as an attorney, saw fit to deny the accusation of probable cause to believe that he <u>personally</u> engaged in conspiracy for obstruction of justice, we believe it appropriate to

---

[1] Please note that Plaintiffs have stated and maintained throughout the *Chodosh* and related litigation that Mr. Thomas, his colleagues Mr. Allan Weiss, and Ms. Sivi Pederson, and their firms, Allan B. Weiss & Associates and the Thomas Law Firm, do not and have never represented PBPA. Individual directors J. Wiley et al., sued by PBPA member Ole Haugen as derivative plaintiff in the action *Haugen v. Wiley*, et al. 30-2010-00432259, retained such counsel in 2011.  Later as of Sept. 2012 such counsel purported to represent PBPA, filing on its behalf a cross complaint, even though doing so made them adverse to their original clients J. Wiley et al.  By representing the former Board and PBPA they represented both sides in the same litigation.  The record shows that (i) such counsel never obtained a conflict waiver, assuming but not conceding that such waiver would remedy the conflict and (ii) that counsel takes the position there was no conflict such that they could represent derivative action defendants J. Wiley et al. and at the same time represent PBPA.  For convenience, in this and other correspondence and in pleadings, such counsel are referred to as counsel to PBPA. However, Plaintiffs have previously stated and asserted in many pleadings and in open court, and hereby repeat, that it has always been and remains their position that Mr. Thomas and colleagues have not and do not effectively and actually represent PBPA due to fatal conflicts of interest that they refuse to acknowledge, must less rectify by ceasing the representation and withdrawing from the litigation. Plaintiffs' position has been asserted and preserved in numerous times.  For the record, Plaintiffs' objection to such counsel purporting to act or contending they act for PBPA is repeated and reaffirmed.

[2] Plaintiffs do not respond to the self-serving and misguided factual inaccuracies and misstatements of law set forth in Mr. Thomas' letter, but may do so in the near future if necessary or appropriate.  Except for the letter's communication of Mr. Thomas' denial for himself personally, (letter page 1, lines 4-6 and pg. 4, *italics*) and the correct statement that PBPA must appear in court through counsel, Plaintiffs dispute and refute and deny everything Mr. Thomas' letter states or asserts.

[3] Mr. Thomas states: ". . . you well know that Palm Beach Park Association can only appear in court through counsel."  (pg. 4, 4th paragraph, 1st sentence)

EXHIBIT I

Saunders, PBPA and Fidelity and their counsel (counsel specified on first page)
Re: Saunders, PBPA and Fidelity Adoptive Admission of Accusation of Obstruction of Justice, P. C. §182;
Request for Response from their Counsel
March 29, 2016
Page 4

afford the same opportunity to deny to other counsel for PBPA and to counsel for Saunders and Fidelity.   While the legal entities have already adoptively admitted to conspiracy to obstruct justice, and while we contend it could be argued that their counsel also adoptively admitted for failure to deny, for clarification and to establish the record Plaintiffs believe that such entities' counsel, identified on the first page of this letter, and subject to the footnotes 1 and 3 caveats, should be afforded the right and opportunity to deny the charge of probable cause to believe that such counsel engaged in conspiracy to obstruct justice as described in the March 23, 2016 letter and its attachments and the March 24 letter.

Mr. Thomas' putative PBPA counsel colleagues, together with Mr. Wood, Ms. Fazel, Mr. Miller, Ms. Jamshidi and Mr. Anderholt (whose status as counsel to PBPA Plaintiffs do not challenge) must keep in mind that the PBPA Opposition to the TRO which PBPA attorney Ms. Fazel filed and served on 12/21/15, which was returned to her in altered state and through her to all PBPA counsel, was an ex parte communication from Judge Moss.  The filed Opposition included handwritten changes that purported (i) to reflect removal of the case from Hon. G. Andler and reassignment of it to already 170.6 disqualified Hon. R. Moss; (ii) to change the hearing from court dept. CX 101 to CX 102 and (iii) to grant continuance of hearing date from 12/22 to 12/28.  Court Clerk return of the altered documents to PBPA counsel constituted an ex parte communication from Judge Moss to PBPA counsel.  My letter of March 24, 2016 to Ms. Fazel and Mr. Wood, copied to other counsel, provides detail and documents about this improper ex parte communication between Judge Moss and PBPA.  It should be noted that Ms. Fazel and Mr. Wood have not refuted or denied the content and charges of the March 24, 2016 letter, which we take as another adoptive admission.  Meanwhile, they have refused to indicate when, on Dec. 21, they received the Opposition with the court's changes and to provide the email with Notice of Confirmation of Filing.  We have renewed our request for the information and Notice.

Therefore, when Mr. Thomas says in his letter that "*I have never had an ex parte communication with Judge Moss . .*" (pg. 4, 4th par. underline added) such statement is false because through his co-counsel to PBPA, who he asserts to represent along with his colleagues and Mr. Wood, Ms. Fazel, et al.,  there was an ex parte communication when Judge Moss caused the PBPA Opposition to the ex parte TRO application to be modified on 12/21 and communicated only to PBPA through its counsel.

Apart from such ex parte communication, established by the court record and not denied by Saunders, PBPA or Fidelity, Plaintiffs request that each of Mr. Weiss, Ms. Pederson, Mr. Wood, Ms. Fazel, Mr. Miller and Ms. Jamshidi assert and state, if they can, denial of having committed or participated in any other ex parte communication or act that was part of the alleged conspiracy to obstruct justice.

Similarly, Plaintiffs request that each of Edward Susolik, Peter Bauman, Robert Coldren, Lisa Salisbury, counsel to Saunders, and Tom Dias, counsel to Fidelity, state and assert their denial, if they can, as to any involvement or participation in the alleged conspiracy to obstruct justice as described in the March 23, 2016 letter and its attachments and the follow up March 24 letter.

EXHIBIT I
300

Saunders, PBPA and Fidelity and their counsel (counsel specified on first page)
Re: Saunders, PBPA and Fidelity Adoptive Admission of Accusation of Obstruction of Justice, P. C. §182;
Request for Response from their Counsel
March 29, 2016
<u>Page 5</u>

Plaintiffs request that each of such counsel for Saunders, PBPA and Fidelity respond (a) individually as to each of them; and (b) provide any explanation or facts that they believe indicate they or any of them did not participate in a conspiracy to obstruct justice under Penal Code §182 as described in the March 23, 2016 letter and its attachments and our letter dated March 24.

We would appreciate any and all explanation or clarification or denial or documents that counsel to Saunders, PBPA, Fidelity or any of them care to provide.

Moreover, in general, if there are facts or documents that Saunders, PBPA, Fidelity or their counsel or any of them believe would diminish or counter the probable cause we believe we reasonably perceive of conspiracy to obstruct justice, please apprise and provide us with such information and documents.

Plaintiffs request the courtesy of receiving any denial, refutation, comment or documents within three (3) days, i.e. on or before this Friday, April 1, 2016 at 5:00 p.m.

Sincerely,

PATRICK J. EVANS

Attachment:  PBPA Counsel Allen L. Thomas' letter dated March 25, 2016 to Patrick J Evans

cc.  (Sent separately; with attachment, by email)

    Current Counsel to John R. Saunders:

    Mark B. Wilson
    Klein Wilson
    4770 Von Karman Avenue
    Newport Beach, CA 90071
    [wilson@kleinandwilson.com]

    *Chodosh* Plaintiffs (w/ attachment), including Ole Haugen

EXHIBIT I
301

**LEWIS**
**BRISBOIS**
**BISGAARD**
**& SMITH LLP**
ATTORNEYS AT LAW

221 North Figueroa Street, Suite 1200
Los Angeles, California 90012
Telephone: 213.250.1800
Fax: 213.250.7900
www.lewisbrisbois.com

CARY L. WOOD
DIRECT DIAL: 213.680.5101
CARY.WOOD@LEWISBRISBOIS.COM

April 6, 2016

File No.
50013.905

Via U.S. Mail/E-Mail pevans@pevanslawoffice.com

Patrick J. Evans, Esq.
Law Offices of Patrick J. Evans
16897 Algonquin Street, Suite F
Huntington Beach, CA 92649

Re:    Ole Haugen vs. Palm Beach Park Association

Dear Mr. Evans:

We are in receipt of your March 24, 2016 letter wherein you accused our office of having improper ex parte communications with Honorable Judge Moss.  We deny each and every accusation in your letter.  No one from our office has had any ex parte communications with Honorable Judge Moss.

Very truly yours,

/s/ Cary L. Wood

Cary L. Wood of
LEWIS BRISBOIS BISGAARD & SMITH LLP

CLW/
cc:    Allen L. Thomas, Esq. (Via E-Mail Only thomaslawfirm@aol.com)
Mark B. Wilson, Esq.(Via E-Mail Only Wilson@kleinandwilson.com)
J. John Anderholt III, Esq.(Via E-Mail Only john@anderholtwhittaker.com)
Thomas E. Dias, Esq. (Via E-Mail Only tom.dias@fnf.com)
Domineh Fazel, Esq.

4812-7371-7808.1

EXHIBIT I

*F. Chodosh, et al., v. J. Saunders, et al.*

**July 21, 2020**

**COMPLAINT**

**EXHIBIT – J**

| | |
|---|---|
| 6/19/16 | Department of Business Oversight, PBPA Consent Decree |

BEFORE THE DEPARTMENT OF BUSINESS OVERSIGHT

OF THE STATE OF CALIFORNIA

In the Matter of ) 
)
PALM BEACH PARK ASSOCIATION, )
)  CONSENT ORDER
Respondent. )
)
)
)

Respondent Palm Beach Park Association and Complainant the Commissioner of Business Oversight ("Commissioner") enter into this Consent Order ("Order") based on the following facts:

## I.   JURISDICTION AND VENUE

1.    The Commissioner of the Department of Business Oversight ("DBO") is authorized to administer and enforce the provisions of the Corporate Securities Law of 1968, Corporations Code section 25000 <u>et seq</u>. ("CSL") and the regulations found at Title 10 of California Code of Regulations.

2.    The Commissioner brings this action pursuant to the provisions of CSL sections 25110 and 25532, and the rules and regulations promulgated thereunder.

3.    The Palm Beach Park Association admits to the jurisdiction of the Department of Business Oversight in this matter solely for the purpose of this order and for the purpose of resolving the Commissioner's investigation of Palm Beach Park Association and its re-issuance of membership certificates.

## II.   STATEMENT OF FACTS

4.    Respondent Palm Beach Park Association ("Association") is a non-profit mutual benefit California Corporation which was formed on December 17, 1997, as a successor in interest to an unincorporated association of the same name, for the purpose of owning and operating a mobile home park located at 101 Palm Drive in the city of San Clemente, California.  Under its Articles of Incorporation, the Association was entitled to facilitate the purchase and operation of a mobilehome

EXHIBIT J
304

State of California - Department of Business Oversight

1    park commonly known as Palm Beach Park ("Park") by its residents and manage a common interest

2    development under the Davis-Stirling Common Interest Development Act.  In 1979, the Association

3    was able to obtain an assignment of the Original Ground Lease and assume the obligations of a

4    Sublease that expired in April 2018, and also acquired a Right of First Refusal to purchase the Park

5    property from the Forster Family Trust, which owned the Park property.

6          5.      At the time of formation in 1997, the Association issued approximately 126

7    memberships to the then residents of the Park for $15,000.00 each.  At the time of the original

8    issuance of memberships, the Association had no ownership interest in the real property on which the

9    Park was located.  It had only a leasehold interest in the property which expired in 2018. As a

10   condition of being allowed to obtain a membership in the Association, members were required to

11   own a mobile home at the Park and be over 55 years of age. The memberships entitled the members

12   to lease from the Association the space at the Park on which their mobile home was located.  The

13   Association facilitated management of the Park and common areas, the costs of which were paid by

14   members through monthly rent and/or special assessments voted on by the members pursuant to the

15   Association's bylaws.

16         6.      At the time of the formation of the Association and the issuance of the original

17   memberships in or about 1997, the Association applied for and received a permit from the then

18   California Department of Corporations, now the Department of Business Oversight, to issue 126

19   memberships in the Association for $15,000.00 each.  As a condition of the permit, the DBO required

20   that members apply for a transfer permit from the DBO whenever they sold their membership to a

21   new member. The transfer of the membership was generally accompanied by the sale of the mobile

22   home of the selling member to the new member.

23         7.      The Association continued to lease the property from the Forster Family Trust until

24   2007.  At that time, the Forster Family Trust notified the Association that it received a bona fide offer

25   by a third party to purchase the Park property and the Association had 30 days to exercise its right of

26   First Refusal to purchase the Park property for $24,750,000.00.  If the Association did not exercise

27   the Right of First Refusal, the Park property would have been sold to the bona fide purchaser and

28   eventually cause the members to be evicted from the Park when the Original Ground Lease expired in

State of California - Department of Business Oversight

-2-
CONSENT ORDER

EXHIBIT J
305

1    2018.

2        8.     The Association's members voted to authorize the Board of Directors to exercise the

3 Right of First Refusal to purchase the Park Property for $24,750,000.00. To facilitate the purchase,

4 an assessment ("Assessment") in the amount of $200,000.00 was levied on each member of the

5 Association. The $200,000.00 assessment approximated the purchase price and costs associated with

6 the Association's purchase of the Park property (126 members multiplied by $200,000.00).

7        9.     When the Assessment was levied on the Association's members, some members were

8 able to pay the Assessment in full and other members agreed to make monthly payments for the

9 Assessment. The Association required as a condition of membership that if any member had not paid

10 the Assessment in full, the remaining balance would be paid by a purchaser of the member's

11 mobilehome at the time of sale either by paying the remaining balance in full or assuming the

12 obligation of the monthly payments.

13        10.     In or about 2014, the Commissioner received complaints from persons involved in

14 litigation against the Association about issues pertaining to membership certificates in the

15 Association. As a result of those complaints, the DBO began an investigation to determine if the

16 transaction surrounding the Association's purchase of the Park property, levy of the $200,000.00

17 Assessment, and the reissuance of membership certificates was done in compliance with the CSL,

18 Business and Professions Code, California Finance Lenders Law and other laws within the DBO's

19 jurisdiction.

20        11.     In or about the end of 2015, the Association sold the land on which the Park is located

21 to a third party. The Association also represented it plans to dissolve the Association and distribute its

22 remaining assets, including the proceeds from the sale of the land, to members in good standing. The

23 Association represented it does not intend to issue, exchange, or sell memberships in the Association

24 in the future under the planned dissolution.

25                       **III.  THE DBO'S FINDINGS**

26        12.     Based on its investigation, the DBO makes the following findings of law and fact.

27 The Association disputes the DBO's findings, and denies it has violated any securities laws which are

28 the subject of the DBO's findings, but agrees to comply with the other terms of this Order to resolve

State of California - Department of Business Oversight

State of California - Department of Business Oversight

1    the DBO's investigation without the need for an administrative hearing or other litigation:

2          13.    The memberships in the Association were securities subject to the CSL pursuant to

3    Corporations Code section 25110.

4          14.    In or about 1997 the DBO issued a permit to the Association to sell memberships for a

5    price of $15,000.00 each. At that time the permit was issued, the Association only had a leasehold

6    interest in the land on which the Park was located.

7          15.    In 2007, the Association materially changed the rights, preferences and privileges of

8    the memberships from those that had previously been permitted by the DBO. These changes required

9    the Association to obtain a new permit from the DBO pursuant to Corporations Code sections

10   25120(a)(1) and 25121, unless an exemption applied.

11         16.    The Association was required to obtain a permit from the DBO pursuant to Business

12   Professions Code section 11010.8 to convert the Park to a resident owned mobile home park unless it

13   filed a Notice of Intent to Offer Subdivided Lands with the California Bureau of Real Estate, pursuant

14   to the procedure contained in Business and Professions Code section 11010.

15   **IV.    CONSENT ORDER TO DESIST AND REFRAIN FROM VIOLATIONS OF**

16   **CORPORATE SECURITIES LAW AND BUSINESS AND PROFESSIONS CODE**

17         Based upon the foregoing findings, the Commissioner of Business Oversight hereby orders

18   the Association to desist and refrain from offering, selling, reissuing or exchanging  memberships in

19   the Association and/or materially changing the rights preferences and privileges of existing

20   memberships, including but not limited to converting the Association into to a resident owned mobile

21   home park under Business and Professions Code section 11010.8, without first applying for and

22   obtaining a permit from the DBO pursuant to Business and Professions Code section 11010.8 and in

23   compliance with Corporations Code sections 25110, 25113,  25120(a) (1) and 25121.  The

24   Association hereby consents to comply with this Order and to desist and refrain from issuing, re-

25   issuing, selling or exchanging any memberships in the Association.  Notwithstanding the foregoing,

26   this Order shall not affect, prevent, or otherwise apply to the Association dissolving as a Corporation

27   in accordance with any applicable law of the State of California.

28

-4-
CONSENT ORDER

**EXHIBIT J**
**307**

State of California - Department of Business Oversight

## V.    ADDITIONAL CONSIDERATIONS

A.    In consideration of the Association's agreement to this Order and the Association's planned dissolution and distribution of assets, the DBO will refrain from taking any further legal action against the Association or its members with respect to any past issuance, offer, sale, exchange or change in the rights preferences and privileges of memberships in the Association. The DBO specifically reserves the right to take legal action against the Association to enforce the terms of this Order and agreement.  In consideration of the DBO's agreement, the Association agrees to waive any claim against the DBO related to or arising out of the DBO's investigation, any application for permit or requests to transfer memberships.

B.    This Order does not limit or create any private rights or remedies against the Association, or limit or create liability of the Association, or limit or create defenses of Association to any claims that may be brought by any person or entity not a party to this agreement. This Order is not intended to be an admission of wrongdoing, liability, or to any of the Findings made by the Commissioner and the DBO as set forth herein.  The Association agrees to this Consent Order to resolve and compromise a disputed claim about whether the laws and regulations set forth herein were violated.  The violations of law alleged herein are expressly denied by the Association.  The Association enters into this Consent Order as a settlement of the issues raised by the DBO's investigation to avoid any further enforcement action or litigation by the DBO.  This Order and the findings of fact and law by the DBO contained herein may not be used in any other action or proceeding by any person or entity not a party to this order and is not admissible in any subsequent legal proceeding against the Association for any purpose, except by the DBO in any subsequent action to enforce the terms of this Order.

C.    Nothing herein shall preclude the State of California, its departments, agencies, boards, commissions, authorities, political subdivisions and corporations, other than the California Department of Business Oversight from asserting any claims, causes of action, or applications for compensatory, nominal and/or punitive damages, administrative, civil, criminal, or injunctive relief against the Association.

D.    This Order and any dispute related thereto shall be construed and enforced in accordance with, and governed by, the laws of the State of California without regard to any choice of law

-5-
CONSENT ORDER

EXHIBIT J
308

State of California - Department of Business Oversight

1   principles.

2   E.      The Association through its execution of this Order acknowledges that it has been served with

3   a copy of the Order, admits the jurisdiction of the DBO solely for the purpose of resolving the

4   Commissioner's investigation of Palm Beach Park Association and its re-issuance of membership

5   certificates and to enforce the terms of this order and is aware of its right to a hearing and appeal in

6   this matter and voluntarily waives its right to a hearing on this matter and to judicial review of this

7   Order under California Corporations Code sections 25532(d) and 25609.

8   F.      The Association enters into this Order voluntarily and represents that no threats, offers,

9   promises, or inducements of any kind have been made by the California Department of Business

10  Oversight or any member, officer, employee, agent, or representative of the California Department of

11  Business Oversight to induce the Association to enter into this Order.

12          This Order shall be binding upon the Association and its successors and assigns. This Order is

13  necessary in the public interest, for the protection of investors, and consistent with the purposes,

14  policies, and provisions of the Corporate Securities Law of 1968.

15

16  Dated: _____July 19, 2016_____      JAN LYNN OWEN

17                                      Commissioner of Business Oversight

18                                      By_____

19                                      MARY ANN SMITH

                                        Deputy Commissioner

20

21

22  Dated: _July 12, 2016_              Palm Beach Park Association

23

24                                      By_____

25                                      DIANA MANTELLI

                                        President

26

27

28

-6-
CONSENT ORDER

EXHIBIT J
309

*F. Chodosh, et al., v. J. Saunders, et al.*

**July 21, 2020**

**COMPLAINT**

**EXHIBIT – K**

| | |
|---|---|
| 01/04/14 | PBPA Ballot Increase Dues $400 / mo. for legal fees |

**IRREVOCABLE MAIL-IN SECRET BALLOT
FOR THE JANUARY 4, 2014 ELECTION
PALM BEACH PARK ASSOCIATION**

I am a Member in Good Standing of the Palm Beach Park
Association, a California Mutual Benefit Corporation.  I authorize the
Board of Directors to effectuate a rent increase of $400.00 per month
per membership.

These monies are to be used for further litigation in Chodash Vs
PBPA and Haugen Vs PBPA and all other litigation against PBPA.

This increase in rent will begin on April 1, 2014.

This rent increase shall end when all litigation is complete.

YES ____

NO ____

**DO NOT WRITE YOUR NAME OR ADDRESS ON THE BALLOT.**

EXHIBIT K
311

*F. Chodosh, et al., v. J. Saunders, et al.*

**July 21, 2020**

**COMPLAINT**

**EXHIBIT – L**

| | |
|---|---|
| 05/09/15 | Park Sale Promotion Materials for HOA members |
| 05/01/15 | Saunders Letter of Intent |
| 06/18-19 | Follow up promotion, Saunders letters 6/18 & 6/19/2015 |
| 06/21/15 | PBPA Board Letter Recommending Saunders sale |

EXHIBIT L
312

## TABLE OF CONTENTS

Tab-1        EXECUTIVE SUMMARY

Tab-2        MAY 9, 2015 PRESENTATION

Tab-3        EXPLANATION OF PLAN OF DISTRIBUTION

TAB-4        EXECUTIVE LETTER OF INTENT (LOI)

Tab-5        ESTIMATED PERSONAL DISTRIBUTION RECAP


BALLOT

EXHIBIT L
313



## Executive Summary

**History:**

In 2007, Palm Beach Residents purchase the park. At that time PBPA had $1.3M in reserve

As honorable as that action was, the euphoria of being a resident owned park was short lived. Even though it was a unanimous vote to purchase the park, a small group of residents refused to either pay their new rent and/or pay their assessment payment.

Litigation commenced in 2009.

In August of 2013 at a PBP special meeting, members amended the bylaws, ratified and approved the $200K assessment **(98-3)** in response to the rulings in the 1st phase of the trial.

Throughout this time there were five (5) unsuccessful attempts to mediate a settlement with Plaintiffs. In November 2013 members ratified a $4.75 settlement that plaintiffs' attorney **declined.**

In April 2014 members approved a legal fund assessment of $400 per month per member.

**Current Status:**



The current status is that PBPA's financial reserves are Zero.  $834K in legal fees was paid in 2014. The legal fee balance is over $300k. The Department of Business Oversight (DBO) issues are unresolved. There are probably two additional trials pending. There are two existing appeals, Mrs. Beardslee and the Derivative Complaint with the possibility of an additional two. And the plaintiffs' attorney continues to state publically and to the Court <u>his intent is to bankrupt PBP.</u>

The approximate cost of continued litigation has been estimated to be $2M. The $400 per month legal assessment being paid now, if not increased, **would continue for another 4 years.**

**Future Challenges:**

The Thrivent loan balloon payment has to be refinanced in Dec of 2017. If there is any litigation pending this could be a monumental issue. Will there be new litigation? How does PBP finance the payment of existing and future legal fees including appeals? There could be an additional loss of $3.6M in lost revenue from plaintiffs during the appeal process. The DBO resolution is an unknown. Additionally, self-governance in managing a $37M asset by a voluntary Board is a tremendous challenge. And, the operating cost is projected to increase and could affect your monthly rent.

**Possible Solution:**

The Board's fiduciary responsibility to PBP is to explore all possible solutions for long range security. Two years ago as the future looked very bleak this process started. The Board has met with independent bankruptcy and receivership attorneys, insurance claim attorneys, sub-division attorneys, and explored numerous settlement options in an effort to find a solution.



EXHIBIT L
314

 As a result, PBP Board is presenting and recommending to the members a new opportunity.

**Sale Opportunity:**

We have an offer to purchase the Park at its appraised value of $37M. Buyer will provide individual investment opportunity for limited partnership for all members is good standing.

We expect that members will again be able sell their homes without interference from DBO. It provides means to pay existing and pending litigation costs Also, it provides a cap on future litigation costs and future liability arising out of the land purchase. We anticipate a resolution of the DBO and self-governance issues.

UPON DISSOLUTION OF OUR NON-PROFIT CORPORATION, IN ACCORDANCE WITH CALIFORNIA CORPORATIONS CODE, MEMBERS IN GOOD STANDING WILL SHARE IN PROFIT OF SALE; AFTER ALL CORPORATE DEBTS AND LIABILTIES ARE PAID OR PROVIDED FOR, INCLUDING CORPORATE CAPITAL GAINS TAX

**Offer Details:**

The Details of the offer are identified in the Letter of Intent and sets forth the general terms and conditions of the sale of the park. The following is a only a general recap;

Sale Approximately $37M, monthly rent will range approximately from $1,150 to $1,975. In years 2-5, there will be a CPI rent increase in the new rent based on the Consumer Price Index, Los Angeles-Riverside-Orange County for existing members. Starting in year 6 rent will have an annual increase with minimum increase of 3.5%. Annual increase not to exceed 7% based on the aforementioned index.

 Saunders will offer free rent for the first three months after the close of escrow. In exchange, PBP will reduce the purchase price by $604,800.

Saunders Property Company will pay approx. 75% of Thrivent $1.5M prepayment penalty. PBP will pay the balance. Buyer will indemnify PBP and its members for all litigation costs, expenses or claims in exchange for a $2M credit off purchase price.

Members will receive a 34 year lease, with guarantee that PBP remains a senior park for duration of lease, with one-time lease assignment to immediate family members with no rent increase, lease can assigned once in the 1st 2 years to a non-immediate family member with rent to be raised no more than 10%. And members In good standing will have opportunity to invest their assessment refund into a "limited" partnership with Buyer.

**Closing:**

In order to fund our immediate cash needs, protect ourselves from individual liability and keep our homes, your Board recommends an alliance with buyer purchasing PBP to remain a senior mobile home park.

Members in good standing must vote to approve the sale, giving the Board authority to sign the letter of intent and subsequent purchase and sale agreement by a 2/3 majority "yes" vote.

In your packet is an example of your approximate "Personal Distribution Recap" for your review. These amounts are estimates and are not guaranties of any distribution.



EXHIBIT L
315

# PALM BEACH PARK MEETING
# MAY 9, 2015

## PALM BEACH PARK MOVING FORWARD

1

EXHIBIT L
316

# HISTORY

- IN 2007 RESIDENTS PURCHASED PBP
- FINANCES--$1.3M IN RESERVE
- LITIGATION COMMENCED IN 2009
- MEMBERS APPROVED IN APRIL 2014 A LEGAL FUND ASSESSMENT OF $400 PER MONTH
- AUGUST 3, 2013, PBP SPECIAL MEETING, MEMBERS AMENDED BYLAWS, RATIFIED AND APPROVED THE $200K ASSESSMENT. **98-3**
- FIVE ATTEMPTS AT MEDIATION WITH PLAINTIFFS
- SEPTEMBER, 2013, MEDIATION TENTATIVE SETTLEMENT $4.75M
- NOVEMBER 9, 2013 MEMBERS SPECIAL MEETING TO RATIFY $4.75M SETTLEMENT AMOUNT

2

EXHIBIT L
317

# CURRENT STATUS

- RESERVES ZERO  $ 0.00
- DEPARTMENT OF BUSINESS OVERSIGHT (DBO) ISSUES ARE UNRESOLVED
- PAID $834,000  IN LEGAL FEES IN 2014
- $300,OOO OUTSTANDING BALANCE OF LEGAL FEES
- PROBABLY TWO ADDITIONAL TRIALS
- TWO EXISTING APPEALS, BEARDSLEE & DERIVATIVE (HAUGEN)
- PLAINTIFFS' ATTORNEY CONTINUES TO STATE PUBLICALLY AND TO THE COURT, THAT HIS INTENT IS TO **BANKRUPT** PBP
- POSSIBLE ADDITIONAL TWO APPEALS
- APPROXIMATE COST OF LITIGATION =$2MILLION
- $400 MONTHLY LEGAL ASSESSMENT
- $2,000,000=4 YEARS OF LEGAL ASSESSMENTS

3

EXHIBIT L
318

# FUTURE CHALLENGES

- <u>REFINANCE CURRENT THRIVENT LOAN -DECEMBER  2017 BALLOON PAYMENT</u>
- CONTINUING  COST AND LENGTH OF TIME OF FUTURE LITIGATION INCLUDING APPEALS
- NEW LITIGATION—HAUSWIRTH SUIT
- RESOLUTION OF DBO ISSUES
- $3.6M POSSIBLE LOSS IN REVENUE FROM PLAINTIFFS
- MANAGING $37M ASSET WITH OUR VOLUNTEER BOARD
- INCREASED OPERATIONG COST OF MANAGING AND MAINTAINING PBP

4

EXHIBIT L
319

# On Going Strategy

- THE BOARD'S FIDUCIARY RESPONSIBIlTY TO PBP IS TO EXPLORE ALL POSSIBLE SOLUTIONS FOR LONG RANGE SECURITY

- TWO YEARS AGO AS FUTURE LOOKED VERY BLEAK THIS PROCESS STARTED

- BOARD MET WITH INDEPENDENT BK AND RECEIVERSHIP ATTORNEYS, INSURANCE CLAIM ATTORNEYS, SUB DIVISION ATTORNEYS, AND FINANCIAL ADVISORS.

5

EXHIBIT L
320

# POSSIBLE SOLUTION

AS A RESULT PBP BOARD IS PRESENTING TO THE MEMBERS A NEW OPPORUNITY.

JOHN SAUNDERS OFFER TO PURCHASE PARK FOR $37M

WILL KEEP PBP A <u>SENIORS</u> ONLY MOBILE HOME PARK

6

EXHIBIT L
321

# SALE OPPORTUNITY

- SELL PBP

- ELIMINATES THRIVENT BALLOON PAYMENT 12/2017

- PROVIDE MEANS TO PAY FOR EXISTING & PENDING LEGAL COSTS

- CAP ON "FUTURE" LITIGATION COSTS

- CAP ON "FUTURE" LIABILITY ARISING OUT OF LAND PURCHASE

- ANTICIPATED RESOLUTION OF DBO ISSUES

- ELIMINATE SELF GOVERANCE ISSUES

7

EXHIBIT L
322

# SALE OPPORTUNTIY CONT'D

- SHARE IN PROFIT OF SALE
  - UPON DISSOULTION OF OUR NON-PROFIT CORPORATION, IN ACCORDANCE WITH CALIFORNIA CORPORATIONS CODE, MEMBERS IN GOOD STANDING WILL SHARE IN PROFIT OF SALE; AFTER ALL CORPORATE DEBTS AND LIABILTIES ARE PAID OR PROVIDED FOR, INCLUDING CORPORATE CAPITAL GAINS TAX

- JOHN SAUNDERS WILL PROVIDE INDIVIDUAL INVESTMENT OPPORTUNITY FOR ALL MEMBERS IN GOOD STANDING

- LAST AND MOST **IMPORTANT—WILL PROVIDE A REALISTIC OPPORTUNITY FOR SENIOR LIVING AT PBP.**

8

EXHIBIT L
323

# DETAILS OF OFFER

- SALE $37M AS VALUED BY PBP APPRAISER

- PBPA WILL BE DISTRIBUTING THE NET PROCEEDS OF THE SALE EQUALLY TO ALL MEMBERS IN GOOD STANDING AT DISOLUTION OF CORPORATION

- ALL MEMBERS IN GOOD STANDING WILL HAVE AN OPPORTUNITY TO INVEST AN AMOUNT EQUAL TO THEIR <u>PAID</u> "PRINCIPLE" ASSESSMENT WITH JOHN SAUNDERS

- **MEMBERS IN GOOD STANDING MUST VOTE TO APPROVE THE SALE, THE BOARDS' AUTHORITY TO SIGN THE LETTER OF INTENT, THE PURCHASE SALE AGREEMENT AND THE DISSOLVING OF OUR NON-PROFIT CORPORATION,  WITH A 2/3 "YES" VOTE**

9

EXHIBIT L
324

# DETAILS OF OFFER-CONT'D

- LETTER OF INTENT-INCLDUED IN PACKET
  - SETS FORTH THE GENERAL TERMS AND CONDITIONS OF THE SALE OF THE PARK

- IN YEARS 2-5 THERE WILL BE A RENT INCREASE EQUAL TO THE CPI FOR LOS ANGELES-RIVERSIDE-ORANGE COUNTY, FOR EXISTING MEMBERS

- STARTING YEAR 6 RENT TO HAVE ANNUAL CPI INCREASE OF 3.5% NOT TO EXCEED 7%

- FREE RENT FOR ALL EXISTING MEMBERS IN GOOD STANDING FOR THE FRIST THREE MONTHS AFTER CLOSE OF ESCROW IN EXCHANGE FOR $608,400 DISCOUNT OF PURCHASE. **MEMBERS IN GOOD STANDING TO PAY ONLY UTILITES IN 1ST 3 MONTHS AFTER CLOSE OF ESCROW.**

10

EXHIBIT L
325

# DETAILS OF OFFER-CONT'D

- THRIVENT PREPAYMENT  PENALTY ESTIMATED AT $1.5M. SAUNDERS PROPERTY COMPANY WILL PAY APPROX. 75%. PBP TO PAY BALANCE

- BUYER WILL IDEMNIFY PBP AND ITS MEMBERS FOR ALL LITIGATION COSTS, EXPENSES OR CLAIMS THAT ARISE AFTER CLOSE OF ESCROW:  $2M CREDIT OFF PURCHASE PRICE.

- A ONE-TIME LEASE ASSIGNMENT FROM PRESENT MEMBER TO <u>IMMEDIATE</u> FAMILY MEMBERS SHALL BE AVAILABLE WITH NO RENT INCREASE.

- LEASE CAN BE ASSIGNED ONCE IN THE 1ST (2) YEARS TO A NON-IMMEDIATE FAMILY MEMBER WITH RENT NOT TO EXCEED A MAXIMUM OF 10%

11

EXHIBIT L
326

# DETAILS OF OFFER CONT'D

- ALL EXISTING MEMBERS IN GOOD STANDING TO RECEIVE 34 YEAR LEASE WITH PBP REMAINING A SENIOR PARK FOR DURATION OF LEASE

12

EXHIBIT L
327

# DETAILS OF OFFER CONT'D

- NEW RENT SCHEDULE:

| PRESENT | LEGAL | PR TAX | TOTAL | | FUTURE |
|---------|-------|--------|-------|---|--------|
| — $232 | $400 | $95 | **$727*** | | $1,150 |
| — $246 | $400 | $95 | **$741*** | | $1,220 |
| — $353 | $400 | $95 | **$848*** | | $1,745 |
| — $372 | $400 | $95 | **$867*** | | $1,840 |
| — $401 | $400 | $95 | **$896*** | | $1,975 |

- ***DOES NOT INCLUDE** ANY ASSESSMENT PAYMENT

- **MONIES RECEIVED FROM DISSOLUTION OF CORPORATION , NET PROCEEDS, CAN PAY FOR NEW RENT INCREASE.**

13

EXHIBIT L
328

# FINANCIAL RECAP

- AN EXAMPLE OF YOUR <u>APPROXIMATE</u> PERSONAL DISTRIBUTION RECAP WILL BE INCLUDED IN YOUR PACKET.

- THESE AMOUNTS ARE ESTIMATES AND ARE NOT GUARANTIES OF ANY INDIVIDUAL DISTRIBUTION

14

EXHIBIT L
329

# CLOSING

- YOUR  BOARD RECOMMENDS AN ALLIANCE WITH SAUNDERS PROPERTY COMPANY PURCHASING PBP TO REMAIN A <u>SENIOR MOBILE HOME PARK</u>

15

EXHIBIT L
330

## UPDATES

After receiving comments and concerns regarding the special members meeting on May 9, 2015, the BOD met with John Saunders to address those concerns. The following is a result of that meeting and are updates to the original presentation dated May 9, 2015. These important changes that improve the PBP's overall offer will also be reflected in the LOI.

1) Palm Beach Park will remain a senior mobile home park. The individual lease to members in good standing will have that guarantee stated for the life of the 34 year lease.

2) The requirement that "deferred capital maintenance and improvements discovered in the 1st 3 years will be an additional cost to the members" is **eliminated.**

3) No rent increase in the new rent for the first 5 years is replaced with: "In years 2-5 rent shall increase in an amount equal to the increase, if any, to the CPI for Los Angeles-Riverside-Orange County."

4) Buyer shall offer all members in good standing free rent for the first three months after close of escrow. Seller shall reduce the price by $604,800. **All members in good standing to pay only utilities in the 1st 3 months after close of escrow.**

EXHIBIT L
331



Saunders will offer free rent for the first three months after the close of escrow.  In exchange, PBP will reduce the purchase price by $604,800.

## EXPLANATION OF PLAN OF DISTRIBUTION

A Nonprofit Mutual Benefit Corporation may only make a distribution to its members upon dissolution.[1]  Before corporate assets can be distributed, the board of directors must either pay or provide for the payment of all corporate debts or liabilities by following a statutory procedure.[2]

Thus, in order to distribute the proceeds from the sale of the Park Land, the members will also vote to approve a resolution electing to wind up and dissolve Palm Beach Association pursuant to California Corporations Code and to adopt a plan of distribution ("Plan of Distribution"); provided however, the election to wind up and dissolve and to adopt the Plan of Distribution shall be contingent upon the close of escrow for the sale of the Park Land.

The Plan of Distribution will include and provide for the following:

1. Upon the sale of the Park Land, the directors shall be authorized to pay or to make adequate provisions for all of the debts and liabilities of the corporation pursuant to the Corporations Code.

2. After the debts and liabilities of the corporation have been paid or adequately provided for, the directors shall be authorized and directed to distribute the remaining assets of the corporation to the members in good standing on a pro rata basis.

3. For the purposes of the Plan of Distribution, the calculation of the gross distribution amount for all members in good standing shall include among the assets of the corporation not only the net proceeds of the sale of the park land, but also the unpaid amounts owed to the corporation by members in good standing on their $200,000 assessment.

   a. Prior to distribution, any amounts owed by a member in good standing on their $200,000 assessment shall be deducted from the gross distribution amount.

---

[1] Corporations Code § 7411
[2] Corporations Code §§ 8713–8714.

1

EXHIBIT L
332



b.  Distribution Exemplar:

**Estimated Personal Distribution Recap**
**Member: John Doe**

**Estimated Assets:**

| | |
|---|---:|
| Palm Beach Park Sale Price | $37,000,000 |
| Indemnification Credit | ($2,000,000) |
| Free Rent Price Adjustment | ($604,800) |
| Adjusted Sale Price | $34,395,200 |
| | |
| Assessments Owed By Members In Good Standing 3/31/15* | $9,300,000 |
| **Total Assets** | **$43,695,200** |

**Estimated Liabilities:**

| | |
|---|---:|
| Thrivent Loan Pay Off | ($12,100,000) |
| Capital Gains Tax | ($3,000,000) |
| Reserve | ($1,000,000) |
| Thrivent Pre Payment Penalty | ($325,000) |
| Broker Fee | ($700,000) |
| Legal Fees | ($300,000) |
| Closing Costs | ($125,000) |
| Escrow Fees | ($25,000) |
| Total Liabilities | ($17,575,000) |
| **Total Funds for Disbursement** | **$26,120,200** |
| | |
| Members In Good Standing | 112 |

**Estimated Individual Disbursement of Funds:**

| | |
|---|---:|
| Gross Distribution Estimate | $233,216 |
| Assessment Owed** | ($150,000) |
| **Total Disbursement** | **$83,216** |

\* This amount will be adjusted at the close of escrow
\*\* Assumes that John Doe has paid $50,000 of the principle
on his $200,000 assessment. The actual amounts owed to
PBPA will be adjusted for each individual member



Since the precise amount of all of the corporation's assets and its debts and liability cannot be know until after the close of escrow, it is important to note that the above example is meant for illustration and estimation purposes only and is not a specific representation or guaranty of the precise amount any member will receive.  PBPA will rely on its accountants and other professionals to determine the final distribution amounts.

2

EXHIBIT L
333

will rely on its accountants and other professionals to determine the final distribution amounts.

Any reserved funds not otherwise expended or utilized and additional amounts remaining as assets of the corporation will be subsequently distributed to the members in a final distribution upon the final winding up of the affairs of the corporation and the filing of the certificate of dissolution.

3

EXHIBIT L
334



4040 MacArthur Blvd., Suite 300
Newport Beach, CA 92660
Tel: (949) 251-0444
Fax: (949) 251-0888

John R. Saunders
President

May 1, 2015

Palm Beach Park Association ("PBPA")
35902 Coast Highway
San Clemente, CA

Re:     ***Non-Binding Letter of Intent regarding that certain real property located in San Clemente, California consisting of a mobile home park with 126 spaces***

Dear Ladies and Gentlemen:

For your consideration, Mr. John Saunders and a New Ownership Entity ("NOE"), a California limited liability company or similar entity to be formed and controlled by Mr. John Saunders (jointly, "Buyer") send this Letter of Intent to PBPA with respect to the purchase and sale of that certain real property all as described on Exhibit "A" to this Letter of Intent (the "Property") upon the terms and conditions set forth below.

The parties contemplate the preparation of a more detailed purchase and sale agreement ("PSA") containing additional terms and conditions that are customary for a transaction of the nature contemplated in this Letter of Intent, and they do not intend this Letter of Intent to constitute a binding agreement for purchase and sale of the Property.

Further efforts by either party to perform due diligence, arrange or obtain financing, or carry out other acts in contemplation of the possible purchase and sale of the Property may not be deemed evidence of intent by either party to be bound by this letter of intent

1.      **Purchase Price**:  The purchase price for the Property shall be Thirty-Seven Million Dollars ($37,000,000.00) payable all cash at the Close of Escrow:

        A.      **Initial Deposit**:  Buyer will make a One Million Dollar ($1,000,000) cash deposit ("Initial Deposit") into escrow when the escrow has been opened and PBPA has been authorized by its Shareholders to execute this Letter of Intent and the PSA. The Initial Deposit shall remain refundable to Buyer until the expiration of the

1

SAUNDERS REVISED LETTER OF INTENT DATED 5-22-15

**EXHIBIT L**
335

Due Diligence Period defined below. At the close of escrow, the Initial Deposit and the interest on any escrow deposits shall be applied against the purchase price.

B.   **Cash Due at Close of Escrow**:  On or before the Close of Escrow, Buyer will deposit into Escrow the balance of the Purchase Price in cash and all additional funds necessary to close the Escrow pursuant to the PSA;

2.   **Property**:  PBPA is the owner of that certain real property described on Exhibit "A" attached hereto which is a mobile home park with 126 spaces and approximately 1.8 acres across Pacific Coast Highway on the oceanfront which is undeveloped land.

3.   **Escrow and Close of Escrow**:  Escrow shall be opened within two (2) business days after mutual execution of the PSA, between Buyer and PBPA, with Fidelity National Title Company, Newport Beach, California, Jody Kelly, Escrow Officer.  The Escrow Period is 90 days following the execution of a PSA ("Close of Escrow").

4.   **Due Diligence Period**:  Buyer shall have 45 days after opening escrow in which to make at Buyer's sole cost and expense an independent analysis of the condition of the Property and suitability of the Property for Buyer's intended purposes (the "Due Diligence Period").  During the Due Diligence Period, PBPA will permit Buyer and its consultants to enter upon the Property to perform soils and other tests on the Property upon presentation to PBPA of proof of liability insurance and indemnity.  The liability insurance to be a minimum of Two Million Dollars ($2,000,000) per occurrence and shall name PBPA as an additional insured.

   a.  The inspections, testing or other entry by Buyer unto the Property shall only occur during business hours at reasonable times on advanced notice to PBPA. All activities undertaken by or on behalf of Buyer in connection with the inspections, testing or other entry shall fully comply with applicable laws and regulations, and Buyer shall promptly restore, at its sole cost and expense, any damage arising in connection therewith. ☐

   b.  Buyer may not conduct any intrusive or destructive inspections, testing or borings without PBPA's prior written consent, which consent shall be at PBPA's sole and absolute discretion ☐

   c.  Buyer agrees to keep confidential and not to disseminate to any third party, and to cause its agents or representatives to keep confidential and not disseminate to any third party, any information Buyer (and/or its agents or representatives) obtains as a result of the inspections, except to the extent disclosure is required by law. This paragraph shall survive the termination of this letter of intent. ☐

   d.  During the Due Diligence Period, Seller agrees to cooperate with Buyer to provide all relevant information, including but not limited to, court filings and other pleadings, related to the litigation and other legal matters set forth in Exhibit "C".

2

SAUNDERS REVISED LETTER OF INTENT DATED 5-22-15

EXHIBIT L
336



5.  **Title**: At the Close of Escrow, PBPA will execute and deliver to escrow holder a Grant Deed conveying fee simple title to the Property, as evidenced by a standard ALTA owner's policy of title insurance issued by Fidelity National Title Company. The title policy shall show title vested in Buyer subject only to those matters disclosed by a preliminary title report delivered to and approved by Buyer during the Due Diligence Period.

6.  **Proration and Costs**:  All items of income and expense relating to the Property, including real property taxes and rents, shall be prorated as of the COE. All costs incurred in connection with the Escrow will be allocated as is customary in Orange County, California, i.e., PBPA shall pay the documentary transfer taxes and the cost of the standard ALTA owner's policy of title insurance. Escrow costs shall be split 50/50, and other costs allocated as aforesaid.

7.  **Broker's Commission**: The only Broker involved in the transaction is Hensley Realty Corporation whose commission upon the consummation of the purchase and sale transaction contemplated in this Letter or Intent shall be paid by PBPA pursuant to the PSA.

8.  **Contingencies**:
    a.  PBPA agrees to conduct a vote seeking an approval by its members to sell the Property pursuant to the terms of this Letter of Intent. The transaction contemplated hereunder shall be contingent upon the approval by at least 2/3rds (66.66%) of the members in good standing of PBPA.

    b.  There is no financing contingency.

9.  **Indemnification and Purchase Price Credit**:
    a.  Indemnity. Upon the Close of Escrow, Buyer shall indemnify, defend, and hold harmless PBPA, and its officers, directors, shareholders, members, employees, agents, and representatives (collectively, "Indemnitee"), against all liability, demands, claims, costs, losses, damages, recoveries, settlements, and expenses (including interest, penalties, attorney fees, accounting fees, and expert witness fees) incurred by Indemnitee ("Losses"), known or unknown, contingent or otherwise, directly or indirectly arising from or related to (a) the suits, actions, and claims described in Exhibit C; and (b) any third party claims arising out of the sale of the Property; provided however, Seller's attorney fees arising from or related to the suits, actions, and claims described in Exhibit C which accrued, became due or arose prior to the Close of Escrow shall be paid by Seller.
    b.  Purchase Price Credit. At the Close of Escrow and in exchange for the indemnifications obligations of Buyer which shall thereby be triggered as described in section 9a. above, Buyer shall receive a credit against the Purchase Price for the Property in the amount of $2,000,000.00.

3



10. **Prepayment Penalty**: Buyer and PBPA both acknowledge that there is current debt on the Property which debt must be paid in full at the close of escrow and which payment will include an approximately $1.7 Million defeasance fee which shall be paid as follows:
    a. Buyer shall pay the first $850,000.00 of defeasance fee;
    b. Buyer to pay half of the balance of the defeasance fees up to $425,000.00
    c. PBPA to pay the balance of the defeasance fee.
    d. Buyer shall have the ability to negotiate directly with the lender regarding a reduction or discount of the defeasance fee.

11. **New Ownership Entity**: John Saunders shall form the NOE to own the Park. John Saunders shall have at least seventy-five percent (75%) ownership in the NOE (not including existing preferred investors described on Exhibit "B" below).

12. **Leaseback**: Buyer agrees to enter into a Leaseback to all of the Members of PBPA who are in good standing at the COE. The basic terms and conditions of the Leaseback Agreement are idenfieid and set forth on Exhibit "B" to this Letter of Intent.

13. **Letter of Intent**: This Letter of Intent shall remain in effect until 10 days after PBPA conducts a member vote for the approval of the execution of this Letter of Intent and a purchase and sale of the Property pursuant to the terms herein. This Letter of Intent shall not constitute a legally binding contract to purchase the Property, but rather an agreement to the basic terms and conditions, which will be incorporated into a mutually acceptable PSA to be drafted by PBPA. Only a fully executed PSA shall bind the parties and said PSA will contain additional contingencies which may cause the transaction not to occur. Upon execution of this Letter of Intent, PBPA shall take the Property off the market in order to negotiate in good faith a legally binding PSA with the Buyer. During the time between execution of this Letter of Intent and execution of a PSA, PBPA agrees that it will not negotiate with other buyers. Efforts by either party to complete Due Diligence, conduct further negotiations, or prepare a PSA shall not be considered as evidence of intent by either party to be bound by this Letter of Intent. The performance, by either party prior to execution of a formal PSA, of any of the obligations which may be included in the PSA between the parties when negotiations are completed, shall not be considered as evidence of intent by either party to be bound by this Letter of Intent.

[This section is left intentionally blank]



4

SAUNDERS REVISED LETTER OF INTENT DATED 5-22-15

EXHIBIT L

338



14.   **Confidentiality**. Buyer and PBPA agree not to disclose the content of this letter of intent or of any negotiations or information received from the other party regarding the Property or the financial condition of the other party to any unrelated third parties without first obtaining the prior written consent of the other party.

If the foregoing terms and conditions are acceptable, please execute the enclosed copy of this Letter of Intent and return it to me via email at the above address.

Very truly yours,

SAUNDERS PROPERTY COMPANY

By: _____

   John R. Saunders, President


The foregoing Letter of Intent is agreed to and accepted by PBPA.

PALM BEACH PARK ASSOCIATION, a
California non-profit mutual benefit corporation

By:_____
                              , President

By:_____
                              , Secretary

5

EXHIBIT L
339

## EXHIBIT "B"

## LEASEBACK TERMS AND CONDITIONS

1.  At or before COE, average rent in the Park shall be $1,800.00 per month per lot. This rent schedule is to be determined by PBPA, with approval of NOE, based on existing rate structure.

2.  No Rent increase for the first year. In years 2 through 5 Rent shall increase in an amount equal to the increase, if any, to the CPI for Los Angeles-Riverside-Orange County. Beginning in year 6 rent shall increase in an amount equal to the increase of the CPI for Los Angeles-Riverside-Orange County; provided however, the minimum increase shall be 3.5% and the maximum increase shall not exceed 7%.

3.  There shall be a one-time pass down from present lot owners to immediate family members with no rent increase.

4.  The lease to be assignable once in the first two (2) years to a non-immediate family member, in which case the Buyer/Assignee rent is to be raised a maximum of 10%.

5.  All existing initial tenant members of PBPA in good standing to receive a life-time (or equivalent) lease with the above terms. Buyer represents and warrants that the Park shall remain a senior only mobile home park.

6.  Buyer shall offer all members in good standing free rent for the first three months after the COE. Seller shall reduce the purchase price by $604,800.

7.  Subject to any restrictions imposed under California law, upon COE, all members of PBPA to receive their paid assessments back or these funds may be transferred to NOE as an investment in NOE per the terms set forth below.

8.  All members in good standing of PBPA are to have the opportunity to invest an amount equal to their paid in assessment in preferred partnership units in the NOE. Such member/investor to receive a proportional interest (their investment divided by the Purchase Price, plus costs (i.e., prepayment penalties, etc. in the NOE)). Any ownership by a member in the NOE shall be subject to a separate written agreement between the member and the NOE.

EXHIBIT B-1

SAUNDERS REVISED LETTER OF INTENT DATED 5-22-15

EXHIBIT L
340



9. Such preferred investors shall not be personally responsible for any of the mortgage or other purchase debt of the NOE.

10. Such preferred investors are to receive their share of any distributed profits in proportion to their ownership.

11. All members electing to invest in the NOE shall have the option of selling their interest to John Saunders at their cost at any time during the first two years following the COE upon 90 days' written notice to John Saunders.

12. Two years after COE, preferred investors may sell their interest to John Saunders provided they and John Saunders can come to a mutually agreed upon price. If an agreed upon price is not reached, then they can sell their interest to a third party acceptable to the NOE ownership subject to the procedure in the Operating Agreement of the NOE.

13. A preferred investor may sell their interest without moving from the Park or may move from the Park without selling their interest. These investments may be left to the investor's heirs upon the investor's death.



14. While it is the choice of PBPA, it is understood by the NOE that upon dissolution, PBPA will be distributing the net proceeds of the sale equally to all members in good standing in accordance with California Corporations Code.

15. All members in good standing must sign releases in favor of PBPA and NOE at or before the COE.



EXHIBIT B-2



SAUNDERS REVISED LETTER OF INTENT DATED 5-22-15

EXHIBIT L
341



**EXHIBIT "C"**
**LITIGATION**

1. *Case No. 30-2010-00432259 Haugen vs Palm Beach Park Association*
2. *Case No. 30-2011-00498722 Palm Beach Park Association vs Eicherly*
3. *Case No. 30-2010-00423544 Chodosh vs Palm Beach Park Association and related cross-complaint (including Palm Beach Park v. Beardslee). Consolidated with:*

   *30-2010-00423807 Eicherly vs Palm Beach Park Association*
   *30-2010-00425213 Harris vs Palm Beach Park Association*
   *30-2010-00423173 Ford Motor Credit Company LLC vs Manes*
   *(Default Judgment by Court on 5/9/11)*
   *30-2010-00425206 Moore vs Palm Beach Park Association*
   *30-2010-00425291 Haugen vs Palm Beach Park Association*
   *30-2010-00425323 Peterson vs Palm Beach Park Association*
   *30-2010-00435331 Curran - Probate*
   *30-2010-00432261 McLaughlin vs Palm Beach Park Association*

4. **30-2014-00720598-CU-CO-CJC  Eicherly vs. Palm Beach Park Association**
5. **Unfiled Department of Business Oversight (DBO) matter**
6. **30-2015-00770213-CU-BC-CJC  Hauswirth v. Palm Beach Park Association**

EXHIBIT B-3

SAUNDERS REVISED LETTER OF INTENT DATED 5-22-15

**EXHIBIT L**
342

REDLINED CHANGES TO

EXHIBIT "B"

LEASEBACK TERMS AND CONDITIONS

1. At or before COE, average rent in the Park shall be $1,800.00 per month per lot. This rent schedule is to be determined by PBPA, with approval of NOE, based on existing rate structure.

2. ~~No Rent increases for five (5) years.  Thereafter, there shall be annual increases based on the CPI for Los Angeles/Long Beach/Anaheim with a floor of 3.5% each year, and a ceiling of 7% each year.~~ No Rent increase for the first year.  In years 2 through 5 Rent shall increase in an amount equal to the increase, if any, to the CPI for Los Angeles-Riverside-Orange County.  Beginning in year 6 rent shall increase in an amount equal to the increase of the CPI for Los Angeles-Riverside-Orange County; provided however, the minimum increase shall be 3.5% and the maximum increase shall not exceed 7%.

3. There shall be a one-time pass down from present lot owners to immediate family members with no rent increase.

4. The lease to be assignable once in the first two (2) years to a non-immediate family member, in which case the Buyer/Assignee rent is to be raised a maximum of 10%.

5. All existing initial tenant members of PBPA in good standing to receive a life-time (or equivalent) lease with the above terms.  Buyer represents and warrants that the Park shall remain a senior only mobile home park.

6. ~~Any deferred maintenance and improvements of a capital nature discovered within the first three years after the COE shall be amortized over their life as additional rent.~~  Buyer shall offer all members in good standing free rent for the first three months after the COE.  Seller shall reduce the purchase price by $604,800.

7. Subject to any restrictions imposed under California law, upon COE, all members of PBPA to receive their paid assessments back or these funds may be transferred to NOE as an investment in NOE per the terms set forth below.

EXHIBIT L
343



8.   All members in good standing of PBPA are to have the opportunity to invest an amount equal to their paid in assessment in preferred partnership units in the NOE.  Such member/investor to receive a proportional interest (their investment divided by the Purchase Price, plus costs (i.e., prepayment penalties, etc. in the NOE)).  Any ownership by a member in the NOE shall be subject to a separate written agreement between the member and the NOE.

9.   Such preferred investors shall not be personally responsible for any of the mortgage or other purchase debt of the NOE.

10.  Such preferred investors are to receive their share of any distributed profits in proportion to their ownership.

11.  All members electing to invest in the NOE shall have the option of selling their interest to John Saunders at their cost at any time during the first two years following the COE upon 90 days' written notice to John Saunders.

12.  Two years after COE, preferred investors may sell their interest to John Saunders provided they and John Saunders can come to a mutually agreed upon price.  If an agreed upon price is not reached, then they can sell their interest to a third party acceptable to the NOE ownership subject to the procedure in the Operating Agreement of the NOE.

13.  A preferred investor may sell their interest without moving from the Park or may move from the Park without selling their interest.  These investments may be left to the investor's heirs upon the investor's death.

14.  While it is the choice of PBPA, it is understood by the NOE that upon dissolution, PBPA will be distributing the net proceeds of the sale equally to all members in good standing in accordance with California Corporations Code.

15.  All members in good standing must sign releases in favor of PBPA and NOE at or before the COE.

EXHIBIT L
344

# PALM BEACH PARK
101 Palm Drive
San Clemente, Ca. 92672

June 21, 2015

Dear Palm Beach Park members in good standing,

This past Saturday was our third town hall meeting regarding the sale of Palm Beach Park. The Board wants to thank all members who attended and those that expressed their opinions and asked questions.

On an issue as important as we are facing, public discourse is an important part of the process and we had this at all three town hall meetings.

Along with the May 9th presentation, many of the questions asked have been answered at the town hall meetings. Some questions unfortunately require a crystal ball. For those that could not attend any or all the meetings a recap is provided in this letter.

**To keep PBP a senior resident park**, your Board stays resolute in recommending the sale of the Park to Saunders Property Group. With the issues that lie ahead, see below, the Board sees the sale the best possible solution.

> Thrivent Balloon payment 12/2017
> Continuing cost and length of time of future litigation including appeals
> New Litigation, Hauswirth suit
> Increased operating costs of managing and maintaining PBP
> Resolution of DBO issues
> Continued loss of revenue from Plaintiffs
> Managing PBP with a volunteer Board

A few points of clarification:

The Board has **not** been trying to sell the park for 2 years. What started 2 years ago was the process of identifying economic alternatives that our ongoing litigation was creating as our reserve account was being depleted. Those economic alternatives included: meeting with financial advisors to investigate the ability to acquire a loan for Thrivent balloon payment, reorganization, filing bankruptcy, entering into receivership, securing loan for a negotiated settlement with plaintiffs, increasing rents to resupply our reserves and increase the $400 legal assessment to reduce litigation debt. Only after it was determined that those alternatives would not provide the end result desired was the sale of the Park elevated to a serious alternative.

It has been asked why the Park was not formally listed. Unfortunately due to ongoing litigation, the Board couldn't disclose the sale offer until it had a bona fide offer that it felt was worthy of your consideration, including indemnification, a buyer with the wherewithal and means to assume the cost of all litigation at the close of escrow, a process (dissolving the corporation) for members to receive disbursement of the proceeds, and a way to assist with the new rent payments associated with the sale.

# EXHIBIT L
345

There were also concerns expressed at the meeting that the indemnification language in the LOI is not bullet proof.  Nothing in the law is "bullet proof," but please be assured that when the Sales Agreement is negotiated our attorney will be tasked with drafting the strongest possible indemnity language to accomplish the intent of the agreement which is to place the responsibility for the payment of all costs, judgments, and expenses arising out of the current litigation and any litigation arising out of the sale of the park upon Mr. Saunders. Rest assured that your Board will not agree to anything less than that. If there is one good thing about having a resident volunteer board, is that your Board is affected the same as all members. It is in our best interest to ensure that we have an acceptable Sales Agreement.

Additional concerns:
Buyer will have pass through charges for taxes and infrastructure costs.  Buyer responded that there will **not** be any pass through including property taxes except for monthly utilities.

Will subleasing of your mobile home be allowed?  Buyer responded that it is not his policy to allow subleasing.

Are residents responsible for correcting pre-existing code violations on their space? Buyer responded that the responsibility for pre-existing code violations for all park owned property such as gas lines running under the homes is the owner's responsibility.

DBO update:  at the request of the DBO, our attorneys have submitted a draft of security permit for review by the DBO. It is hoped that this will provide the avenue that again will allow our residents to sell their homes in Palm Beach Park.

What happens if the buyer decides to sell PBP?  Our attorney advises that if that did happen the new buyer would acquire the park property subject to the terms of any existing leases.

**In closing, your Board asks for support in selling Palm Beach Park to Saunders Property Group.** Additionally, regardless of your position on this very important issue, please exercise your right to vote and do vote. We look forward to seeing you June 28th to determine the outcome of the vote.

Sincerely,
Palm Beach PARK Board of Directors

EXHIBIT L
346



# SAUNDERS PROPERTY
## COMPANY

4040 MacArthur Blvd., Suite 300
Newport Beach, CA 92660
Tel: (949) 251-0444
Fax: (949) 251-0888

John R. Saunders
President

June 19, 2015

Dear Palm Beach Park Residents,

We have been given the June 17, 2015 e-mail from Richard Rogers.

In his letter he refers to the link to "FREQUENTLY ASKED QUESTIONS" Regarding the California Mobilehome Park Residency Law (MRL).

The MRL Law is designed to outline the relationship between the park owner and the residents. It is to protect the resident and is in their favor and is long and involved so the "64 Questions" were designed to help clarify and succinctly summarize the MRL. Mr. Rogers itemized the following questions:

# 2 "Can the park charge separate maintenance or pass through fees in addition to the rent?"

Our answer is:

Excluding the individual member's utilities usage, we do not pass through any additions to the rent such as regular maintenance, infrastructure upgrade or any other "pass through".

#10 "Why do residents have to pay taxes on their mobile homes in addition to paying the park owners a fee for property taxes?"

Our answer is:

We do not charge the residents for property taxes or pass them through.

#36 Can the park prevent residents from subleasing the mobile home?

Our answer is:

Other than Park Owned Homes it is not our policy to allow subleasing

#46: "Is the resident of or the park owner responsible for correcting pre-existing code violations on their space?

EXHIBIT L
347

Our answer is:

**We as park owner are responsible for pre-existing code violations for all park owned property, such as gas, lines running under the homes.**

We continue to look forward to answer any specific questions you may have.

Sincerely,

John Saunders

Saunders Property Company

EXHIBIT L
348



4040 MacArthur Blvd., Suite 300
Newport Beach, CA 92660
Tel: (949) 251-0444
Fax: (949) 251-0888

John R. Saunders
President

June 18, 2015

Palm Beach Park Association

35902 Coast Highway

San Clemente, CA 92672

RE:    Palm Beach Park

Limited Partnership Structure

Dear Ladies and Gentlemen,

If any of the residents-in good-standing wish to reinvest the amount of their paid-in principal to become a limited partner with the new ownership, they are welcome to do so.

Please review the attached summary which outlines the basics of our offer to partner with residents-in-good-standing. This offer, as well of the Letter of Intent, expires on June 30, 2015.

Thank you.

Sincerely,

John Saunders

Saunders Property Company

EXHIBIT L
349

## Summary of Our Offer to Partner with Residents-in-Good-Standing

1. Each member-investor will receive a proportional interest (their investment divided by the Purchase Price plus costs (i.e. prepayment penalties etc.) in the New Ownership Entity (NOE) and will receive their share of any distributed profits in proportion to their ownership.
2. The investors will not be personally responsible for any of the mortgage or other purchase debt
3. The investors will have the option of selling their interest to John Saunders at their cost within two years of close of escrow with 90 days written notice.
4. After two years they may sell to Saunders if both agree on a price.  If agreement is not reached, investors may sell to an outside party approved by the NOE, approval not to be unreasonably withheld.
5. An investor may sell their interest without moving from the park or may move from the park without selling their interest.  The investment may be left to heirs upon the investors death.

EXHIBIT L

350

*F. Chodosh, et al., v. J. Saunders, et al.*

**July 21, 2020**

**COMPLAINT**

**EXHIBIT – M**

| | |
|---|---|
| 11/30/15 | Hometown America, cover letter to Mantelli |
| 11/30/15 | Hometown America, higher offer to buy Park |



**November 30, 2015**

PALM BEACH PARK ASSOCIATION
c/o Diana Mantelli, President
101 Palm Dr.
San Clemente, CA 92672-3647

Dear Diana:

We have become aware that you are considering a sale of Palm Beach Park and want to express our strong interest in acquiring the community.  Hometown America is a well-known and respected manufactured housing community owner and operator in several states.  We own 15 properties in California, including Laguna Terrace not too far from you in Laguna Beach.  As an introduction, below is a brief history and overview of Hometown America (www.hometownamerica.com).

Founded in 1997, Hometown is a private real estate investor based in Chicago.  Since 2002, the company has been owned and operated by the management team with Washington State Investment Board ("WSIB") as our sole investor.  We operate under a long-term operating agreement with WSIB which has committed more than $1 billion of equity to our enterprise.  Today, our portfolio is comprised of 50 communities valued at more than $2 billion.  Our assets are primarily high quality, age-restricted communities concentrated in California, the Northeast, Florida, and Chicago.  As evidence of Hometown America's aggressive acquisition appetite, we have purchased seven communities in California thus far in 2015.

Once Hometown America became aware that Palm Beach Park was for sale, we did our research.  Based on current market conditions and our understanding of the prior offer the HOA considered, we are presenting the enclosed offer to purchase Palm Beach Park.  As illustrated in the letter of intent, our offer will net the resident association $2.275 million (approximately $20,000 per member) more than the other offer under consideration.  As you review, please take notice that ours is an all-cash offer which enhances surety of a quick closing.  We are aware of the current litigation, and have experience with these types of issues.  After reviewing the publically available information, we expect to resolve the litigation in conjunction with the sale.

We know that time is of the essence, and that a sale is a priority for the members and residents.  We pledge to move as rapidly as possible to bring the sale to a conclusion that will benefit all involved and allow the residents to enjoy and live in a community that is well run and well maintained by a professional management company.

Please contact me with any questions.  I am also free to meet you at the community to present our offer in more detail and answer any questions you might have.  I look forward to hearing from you.

Best regards,


Doug Minahan
Vice President, Acquisitions
(312) 604-7574
dminahan@hometownamerica.com

EXHIBIT M



November 30, 2015

PALM BEACH PARK ASSOCIATION
c/o Diana Mantelli, President
101 Palm Dr.
San Clemente, CA 92672-3647

RE:  Palm Beach Park, San Clemebte, CA (the "Property")

Dear Diana:

The purpose of this letter is to confirm the interest of Hometown America, L.L.C. or one of its affiliates ("Purchaser") in acquiring the entire fee simple and leasehold interests in the Property, a manufactured housing community with 126 sites in San Clemente, CA.  The Purchaser would be buying the improvements thereon, all easements and appurtenances thereto, and all personal property including inventory homes used or useful in connection with the operation and maintenance of the improvements (collectively, the "Property").

The following is a summary of some of the major points of the Purchaser's expression of interest in purchasing the Property:

1.  <u>Purchase Price</u>: $38,250,000, less a $2,000,000 credit to cover litigation issues ("Indemnification Credit") and a $605,000 credit for three months of free rent. These credits mirror your prior offer.  In addition, Hometown will pay 100% of the prepayment penalty associated with the payoff of the existing loan and the association will not be responsible for a sales commission since Hometown is not represented by a broker.  Therefore, our net purchase price of $35,645,000 exceeds your previous offer by $2,275,000, or approximately $20,000 per member.  Below is a table summarizing Hometown's offer and the net proceeds payable to the community:

| | |
|---|---|
| Gross Purchase Price | $38,250,000 |
| Less: Litigation Credit | ($2,000,000) |
| Less: Three Months Free Rent | ($605,000) |
| Less: Debt Repayment Fee (Hometown to pay this) | $0 |
| Less: Broker Fee (no broker involved) | $0 |
| Net Purchase Price to the Community | $35,645,000 |

2.  <u>Earnest Money Deposit</u>: $350,000 will be paid at time of signing the Purchase Agreement (as defined below).

3.  <u>Contract and Closing</u>: Upon Seller's acceptance of this letter, Purchaser will commence preparation of a definitive purchase and sale agreement in a form customary for a transaction of this size and type (the "Purchase Agreement").

EXHIBIT M
353

4.     <u>Inspection Period</u>:  Purchaser shall have thirty (30) days after execution and delivery of the Purchase Agreement to cause one or more attorneys, engineers, auditors, architects and other experts of its choice and at Purchaser's expense to (i) inspect the Property and any documents related to the Property, and (ii) inspect, examine, survey, obtain engineering inspections, appraise and otherwise do that which, in the opinion of Purchaser, is necessary to determine the condition and value of the Property for the uses intended by Purchaser.  Purchaser understands and agrees that the information obtained pursuant to such inspection shall be kept in confidence and shall not be revealed to outside parties other than to its lenders, attorneys, accountants, investors, principals, affiliates or clients or as otherwise required by law or for any valid business purpose of Purchaser.

5.     <u>Closing Date</u>:  The closing date of the purchase and sale of the property shall be twenty (20) days after the Inspection Period.

6.     <u>Real Estate Commission</u>:  Seller and Purchaser acknowledge that Seller is responsible for commissions payable in this transaction, if any.  Purchaser has not engaged a broker in conjunction with this transaction.

7.     <u>Closing Costs</u>:  Seller shall be responsible for all transfer taxes, closing fees and other expenses due from or incurred by Seller in connection with the transaction.

8.     <u>Certain Warranties</u>:  The Purchase Agreement shall contain customary representations, warranties, indemnities or other satisfactory assurances.

9.     <u>Prorations</u>:  Purchaser will receive a credit against the purchase price to be paid at closing on account of security deposits, prepaid rents, property taxes and assessments, and other items of income and expense as of midnight on the day preceding closing.

10.    <u>Documents to be Delivered</u>:  The Purchase Agreement shall contain a list of requested documents, copies of which Seller shall promptly furnish Purchaser within 5 days of the execution date of the Purchase Agreement.

Purchaser and Seller each acknowledge that (i) a transaction of this type involves many essential and nonessential terms and conditions and that there has not yet been a definite statement of all the terms and conditions of the proposed transaction, (ii) this letter is not intended to constitute an offer or an acceptance of an offer, and (iii) this letter is not intended to constitute an agreement to execute the Purchase Agreement or any real estate agreement in the future.  It is the intention and understanding of Purchaser and Seller that the only instrument executed between Purchaser and Seller with respect to the Property shall be the Purchase Agreement and that the Purchase Agreement, if executed, will contain all the terms and conditions deemed essential by Purchaser and Seller with respect to the purchase and sale of the Property as contemplated by this letter.

Notwithstanding (a) anything contained in this letter to the contrary, (b) subsequent negotiations, (c) any action taken hereafter by either Purchaser or Seller, or (d) any actual or claimed reliance, it is understood that, except for the obligations set forth in the immediately preceding paragraph, which shall survive termination of this letter, neither Purchaser nor Seller will be legally bound in any

manner unless and until the Purchase Agreement has been prepared, executed and delivered by both Purchaser and Seller.

Please confirm that the foregoing accurately sets forth Seller's understanding with Purchaser by signing a copy of this letter below where noted and returning the same to me within seven (7) days of the date of this letter of intent.


Very truly yours,

HOMETOWN AMERICA, LLC
By:   Hometown Communities Limited Partnership


Doug Minahan
Vice President

ACCEPTED AND AGREED TO THIS _____ DAY OF _____, 2015.

BY:          _____

NAME:      _____

TITLE:      _____
("Seller")

- 3 -

EXHIBIT M

***F. Chodosh, et al., v. J. Saunders, et al.***

**July 21, 2020**

**COMPLAINT**

**EXHIBIT – N**

| | |
|---|---|
| 04/29/19 | State Auditor, 1st ever Audit of CJP, Auditor's Cover Letter and 2 Pgs. |



# *Commission on Judicial Performance*

Weaknesses in Its Oversight Have Created
Opportunities for Judicial Misconduct to Persist

*April 2019*

**REPORT 2016-137**



EXHIBIT N
357

**Elaine M. Howle** *State Auditor*



April 25, 2019
*2016-137*

The Governor of California
President pro Tempore of the Senate
Speaker of the Assembly
State Capitol
Sacramento, California 95814

Dear Governor and Legislative Leaders:

At the request of the Joint Legislative Audit Committee, the California State Auditor presents this audit report of the Commission on Judicial Performance (CJP). CJP is the agency charged with investigating complaints about judicial misconduct and deciding whether to discipline California judges for violations of the code of judicial ethics, and our review found that CJP must address the following weaknesses:

- It does not consistently take all reasonable steps when it investigates alleged misconduct.

- Its structure and disciplinary processes do not align with best practices.

- It has not worked sufficiently to increase its transparency and accessibility.

In about one-third of the cases we reviewed, we found that CJP's investigators did not take all reasonable steps to determine the existence or extent of alleged misconduct, such as inappropriate demeanor or improper delegation of duties to court staff. These missed steps include not speaking with all relevant witnesses, not obtaining additional evidence, and not taking a broad approach to determining misconduct in light of a pattern of allegations. Furthermore, CJP's structure—as a single entity that both investigates alleged judicial misconduct and makes decisions about the appropriate level of discipline—results in judges facing potential discipline from a body of commissioners that is privy to unfounded allegations of misconduct. CJP also delegates responsibility for evidentiary hearings on alleged misconduct to three judges appointed by the Supreme Court of California, a practice that falls short of the voters' intent to increase the public's role in judicial discipline with the passage of Proposition 190 in 1994. Finally, CJP has not taken steps to hold meetings that are open to the public or to accept electronically submitted complaints, despite decades of public scrutiny about its lack of transparency and inaccessibility.

CJP's operations and structure must change significantly to address the issues that this audit revealed. CJP can change its internal policies to address concerns about the planning and supervision of its investigations. However, changes to CJP's structure will require an amendment to the California Constitution and CJP will need to inform the Legislature about any related funding needs as it adjusts its practices.

Respectfully submitted,

*Elaine M. Howle*

ELAINE M. HOWLE, CPA
California State Auditor

# Summary

## Results in Brief

A strong judicial oversight agency is essential to maintain a fair and impartial judiciary that limits the potential for judges to abuse or misuse their power. Since its inception in 1960, the Commission on Judicial Performance (CJP) has been the single agency responsible for investigating complaints of judicial misconduct.[1] CJP's mission is to protect the public, enforce rigorous standards of judicial conduct, and maintain public confidence in the integrity and independence of the judicial system. Its 11 commissioners—consisting of judges, attorneys, and members of the public—discipline judges when CJP's staff prove with clear and convincing evidence that those judges have engaged in misconduct. Judicial misconduct usually involves behavior that conflicts with the California Code of Judicial Ethics (ethics code), which requires judges to diligently, impartially, and properly perform their duties in a way that does not undermine public confidence in the judiciary. However, this audit concludes that CJP has missed opportunities to fully investigate allegations of misconduct, has a structure and processes for discipline that do not align with best practices and falls short of the intent of the voters, and has failed to ensure it is sufficiently transparent and accessible to the public.

We found that flaws in CJP's investigative processes could allow judicial misconduct to go undetected and uncorrected. Examples of alleged misconduct from the cases that we reviewed include threatening to assault litigants, inappropriate comments, and inappropriate relationships with subordinates. When we reviewed 30 of CJP's investigations of judicial misconduct, we determined that in about one-third of those cases, investigators did not take all reasonable steps—such as interviewing relevant witnesses, obtaining necessary evidence, or observing the judges—to determine the existence or extent of alleged misconduct. For example, one case that we reviewed involved a judge who made aggressive and intimidating comments from the bench. Although CJP was able to discipline the judge for some of the allegations in this case, it did not attempt to obtain audio files that may have proved further misconduct. The weaknesses we observed in CJP's investigations are due in part to a lack of key safeguards for ensuring high quality investigations, such as documented investigation strategies and regular managerial oversight.

*Audit Highlights . . .*

*Our audit regarding CJP's processes for investigating and disciplining judges highlighted the following:*

» *CJP's investigators failed to pursue allegations thoroughly and ignored warning signs of ongoing misconduct.*

  • *In about one-third of the cases we reviewed, investigators did not take all reasonable steps—interviewing witnesses, obtaining evidence, or observing the judges—to determine the existence or extent of alleged misconduct.*

  • *CJP does not evaluate its complaint data to identify potential patterns of judicial misconduct that could merit investigation.*

» *CJP's structure and disciplinary proceedings are not aligned with judicial discipline best practices.*

  • *Commissioners are involved in both the investigatory and disciplinary functions, resulting in judges facing potential discipline from a body of commissioners that is privy to unfounded allegations of misconduct.*

  • *CJP's reliance on judges to hear cases involving their peers falls short of the voters' intent to increase the public's role in judicial discipline with the passage of Proposition 190 in 1994.*

» *CJP has not taken important steps to improve its transparency and accessibility to the public.*

  • *It has rarely directed its outreach activities toward members of the public—out of more than 120 events held during a five-year period, only three targeted the general public.*

---

[1] Throughout this report, we use the abbreviation *CJP* to refer to the agency's 11 commissioners and 22 staff. We use the term *commission* to refer to the decision-making body of 11 commissioners.

*continued on next page . . .*

EXHIBIT N
359

*F. Chodosh, et al., v. J. Saunders, et al.*

**July 21, 2020**

**COMPLAINT**

**EXHIBIT – O**

| 01/01/2016 | Atty. fee payout grid, end 2015 early 2016, undated |
| 2007-2017 | Atty. Fees Paid to Thomas, Salisbury, et al. 2007 – 2017 |

**PALM BEACH PARK ASSOCIATION–ATTORNEYS' FEES PAID**

**IN THE PALM BEACH PARK MATTERS, 2007 TO PRESENT**

**(2007 –2017, Reported except 2016-2017 amount, which is Estimate)**

| Ref. Line | Palm Beach Park Association | "Legal" Fees | Reference,  Source of Information |
|---|---|---|---|
| Year | Years / Period Ending | Amounts | Reference: PBP Financial Statements / Newsletter |
| 2007 | 12/31/2007 | $198,420 | Paid to Gibbs / other attorneys 2007 |
| 2008 | 12/31/2008 | $99,211 | Paid to Gibbs / other attorneys 2008 |
| 2009 | 12/31/2009 | $191,000 | Newsletter, Feb., 2010 |
| 2010 | 12/31/2010 | $209,693 | Newsletter, Feb.  2011 |
| 2011 | 12/31/2011 | $366,383 | Newsletter, Feb.  2012 |
| 2012 | 12/31/2012 | $807,239 | Newsletter, Feb.  2013 |
| 2013 | 12/31/2013 | $626,878 | Trial Exh. PBPA produced Dec. 14, 2015 |
| 2014 | 12/31/2014 | $833,936 | Trial Exh. PBPA produced Dec. 14, 2015 |
| 2015 | 12/31/2015 | $1,113,936 | PBPA 2015 Fin. Stmnt. & Atty. Detail |
| 2016-7 | As of Feb. 2017 (estimated) | $600,000 | Est. based on PBPA Distribution Letter to Members, dated 3/9/17 |
| TOTAL | 2007 – 2017* | $5,046,696** | |
| ******* | ****************** | ************** | ********************************************** |

*Figures do not include approximately $400,000 in legal fees that PBPA paid to opposing counsel in 2012 when it lost the unlawful detainer cases.

**It is believed this figure is low; additional fees were paid to PBPA counsel.


************************************************************************************************

Rev. 6/2017

**12 EFS 2874**

EXHIBIT O
361

**Palm Beach Park**
**Schedule of Legal Fees**
**2015**

| Law Firms | Jan | Feb | March | April | May | June | July | Aug | Sept | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | 0.00 |
| Beam & Associates | | 2,500.00 | | | | | 2,000.00 | | | 14,150.52 | | | 18,650.52 |
| Allen Weiss & Assoc. | 41,200.00 | 44,000.00 | 45,200.00 | 194,400.00 | 43,600.00 | 44,000.00 | 43,200.00 | 43,600.00 | 44,000.00 | 42,400.00 | 42,000.00 | 43,600.00 | 671,200.00 |
| Anderholt-Whittaker | 20,000.00 | | 30,000.00 | 40,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | 65,000.00 | 15,000.00 | 75,078.93 | 320,078.93 |
| Trevi Venture | | | 915.00 | 545.00 | 250.00 | 250.00 | 250.00 | 250.00 | 250.00 | 250.00 | 250.00 | 250.00 | 3,460.00 |
| Manning | 2,709.50 | 209.00 | | 38.00 | | | | | | | | | 2,956.50 |
| Richardson | | | | | | | | 2,200.00 | | | 413.86 | | 2,613.86 |
| Lewis, Brisbois | | 1,063.67 | | | | | 3,169.67 | 3,062.21 | 752.30 | 1,731.58 | 1,373.49 | 705.89 | 11,858.81 |
| Salisbury | 1,725.00 | 1,281.00 | 15,926.00 | 6,449.50 | | 1,336.00 | 2,960.00 | 18,098.55 | 5,071.50 | 3,533.81 | 7,391.50 | 11,648.50 | 75,421.36 |
| Retro Investigation | 3,093.41 | 4,482.18 | | | | | | | | | | | 7,575.59 |
| **Total Per Month** | **68,727.91** | **53,535.85** | **92,041.00** | **241,432.50** | **58,850.00** | **60,586.00** | **66,579.67** | **82,210.76** | **65,073.80** | **127,065.91** | **66,428.85** | **131,283.32** | **1,113,815.57** |

EXHIBIT _Q

*F. Chodosh, et al., v. J. Saunders, et al.*

**July 21, 2020**

**COMPLAINT**

**EXHIBIT – P**

| 10/06/14 | HOA PBPA President D. Mantelli as Cowgirl Sheriff, memo to members: "we won" |
|---|---|

October 6, 2014

Dear PBP Members,

I have attached the court rulings I received this am.

There were six (6) issues to be decided.

# CONGRATULATIONS WE HAVE A VICTORY ON ALL SIX ISSUES.



EXHIBIT P

364

**SUPERIOR COURT OF CALIFORNIA,**
**COUNTY OF ORANGE**
**CIVIL COMPLEX CENTER**

**MINUTE ORDER**

DATE: 10/03/2014                    TIME: 10:40:00 AM          DEPT: CX102
JUDICIAL OFFICER PRESIDING: Robert J. Moss
CLERK:  Betsy Zuanich
REPORTER/ERM: None
BAILIFF/COURT ATTENDANT:  None

CASE NO: **30-2010-00423544-CU-BC-CXC** CASE INIT.DATE: 11/08/2010
CASE TITLE: **In Re Palm Beach Park Association Cases (Chodosh)**
CASE CATEGORY: Civil - Unlimited      CASE TYPE: Breach of Contract/Warranty

EVENT ID/DOCUMENT ID: 72036732
**EVENT TYPE**: Chambers Work

**APPEARANCES**

*Deemed Related to:*

*Case No.  30-2010-00432259    Haugen  vs  Palm Beach Park Association*

*Consolidated with:*

| | |
|---|---|
| *30-2010-00423807* | *Eicherly  vs  Palm Beach Park Association* |
| *30-2010-00425213* | *Harris  vs  Palm Beach Park Association* |
| *30-2010-00423173* | *Ford Motor Credit Company LLC  vs  Manes* |
| | *(Default Judgment by Court on 5/9/11)* |
| *30-2010-00425206* | *Myrle A. Moore, in her capacity as trustee of the Moore Family Trust dated* |
| | *June 24, 1994  vs  Palm Beach Park Association* |
| *30-2010-00425291* | *Haugen  vs  Palm Beach Park Association* |
| *30-2010-00425323* | *Peterson  vs  Palm Beach Park Association* |
| *30-2010-00435331* | *Curan-Probate* |
| *30-2010-00432261* | *McLaughlin  vs  Palm Beach Park Association* |

There are no appearances by any party.

The Court, having taken the above-entitled matter under submission on 9/22/14 and having fully considered the arguments of all parties, both written and oral, as well as the evidence presented, now rules as follows:

The parties stipulated that for Phase II of the trial of this matter, the court will decide six specific legal

---

DATE: 10/03/2014                    MINUTE ORDER                              Page 1
DEPT: CX102                                                          Calendar No.

EXHIBIT P
365

*F. Chodosh, et al., v. J. Saunders, et al.*

**July 21, 2020**

**COMPLAINT**

**EXHIBIT – Q**

| | |
|---|---|
| 11/10/06 | CJC Memo re: Presiding Judge Responsibilities |
| 04/26/16 | Complaint to Presiding Judge Margines re: Judge Moss |



## Judicial Council of California
### ADMINISTRATIVE OFFICE OF THE COURTS

455 Golden Gate Avenue • San Francisco, California 94102-3688
Telephone 415-865-4200 • Fax 415-865-4205 • TDD 415-865-4272

# MEMORANDUM

**Date**
November 10, 2006

**Action Requested**
For your information

**To**
Presiding Judges of the Superior Courts

**Deadline**
N/A

**From**
Mary M. Roberts, General Counsel
Deborah Brown, Managing Attorney
Mark Jacobson, Senior Attorney
Office of the General Counsel

**Subject**
Addressing Misconduct by Other Judges

---

This memorandum is an updated version of a memorandum that was initially prepared in response to questions from presiding judges about what action to take when they become aware of misconduct by other judges. In response to these inquiries, the Administrative Office of the Courts' Office of the General Counsel compiled a review and summary of source material available to assist presiding judges in complying with their ethical obligation to address judicial misconduct. This memorandum includes a review of the law, a compilation of the advice offered by the California Judges Association's Judicial Ethics Committee and David Rothman's *California Judicial Conduct Handbook*, and information obtained from the Commission on Judicial Performance (CJP). It also addresses how to interpret the requirement in canon 3D(1) of the California Code of Judicial Ethics that judges take "appropriate corrective action" when they become aware of misconduct by other judges. Specifically, the memorandum sets forth (1) factors to consider in deciding what corrective action is appropriate, (2) tips on seeking advice in making this determination, (3) examples of appropriate corrective action under certain circumstances, and (4) examples of discipline the CJP has imposed on judges for failure to take corrective action.[1]

---

[1] This memorandum can be found on the Serranus Web site at *http://serranus.courtinfo.ca.gov/opinions/loca/* under "Ethics."

Presiding Judges of the Superior Courts
November 10, 2006
Page 2

The Office of the General Counsel initially developed this information in 2004 in consultation with the Judicial Council's Task Force on Judicial Ethics Issues and the Executive Committee of the Judicial Council's Trial Court Presiding Judges Advisory Committee. This memorandum replaces the previous March 8, 2004 memorandum on this subject. The updated information includes new contact information for employees of the Administrative Office of the Courts (AOC) and for the California Judges Association's Judicial Ethics Hotline, recent information about the Judicial Officers' Assistance Program, and additional information about appropriate corrective action.

Please note that the information contained in this memorandum is not intended as legal advice in any specific situation. The Office of the General Counsel is available, however, to provide specific legal advice to presiding judges on addressing misconduct by other judges.

## I.    Canon 3D

A judge who becomes aware of misconduct by another judge is required by canon 3D(1) of the Code of Judicial Ethics to take "appropriate corrective action." There is, however, very little guidance on what constitutes "appropriate corrective action."

Canon 3D(1) specifically states:

> Whenever a judge has reliable information that another judge has violated any provision of the Code of Judicial Ethics, the judge shall take or initiate appropriate corrective action, which may include reporting the violation to the appropriate authority.
>
> *ADVISORY COMMITTEE COMMENTARY:*
> *Appropriate corrective action could include direct communication with the judge . . . who has committed the violation, other direct action if available, or a report of the violation to the presiding judge, appropriate authority, or other agency or body. . . .*

This canon applies to all judges. However, because of their leadership position within the court, presiding judges are more likely to have or receive information about misconduct by other judges in the court.

## II.    What is "Appropriate Corrective Action"?

No language in canon 3D mandates that any certain type of conduct be reported to the CJP. The commentary to the canon suggests that appropriate corrective action might be direct communication with the judge, reporting the conduct to the presiding or supervising judge, or filing a complaint with the CJP. Thus, for example, if a judge becomes aware that another judicial officer has been drinking excessively at lunch and the judicial officer's ability to perform his or her judicial duties is thereby impaired, the judge must take appropriate corrective action.

Presiding Judges of the Superior Courts
November 10, 2006
Page 3

The action could include (depending on the circumstances) talking to the judicial officer, reporting the matter to the presiding judge, or reporting the matter to the CJP.

**A.     Factors to Consider**

The factors to consider in deciding what corrective action to take include the following:

- The seriousness of the misconduct
- Whether the misconduct is an isolated incident or part of a pattern of inappropriate behavior
- Whether there is an entity specifically designed to address the type of misconduct at issue (e.g., the Judicial Support Hotline sponsored by the California Judges Association, which makes referrals to specialists for such problems as substance abuse, or the Judicial Officers' Assistance Program)
- Whether any criminal offense was involved
- How similar misconduct has been addressed by the court in the past
- If the judge has been confronted, the judge's reaction (e.g., whether the judge accepts responsibility and indicates a willingness to address the issue)

**B.     Seeking Advice and Resources**

It is often unclear what corrective action should be taken when a judge becomes aware of misconduct by another judge. It is very difficult to define a category of misconduct and state that a certain type of corrective action is always appropriate for that type of misconduct.

In determining the appropriate corrective action, it is useful to seek advice from others. The Judicial Ethics Committee of the California Judges Association frequently receives and responds to this type of inquiry and is an excellent resource. The telephone number of the Judicial Ethics Hotline is 415-263-4600.

It is also useful to contact other judges to solicit advice on appropriate corrective action. Presiding judges may wish to contact former presiding judges in the county or current or former presiding judges from other counties to ask what those judges would do in a particular situation. If a presiding judge contacts another judge or former judge for advice, the presiding judge should keep the name of the subject judge confidential.

It may be worthwhile to consult the *California Judicial Conduct Handbook* by David Rothman. The book contains a section on this issue. (Rothman, *California Judicial Conduct Handbook* (2d ed. 1999) § 5.65, pp. 152–154.)

If a presiding judge is interested in obtaining legal advice generally about corrective action and wishes to engage in a privileged communication, he or she is advised to contact the AOC's Office of the General Counsel. More specifically, if a presiding judge becomes aware of misconduct by another judge that may involve unlawful behavior, such as sexual harassment, he or she should contact the Office of the General Counsel for privileged legal advice.

**EXHIBIT Q**

369

Presiding Judges of the Superior Courts
November 10, 2006
Page 4

Another resource available to all justices, judges, and subordinate judicial officers is the Judicial Officers' Assistance Program (JOAP). The JOAP is a counseling and consultation service designed to help judges and their family members with a wide range of personal issues, including substance abuse. Referral of a judge to the JOAP may constitute appropriate corrective action. A judge can contact the JOAP directly by calling the program's administrator—Magellan Health Services—at 800-424-4159 or by visiting the Magellan Web site at *www.magellanhealth.com.*[2] To obtain information about the program from the AOC, a judge can contact Virginia Robles, Senior Pay and Benefits Specialist in the AOC's Human Resources Division, at 415-865-4295 or virginia.robles@jud.ca.gov; or Elaine Carlino, Senior Human Resources Analyst, at 415-865-4304 or elaine.carlino@jud.ca.gov. In addition, information about the program can be found on the Serranus Web site at *http://serranus.courtinfo.ca.gov/programs/hr/documents/judoff_assist _prog_broch.pdf.*

**C.     Examples of Corrective Action**

The following examples of corrective action are drawn from Ethics Updates, published by the Judicial Ethics Committee of the California Judges Association (CJA), and David Rothman's *California Judicial Conduct Handbook.* It is important to bear in mind that people may differ in their view of what constitutes appropriate corrective action, and the CJP may not agree with the actions recommended below by the CJA and Judge Rothman.

**Sexual Harassment**

- A presiding judge who has received an employee complaint that another judge made an inappropriate sexual remark must take appropriate action, which might include discussion with the parties or referral to the CJP. (December 1995 CJA Ethics Update.)

**Criminal or Unlawful Conduct**

- If a judge has reliable information that another judge has committed a serious criminal offense, the conduct must be reported to both the CJP and the appropriate law enforcement agency. (Rothman, *California Judicial Conduct Handbook* (2d ed. 1999) § 5.65, p. 153.)

- If a judge has probable cause to believe that another judge has converted a significant amount of court property for personal use, the judge should report this conduct directly to the CJP. (February 1994 CJA Ethics Update.)

---

[2] To access the information on the Web site, a judge should click on the "I'm a Member" button, then click on "New or unregistered user." The program number is the same as the toll-free number—800-424-4159. The judge can register as a new user or continue unregistered, but only registered users have access to secured messaging with Magellan's clinicians.

Presiding Judges of the Superior Courts
November 10, 2006
Page 5

- A judge before whom another judge has entered a plea to driving under the influence must take some corrective action (e.g., referral to a treatment program, reporting to the appropriate supervising judge, etc.). (January 1997 CJA Ethics Update.)[3]

- A judge has an obligation to take or initiate appropriate measures concerning a judge who disobeys the county's anti-smoking ordinance. (February 1994 CJA Ethics Update.)

- A presiding judge who knows that a judge has willfully refused to comply with a jury summons despite the presiding judge's admonitions to do so has two obligations: (1) schedule a sanctions hearing according to statute, arranging for a judge assigned by the Judicial Council to conduct the hearing; and (2) report the judge to the CJP in light of the judge's willful and deliberate defiance of the presiding judge's admonitions. (March 2006 CJA Ethics Update.)

**Refusing Assignments**

- A judge assigning cases must report a judge who refuses to accept those assignments. (December 1995 CJA Ethics Update.)

**Demeanor**

- A judge's display of inappropriate anger and abusiveness in court, or the telling of an offensive joke, would be the sort of conduct that can appropriately be dealt with either directly with the judge or by reporting to the presiding judge. (Rothman, *California Judicial Conduct Handbook* (2d ed. 1999) § 5.65, pp. 152–153.)

**Incapacity**

- If a judge becomes aware of erratic behavior by another judge that might indicate mental breakdown, it should be reported to the presiding judge so that immediate action can be taken to protect the public and secure help for the judge. (Rothman, *California Judicial Conduct Handbook* (2d ed. 1999) § 5.65, p. 154.)

**Improper Transfers/Attempting to Influence Cases**

- If a judge becomes aware that another judge has attempted to improperly influence another judge's decision, it should be reported to the presiding judge and the CJP. (Rothman, *California Judicial Conduct Handbook* (2d ed. 1999) § 5.65, pp. 153–154.)

- A presiding judge confronted with a judge who keeps matters after being disqualified, threatens a colleague, and refuses a transfer must report that judge to the CJP. (December 1995 CJA Ethics Update.)

---

[3] Note that canon 3D(3) of the California Code of Judicial Ethics requires a judge who is charged with or convicted of a DUI to report that fact to the CJP in writing.

EXHIBIT Q

Presiding Judges of the Superior Courts
November 10, 2006
Page 6

**Political Activity**

- A presiding judge must take appropriate corrective action upon discovering that a commissioner has endorsed a candidate for nonjudicial office in violation of canon 5A. (January 1998 CJA Ethics Update.)

### III. Disciplinary Action by the CJP for Failure to Report

Very few judges have been disciplined by the CJP for failure to take corrective action concerning other judges who have engaged in misconduct. In 2002, a judge received an advisory letter, which is considered disciplinary action,[4] for failure to take action. In the CJP's 2002 Annual Report, the description of the matter is as follows: "A judge failed to take any action when information revealing potential serious wrongdoing by a judicial colleague was before the judge." In a 1997 case, the CJP sent an advisory letter to a judge who "failed to take appropriate action after presiding over alcohol-related charges involving another judge."

Another judge was investigated for failing to report an incident in which he observed a judge deflating the tires on a van parked in the judge's parking place. In that case, in which the California Supreme Court rejected the CJP's recommendation of public censure, the court stated, "[I]f a judge is a direct witness to manifestly unprofessional conduct that is either serious or repeated, the judge should, unless circumstances dictate otherwise, report that conduct to appropriate authorities who can investigate further and take any necessary disciplinary action." (*Dodds v. Commission on Judicial Performance* (1995) 12 Cal.4th 163, 173.)

It is noteworthy that no judge has been disciplined in California for taking the *wrong* corrective action.

Whenever a presiding judge takes corrective action, he or she should preserve a record of the action taken. This record can be used to demonstrate that the presiding judge has complied with canon 3D(1). When a new presiding judge takes office, the record or a copy thereof should be provided to the new presiding judge. This will enable the new presiding judge to determine whether a judge has engaged or is engaging in a pattern of misconduct and what corrective action is appropriate under the circumstances.

MMR/DB/MJ/gf
cc:   William C. Vickrey, Administrative Director of the Courts
      Ronald G. Overholt, Chief Deputy Director
      AOC Regional Administrative Directors
      AOC Division Directors

---

[4] See *Oberholzer v. Commission on Judicial Performance* (1999) 20 Cal.4th 371, 389.

# Law Office Of Patrick J. Evans

**16897 Algonquin Street, Suite F**
**Huntington Beach, CA 92649**
**Tel.: (714) 594 – 5722; Fax: (714) 840 – 6861**
**E-mail: pevans@pevanslawoffice.com**

April 26, 2016


**DELIVERED TO DEPT. C01**

**Honorable Charles Margines**
**Presiding Judge**
**Orange County Superior Court, Dept. C01**
700 Civic Center Drive West
Santa Ana, California 92701


Re: **STATEMENTS OF DISQUALIFICATION AND COMPLAINT**
    **AGAINST ORANGE COUNTY SUPERIOR COURT JUDGE**
    **THE HONORABLE ROBERT J. MOSS, ARISING IN THE CASE:**
    ***Ole Haugen  vs. Palm Beach Park Assoc.*, #30-2015-00819837**
    **and related cases; WILLFUL JUDICIAL MISCONDUCT - TAKING**
    <u>**BACK CASE ON WHICH JUDGE WAS DISQUALIFIED**</u>


To:   The Honorable Charles Margines,
      Presiding Judge, Orange County Superior Court:

I represent Floyd Chodosh and others in several cases concerning the Palm Beach Mobilehome Park.   Hon. Nancy Wieben Stock (Ret.) was the trial judge through 2013.  Honorable Robert J. Moss took over the cases January 2014.  We write to make you aware of our complaint against Honorable Robert J. Moss.

On Friday, April 22, 2016, we filed Statements of Disqualification, Memorandum of Points and Authorities and Requests for Judicial Notice.   Accompanying this letter is a small 3 ring binder with the Statements and Statement Appendix of Exhibits and Memorandum (and copy of proof of service).   The Requests for Judicial Notice are in three large binders.  Judge Moss was served yesterday.

.

Letter to OCSC Presiding Judge, Hon. Charles Margines
April 26, 2016
Page 2

On Nov. 12, 2015 Ole Haugen filed suit to stop his HOA from selling the "seniors only" mobilehome park where he lives.  He contends the sale arranged by the Board President was void for having fiduciary breach, fraud and self-dealing.  The Park is about 13.5 acres of valuable coastal property in Orange County.

The case was initially assigned to Judge Randall Sherman.  On Nov. 16, 2015 Judge Sherman reassigned the case to Judge Moss as a related case to the Palm Beach Park litigation.  Mr. Haugen filed a 170.6 challenge against Judge Moss.

On Nov. 30, 2015 your Honor the Presiding Judge granted Plaintiff Ole Haugen's 170.6 peremptory challenge and reassigned the case.  (Dept. C01, 11/30/15 Minute Order, copy attached, one page).

On Dec. 21, 2015, Mr. Haugen filed for a TRO to stop the sale of the Palm Beach seniors only mobilehome park ("Park"). The HOA seller and buyer had scheduled to close the sale on Dec. 22, 2015.  The TRO application, filed Dec. 21, threatened the closing.

On Dec. 21-22, Judge Moss, who was on vacation (App. Exh. B, pg. P pg. 141, lines 23-26), called in to the court and intervened in the *Haugen* case; a case where the Presiding Judge had ruled he was disqualified.

Acting through his clerk, Judge Moss took back and took over the *Haugen* case. On Dec. 22, 2015 he entered two (2) Minute Orders.  The first Order continued the TRO hearing to Monday 12/28 in his courtroom. (Ent. 12/22 9:00 a.m.).

In the second Minute Order, Judge Moss purported to grant an objection (filed 12/1) to the 170.6 (filed 11/25, granted 11/30) to strike the 170.6 and place himself back on the *Haugen* case.  (Ent. 12/22, 9:29 a.m., copy attached).  Also, Judge Moss, or someone acting at his direction, on Dec. 21, caused the filing clerk to alter pleading cover pages to move the TRO hearing to Judge Moss' courtroom and to continue the hearing to 12/28.  (Appendix of Exhibits C, D, E)

Four hours after Judge Moss' 12/22 9:29 a.m. Minute Order (copy attached) that put him back on the case, the Park sale closed.  The Grant Deed recorded 12/22/15 at 1:18 p.m.  (Copy of Deed face sheet attached)

EXHIBIT Q

Letter to OCSC Presiding Judge, Hon. Charles Margines
April 26, 2016
Page 3

On Dec. 1, 2015 Judge Moss admitted on the record that he was disqualified in the *Haugen* case. (App. Exh. B, pg. 24, lines 18-19, pg. 25, lines 23-26). Three (3) weeks later, on Dec. 22, he took back the *Haugen* case. (12/22 9:29 a.m. Minute Order attached) We contend his action was unlawful and willful judicial misconduct under cited California Supreme Court cases.

The Presiding Judge has the "ultimate authority to make judicial assignments", . . . including assigning and reassigning cases. (CRC, Rule 10.603, subd. (b) &(c)) Judge Moss had no power or authority to override your Honor's 11/30/15 Minute Order (copy attached) that granted Mr. Haugen's 170.6.

On the authority of Calif. Judges Association Op. No. 64 (2009) and Canons 3D(1) and 3(c)(3) et al., we submit this matter to you as Presiding Judge for investigation.

Sincerely,

PATRICK J. EVANS

Attached: 11/30 and 12/22/15 Minute Orders, 1st page of Grant Deed 12/22/15
Encl.: Four (4) 3 ring binders, one small binder and 3 large binders

cc. (By email, with attachments, w/o encls.)

Palm Beach Park Cases' Opposing Counsel:

Allen Thomas
Allan Weiss
Sivi Pederson
Cary Wood
Domineh Fazel

**SUPERIOR COURT OF CALIFORNIA,
COUNTY OF ORANGE
CENTRAL JUSTICE CENTER**

**MINUTE ORDER**

DATE: 11/30/2015                    TIME: 03:03:00 PM        DEPT: C01

JUDICIAL OFFICER PRESIDING: Supervising Judge Charles Margines
CLERK: L. Labrador
REPORTER/ERM: None
BAILIFF/COURT ATTENDANT:

CASE NO: **30-2015-00819837-CU-BC-CXC** CASE INIT.DATE: 11/12/2015
CASE TITLE: **Haugen vs. Palm Beach Park Association**
CASE CATEGORY: Civil - Unlimited      CASE TYPE: Breach of Contract/Warranty

EVENT ID/DOCUMENT ID: 72275651
**EVENT TYPE**: Chambers Work

**APPEARANCES**

There are no appearances by any party.

A Peremptory Challenge under C.C.P.§170.6 as to the Honorable Robert J. Moss having been filed on 11/25/15, by Plaintiff, and this matter having been transferred to C1 for reassignment, the Court now rules as follows:

This case is reassigned to the Honorable Gail A. Andler in Department CX101 for all purposes.

Counsel to contact clerk in Department CX101 within 15 days of receipt of this order to reschedule any pending hearings.

The Court determines that for purposes of exercising C.C.P.§170.6 rights, there are two sides to this matter unless the contrary is brought to the attention of the Court, by Ex-Parte motion. Counsel has 15 days from the date of the enclosed certificate of mailing in which to exercise any rights under C.C.P.§170.6.

Court orders Clerk to give notice. Plaintiff to give notice to any parties not listed and to file proof of service with the court within 10 days.

DATE: 11/30/2015                         MINUTE ORDER                              Page 1
DEPT: C01                                                                    Calendar No.

**404**

EXHIBIT Q

**SUPERIOR COURT OF CALIFORNIA,
COUNTY OF ORANGE
CIVIL COMPLEX CENTER**

**MINUTE ORDER**

DATE: 12/22/2015                TIME: 09:29:00 AM        DEPT: CX102

JUDICIAL OFFICER PRESIDING: Robert J. Moss
CLERK: Betsy Zuanich
REPORTER/ERM: None
BAILIFF/COURT ATTENDANT: None

CASE NO: **30-2015-00819837-CU-BC-CXC** CASE INIT.DATE: 11/12/2015
CASE TITLE: **Haugen vs. Palm Beach Park Association**
CASE CATEGORY: Civil - Unlimited        CASE TYPE: Breach of Contract/Warranty

EVENT ID/DOCUMENT ID: 72288789
**EVENT TYPE**: Chambers Work

**APPEARANCES**

There are no appearances by any party.

Peremptory Challenge pursuant to C.C.P. §170.6 was filed by Plaintiff on 11/25/15, as to the Hon. Robert J. Moss.

Matter was referred to Dept. C1 and case was reassigned to the Hon. Gail A. Andler in Department CX101.

Defendant's Objection to the 170.6 against Judge Moss was filed on 12/01/15.

The Court, having read and considered the objection, now rules as follows:

Defendant's objection is granted.

Peremptory challenge is stricken.

Clerk to give e-Service notice to counsel.

DATE: 12/22/2015                  MINUTE ORDER                          Page 1
DEPT: CX102                                                        Calendar No.

850

EXHIBIT Q

Branch :A14.User :BHAR                    Comment:                          Station Id :RWF1

Recorded in Official Records, Orange County
Hugh Nguyen, Clerk-Recorder

‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖ 18.00
* $ R 0 0 0 8 0 4 2 6 9 6 5 * *

**RECORDING REQUESTED BY**

**2015000644197 1:18 pm 12/22/15**

**AND WHEN RECORDED MAIL TO:**

65 405 G02   5 10

ICC 35902 LLC and 3187 Redhill LLC
4040 MacArthur Boulevard, Suite 300
Newport Beach, CA 92660

20350.00 20350.00 0.00 0.00 12.00 0.00 0.00 0.00

Title and Escrow No.  23057972
Parcel No.(s):
**691-311-14, 691-341-02, 691-341-03**

SPACE ABOVE THIS LINE FOR RECORDER'S USE

**GRANT DEED**

THE UNDERSIGNED GRANTOR(s) DECLARE(s)          Documentary Transfer Tax is $40,700.00
☐ unincorporated area                          ☑ computed on full value of interest or property  conveyed, or
☑ the city of San Clemente                     ☐ full value less value of liens or encumbrances  remaining at the
                                                    time of sale

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged,

**PALM BEACH PARK ASSOCIATION, a California Nonprofit Mutual Benefit Corporation**

hereby GRANT(s) to

**ICC 35902 LLC, a Delaware limited liability company, as to an undivided 26% tenancy-in-common interest, and**

**3187 Redhill LLC, a Delaware limited liability company, as to an undivided 74% tenancy-in-common interest**

the following real property in the County of Orange, State of California:

**Legal Description attached hereto as Exhibit "A" and made a part hereof.**

MAIL TAX STATEMENTS AS DIRECTED ABOVE

Page 1 of 2
gGRANTDEE (DSI Rev. 11/03/14)

ORANGE,CA                         Page 1 of 5                    Printed on 1/13/2016 1:40:09 PM
Document: DD 2015.644197

1212

*F. Chodosh, et al., v. J. Saunders, et al.*

**July 21, 2020**

**COMPLAINT**

**EXHIBIT – R**

| 2017 | AG Form Letters, CJP<br>"exclusive jurisdiction"; all judge complaints to CJP |
|------|------------------------------------------------------------------------------|

Thank you for your correspondence to the Office of the Attorney General regarding a California judge, commissioner, or referee.

We have reviewed your correspondence and determined that the following agency is in a much better position to render assistance to you in this matter. If you wish to pursue the matter further, we suggest you contact:

> Commission on Judicial Performance
> 455 Golden Gate Avenue, Suite 14400
> San Francisco, CA 94102
> Telephone:  (415) 557-1200
> Fax:  (415) 557-1266
> Internet:  http://cjp.ca.gov/

The Commission on Judicial Performance is the independent state agency in California responsible for investigating complaints of judicial misconduct and judicial incapacity and for disciplining judges, pursuant to article VI, section 18 of the California Constitution. This agency has exclusive jurisdiction over judicial complaints.

We hope that our effort to help you to identify the correct government office to address your concern will be beneficial to you.

Again, thank you for contacting the Office of the Attorney General.

PL 408 Jud      page 1 of 1

EXHIBIT R
380

Thank you for your correspondence to the Office of the Attorney General.

While we appreciate the time and effort it has taken to contact our office, we are unable to assist you. The role of the Attorney General is to represent the People of California, collectively, in civil and criminal matters before trial courts, appellate courts, and the supreme courts of California and the United States. However, the Attorney General is prohibited by law from representing private individuals or providing legal advice, legal research or legal analysis to private individuals under any circumstances. As a result, the Attorney General cannot represent you in your private litigation or intercede on your behalf.

Therefore, we suggest that you consult with a private attorney to determine any civil remedies that may be available to you. An attorney would directly represent your interests and is the one whose advice would be most helpful to you.

Your complaint about the judge(s) involved in this case should be directed to the Commission on Judicial Performance. The Commission has exclusive jurisdiction over complaints against judges. You may contact the Commission as follows:

Commission on Judicial Performance
455 Golden Gate Avenue, Suite 14400
San Francisco, CA 94102
Telephone: (415) 557-1200
Fax: (415) 557-1266
Internet: http://cjp.ca.gov

We regret that we are unable to assist you. However, we hope the information we have provided clarifies our restrictions in regard to your request. Thank you again for writing.

```
PL 902B judge in civil case  pg. 1 of 1
```

EXHIBIT R

Thank you for your correspondence to the Office of the Attorney General regarding a criminal case.

While we appreciate the time and effort it has taken to contact our office, we are unable to assist you. This office has no authority to provide advice or representation to defendants. In addition, the role of the Attorney General's Office is to represent the State of California in criminal appellate cases and to advocate that convictions be upheld.

If you wish to pursue this matter, we suggest that you consult with an attorney. An attorney would directly represent your interests and is the one whose advice would be most helpful to you.

Your complaint about the judge(s) involved in this case should be directed to the Commission on Judicial Performance. The Commission has exclusive jurisdiction over complaints against judges. You may contact the Commission as follows:

Commission on Judicial Performance
455 Golden Gate Avenue, Suite 14400
San Francisco, CA 94102
Telephone:  (415) 557-1200
Fax:  (415) 557-1266
Internet:  http://cjp.ca.gov

Again, thank you for contacting the Office of the Attorney General.

```
PL 903B judge in criminal case  pg. 1 of 1
```

EXHIBIT R

Thank you for your correspondence to the Office of the Attorney General regarding a child custody and/or visitation matter. We regret that we are unable to assist you, as our office has no jurisdiction over child custody or visitation issues.

Concerns about child custody and visitation orders issued by the Family Court must be directed to the Family Court Services Office in the county where the orders were issued. Family Court Investigators, Child Custody Evaluators, and Family Court Mediators are available to provide dispute resolution in each of the 58 counties. Contact information is available at http://www.courts.ca.gov/selfhelp-familycourtservices.htm.

If you suspect that a child's health or safety is jeopardized due to abuse or neglect by a parent or other caretaker who has custody of the child, please contact the police or sheriff's department and the Child Welfare Services Agency in the county where the child resides. If you are the victim of parental child stealing or willful concealment of your child to frustrate visitation, you should file a report with your local police or sheriff's department, who will refer the case to the county district attorney's Office for prosecution, if appropriate.

We have forwarded your complaint to our new Bureau of Children's Justice (BCJ). On January 5, 2015, the Office of the Attorney General announced the formation of BCJ within the California Department of Justice (CADOJ). The new Bureau will be dedicated to enforcing civil and criminal laws to ensure that all of California's children are on track to meet their full potential. BCJ's efforts will focus on several areas, including California's foster care and adoption systems, discrimination in education, elementary school truancy, human trafficking of vulnerable youth, and childhood trauma. The Bureau of Children's Justice will use the criminal and civil law enforcement powers of CADOJ, identify and pursue needed improvements to public policy regarding children, and work with local, state, and national stakeholders to enhance supports available for children in need and to hold those who prey on the most vulnerable children accountable.

BCJ uses complaints to develop information about patterns or practices that might indicate the need for formal investigation or law enforcement action by our office. Once a pattern is discovered, what originated as a private dispute may become a matter of broad public interest and thus warrant the Attorney General's intervention under state and federal civil rights laws. When this office files legal action, it is done on behalf of the collective legal interests of the people and is primarily directed at ending ongoing illegal activity.

If you have a complaint against the judge assigned to this case, contact the Commission on Judicial Performance. The Commission is responsible for investigating complaints of judicial misconduct and judicial incapacity and for disciplining judges. The Commission may be contacted as follows:

Commission on Judicial Performance
455 Golden Gate Avenue, Suite 14400
San Francisco, CA 94102
Telephone:  (415) 557-1200
Fax:  (415) 557-1266
Internet:  http://cjp.ca.gov/

```
PL 809 child custody  pg. 1 of 2
```

EXHIBIT R
383

If you have a complaint against an attorney involved with this case, contact the State Bar. The Bar takes complaints against attorneys from citizens and other sources, investigates those complaints, and prosecutes attorneys against whom allegations of unethical conduct appear to be justified.  You may contact the Bar as follows:

State Bar of California
Intake Unit
845 S. Figueroa Street
Los Angeles, CA  90017
Telephone:  (213) 765-1000 (outside of CA) or  (800) 843-9053 (toll free)
Internet:  http://www.calbar.ca.gov

If you have a complaint against a mediator or evaluator with Family Court Services, talk to the Director of Family Court Services at your local court to find out how to make a complaint. Follow the procedures for filing a complaint in your court.  If you are not happy with the result after you file the complaint, you can explain your complaint to the judge at the time of your hearing.  If your complaint is about ethical conduct, or if you believe the court did not deal with your complaint appropriately, there are state licensing boards that address complaints about licensed professionals.

The Board of Behavioral Sciences licenses and regulates Marriage and Family Therapists (MFT), Licensed Clinical Social Workers (LCSW), and Licensed Educational Psychologists (LEP).  This agency may be contacted as follows:

Board of Behavioral Sciences
1625 North Market Blvd., Suite S-200,
Sacramento, CA 95834
Telephone: (916) 574-7830
Fax: (916) 574-8625
http://www.bbs.ca.gov/

The Board of Psychology licenses and regulates psychologists. This agency may be contacted as follows:

California Board of Psychology
1625 North Market Blvd., Suite N-215
Sacramento, CA 95834
Telephone:(866) 503-3221
Internet: http://www.psychboard.ca.gov/

Finally, we recommend that you consult with a family law attorney.  An attorney would directly represent your interests and is the one whose advice would be most helpful to you.  You may obtain a referral to a certified lawyer referral service by contacting the State Bar at (866)442-2529 (toll-free in California) or (415)538-2250 (from outside California), or via their website at:  http://www.calbar.ca.gov.

Again, thank you for contacting the Office of the Attorney General.

```
PL 809 child custody  pg. 2 of 2
```

EXHIBIT R
384

Thank you for your correspondence to the Office of the Attorney General.

If you have concerns about your criminal case or if you wish to appeal a conviction, you should consult with an attorney. An attorney would directly represent your interests and is the one whose advice would be most helpful to you. This Office has no authority to provide advice or representation to defendants. In addition, the role of the Attorney General's Office is to represent the State of California in criminal appellate cases and to advocate that convictions be upheld.

If you are seeking a modification of your sentence pursuant to Proposition 36, Proposition 47, or Proposition 64 you should consult with your public defender or a private attorney. The law requires that you file a petition in the superior court where you were sentenced if you believe you are entitled to relief under these propositions. The Attorney General cannot assist you in preparing a court filing.

If you have questions about parole, including questions related to Proposition 57, then you should contact the Board of Parole Hearings. The Board may be contacted as follows:

Board of Parole Hearings
P.O. Box 4036
Sacramento, CA 95812-4036

If you have a complaint against an attorney, you should contact the State Bar. The Bar has exclusive jurisdiction over complaints against attorneys. You may contact the Bar as follows:

State Bar of California
Intake Unit
845 S. Figueroa Street
Los Angeles, CA  90017
Telephone:  (213) 765-1000 (outside of CA) or  (800) 843-9053 (toll free)
Internet:  http://www.calbar.ca.gov

If you have a complaint against a judge, you should contact the Commission on Judicial Performance. The Commission has exclusive jurisdiction over complaints against judges. You may contact the Commission as follows:

Commission on Judicial Performance
455 Golden Gate Avenue, Suite 14400
San Francisco, CA 94102
Telephone:  (415) 557-1200
Fax:  (415) 557-1266
Internet:  http://cjp.ca.gov

If you have a complaint against a District Attorney, please be advised that California law gives discretionary authority to a locally elected prosecutor in filing criminal actions. Your

PL 903J jail inmate letter pg. 1 of 4

EXHIBIT R
385

concerns about the District Attorney should be discussed with your attorney so that they may be addressed through the judicial process.

If you have a complaint against a law enforcement agency, please be advised that it is the Department of Justice policy that local governments will be primarily responsible for citizen complaints against law enforcement agencies or employees of law enforcement agencies, and that appropriate local resources (e.g. sheriff or police department, district attorney, citizens review commission, and/or grand jury in the area of jurisdiction) be utilized for resolution of such complaints.

You should first direct your complaint to the local law enforcement agency.  Every law enforcement agency in California is required to establish a procedure to investigate citizens' complaints (Penal Code Section 832.5). A written description of the procedure is available from all law enforcement agencies. If a resolution of your complaint is not obtained through this procedure, you should contact the county district attorney and county grand jury in the county where the law enforcement agency is located. Most complaints against local law enforcement can be resolved by contacting the aforementioned agencies.

If you are seeking a pardon, you should contact the Office of the Governor. You may contact the Governor as follows:

Office of the Governor
State Capitol
Attn: Legal Affairs Secretary
Sacramento, CA 95814
Internet: gov.ca.gov/pdf/interact/how_to_apply_for_a_pardon.pdf

If you wish to file a monetary claim against the State of California, you should contact the California Government Claims Board.  You may contact the Board as follows:

Government Claims Program
P.O. Box 3035
Sacramento, CA 95812-3035
Telephone: (800) 955-0045
Internet: http://www.vcgcb.ca.gov/claims/howtofile.aspx

If you wish to advocate for a California law to be enacted, amended or repealed (IE sentencing laws), you should contact your representatives in the California Legislature. Your may contact the Legislature as follows:

California State Assembly
State Capitol

PL 903J jail inmate letter pg. 2 of 4

EXHIBIT R
386

P.O. Box 942849
Sacramento, CA 94249-0000
Internet: http://www.assembly.ca.gov


California State Senate
State Capitol
Sacramento, CA 95814
Internet: http://www.senate.ca.gov

If you have questions or concerns pertaining to your immigration status, you should contact the U.S. Citizenship and Immigration Services. You may contact your nearest field office as follows:

San Diego Field Office, 1261 3rd Avenue, Suite A, Chula Vista, CA 91911
Fresno Field Office, 1177 Fulton Mall, Fresno, CA 93721
Imperial Field Office, 509 Industry Way, Imperial, CA 92251
Los Angeles Field Office, 300 North Los Angeles Street, Los Angeles, CA 90012
Sacramento Field Office,  650 Capitol Mall, Sacramento, CA 95814
San Bernardino Field Office, 655 West Rialto Avenue, San Bernardino, CA 92410
San Francisco Field Office, 444 Washington Street, San Francisco, CA 94111
San Jose Field Office, 1887 Monterey Road, San Jose, CA 95112
Santa Ana Field Office, 34 Civic Center Plaza, Santa Ana, CA 92701

Please note, the Attorney General referenced in statutes pertaining to immigration refers to the United States Attorney General, not the California Attorney General.

If you feel the information contained within your criminal history record is incorrect, you may submit a formal challenge to the Department of Justice only after you have received a copy of your record from the Department pursuant to California Penal Code sections 11120 to 11127. Bureau of Criminal Identification and Information (BCII) form 8706, Claim of Inaccuracy or Incompleteness, will be mailed to you along with your record. Submit form 8706 and any supporting documentation to the Department of Justice to the address provided on the form. The challenge will be reviewed and a written response will be provided along with an amended copy of your criminal history record if appropriate. You may contact the Record Review Unit as follows:

California Department of Justice
Record Review Unit
P.O. Box 903417
Sacramento, CA 94203-4170
Telephone: (916) 227-3849
Internet: http://ag.ca.gov/fingerprints/

If you are trying to obtain court records, please contact the clerk of the Superior Court where you were convicted. The clerk will either be able to provide you with the records, or advise you

PL 903J jail inmate letter pg. 3 of 4

EXHIBIT R
387

if the records have been transferred or destroyed. If the records are no longer available directly from the Superior Court, you may be able to obtain copies from the attorney who represented you.

Our Office cannot provide you with transcripts of oral proceedings in the Superior Court. Government Code Section 69954 requires that transcripts of oral trial court proceedings be acquired from the court reporter, and not from another government agency that may possess the transcript. The clerk of the Superior Court of the county in which the proceedings were held may be able to assist you in locating and acquiring court transcripts. In addition, you may be able to obtain copies from the attorney who represented you.

Our Office also cannot provide you with laboratory case records prepared by our Bureau of Forensic Services. Laboratory case records prepared by the Bureau of Forensic Services are considered investigatory records of this Office. Government Code Section 6254, subdivision (f) expressly exempts investigatory and security files of the Attorney General from disclosure. Also, in the case of Dick Williams v. Superior Court (1993) 5 Cal.4th 337, 354 the California Supreme Court held that investigative records in the possession of law enforcement agencies are exempt from disclosure.

We hope this information will be helpful to you.

```
PL 903J jail inmate letter pg. 4 of 4
```

EXHIBIT R

Thank you for your correspondence to the Office of the Attorney General.

If you have a complaint against a state correctional facility or correctional employee, you should contact the Office of the Inspector General. The Office of the Inspector General is responsible for independent oversight of the California Department of Corrections and Rehabilitation, which includes Adult Operations, Adult Programs, Juvenile Justice, the Corrections Standards Authority, the Board of Parole Hearings, the State Commission on Juvenile Justice, the Prison Industry Authority, and the Prison Industry Board. You may contact the Inspector General as follows:

Office of the Inspector General
10111 Old Placerville Road, Suite 110
Sacramento, CA 95827
Telephone: (800) 700-5952
Fax: (916) 928-5974
Internet: http://www.oig.ca.gov/

If you wish to appeal your conviction, you should consult with an attorney. An attorney would directly represent your interests and is the one whose advice would be most helpful to you. This Office has no authority to provide advice or representation to defendants. In addition, the role of the Attorney General's Office is to represent the State of California in criminal appellate cases and to advocate that convictions be upheld.

If you are seeking a modification of your sentence pursuant to Proposition 36, Proposition 47, or Proposition 64 you should consult with your public defender or a private attorney. The law requires that you file a petition in the superior court where you were sentenced if you believe you are entitled to relief under these propositions. The Attorney General cannot assist you in preparing a court filing.

If you have questions about parole, including questions related to Proposition 57, then you should contact the Board of Parole Hearings. The Board may be contacted as follows:

Board of Parole Hearings
P.O. Box 4036
Sacramento, CA 95812-4036


If you have a complaint against an attorney, you should contact the State Bar. The Bar has exclusive jurisdiction over complaints against attorneys. You may contact the Bar as follows:

State Bar of California
Intake Unit
845 S. Figueroa Street
Los Angeles, CA  90017
Telephone:  (213) 765-1000 (outside of CA) or  (800) 843-9053 (toll free)
Internet:  http://www.calbar.ca.gov

PL 903P state prisoner letter pg. 1 of 4

EXHIBIT R

If you have a complaint against a judge, you should contact the Commission on Judicial Performance. The Commission has exclusive jurisdiction over complaints against judges. You may contact the Commission as follows:

Commission on Judicial Performance
455 Golden Gate Avenue, Suite 14400
San Francisco, CA 94102
Telephone:  (415) 557-1200
Fax:  (415) 557-1266
Internet:  http://cjp.ca.gov

If you have a complaint against a District Attorney, please be advised that California law gives discretionary authority to a locally elected prosecutor in filing criminal actions. Your concerns about the District Attorney should be discussed with your attorney so that they may be addressed through the judicial process.

If you have a complaint against a law enforcement agency, please be advised that it is the Department of Justice policy that local governments will be primarily responsible for citizen complaints against law enforcement agencies or employees of law enforcement agencies, and that appropriate local resources (e.g. sheriff or police department, district attorney, citizens review commission, and/or grand jury in the area of jurisdiction) be utilized for resolution of such complaints.

You should first direct your complaint to the local law enforcement agency.  Every law enforcement agency in California is required to establish a procedure to investigate citizens' complaints (Penal Code Section 832.5). A written description of the procedure is available from all law enforcement agencies. If a resolution of your complaint is not obtained through this procedure, you should contact the county district attorney and county grand jury in the county where the law enforcement agency is located. Most complaints against local law enforcement can be resolved by contacting the aforementioned agencies.

If you are seeking a pardon, you should contact the Office of the Governor. You may contact the Governor as follows:

Office of the Governor
State Capitol
Attn: Legal Affairs Secretary
Sacramento, CA 95814
Internet: gov.ca.gov/pdf/interact/how_to_apply_for_a_pardon.pdf

If you wish to file a monetary claim against the State of California, you should contact the California Government Claims Board.  You may contact the Board as follows:

Government Claims Program
P.O. Box 3035

            PL 903P state prisoner letter pg. 2 of 4

EXHIBIT R

Sacramento, CA 95812-3035
Telephone: (800) 955-0045
Internet: http://www.vcgcb.ca.gov/claims/howtofile.aspx

   If you wish to advocate for a California law to be enacted, amended or repealed (IE sentencing laws), you should contact your representatives in the California Legislature. Your may contact the Legislature as follows:

California State Assembly
State Capitol
P.O. Box 942849
Sacramento, CA 94249-0000
Internet:  http://www.assembly.ca.gov


California State Senate
State Capitol
Sacramento, CA 95814
Internet:  http://www.senate.ca.gov

   If you have questions or concerns pertaining to your immigration status, you should contact the U.S. Citizenship and Immigration Services. You may contact your nearest field office as follows:

San Diego Field Office, 1261 3rd Avenue, Suite A, Chula Vista, CA 91911
Fresno Field Office, 1177 Fulton Mall, Fresno, CA 93721
Imperial Field Office, 509 Industry Way, Imperial, CA 92251
Los Angeles Field Office, 300 North Los Angeles Street, Los Angeles, CA 90012
Sacramento Field Office,  650 Capitol Mall, Sacramento, CA 95814
San Bernardino Field Office, 655 West Rialto Avenue, San Bernardino, CA 92410
San Francisco Field Office, 444 Washington Street, San Francisco, CA 94111
San Jose Field Office, 1887 Monterey Road, San Jose, CA 95112
Santa Ana Field Office, 34 Civic Center Plaza, Santa Ana, CA 92701

Please note, the Attorney General referenced in statutes pertaining to immigration refers to the United States Attorney General, not the California Attorney General.

   If you feel the information contained within your criminal history record is incorrect, you may submit a formal challenge to the Department of Justice only after you have received a copy of your record from the Department pursuant to California Penal Code sections 11120 to 11127. Bureau of Criminal Identification and Information (BCII) form 8706, Claim of Inaccuracy or Incompleteness, will be mailed to you along with your record. Submit form 8706 and any supporting documentation to the Department of Justice to the address provided on the form. The challenge will be reviewed and a written response will be provided along with an amended copy of your criminal history record if appropriate. You may contact the Record Review Unit as follows:

PL 903P state prisoner letter pg. 3 of 4

EXHIBIT R
391

California Department of Justice
Record Review Unit
P.O. Box 903417
Sacramento, CA 94203-4170
Telephone: (916) 227-3849
Internet: http://ag.ca.gov/fingerprints/

If you are trying to obtain court records, please contact the clerk of the Superior Court where you were convicted. The clerk will either be able to provide you with the records, or advise you if the records have been transferred or destroyed. If the records are no longer available directly from the Superior Court, you may be able to obtain copies from the attorney who represented you.

Our Office cannot provide you with transcripts of oral proceedings in the Superior Court. Government Code Section 69954 requires that transcripts of oral trial court proceedings be acquired from the court reporter, and not from another government agency that may possess the transcript. The clerk of the Superior Court of the county in which the proceedings were held may be able to assist you in locating and acquiring court transcripts. In addition, you may be able to obtain copies from the attorney who represented you.

Our Office also cannot provide you with laboratory case records prepared by our Bureau of Forensic Services. Laboratory case records prepared by the Bureau of Forensic Services are considered investigatory records of this Office. Government Code Section 6254, subdivision (f) expressly exempts investigatory and security files of the Attorney General from disclosure. Also, in the case of Dick Williams v. Superior Court (1993) 5 Cal.4th 337, 354 the California Supreme Court held that investigative records in the possession of law enforcement agencies are exempt from disclosure.

We hope this information will be helpful to you.

```
PL 903P state prisoner letter page 4 of 4
```

EXHIBIT R
392

*F. Chodosh, et al., v. J. Saunders, et al.*

**July 21, 2020**

**COMPLAINT**

**EXHIBIT – S**

| | |
|---|---|
| 07/20/18 | *Chodosh v. PBPA*, Appeal Oral Arg. Transcript |
| 12/18/18 | Opinion, Bedsworth, J., excerpt re: contempt |
| 01/09/19 | Order Denying Pet. Rehearing, excerpt re: contempt |

IN THE COURT OF APPEAL OF THE STATE OF

CALIFORNIA FOURTH DISTRICT – DIVISION THREE


July 20, 2018

| | |
|---|---|
| FLOYD M. CHODOSH, et al., | ) Case No. G053798 |
| Plaintiffs and Appellants, | ) Audio No. Chodosh |
| | ) |
| v. | ) |
| | ) |
| PALM BEACH PARK ASSOCIATION, | ) |
| Defendant and Respondent. | ) |
| | ) |
| Respondents. | ) |

_____ )


**Transcription Of Tape-Recorded Hearing**


Transcribed by:
Nanette Jensen

Job Number:
TP91080B


EXHIBIT S
394

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19      ATTORNEY EVANS:  Since we're having a hearing today

20      on the motion to disqualify, I won't -- I don't

21      believe it's necessary to say a whole lot about

22      that.  I believe our papers are quite extensive.  I

23      don't believe that there's a --

24          JUSTICE BEDSWORTH:  They're definitely extensive.

25          ATTORNEY EVANS:  Yeah.  I don't believe there's a

6

EXHIBIT S

1    prayer that what I filed AND positions we've taken of

2    a fact in law that we've laid out puts us anywhere

3    near this Koven case which I knew about.

4        For one thing, we had -- we add federal law suit

5    that the district court dismissed without prejudice

6    and that was reversed by the Ninth Circuit to be --

7    I'm sorry -- was dismissed with prejudice by the

8    district court and the Ninth Circuit reversed that.

9        And what we also have what's absolutely

10   astounding I reread it yesterday, thought about it,

11   and he's not here today, Mr. Miller, but we have his

12   July 17 letter calling me names and so forth.

13   Nothing of any substance, no facts of course.  But he

14   says -- he flat out says, quote, "On November 25,

15   2015 Mr. Haugen again filed another challenge against

16   Judge Moss under code of civil procedure section

17   170.6.  On December 22 Judge Moss granted the

18   association objection but the challenge was

19   defective, improper, and untimely.  Judge Moss

20   retained jurisdiction over the case."

21       So what I want to know during that three-week

22   period he must have lost jurisdiction or how did he

23   retain it?  I mean, this is offensive and absurd, but

24   what it really is, is an admission.  An admission of

25   what Judge Moss did.

7

EXHIBIT S
396

```
 1          Judge Moss called in from vacation precisely on
 2     time to supposedly take back this case and stop a
 3     TRO.  He gets it backwards.  First he stops the TRO.
 4     He's not even the judge on the case.  Then re-
 5     qualifies, auto-self re-qualifies himself, which
 6     everyone knows that's just common sense that you
 7     can't do that.  I mean, a bad hockey player put in
 8     the penalty box can't say, "well, you said two
 9     minutes ref, but you know what?  I've decided it's
10     only going to be a minute.  I'm going back on the
11     ice."  Same concept.
12          The other offensive thing is somehow what Judge
13     Moss did in that case which is willful, judicial
14     misconduct under all the -- under all the case law
15     that's been laid out in our papers repeatedly.  It
16     was intentional disregard of the law.  It was a fix.
17     And they want to talk about how a fix is something
18     that -- a fix is defined in the judge handbook which
19     I have a copy of here.
20          But their argument is, well, if Judge Moss did
21     that in the Haugen case, if he fixed that case so
22     that these self-dealing fiduciaries could steal this
23     park for millions under value, they didn't even have
24     an appraisal.  They hid from the members another
25     offer in writing that was higher.  And the attorneys
```

8

LYNDEN J. AND ASSOCIATES, INC.   (800) 972-3376

EXHIBIT S

397

```
1        were involved in all of it.
2            What they're saying is somehow Judge Moss did
3        that in one case but on the other case you can't
4        consider that because he must have been fair and
5        impartial in one case but not the other.  There was
6        some kind of split personality.
7            JUSTICE BEDSWORTH:  Okay.  So you just told us
8        that Judge Moss engaged in willful, judicial
9        misconduct and was part of a fix of the case; is that
10       correct?
11           ATTORNEY EVANS:  I said that in the papers, Your
12       Honor.  It's in the papers already.
13           JUSTICE BEDSWORTH:  And you're saying it again
14       today?
15           ATTORNEY EVANS:  That's right.
16           JUSTICE BEDSWORTH:  That's sounds --
17           ATTORNEY EVANS:  Well, you asked.
18           JUSTICE BEDWORTH:  That sounds to me like direct
19       contempt.
20           ATTORNEY EVANS:  Well, let's have an OSC re
21       contempt.  Let's get Judge Moss in here and see what
22       he has to say about things.
23           JUSTICE BEDSWORTH:  We will consider whether
24       we're going to have an OSC re contempt.
25           ATTORNEY EVANS:  Well, all we need to do is ask
```

9

```
 1        Judge Moss a few questions.  It's pretty simple.

 2            JUSTICE BEDSWORTH:  You have more time.

 3            ATTORNEY EVANS:  I'll reserve the rest for

 4        rebuttal.

 5            JUSTICE BEDSWORTH:  Very well.

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

10

LYNDEN J. AND ASSOCIATES, INC.   (800) 972-3376

EXHIBIT S

399

1

2

3

4

5

6

7

8

9

10

11

12          JUSTICE BEDSWORTH:  You have two minutes.

13        ATTORNEY EVANS:  And this idea that the members

14     consented, that they consented to the leases.  They

15     consented to all of this.  No, they didn't.  They're

16      victims.  They're victims of crime by a fiduciary.

17          Now, I'd like to conclude with a motion to

18     disqualify.  And I read before the admission that

19     Judge Moss came back into that case after being

20     disqualified on a 170.6, took back jurisdiction, and

21     then four hours later after he came back in the

22     case, calling in from vacation, the deed for the

23     fiduciary fraud sale recorded.  Amazing timing.  He

24     was on vacation.  I don't know if he was on a beach

25     in Tahiti or in his back

                                                    32

1      yard.  But somehow he called in just in time and he

2      says he had no ex parte contact.

3           What?  He had a dream?  Just call in on a case

4      not in his courtroom on which he'd been disqualified?

5      He admitted he was disqualified.  Just called in all

6      of a sudden?  Stopped the TRO.  Oh, now, I guess I'll

7      put myself back on the case as the judge.

8           It's offensive.  And I've put in the papers and I

9      have made that charge and I'm making it right here.

10          JUSTICE BEDSWORTH:  Your time is up, sir.

11          ATTORNEY EVANS:  Thank you.

12          JUSTICE BEDSWORTH:  I'm now going to take this

13     matter into submission because you've mentioned a

14     couple of things that you were willing to brief and

15     we will want to do that.  And because in 31 years on

16     the bench I've never had to deal with whether or not

17     conduct is contempt or not.  So I need to spend a

18     little bit of time on that and figure out where we

19     are on that.

20          ATTORNEY EVANS:  I would be please to --

21          JUSTICE BEDSWORTH:  I think not.

22          ATTORNEY EVANS:  Do whatever you may want, Your

23     Honor.  Other thing as far as additional briefing is

24     the court might specify what briefing we want.

25          JUSTICE BEDSWORTH:  We will.  If we decide we

                                                    33

LYNDEN J. AND ASSOCIATES, INC.   (800) 972-3376

EXHIBIT S
401

Filed 12/17/18 Chodosh v. Palm Beach Park Assn. CA4/3

*[TRUNCATED PORTION OF OPINION RE: CONTEMPT]*

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FOURTH APPELLATE DISTRICT

### DIVISION THREE

| | |
|---|---|
| FLOYD M. CHODOSH et al., | |
| Plaintiffs and Appellants, | G053798 |
| v. | (Super. Ct. No. 30-2010-00423544) |
| PALM BEACH PARK ASSOCIATION, | O P I N I O N |
| Defendant and Respondent. | |

Appeal from a judgment of the Superior Court of Orange County,  Robert J. Moss, Judge.  Affirmed in part, reversed in part and remanded with directions.

Law Office of Patrick J. Evans and Patrick J. Evans for Plaintiffs and Appellants.

Lewis Brisois Bisgaard & Smith, Jeffry A. Miller, Cary L. Wood and Allison A. Arabian; Allan B. Weiss & Associates, Allan B. Weiss, Allen L. Thomas and Allison A. Arabian for Defendant and Respondent.

EXHIBIT S

1. *Judicial misconduct*.   [at Op. pg. 19]

. . . . . [text omitted] . . . .

[at pg. 20]  But one more point must be made:  Attorney Evans has engaged in a pattern of inflammatory accusations against any number of judges who have ruled against him, including not only Judge Moss but the Presiding Justice of this Division.  Worse, at oral argument in this court, he practically invited us to hold him in contempt for accusing Judge Moss of fixing the result.  (See *In re Koven* (2005) 134 Cal.App.4th 262.)

. . . . . . [text omitted] . . . .. . . . [at pg. 21]

We choose not to set contempt proceedings for Attorney Evans for the calumnies he has casually hurled at Judge Moss, nor for those directed at this court.  [FN22]   We conclude he craves the attention of such a hearing more than he would suffer from its result.  We choose to deny him that attention and write off his intemperance to an excess of zeal on behalf of vulnerable and elderly clients.  . . . .:

. . . . . . [text omitted] . . . .. .

BEDSWORTH, ACTING P. J.

WE CONCUR:

IKOLA, J.

THOMPSON, J.

[FN22 at pg. 21] The general idea being that the Courts of Appeal are engaged in a grand conspiracy to cover up injustice perpetrated by trial judges.  Our primary sin, it seems, was to reject Attorney Evans' petition for writ of mandate to remove Judge Moss from the case.

2

EXHIBIT S
403

Court of Appeal, Fourth Appellate District, Division Three
Kevin J. Lane, Clerk/Executive Officer
Electronically FILED on 1/8/2019 by M. Castaneda, Deputy Clerk

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| FLOYD M. CHODOSH et al., | |
| Plaintiffs and Appellants, | G053798 |
| v. | (Super. Ct. No. 30-2010-00423544) |
| PALM BEACH PARK ASSOCIATION, | ORDER DENYING PETITION FOR REHEARING |
| Defendant and Respondent. | |

The petition for rehearing filed on January 2, 2019, is DENIED. For the benefit of the parties and any further review of this case, we make these observations concerning the petition:

(1) This court most assuredly did not agree with attorney Patrick Evans' allegation that Judge Moss "fixed" a related case against appellants. The fact an appellate panel exercises its discretion not to give an attorney the spotlight of a contempt hearing based on a statement the attorney made in open court does not establish the truth of his statement.

..... [Text Omitted] . . .

BEDSWORTH, ACTING P. J.

WE CONCUR:

IKOLA, J.

THOMPSON, J.

EXHIBIT S

*F. Chodosh, et al., v. J. Saunders, et al.*

**July 21, 2020**

**COMPLAINT**

**EXHIBIT – T**

| 1983-2019 | CJP Rule 102(g) and Policy Declaration 4.2, grid data [35,000 complaints against judges 1983 – 2019] |
| 08/29/17 | CJP Report Judge Crime referred "multiple occasions" |
| 10/22/03 | <u>Daily Journal</u>, CJP "referred J. Danser to DA" |
| 1988 etc. | <u>LA Times</u>, San Diego convicted judges 1988, 1997, 2000 |

EXHIBIT T

## <u>INTERROGATORIES – JUDGE CRIME REFERRAL STATISTICS</u>

**Commission on Judicial Performance Rule 102(g), Policy Guideline 4.2,**
**and CJP August 29, 2017 Public Statement that on "*Multiple Occasions*"**
**<u>CJP Has Referred "Possible" Judge Crime to Prosecutors</u>**

Commission Rule 102 (g), provides:

> (<u>Disclosure of information to prosecuting authorities</u>) The commission may release to prosecuting authorities at any time information which reveals possible criminal conduct by the judge or former judge or by any other individual or entity.

On August 29, 2017, the CJP posted to its website its REPORT CONCERNING ADOPTION OF ADDITIONS AND AMENDMENTS TO RULES OF THE COMMISSION ON JUDICIAL PERFORMANCE [undated; issued August 29, 2017, pg. 15, (23 pages)] (See cover page and page 15, attached; the "Report"); document available/formerly on Commission website homepage under "Pending Cases - Press Releases & Documents", "Miscellaneous")

The CJP acknowledged public allegation and assertion that: "the Commission rarely, if ever, exercises its discretionary authority under this rule."   Responding in the Report, the CJP stated: "That is not the case. The Commission has on multiple occasions reported possible criminal conduct to prosecuting authorities."

This discovery, for Plaintiffs and the People, seeks the information behind the statement "The Commission has on multiple occasions reported possible criminal conduct to prosecuting authorities." The discovery asks specific questions about commission action with regard to referral of evidence of possible judge crime.

Interrogatories are derived from CJP Policy Guideline 4.2:

4.2 Disclosure of Information to Prosecuting Authorities

> When, in the course of evaluating complaints or conducting investigations, commission staff acquires information revealing **possible criminal conduct by a judge**, former judge or by any other individual or entity, such information **shall** be brought to the attention of the commission at the earliest possible opportunity for consideration of a referral of the information to prosecuting authorities. **Such a referral requires a vote of a majority of the commission members**.

*(*Emphasis added; Policy Declarations of the CJP, CJP website, tab: "legal authority")

Page **1** of **5**

[Complaint, Exhibit T Special Interrogatories and response form, 7/21/20]

## SPECIAL INTERROGATORIES 1-4
## TO COMMISSION ON JUDICIAL PERFORMANCE

**TO: DEFENDANT THE COMMISSION ON JUDICIAL PERFORMANCE:**

Under oath, please respond to the following special interrogatories 1-4:

Please respond by filling in the blanks on the attached response form and grid with all requested figures.  Upon completion, please sign, date and affirm the veracity of the responses using the signatory provision at the end of the form

With regard to the foregoing Rule 102(g) and Policy Declaration 4.2, please answer the following special interrogatories for years the Rule and Guideline have been in effect, 1997 - 2019.  Proposed response form and grid are attached.

Special Interrogatories:

1. Please state the number of times for the year Staff attorneys "brought to the attention of the commission" [the] "possible criminal conduct by a judge".

2. Please state the number of times that year the commission under took "consideration of [referral of the possible judge crime] information to prosecuting authorities."

3. Please state the number of times that year the commission conducted a vote for a "referral" [of the "possible judge crime" information] to prosecuting authorities.

4. Please state the number of times that year the commission held, by majority vote, to make "referral" of "possible judge crime" information to prosecuting authorities.

Attached is a three (3) page response and grid form to be used for Interrogatories 1-4.

Please note that grid refers to "CJP Annual Report - Number of Complaints received".

The number of complaints the CJP received for each year is set forth in CJP annual reports collected on-line at CJP website, divided into four (4) groups by year:
2010 – 2019   -   2000-2009   -   1990 – 1999   -   1983 – 1989.

See, CJP website, "statistics"   https://cjp.ca.gov/annual_reports/

Note: Rule 102 (g) and Policy Declaration 4.2 became effective in 1997.

Page **2** of **5**

[Complaint, Exhibit T Special Interrogatories and response form, 7/21/20]

# COMMISSION ON JUDICIAL PERFORMANCE

## RESPONSE TO INTERROGATORIES

The Commission on Judicial Performance provides the following responses to Interrogatories 1-4:

| Years 2010-2019 | 2019 | 2018 | 2017 | 2016 | 2015 | 2014 | 2013 | 2012 | 2011 | 2010 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Annual Report No. of Complaints | 1241 | 1246 | 1251 | 1234 | 1245 | 1212 | 1209 | 1143 | 1158 | 1176 | 12115 |
| Report pg. no. ref. | 11 | 9 | 14 | 9 | 9 | 9 | 9 | 9 | 9 | 7 | ----- |
| **Responses to Interrogatories:** | ------ | ------ | ------ | ---- | ---- | ---- | ---- | ---- | ---- | ---- | ----- |
| *Staff Atty.*  #1 | | | | | | | | | | | |
| *Comm. Con.*  #2 | | | | | | | | | | | |
| *Comm. Vote*  #3 | | | | | | | | | | | |
| *No. Referrals* #4 | | | | | | | | | | | |

| Years 2000-2009 | 09 | 08 | 07 | 06 | 05 | 04 | 03* | 02 | 01 | 00 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Annual Report No. of Complaints | 1161 | 909 | 1077 | 1019 | 965 | 1114 | 1011 | 918 | 835 | 951 | 9960 |
| Report pg. no. ref. | 7 | 7 | 11 | 11 | 11 | 11 | 11 | 11 | 11 | 11 | ---- |
| **Responses to Interrogatories:** | --- | ---- | ---- | ---- | ---- | ---- | ---- | ---- | ---- | ---- | ---- |
| *Staff Atty.*  (1) | | | | | | | | | | | |
| *Comm. Con.*  (2) | | | | | | | | | | | |
| *Comm. Vote*  (3) | | | | | | | | | | | |
| *#Referrals*  (4) | | | | | | | | | | | |

*<u>Daily Journal</u> 10/22/03 report, CJP stated to have referred Judge W. Danser to District Atty. (see attached) *Inquiry Concerning Judge William R. Danser,* No. 172 (6/2/05; CJP); *Danser v. California Public Employees' Retirement System* (2015) 240 Cal.App.4th 885)  However, investigation reveals that the District Attorney sought and obtained County Grand Jury indictment against Judge Danser based on non-CJP complainant.  The Judge Danser criminal case was not commenced because of CJP referral to prosecuting authorities under Rule 102(g) and Policy Declaration 4.2.   The <u>Daily Journal</u> article (attached) is the only public record that refers to possible CJP referral of judge crime to prosecuting authorities.  Based on review of the Judge Danser file, the article's statement that the CJP "referred the case to the Santa Clara County district attorney's office" is incorrect.

Research of public records and CJP information does not indicate that the CJP has ever, since 1983, referred evidence of possible judge crime to prosecuting authorities.  Contrary to CJP claim of referral on "multiple occasions" (Rule Report 8/29/17 pg. 15, see attached), research and records indicate that CJP has never referred evidence of possible judge crime to prosecuting authorities.

Page 3 of 5

[Complaint, Exhibit T Special Interrogatories and response form, 7/21/20]

EXHIBIT T

| Years 1999-1990 | 99 | 98 | 97 | 96 | 95 | 94 | 93 | 92 | 91 | 90 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Annual Report No. of Complaints | 1022 | 1125 | 1183 | 1187 | 1251 | 1320 | 950 | 966 | 744 | 885 | 10633 |
| Report pg. no. ref. | 11 | 13 | 11 | 12 | 2 | 4 | 3 | 1 | 1 | 2 | ---- |
| **Responses to Interrogatories:** | ---- | ---- | ---- | ---- | ---- | ---- | ---- | ---- | ---- | ---- | ---- |
| *Staff Atty.* **(1)** | | | | Rule | 102g | Gdl | 4.2 | Eff. | 1997 | | |
| *Comm. Con.* **(2)** | | | | Use | Prior | Rule | & | guid | e- | line | |
| *Comm. Vote* **(3)** | | | | | | | | | | | |
| *#Referrals* **(4)** | | | | | | | | | | | |

| Years 1989-1983 | 1989 | 1988 | 1987 | 1986 | 1985 | 1984 | 1983 | Totals |
|---|---|---|---|---|---|---|---|---|
| Annual Report – No. of Complaints | 860 | 693 | 547 | 476 | 317 | 388 | 351 | 3632 |
| Report pg. no. ref | 2 | 2 | 2 | 1 | 3 | 2 | 10 | ------ |
| Responses to Interrogatories: | | Based | on | Prior | Rule | Guide | Lines | ------- |

## GRAND TOTALS:

| | | |
|---|---|---|
| Rule 102(g) and Guideline 4.2 in effect 22 years, 1997-2019 | / | For 22 Years: |
| CJP – Total Number of Complaints received 22 Years 1997 - 2019 | / | 25405 |
| **Responses:** | / | ********** |
| *Staff Atty.* **No. 1** | / | |
| *Comm. Con.* **No. 2** | / | |
| *Comm. Vote* **No. 3** | / | |
| *#Referrals* **No. 4** | / | |

| | | |
|---|---|---|
| 1996 and Prior, Back to 1983 (13 years) total complaints | / | 10935 |
| Responses / figures:  as appropriate based on prior rule / guideline | / | |

| | | |
|---|---|---|
| CJP – Total Number of Complaints received All Years 1983 - 2017 | / | 36340 |

[Complaint, Exhibit T Special Interrogatories and response form, 7/21/20]

EXHIBIT T

**AFFIRMATION OF RESPONSES FROM THE**

**CALIFORNIA COMMISSION ON JUDICIAL PERFORMANCE**

The undersigned, for the Commission on Judicial Performance, states and

declares that the foregoing statistics, figures and other writing and information,

given as the responses of the Commission to the Interrogatories, were taken

or derived from Commission records.

I declare on penalty of perjury under the laws of the State of California

that the foregoing is true and correct.

Executed at _____, California

Dated:  _____, 2020

Name:  _____

Title:  _____

The Commission on Judicial Performance

[Complaint, Exhibit T Special Interrogatories and response form, 7/21/20]

EXHIBIT T



**STATE OF CALIFORNIA**
**COMMISSION ON JUDICIAL PERFORMANCE**
**455 Golden Gate Avenue, Suite 14400**
**San Francisco, California 94102**
**(415) 557-1200**
**Fax (415) 557-1266**

## REPORT CONCERNING ADOPTION OF ADDITIONS AND AMENDMENTS TO RULES OF THE COMMISSION ON JUDICIAL PERFORMANCE

Pursuant to its rulemaking authority under article VI, section 18, subdivision (i) of the California Constitution and section 3.5 of the Policy Declarations of the Commission on Judicial Performance, on March 1, 2017, the Commission on Judicial Performance circulated for public comment a set of proposals for additions and changes to certain of its rules. Following consideration of the comments and responses to comments, at its meeting on June 28, 2017, the commission adopted some of the proposed rule amendments, with some modifications, and determined not to adopt others, as summarized below. The text of each addition and amendment is attached and the final version of the amended rules may be found on the commission's website at http://cjp.ca.gov.

This report also discusses rule proposals that were circulated for public comment but not adopted and rule proposals submitted to the commission during its 2016 biennial rule review that were not circulated for public comment, with the commission's explanation for not pursuing those proposals.

The commission is seeking comments on further proposed rule amendments. The invitation to comment can be found on the commission's website.

I. **EXPLANATION OF RULE AMENDMENTS AND DISCUSSION OF PUBLIC COMMENTS**

A. **Amendment to Rule 116.5 to Specify Attorneys Who May Be Designated to Negotiate a Proposed Settlement**

**Explanation of Amendment**

The California Judges Association (CJA) proposed that rule 116.5 be amended to specify that an attorney member of the commission staff, in addition to the examiner, may be designated to negotiate a proposed resolution of a matter during a preliminary investigation. The

RJN 062

### 10. Proposed Amendment to Rule 102(g) to Require Release of Information to Prosecuting Authorities

Currently, rule 102, subsection (g), provides that the commission may provide to a prosecuting agency at any time information which reveals possible criminal conduct by a judge, or any other individual or entity. SJI proposes that "may" be amended to "shall," making disclosure mandatory.[6] SJI asserts that the commission rarely, if ever, exercises its discretionary authority under this rule. That is not the case. The commission has on multiple occasions reported possible criminal conduct to prosecuting authorities.

The commission believes the requirement should remain discretionary. Under the proposed rule, the commission would be required to turn over to prosecuting authorities any information which reveals possible criminal conduct, even if the information is determined to be unsubstantiated. This would require an unwarranted use of time and resources for the commission and the prosecuting authorities.

### B. Rule Proposals Submitted by California Judges Association

By letters dated September 28, 2016 and October 21, 2016, the California Judges Association (CJA) submitted proposed rule amendments and additions for consideration during the commission's biennial rules review. CJA is a private, dues supported, association of California active and retired judicial officers.

After consideration of each of the proposals submitted, the commission determined not to circulate for public comment or adopt the following proposals.

### 1. Proposed Amendment to Rules to Allow for Educational Letters

CJA proposed that the commission amend its rules to require the commission, prior to the issuance of an advisory letter, "to consider if a non-disciplinary educational letter is appropriate as an alternative, and, if so, issue one accordingly."

Prior to the Supreme Court decision in *Oberholzer v. Commission on Judicial Performance* (1999) 20 Cal.4th 371, advisory letters were generally not considered discipline. The commission issued advisory letters to caution or express disapproval of a judge's conduct. In *Oberholzer*, the Supreme Court held that the commission had authority to issue advisory letters, and that they constitute disciplinary action. The court noted that the amendments to the constitution pursuant to Proposition 190 codified the commission's practice of issuing advisory letters by stating that "the text of any private admonishment, *advisory letter, or other*

---

[6] In response to the commission's solicitation of public comments on proposed rules, Sharon Noonan Kramer proposed a similar rule amendment, which would require the commission to notify state and federal prosecuting authorities when a judge is alleged to have engaged in willful felony acts. Her proposal is not addressed independently in this report because it was received after the time for submission of proposed rule amendments had expired. However, the response to SJI's proposal is also responsive to her proposal.

15

RJN 076

Judges And Judiciary



Oct. 22, 2003

# Judge Tells Court He Isn't Guilty

## SAN JOSE - Santa Clara Superior Court Judge William Danser was back in court Monday, but not on his old bench in Department 42 at the Hall of Justice.

**By Craig Anderson**      Daily Journal Staff Writer      SAN JOSE - Santa Clara Superior Court Judge William Danser was back in court Monday, but not on his old bench in Department 42 at the Hall of Justice.

Instead, dressed in a blue suit and walking with a pronounced limp, Danser went to the main downtown courthouse and pleaded not guilty to nine criminal charges - including a felony conspiracy count - in connection with his dismissal of traffic tickets and decision to give light sentences to two DUI defendants.

"Not guilty, your honor," Danser said when asked for his plea by retired Santa Cruz County Superior Court Judge William Kelsay.

Former Los Gatos police detective Randy Bishop, said by prosecutors to have conspired with Danser to fix tickets for members of two professional sports teams for whom the officer worked, also pleaded not guilty.

Danser, suspended with pay while the criminal case is pending, would be removed from the bench if he is convicted of a single misdemeanor, according to a spokeswoman with the Commission on Judicial Performance, which referred the case to the Santa Clara County district attorney's office.

Danser declined to comment following the brief hearing. *People v. Danser*, 210838.

Prosecutor David Pandori also refused comment, following a consistent policy of the district attorney's office to say nothing about the indictments even after they were unsealed. Officials believe the transcript of the grand jury proceedings, which was released Oct. 9, speaks for itself - and they do not want to feed allegations they have any sort of vendetta against Danser.

Danser is accused of doing favors for personal friends, relatives of court personnel and members of the San Jose Sharks and San Jose Earthquakes sports teams. With one exception, prosecutors do not accuse him of getting anything in return. (In that instance, a man whose traffic ticket was dismissed gave a donation to the Little League organization in which Danser was involved.) But the judge did like

"being able to pull favors for people."   Pandori told the Grand Jury.

Prosecutors have declined to respond to claims by Bishop's attorney, Craig Brown of San Jose, that prosecutors may have violated their responsibilities to disclose exculpatory evidence as required under *Brady v. Maryland*, 373 U.S. 83 (1963).

Bishop was interviewed by attorneys for the Commission on Judicial Performance, but the full transcript of that conversation wasn't presented to the grand jury. Brown said Monday his client had no idea during the CJP interview that he might be the target of a criminal investigation, and only found out when the grand jury convened last month.

"There was a failure to present all of the exculpatory evidence," Brown said.

San Jose attorney Ken Robinson repeated Monday the main themes he has stated since he began representing Danser. "A judge has the authority to dismiss matters in the interests of justice," the defense lawyer said. "The Penal Code allowed him to do everything that he did."

Robinson noted that the term, "in the interests of justice," is vague, suggesting a possible line of defense. "What does that mean?" he asked.

Brown complained about the felony charge against his client, arguing Bishop is being dragged into the matter as a felony defendant to bolster the case against Danser.

"It's a matter of tactics in terms of criminal prosecution," he said. "I think Randy Bishop is being used."

Brown said Bishop went to Danser because he knew the judge and had worked with him on cases before, not because he expected any special treatment.

Judge Tells Court He Isn't Guilty

#261087

**Craiq Anderson**
Daily Journal Staff Writer

EXHIBIT T
413

**Los Angeles Times** | ARTICLE COLLECTIONS

← Back to Original Article

# Judge Guilty in Fixing of Son's Parking Fines

December 21, 1988 | ROBERT W. STEWART | Times Staff Writer

A veteran Beverly Hills Municipal Court judge was found guilty Tuesday of conspiring to obstruct justice by improperly suspending the fines on more than 200 parking tickets issued to automobiles driven by the jurist's son and the youth's friends.

"We really soul searched and we did a . . . good job of trying to find him not guilty. But there was no alternative," said Donald Small, 28, the foreman of the Beverly Hills Municipal Court jury that deliberated for 2 1/2 days before finding Judge Charles D. Boags guilty of the misdemeanor offense.

"Public officials must be accountable for what they're doing," Small said.

Boags was impassive as the verdict was read. But the judge's son, Martin R. Boags, who is on leave from the U.S. Air Force Academy, clutched his head in his hands as he slumped in his seat in the front row of the spectators' gallery.

The judge did not speak to reporters. However, Richard G. Hirsch, one of Boags' attorneys, said, "Obviously we're all disappointed with the verdict. We have felt right along, and still feel, that Judge Boags committed no crime. We will appeal this verdict."

Hirsch's co-counsel, Johnnie L. Cochran Jr., added: "We see this as a setback, a serious setback obviously. But (it is) the first step along the way and we expect that he (Boags) will ultimately be vindicated. We feel strongly about that."

Under California law, Judge Carlos Baker Jr., who presided, could sentence Boags to up to one year in jail. Deputy Dist. Atty. Lawrence Mason, who on Tuesday stood in for the prosecutor, said his office has not yet decided what punishment it will request when Boags is sentenced Feb. 10.

Boags served for 20 years as a Los Angeles County deputy public defender before he was appointed to the bench in 1979 by then-Governor Edmund G. Brown Jr. He has twice been reelected.

During the four-week conspiracy trial, Deputy Dist. Atty. Richard Healey sought to persuade jurors that Boags and his son had entered into an informal but clearly understood agreement under which Martin Boags handed over to his father parking tickets with the understanding that the judge would suspend the fines. To prove a conspiracy, the prosecution must prove the existence of some type of agreement to subvert the law.

Healey introduced into evidence 205 parking tickets, initialed by Boags, on which the judge had recorded guilty pleas and suspended the fines. One hundred forty-five of the tickets were issued to a car registered to the judge himself and driven by his son to Beverly Hills High School. The tickets were issued in 1984, 1985 and 1986.

## Members of the Team

Healey argued that Martin Boags and his friends, several of whom were fellow members of the high school's football team, received special treatment, not only because their fines were always suspended, but because they were not required to appear in court.

"These tickets were being passed across the breakfast table," Healey told the jurors in his closing argument. "The judge had the right to suspend the fines. That's true. But he did not have the right to enter into an agreement beforehand . . . 'Give me the tickets, Marty, you're going to get your fine suspended.' "

Healey conceded that he had no direct evidence of the agreement, and noted that Martin Boags had testified that he did not know what the disposition would be when he handed the parking tickets to his father. But the prosecutor told the jurors that they could infer that the agreement existed, because the judge never imposed a fine.

"That was our biggest hang-up right there, the agreement," Small said. "We really soul searched and tried to find alternatives to where there wouldn't be an agreement and we just couldn't find it."

The jury foreman said a key factor was a conflict between the testimony of Martin Boags, who testified that he did not know what would happen to the tickets, and the testimony of a friend, whose ticket was fixed, that the younger Boags had told him how the citation would be handled, Small said.

The jury earlier Tuesday had reported that it had reached an impasse. But after Martin Boags' testimony was re-read, the panel reached a verdict.

Cochran had argued that the judge is an honest man who erred ethically by failing to disqualify himself from handling his son's tickets.

Among the 18 defense witnesses were two Superior Court judges and a senior Los Angeles County prosecutor, who attested to Boags' honesty and integrity. The judge did not testify in his own behalf.

Cochran told jurors that court officials established through their testimony that parking tickets are handled with leniency by most Beverly Hills judges because of the severe parking problems in the community, especially in the neighborhood of the high school.

Outside court Tuesday, Cochran said a central issue of an appeal will be Judge Baker's failure to allow expert witnesses to testify that sentencing is a matter that the law leaves solely to a judge's discretion.

EXHIBIT  T
414

The charges against Boags were filed in January, 1987, nine months after The Times disclosed that the judge had engaged in a pattern of suspending fines for his son and the young man's friends.

At the time, Dist. Atty. Ira Reiner said, "What Judge Boags was doing, stripped down to its essentials, was fixing tickets for his son and fixing tickets for his son's friends. . . ."

---

**Los Angeles Times**  Copyright 2019 Los Angeles Times

EXHIBIT T
415

**Los Angeles Times** | ARTICLE COLLECTIONS

← Back to Original Article

# Ex-Judge Sentenced in San Diego Bribery Case

*Courts: Michael Greer gets three years probation and avoids prison term. His helpful testimony and poor health are cited.*

February 07, 1997 | TONY PERRY | TIMES STAFF WRITER

SAN DIEGO — Once he was a dominant and respected presence on the San Diego Superior Court--known for his hard work, confident manner and booming voice.

But on Thursday, former Superior Court Judge Michael Greer--now sick, disgraced and described in court papers as suicidal--stood before a federal judge and struggled to take responsibility for "this incredible disaster" that led him to plead guilty to taking bribes from a flamboyant trial attorney.

In the end, U.S. District Judge Edward Rafeedie sentenced Greer, 63, to three years probation, accepting a recommendation from federal prosecutors to spare him from a prison sentence.

Prosecutors agreed to make such a recommendation in exchange for Greer's testimony on fraud and racketeering charges against attorney Patrick Frega and former Superior Court Judges G. Dennis Adams and James Malkus.

On Wednesday, Rafeedie sentenced Frega and Adams to 41 months in prison and Malkus to 33 months. Rafeedie said he doubted that prosecutors could have convicted Frega, Adams and Malkus without Greer's testimony, which he described as "frank, honest and powerful."

At his sentencing Thursday, Greer said: "Early on I recognized Mr. Frega for what he was, but I did not have the courage to put an end to the problem before any further damage occurred. There has not been a day in the last several years that the horror I created is not on my mind and eating away at my insides."

In pleading guilty, Greer admitted helping Frega win cases by providing inside information, devising legal strategies and steering the cases to "friendly" judges.

Before his resignation in 1993 amid an investigation by the state Commission on Judicial Performance, Greer was one of the preeminent judges on the local bench and one of the few to enjoy a statewide reputation. In the weeks before his 1996 indictment, he attempted suicide by slashing his wrists.

A graduate of UCLA Law School, Greer had a civil practice and was active in Democratic politics, including the presidential campaign of Robert F. Kennedy, before former Gov. Edmund G. "Jerry" Brown Jr. named him to the bench, where he served for 17 years.

At a time when court systems in other counties were becoming gridlocked, Greer devised a "fast track" method to keep the San Diego courts from being stymied by too many lawsuits and too few judges. He was able to persuade warring parties to settle high-stakes civil litigation without going to trial.

He successfully pressured the governor to help bail out an overworked legal system. He lectured law students and helped reporters understand legal procedure and complexities.

And after his peers elected him presiding judge, he had even greater power to force settlements on reluctant civil litigants or to direct a case to the judge of his choosing.

Greer admitted misusing that power in exchange for $75,000 worth of bribes from Frega. Assistant U.S. Atty. Phillip L.B. Halpern said Greer's testimony "revealed the dirty little secrets that had plagued this town for a long time."

Rafeedie said that in his sentencing, he was swayed by warnings from Greer's doctors that he might not survive a prison term. Greer suffers from heart problems, depression, diabetes, ulcers, prostate trouble, skin cancer and high cholesterol.

"I don't want to impose a death sentence on the man--his condition is fragile enough," Rafeedie said.

During the judicial corruption trial, Greer testified that he struck up a friendship with Frega that soon ripened into an "uncle-nephew" relationship. Frega was soon lavishing gifts on him and his family: computers, car repairs, vacation getaways, membership in an athletic club and other items.

Greer testified that at first, he was able to convince himself that he was not doing anything wrong. But he said that when he drove a Mercedes given to him by Frega, he had a "sick feeling" and knew he had been corrupted.

Rafeedie said he hoped the public's faith in the local courts has not been undermined.

"I think this is an aberration in this district because I believe judges in the San Diego Superior Court are honest and honorable people," Rafeedie said. "One of my fears about this kind of case is that people will say: 'This is par for the course.' People should not judge all members of the bar and bench by this case."

Greer told Rafeedie that the case has left him with mountainous debt, that he and his wife are being forced to sell their home to pay creditors and that he feels "exiled" from his profession.

"People have to understand that Judge Greer is basically a ruined human being," said Robert Brewer, Greer's lawyer.

EXHIBIT  T

**Los Angeles Times** | ARTICLE COLLECTIONS

← Back to Original Article

California and the West

# 2 Former San Diego Judges, Lawyer Get Prison Terms

*Court: All receive minimum sentences in the gifts-for-favors scandal that shook city's legal system.*

June 13, 2000 | TONY PERRY | TIMES STAFF WRITER

Two former San Diego judges and a former "lawyer of the year" were sentenced Monday by a federal judge in Los Angeles to minimum prison sentences for their roles in a gifts-for-favors scandal that rocked the San Diego legal system.

The case revealed publicly an old-boy network of unusual coziness among some lawyers and judges.

Former Superior Court Judges James Malkus and G. Dennis Adams and former civil attorney Patrick Frega were ordered by U.S. District Court Judge Edward Rafeedie to begin their sentences July 10. The three have been free while appealing their 1996 convictions.

"I have suffered shame, humiliation and sleepless nights," Malkus told Rafeedie.

"I'm mortified by the embarrassment I have caused the judiciary," Adams said outside the courtroom.

Rafeedie rebuffed a request by federal prosecutors to impose maximum sentences.

Still, the case reaffirmed the controversial principle that it is illegal, not just unethical, for judges to receive gifts from lawyers whose cases they are hearing-- even if it cannot be proven that the gifts were in exchange for specific preferential treatment.

Rafeedie sentenced Adams, 58, to 38 months; Malkus, 63, to 30 months; and Frega, 54, to 41 months. In all three cases the sentences were the minimum under federal guidelines.

After the 1996 trial, Rafeedie sentenced Adams and Frega to 41 months and Malkus to 33 months. But the 9th Circuit Court of Appeals voided one count of the conviction against the two judges. The case went back to Rafeedie for resentencing after the U.S. Supreme Court declined to hear an appeal.

A third ex-jurist, former Presiding Judge Michael Greer, escaped a prison sentence only by becoming the star witness for prosecutors. He pleaded guilty and was placed on probation.

Frega, who often represented consumers against large corporations, lavished more than $100,000 in gifts on the three judges from 1983 to 1992. Among them: automobiles, vacations, office equipment, health club memberships and jobs for the judges' children.

The judges coached Frega on how to present his cases, pressured opposing attorneys into reaching out-of-court settlements and assigned his cases to "friendly" judges.

Greer and Malkus resigned in 1993 during an investigation by the Commission on Judicial Performance. Adams was ousted by the California Superior Court in 1995. A dozen other San Diego judges and lawyers received scolding letters from the commission.

San Diego Presiding Court Judge Wayne Peterson, in a telephone interview, said the case has been "a dark cloud" over the San Diego judiciary.

"Members of the judiciary have had to suffer for the sins of these participants for years," he said. "It's very difficult to be on the defensive for actions you did not commit, errors you did not make."

**Los Angeles Times**   Copyright 2019 Los Angeles Times          Index by Keyword  |  Index by Date  |  Privacy Policy  |  Terms of Service

*F. Chodosh, et al., v. J. Saunders, et al.*

**July 21, 2020**

**COMPLAINT**

**EXHIBIT – U**

| | |
|---|---|
| 06/24/14 | AG Kamala Harris Response re: reported Judge crime |
| 06/09/14 | Atty. B. Kaufman Ltr. to Harris reporting judge crime |

EXHIBIT U
418

*KAMALA D. HARRIS*
*Attorney General*

*State of California*
**DEPARTMENT OF JUSTICE**



**PUBLIC INQUIRY UNIT**
P.O. BOX 944255
SACRAMENTO, CA 94244-2550
(916) 322-3360
TOLL FREE: (800) 952-5225
TTY   CA Relay Service
(800) 735-2922

June 24, 2014

PIU: 97476

Ms. Barbara Kauffman, Esq.
204 West Lake Street, Suite D
Mount Shasta, CA 96067

**RE: Marin County Superior Court Executive Officer Kim Turner**
**Marin County Superior Court Judge Beverly Wood**

Dear Ms. Kauffman:

Thank you for your follow-up correspondence of June 9, 2014 regarding your complaints against an employee and a judge of the Marin County Superior Court.

As we explained in our letter of March 17, 2006, our office does not have legal authority over judicial branch employees. Again, if you wish to pursue this matter, we suggest that you send a letter of complaint to the presiding judge of the court. In addition, you may wish to send a letter of complaint to the Administrative Office of the Courts. This office may be contacted as follows:

Administrative Office of the Courts
Attn: Human Resources Division
455 Golden Gate Avenue
San Francisco, CA 94102-3688

In regards to your complaint against Judge Beverly Wood, as you know, the Commission on Judicial Performance is the independent state agency in California responsible for investigating complaints of judicial misconduct and judicial incapacity and for disciplining judges, pursuant to article VI, section 18 of the California Constitution. This agency has exclusive jurisdiction over judicial complaints. You may contact the Commission as follows:

Commission on Judicial Performance
455 Golden Gate Avenue, Suite 14400
San Francisco, CA 94102
Telephone: (415) 557-1200
Fax: (415) 557-1266
Internet: http://cjp.ca.gov/

We regret that we could not be of further assistance to you, but hope that the information we have provided clarifies our restrictions in regard to your request.

EXHIBIT U
419

June 24, 2014
Page 2

Thank you again for sharing your concerns with our Office.

Sincerely,

C. Hallinan
Public Inquiry Unit

For    KAMALA D. HARRIS
Attorney General

EXHIBIT U
420

LAW OFFICES OF

# BARBARA A. KAUFFMAN

204 West Lake Street, Suite D
MOUNT SHASTA, CALIFORNIA 96067
Telephone: (530) 926-3700
Facsimile: (888) 283-1951
E-Mail: bkfamlaw@sbcglobal.net

June 9, 2014

Governor Jerry Brown
c/o State Capitol, Suite 1173
Sacramento, CA 95814

Attorney General Kamala Harris
1300 "I" Street
Sacramento, CA 95814-2919

U.S. Attorney's Office
Robert T. Matsui United States Courthouse
501 "I" Street, Suite 10-100
Sacramento, CA 95814

Chief Justice Tani Cantil-Sakauye
Chair, Judicial Council
Chair, Comm. on Judicial Appointments
455 Golden Gate Ave.
San Francisco, CA 94102

Commission on Judicial Performance
455 Golden Gate Avenue
Suite 14400
San Francisco, CA 94102

Marin County Grand Jury
3501 Civic Center Drive
San Rafael, CA 94903

The Honorable Faye D'Opal
Presiding Judge
Marin County Superior Court
3501 Civic Center Drive
San Rafael, CA 94903

Sheriff Robert Doyle
Marin County Sheriff's Department
3501 Civic Center Drive #145
San Rafael, CA 94903

Re:   Report of Evidence Tampering, Obstruction of Justice by:
Marin Superior Court Judge Beverly Wood
Marin Court Executive Officer Kim Turner

Dear Sir/Madam:

I am writing to report what appear to be very serious violations by Marin Superior Court Judge Beverly Wood and former CA Judicial Council Member/current Marin Court Executive Officer Kim Turner, of, among other things, Government Code section 6200, CA Penal Code sections 182 and 96.5, and Federal RICO statutes.

As will be detailed below, the Marin County Superior Court Registers of Actions are being deliberately altered, and false certified Registers of Actions and minute orders are intentionally being created and disseminated, in cases involving Marin Superior Court bench

EXHIBIT U
421

officer Beverly Wood. This is being done with the knowledge and assistance of Marin Court Executive Officer (former Judicial Council Member) Kim Turner. Both have been notified of the falsification of records; both have been offered the opportunity to remedy the falsification of Court records; both have declined that opportunity. Turner went so far as to suggest in writing that the falsified information in the Marin court register of actions and minute orders was true and could be relied upon as true. The actions of Turner and Wood have irreparably harmed Petitioner/Mother herein, and undermined any confidence the public or others (including the Court of Appeal) could or should have with respect to the integrity of the Marin County Superior Court Register of Actions and Minute Orders, perhaps, but not necessarily, especially those involving Judge Beverly Wood and her husband's law firm, Freitas McCarthy.

**Summary of charges herein:** On October 3, 2013, Petitioner/Mother (hereafter "Mother") in Marin court case number FL 064080 filed a California Code of Civil Procedure section 170.1 request for disqualification of Judge Beverly Wood, citing, among other things, four documented instances of substantive, illegal, and prejudicial ex parte communications and proceedings between Wood and Respondent/Father (hereafter "Father"), a former client of Wood's law firm, Freitas McCarthy in the time period June 10, 2013 through August 30, 2013. Wood orally struck the disqualification request that same day, October 3, 2013. Mother has proof that the unsigned, written minute order striking the disqualification was entered 25 days later, on October 28, 2013. The certified register of actions and certified minute order state that the minute order striking the disqualification was entered on October 3, 2013. The date the order was entered is crucial to Mother's legal position that according to statutory and case law, Wood was disqualified by operation of law because the written order was not officially entered and effective within 10 days of service of the request for disqualification. Mother and her counsel have asked Court Executive Officer Kim Turner and Judge Beverly Wood for an official Notice of Entry of Order striking the disqualification motion. Both have refused, although pursuant to CCP Section 170.3(d), *service of written Notice of Entry of the order striking the disqualification* triggers a 10-day time limit within which to file a writ challenging a disqualification order.

**Prior allegations:** In 2010, Marin family law attorney Paul Camera reported to Marin Presiding Judge Terence Boren and the Commission on Judicial Performance the secret retroactive alteration of family court records (the register of actions and a minute order) in a case involving Beverly Wood. Mr. Camera pointed out that pursuant to Government Code section 6200, it is a crime punishable by 2-4 years in state prison, for "every officer having the custody of any record, map, or book, or of any paper or proceeding of any court, filed or deposited in any public place", to "alter or falsify" such record. See Mr. Camera's 3/23/2010 complaint to the Commission on Judicial Performance with referenced 3/22/2010 letter to then Presiding Judge Terence Boren, submitted herewith as **Exhibit "A"** and incorporated herein by this reference. Mr. Camera reports the behavior of then-Commissioner Beverly Wood and includes the documentary proof of the alteration of official court records seven months after the fact. He reports Wood's unprofessional inclusion of inaccurate, inappropriate and irrelevant personal attacks in her order defending the alteration of records, in an apparent attempt to discredit Mr. Camera and his client, and in Mr. Camera's words, "deflect attention *away from what happened*". (It is believed but has not been confirmed by checking the file that Wood's court clerk subsequently claimed she served a Notice of Entry of Judgment on the attorneys in this

EXHIBIT U
422

case, but none of the attorneys on either side of the case received it, thereby compromising appellate remedies. It is believed that Judge Faye D'Opal was the judge on the case at the time the Notice of Entry of Judgment issue was addressed.)

In 2009, while a Joint Legislative Audit Committee investigation of the Marin Family Court was pending, CA Judicial Council Member/Marin Court Executive Officer Kim Turner, with approval by the CA Administrative Office of the Courts, and knowledge of the Marin Superior Court bench, ordered the mass destruction of child custody evidence contained in Marin Family Court Services files, while blocking the state auditor's access to Marin family court documents and employees. The longtime Marin Family Court Services supervisor resigned while Turner was denying auditor access to court employees, and was thereafter unavailable to be interviewed by the state auditor.

**Background of this case:** Mother has unsuccessfully sought the disqualification of Commissioner-turned-Judge Beverly Wood since Wood first entered this case in 2008 and commenced a pattern of prejudicial conduct favorable to multimillionaire Father, *a former client of the Freitas McCarthy law firm*. Wood's husband, Peter Kleinbrodt, is a managing partner at the Freitas McCarthy law firm with Neil Moran, husband of Wood's good friend Marin Judge Lynn Duryee (who just retired this year). Wood was an associate at the Freitas McCarthy law firm before being selected to serve as a Marin County Commissioner. Each year Wood reports a hefty interest in the Freitas McCarthy law firm.

Delivered herewith as **Exhibit "B"** are communications with the Marin Superior Court questioning the very financial and political ties between Freitas McCarthy and key members of the Marin bench, including the fact that Freitas McCarthy was the top campaign donor to many of the Marin judges' election efforts, and Freitas McCarthy partner Neil Moran (Judge Duryee's husband) was the campaign treasurer for said election campaign efforts. Also questioned in those communications was the selection of Beverly Wood by the Marin Superior Court *from a field of 50 or more applicants* to serve as Marin Court Commissioner. Father's former attorney, Freitas McCarthy attorney Ali Quam, was subsequently selected by the Marin Superior Court to serve as their Family Law Facilitator, and Father is able to consult with her for free now.

Between June 10, 2013, and August 30, 2013 alone, while Mother was represented by child custody counsel, had a pro per Federal lawsuit pending against Wood, and was asking that Wood recuse herself in every pleading and at every hearing, Wood engaged in at least *four documented incidents of inappropriate and highly prejudicial ex parte communications with the Father*. Unbeknownst to Mother until months later, this began on June 10, 2013, when Father gave Wood a detailed secret letter denigrating Mother and telling Wood specifically what vacation and custody orders he wanted. He and Wood followed that letter up on June 21, 2013, at which time they engaged in unreported secret ex parte proceedings at which Wood secretly gave Father the vacation order he requested. Father left the country with the child, without Father or the Court serving Mother with the secret letter, the secret ex parte application, or the resulting secret order. On July 17, Father and Wood again engaged in unreported ex parte communications, at which time Father presented an ex parte application without notice to Mother's counsel. Mother had been informed by a third party that this was Father's intention,

June 9, 2014 Letter to Officials Re Wood/Turner Evidence Tampering, Etc.                  3

and Mother's counsel warned Wood's clerk in advance that Father was intending to bring another secret ex parte. Father told Wood when he appeared on July 17, 2013 that he would not serve Mother's counsel with the ex parte application. *Rather than summarily informing Father that he had to comply with proper ex parte procedures involving notice and service of the ex parte application as required by the CA Family Code, and State and Local Rules of Court, Wood moved the ex parte hearing to the next day and had her court clerk give Mother's counsel notice and service of Father's ex parte papers.* Mother noticed and served her own ex parte application for hearing the same day.

On July 18, 2013, when Mother's counsel tried to make an objection on the court-reported record to the secret ex parte proceedings and secret orders being issued, Wood and Father repeatedly interrupted Mother's counsel. Wood told Mother's counsel that "we're not going to go there"; and "I don't want to go into this whole conspiracy and secret things" and "for God's sake would you please try to stay on topic". Wood denied Mother's ex parte application (which included a request that the child be able to travel to New York for his vacation time with her as she was ill and could not travel) and granted Father's request (which included a request that the child not be allowed to go to New York) without bothering to read Mother's ex parte application. **Wood ordered that the parties' child had to stay in the State of California.**

The early morning of July 19, 2013, Mother's counsel called and asked that the Marin records department immediately make a copy of the July 18, 2013 minute order (prohibiting out of state travel) available by fax, email, or for pick up, because Mother feared that Father was going to remove the child from California in violation of that order. Mother wanted the order to provide to Father with a demand that he not remove the child from California. The Marin records department initially refused to fax or email the order to Mother's counsel, or release the order to a messenger or anyone but Mother's counsel (who was already out of town), or Mother (who was ill in New York). Mother's counsel wrote a scathing email to court administration, pointing out that Father, a former client of Wood's Freitas McCarthy law firm, was getting special treatment. Specifically, that Wood was having secret ex parte hearings with Father, issuing secret orders to Father without service to Mother, had used public resources (her clerk) to effect notice and service of Father's July 18, 2013 ex parte, yet Mother could not even get a copy of the resulting July 18, 2013 order. Mother's counsel asked that her July 19, 2013 e-mail to court administration be forwarded to Marin Presiding Judge James Ritchie, and Marin Family Law Presiding Judge Verna Adams, and considered a complaint and request for investigation about the improper use of Wood's courtroom to effect special treatment and advocacy for Father. *Mother's counsel reminded the Court that in 2010 minor's counsel had been appointed in the case, payable by public resources, although Father is a multi-millionaire.* The Court ultimately emailed the July 18, 2013 order to Mother's counsel, but it was too late. Father reportedly informed Mother that he had indeed taken the child out of the state in violation of Wood's order.

On August 5, 2013, Father reportedly attempted to bring another secret ex parte before Wood, but Wood was not available so he brought it before Judge Verna Adams. Mother learned of this when the parties' young child reported that he had gone to Court with Father (prohibited by local rules) and he had talked to the judge with white hair. The register of actions reveals the child's "appearance", that it was an unreported proceeding, that Adams read, considered, and returned to Father his ex parte application, with direction that he should bring the matter before

June 9, 2014 Letter to Officials Re Wood/Turner Evidence Tampering, Etc.            4

Wood when she was back in session. Father's ex parte papers and the resulting orders were never served on Mother, and the ex parte application is not in the Court file. Mother has no idea what Judge Adams read or what Father told Judge Adams. That same day, August 5, Father unilaterally continued a hearing he had scheduled for August 22, 2013. The register of actions reveals this was done "by agreement", but Father had never mentioned this to Mother's counsel, there was no agreement, and the continuance was granted without Father providing a letter confirming such an agreement as is normally required.

On August 30, 2013, Father again brought a secret ex parte application before Wood, again without notice and with no reporter present. Mother found out about it after the fact only because she had heard from Father that he had received some type of ex parte order from the Court ensuring he would have the upcoming Labor Day weekend with the parties' child. The minute order from the hearing reveals that Wood told Father to serve Mother's counsel, he refused, so Wood set the matter for a hearing, made a referral to Family Court Services recommending mediation, and told Father to file his papers. *The register of actions reveals that Father then stated concerns about a custody issue that day, Judge Wood passed the matter, ordered the Court file, re-called the matter, and gave Father a copy of an order in the file.* In other words, Wood again heard substantive ex parte argument from Father, and used court resources (her court clerk) to perform research and provide documents on his behalf.

On September 19, 2013, Mother's counsel emailed court administration, asking whether her July 19, 2013 emailed complaint had been forwarded to Judge Adams and Judge Ritchie, and inquiring as to the status of the complaint. She informed administration of what had transpired since her July 19, 2013 emailed complaint, and asked that her September 19, 2013 follow-up email be forwarded to Judge Ritchie and Judge Adams.

On October 3, 2013, Mother served a California Code of Civil Procedure section 170.1 judicial disqualification request on Wood, citing the above instances of prejudicial ex parte proceedings and more. The disqualification request was accompanied by a meticulous record supporting Mother's claims. The 170.1 application, without attachments, is attached hereto as **Exhibit "C"**. The supporting documents are in the Court file.

Notwithstanding the fact that CCP Section 170.3(c)(5) provides that a judge who refuses to recuse himself or herself shall not pass upon his or her own disqualification, Wood orally struck Mother's disqualification herself on October 3, 2013, and then forced a custody hearing to go forward. She indicated she would prepare a written order. For weeks after Wood's oral pronouncement Mother and her attorney checked the register of actions to see if a written order striking the disqualification had been entered, because pursuant to CCP Section 170.3(d) service of Notice of Entry of the order striking the disqualification triggers a 10-day time limit within which to file a writ challenging the order. Mother and/or her counsel twice (October 11 and 16) obtained copies of the register of actions entries to prove no order regarding the disqualification had yet been entered. Commencing October 10, 2013, Mother and her counsel requested the court file so they could get a certified copy of a DCSS fee order Father had violated in order to place an abstract of judgment on Father's home before he sold it. Wood kept the file sequestered in her chambers.

June 9, 2014 Letter to Officials Re Wood/Turner Evidence Tampering, Etc.                          5

On October 28, 2013 Mother's counsel commenced an email dialogue with Marin Administration, complaining that the file had been unavailable for 18 days, while Mother was trying to get an order from those files so she could file an abstract of judgment on Father's house before he sold it. That same day, she was informed that the file was available.

On October 29, 2013, Wood issued a written custody order prejudicial to Mother stemming from the October 3, 2013 custody hearing, but the order did not include a written determination of Mother's October 3, 2013 disqualification request.

Mother's counsel subsequently learned via a telephone call with Marin court clerk Vita Johanson that a minute order *dated October 3, 2013* striking the disqualification was in the file. Mother's counsel asked Vita to look up the date the minute order was entered, and Ms. Johanson stated that it had been entered on *October 28, 2013*.

*Without revealing what Ms. Johanson had told her*, on November 5, 2013, Mother's counsel emailed court administration, informing them that Mother had not yet received a minute order, a regular order, or a Notice of Entry of Order regarding Wood's ostensible striking of the October 3, 2013 disqualification request, although it was well outside the 10 days within which Wood had to act on Mother's request. Mother's counsel asked a) when the Notice of Entry would be forthcoming; b) for confirmation of the date the minute order was entered striking the disqualification; and c) direction to a rule or handbook stating the time frame within which a minute order had to be entered by a court clerk. She also noted that she had called Judge Ritchie's clerk to find out the status of the July 19, 2013 and September 19, 2013 complaints, and to ask if the case had been reassigned due to Wood's non-action. She inquired as to whether the complaints had actually been forwarded to Judge Ritchie. She noted that Judge Ritchie had oversight responsibility of then-Commissioner Wood as of June 2013, when Wood engaged in her June 10 and June 21 secret ex parte communications with Father; that he thereafter had oversight responsibility to report her behavior as a judge if it did not comport with the Code of Judicial Ethics, and that he needed to know what was going on in his courthouse. Mother's counsel reminded administration that she *"was involved in apprising the legislature of what was transpiring in the Marin Family Court requiring a JLAC audit and have no problem going back and telling everyone again that the problems continue unabated, with Marin Superior Court judges now completely and with impunity eliminating the due process rights of litigants, perhaps especially targeting those like [Mother] who initially provided evidence to the State Auditor."*

On November 7, 2013, Mother followed up with another email to court administration, asking with respect to the October 3, 2013 proceedings what orders were entered into the permanent minutes, when (date and time) and by whom; what minute orders had been entered, when (date and time) and by whom; what changes to the minutes had been made, when (date and time), and by whom; what orders had been served, when, and by whom.

On November 8, 2013, Mother and her counsel went to the Marin Records Department to look at the register of actions and court file. They observed that the Court register of actions *had been altered* to indicate a minute order striking the disqualification was entered on October 3, 2013, and *that an unsigned minute order striking the disqualification without stating a basis had been issued indicating that it was entered on October 3, 2013.* They obtained a certified

June 9, 2014 Letter to Officials Re Wood/Turner Evidence Tampering, Etc.                    6

copy of the register of actions as of 11/8/2013 at 12:30 p.m., and a certified copy of the minute order falsely dated October 3, 2013 from the records department, and then, upon request to the Marin records department supervisor, had the records department file clerk Lindsay Lara look up the actual date the minute order was entered. Ms. Lara reported (as Ms. Johanson had before her) that the actual date the minute order was entered was October 28, 2013, not October 3, 2013, and Ms. Lara confirmed this information in an informal signed writing on a copy of the minute order.

Meanwhile, on November 8, 2013, former Judicial Council Member/current Court Executive Officer Kim Turner sent a reply e-mail to Mother's counsel (obviously without knowledge of Lindsay Lara's signed statement), telling her as follows:

*"The Presiding Judge will not respond to your complaints about Judge Wood and is not required to investigate your many perceptions about what transpired between clerks in the courtroom and the Clerk's office. As you well know, you have written volumes over the years about your theories of misconduct. The court has diligently researched and investigated those complaints and found them to be without merit, time and again".*

*"The court is under no obligation to respond to the litany of questions about who entered minutes, on what date, at what time, whether the minutes were amended, what orders have been served, by whom, and other like inquiries. All judicial orders are also in the register of actions. All documents filed and proofs of service, when filed, are in the court file. The register of actions and the documents contained in the court file provide you with answers to those questions to which you are entitled to answers".*

The above-referenced communications between Mother's counsel and Court Administration from July 19, 2013 and November 8, 2013 are delivered herewith as **Exhibit "D"**.

The excerpt from the October 11, 2013 register of actions showing that no minute order had been entered for October 3, 2013, the excerpt with the false October 3, 2013 entry from the certified November 8 register of actions, the falsified certified "October 3, 2013" minute order striking the disqualification, and the uncertified copy of the minute order with the signed statement of Lindsay Lara are delivered herewith as group **Exhibit "E"**.

Based on the fact that Wood had not issued, filed or served a <u>signed</u> order (which arguably is required pursuant to CCP section 581d) of any kind striking Mother's disqualification, and that the unsigned minute order striking the disqualification had not been entered until 25 days after service of the disqualification on Judge Wood (although a judge's authority to strike a statement of disqualification must be exercised within 10 days of service of the disqualification), on November 15, 2013, Mother brought an ex parte application before Marin's then-presiding Judge James Ritchie, arguing that Wood had been disqualified as a matter of law, and asking that the case be re-assigned. At the hearing Ritchie declined to reassign the case, stating his belief that Wood's oral order was sufficient to strike the disqualification request. However, the Minute order stemming from the hearing specifically states: "NO FINDINGS-NO ACTION TAKEN". Judge Ritchie retired soon thereafter.

June 9, 2014 Letter to Officials Re Wood/Turner Evidence Tampering, Etc.                    7

On January 3, 2014, Father noticed another non-emergency ex parte application on January 7, 2014 before Judge Wood. He did not specify the relief requested. On January 5, 2014, Mother's counsel asked him to serve his papers in advance. He did not. Mother's counsel appeared by Courtcall, and objected to the ex parte given that it was not an emergency, and he had not served his ex parte papers as required by state and local laws and rules of court. Wood granted Father's request for vacation time, although Wood conceded this request was not an emergency, and set Father's other requests for further hearing. Neither Father nor Wood ever served the resulting signed order granting vacation time (which Wood gave to Father on January 7, 2014) on Mother's counsel, notwithstanding her repeated request for same.

On January 8, 2014, Mother filed "Petitioner's Objection to Judicial Authority of Beverly Wood", voicing her "continuing objection to Judge Beverly Wood's authority to hear or act in this case for any purpose". She attached her November 15, 2013 ex parte application to Judge Ritchie (without exhibits), noted that he had stated his "belief" that an oral order striking the disqualification was sufficient, and then provided the law making clear that an "order" is by definition a direction of a court or judge, *made or entered in writing* (CCP section 1003); and that pursuant to <u>Marriage of Drake</u> (1997) 53 Cal.App.4th, 1139, 1170 in family law cases, as in other cases, *an order of the court must be written to be effective, because a court may change its ruling until such time as the ruling is reduced to writing and becomes its order.*

Mother stated as follows in her above-mentioned objection to Wood's authority:

*"Petitioner invites Judge Wood and the Presiding Judge of the Superior Court to consult with counsel about the legal issues raised herein before any further matters in this case are calendared before and heard by Judge Wood. Petitioner believes that in the first instance Judge Wood disingenuously and improperly attempted to claim there was no basis for disqualification when she made her oral ruling striking the disqualification. Petitioner believes Wood has used and continues to use her position on the bench to a) advocate for Respondent, a former client of the law firm at which Wood's husband is the managing partner, and b) deprive Petitioner of her due process rights and advocate against Petitioner, who has named Wood in a federal lawsuit for her egregious behavior in this case. At this point Petitioner's beliefs are secondary to the fact that it appears very clear that pursuant to the authority cited above, Wood was disqualified by operation of law; that she has no power to act in this case; and that the orders she continues to make notwithstanding Petitioner's continuing objections to her authority and to her ongoing violations of Petitioner's due process rights are made in violation of the law".*

A courtesy copy of Mother's January 8, 2014 Objection was served on Marin Presiding Judge Faye D'Opal. A copy of the Objection is delivered herewith as **Exhibit "F"**.

On January 16, 2014, Mother filed an ex parte request for recusal of Judge Wood, correction of the official record, a formal Notice of Entry of Order with respect to Wood's October 3, 2013 disqualification order, and attorney's fees so she could file a writ of Wood's disqualification order and an appeal of her custody orders. She said:

June 9, 2014 Letter to Officials Re Wood/Turner Evidence Tampering, Etc.                    8

EXHIBIT U
428

*"Because Wood continues to entertain procedurally defective ex parte proceedings, and issue prejudicial secret orders that are not served, if she does not recuse herself as ethically required I will have to take her to the Court of Appeal and other oversight entities".*

*"I must have a correct official record of when the minute order was entered. I want a formal Notice of Entry of Order from Gina Compton stating when it was entered and I want the minute order and register of actions corrected to reflect that date.* **It would be a highly prejudicial obstruction of justice to deny me this".** (bold emphasis added).

*"I am also requesting $7,500 in fees for a writ, and $15,000 in fees for an appeal".*

Mother's Income and Expense Declaration reflected $671 per month in Worker's compensation income, and estimated that Father's income was $30,000 per month.

Father neither responded to object to the ex parte application, nor appeared at the hearing. Judge Wood nonetheless stated it was not an emergency, denied the application in its entirety, told Mother's counsel to "writ, appeal, whatever", and when Mother's counsel again tried to ask for a Notice of Entry of Order, was told by Wood "not to disrupt her courtroom" and to "leave". A copy of the transcript from the January 16, 2014 hearing is delivered herewith as **Exhibit "G".**

Mother filed the ex parte application for hearing on the Court's regular calendar, February 27, 2014.

On January 24, 2014, Mother filed another continuing objection "to Judge Beverly Wood's authority and jurisdiction to act in this case for any purpose", and to an improperly noticed custody motion filed by Father set for hearing on February 6, 2014.

On February 5, 2014, Wood issued a tentative ruling on Father's custody motion, continuing the hearing to February 27, 2014, the same date as Mother's motion. Mother's counsel nonetheless traveled to Marin for the February 6, 2014 hearing, in case Father objected to the tentative ruling and she had to appear. Father did not call Mother's counsel to state his intention to contest the ruling and appear on February 6, 2014 as required by local rules, and as a consequence Mother's counsel did not appear in court on Mother's case on February 6, 2014.

However, on February 6, 2014, Father – who at this point had many times prepared ex parte papers, and repeatedly had been admonished to give notice of ex parte applications and serve ex parte papers--nonetheless DID appear ex parte in Judge Wood's Courtroom. This was one of the few ex parte applications that were reported, and the transcript gives insight to the type of interactions he had likely been having with Wood for months.  He orally explained to Judge Wood that he wanted to take the parties' child out of school, and to the Bahamas, the following week.  Wood noted that Mother's counsel *"adores finding technical issues"* and he and Wood then engaged in a remarkable exchange during which Wood advised Father to bring an ex parte application the following Monday, February 10, and to give notice to Mother's counsel.  Instead of referring Father to the Family Law Facilitator's office to prepare proper papers in compliance with state and local rules of court, Wood said:  *"So what we have to do. . .is we have to properly notice. . .an ex parte application...  So what you need to do is you need to*

June 9, 2014 Letter to Officials Re Wood/Turner Evidence Tampering, Etc.                    9

*put together a sheet of paper and say "I am going to the Court--. . . .to ask for this. . .OK? . .And then you can e-mail, scan, whatever--... to [Mother's counsel]. . .and I would do it a couple of days in advance. . . .But you have to do that, and you have to be very careful about it, okay. . .so that we can avoid all these writs and appeals."* Father said *"But most importantly, I want to take him [the child] with me on the 13ᵗʰ".* Wood responded: *"I understand. . . .That's why you need to notice her, and you could—you could come in on Monday if you notice her by the end of business day today. But write out on a sheet of paper what it is you want, and if you can e-mail or scan it, or something like that, so that we have a record of having done it---...that would be good too."* Mother's counsel obtained this transcript on June 4, 2014. It is delivered herewith as **Exhibit "H"**. Delivered herewith as **Exhibit "I"** is the law regarding ex parte applications (Family Code section 3064; CRC 5.151 and 5.167; California Judge's Benchguide 200—Child Custody and Visitation 2012, section 200.7, 200.35; Marin Superior Court Local Rules 6.6) If a practicing lawyer advised a client to do what Judge Wood instructed Father to do to get a non-emergency vacation order ex parte ("write on a sheet of paper what it is you want") the lawyer could face malpractice charges, and the client could face sanctions.

On Friday, February 7, Father gave e-mail notice to Mother's attorney that he was going to make an ex parte application on February 10, 2014 for extended visitation time with the parties' child. With respect to relief requested he stated as follows: *"I am seeking to move the presently scheduled 2/20 hearing as per the most recent order to 2/27 when another hearing is already scheduled as well as to extend [child's] next visitation with me which starts this afternoon until 2/26 when my second visitation with him this month ends."*

Mother's counsel asked Father to provide the ex parte papers in advance of the hearing, and arranged to appear by Courtcall. Father did not provide any ex parte papers to Mother's counsel, and arrived in Court on February 10, 2014, without papers. Instead of being sent away, Mother's counsel heard Wood's clerk tell him he had to "go down the hall" to prepare ex parte papers. This took a full hour, and when Father returned, Mother's counsel first objected "for the record" to Wood hearing the case, and noted she had not received a Notice of Entry of Judgment regarding the disqualification. Wood told her "there is no record, because there is no reporter". Mother's counsel then objected that obviously she had not seen Father's papers, because he had just done them. Wood told her that all the application said was one sentence to the effect of "Father is seeking makeup vacation time". **Neither Wood nor Father told Mother's counsel that Father had appeared the prior Thursday and asked that the child miss school and travel to the Bahamas with Father.** Mother's counsel stated that this was not an emergency, reiterated ALL of the law regarding ex parte applications set forth in **Exhibit I**, and reiterated that Father and the Court were not following those laws. Wood asked Mother's counsel if she had "any objections other than the law", and then granted Father's request without specifying what she was ordering. She apparently issued a written order on the spot. Neither Father nor Wood provided a copy of the order to Mother or her counsel. Father delivered a copy to the police and the child's school to ensure enforcement of the order, and announced that he intended to take the child to the Bahamas returning February 25, 2014. Mother's counsel tried to get the order from the police, the child's school, and Father; none would provide them to her. Mother tried to get a copy of the register of actions or a minute order or the actual order. Nothing was reflected in the register of actions, no minute order was entered, and Wood sequestered the file in her chambers. Mother was unable to get a copy of the order until the next hearing took place on

June 9, 2014 Letter to Officials Re Wood/Turner Evidence Tampering, Etc.                    10

EXHIBIT U
430

February 27, 2014. The police let Mother see the order, however, and it *a) required the child to be back in school by February 24, 2014; b) required return to Mother on February 25, 2014,* and c) made no mention of out-of-country travel. Father returned the child to school and Mother on February 26, 2014. In other words, Father got the order, delivered the order to the police and school, announced that he was going to violate the order, and did violate the order.  Mother's counsel did not see or receive the February 10, 2014 order until February 27, 2014, when Wood's clerk gave it to her at a court hearing. The register of actions does not reflect that a hearing took place on February 10, 2014. There is no entry at all for 2/10/14. There is an entry for 2/19/14 reflecting that a 2/10/14 order prepared by Wood was entered on February 19, 2014. There is no entry reflecting service of the order.

On February 26, 2014, Mother's counsel noticed an ex parte application set for hearing on February 27, 2014, based on Father's premeditated contempt of the Court's apparent 2/10/14 orders that resulted in the child being taken out of the country and missing four or five days of school. Mother requested sole custody, alternate weekend visitation for Father, return of the child's passport, and an order forbidding travel with the child outside of Marin without court order.

At the February 27, 2014 hearing on Mother's motion for recusal, correction of the record, Notice of Entry of Order, and attorney's fees, Wood orally denied Mother's request for attorney's fees, and took Mother's request for a Notice of Entry of Order under submission. Wood continued Father's custody motion to April 7, 2014 and referred the parties to Family Court Service mediation. She gave Mother's counsel permission to appear at all non-evidentiary hearings, including the April 7 hearing, by Courtcall. She stated that she would prepare a written order on all issues.  Wood denied Mother's ex parte request for temporary custody orders, stating it was not an emergency—although the concerns stated in Mother's application—that Father would again take the child out of the country in violation of court orders—falls specifically within the Family Code section 3064 category "immediate risk that the child will be removed from the State of California". Mother set her custody ex parte for hearing on April 10, 2014.

The written order stemming from the February 27, 2014 hearing, issued April 2, 2014, stated that Mother's request for disqualification "is merely another in a long line of Mother's theories of conspiracies against her by this Court. . ." and accused Mother's counsel of focusing on "procedural minutia". Wood made no order on Mother's request for correction of the record, or for a Notice of Entry of Judgment.

On April 7, 2014, Mother's counsel appeared by Courtcall for the further hearing on Father's custody motion. Father had brought his oldest son from another relationship to testify although it was supposed to be a non-evidentiary hearing. Mother's counsel objected and reminded the Court that Mother had asked for a long-cause evidentiary hearing "from the get-go" [she provided a witness list including the boy, the police, the Family Court Services mediator, and more with her responsive papers] and was asking and entitled to a long-cause evidentiary hearing so she could call the boy and other witnesses. Wood admonished Mother's counsel not to interrupt or she would hang up. Mother's counsel said, one more time, that she had asked for an evidentiary hearing. Wood hung up and proceeded to take testimony from the boy and conclude the hearing without participation by Mother's counsel.

June 9, 2014 Letter to Officials Re Wood/Turner Evidence Tampering, Etc.                    11

On April 10, 2014, Mother appeared on her custody request initially made by ex parte application on February 27, 2014. Mother's counsel reiterated her request for a Notice of Entry of Judgment stemming from the October 3, 2013 disqualification. Mother then addressed her motion, noting that Father had filed no responsive pleadings, and it was essentially unopposed. She reiterated her request for an evidentiary custody hearing. Wood focused the hearing on three items raised by Father that were not a part of the calendared hearing or Wood's tentative ruling (including Father's new, unnoticed request to take the child to Sugar Bowl) and took the matter under submission.

On May 8, 2014, Wood issued a scathing custody order giving Father sole legal custody of the parties' child. She went to great lengths to denigrate Mother, characterize Mother's concerns as "paranoid" and accuse Mother and Mother's counsel of having an agenda to establish a "secret conspiracy". However, *Wood again did not rule on Mother's request for correction of the record or for issuance of a formal Notice of Entry of Judgment.*

It is long past 90 days since the submission on February 27, 2014 of Mother's request for correction of the record and Issuance of a Notice of Entry of Judgment determining Mother's disqualification request. Pursuant to Article 6, Section 19 of the California Constitution, as of May 28, 2014, it appears Wood is not entitled to receive her salary until she rules on Mother's request for correction of the record and Notice of Entry of Judgment.  Mother does not know if Wood executed a Government Code section 68210 affidavit falsely stating that no matters remain pending before her submitted for more than 90 days, and whether she has collected her paycheck.

It appears that Judge Wood and Court Executive Officer Kim Turner are now in great professional and legal peril. If a Notice of Entry of Order is issued reflecting that the disqualification order was entered on October 28, 2013, rather than October 3, 2013, a) it supports Mother's argument that Wood's order is void on its face, and she has had no authority to act; and b) it proves that the current certified register of actions and certified minute order with respect to October 3, 2013 contains entries both Wood and Turner know are false. As it now stands, they are both knowingly and intentionally perpetuating a false official record.

California Rule of Court 10.603 (Authority and Duties of Presiding Judge) required Judge D'Opal to ensure that no cause under submission remains undecided and pending for longer than 90 days.  It requires her to notify the Commission on Judicial Performance of a judge's substantial failure to perform judicial duties. It requires her to provide general direction to and supervision of Court Executive Officer Kim Turner.

Marin County has a long and unabated record of administrative and bench misconduct repeatedly reported to the Commission on Judicial Performance, the Chief Justice, two Attorney Generals, two Governors, the Administrative Office of the Courts, the Legislature, the Judicial Council, the JNE commission, the Marin Grand Jury, and others.  Most recently there was significant public outcry when Judicial Council Member Kim Turner ordered the mass destruction of child custody evidence contained in the Marin Family Court Services mediation working files, while a Joint Legislative Audit Committee investigation of the Marin Superior

June 9, 2014 Letter to Officials Re Wood/Turner Evidence Tampering, Etc.                    12

Court was pending, and while Turner was blocking auditor access to court files and personnel (meanwhile the longtime mediation supervisor resigned and was ultimately unavailable for auditor interview). Turner claimed she was destroying the files for storage purposes, and she apparently escaped prosecution for evidence tampering with the claim that the files destroyed were not "court files" covered by Government Code section 6200. Included in the mediation files destroyed were those of Mother and Father in this case, containing important child custody information relevant to prior rulings in this case.

The legislature did its job by providing CCP 170 et seq as a means to allow litigants to disqualify corrupt or biased judges. Per CCP 170.3 a judge generally is not allowed to rule on disqualification requests filed against him or her except in very narrow circumstances, and in fact cannot take further substantive action in the case until an outside judge rules on the disqualification request.   Litigants are required to seek writ relief on the court's order determining the question of disqualification within 10 days of service of written Notice of Entry of the court's disqualification order. Wood thwarted this statutory protection by denying her own disqualification request, and refusing to issue a correct Notice of Entry of her disqualification order, while continuing to aggressively advocate for her law firm's former client, and issue orders favorable to her law firm's former client vociferously attacking mom and her lawyer.

The legislature did its job by providing Family Code sections 2030 et seq and Family Code section 7605, to ensure that financially disadvantaged parents can be represented by counsel in Family Law proceedings.  After repeatedly taunting Mother to "go writ! go appeal!" if she didn't like what Wood was doing,  Wood effectively thwarted statutory fee protections and *eliminated* Mother's ability to file a writ or appeal by denying Mother's request that multimillionaire Father provide appellate attorney's fees and costs so that she *could* seek appellate relief.

The legislature did its job by ordering a JLAC audit of the Marin Family Court. It was thwarted by Kim Turner, the Administrative Office of the Courts, and the Marin Bench when they participated in the mass destruction of child custody evidence and eliminated key employees before they could be interviewed, with the result that this information was not available to the State Auditor.

The public has done its job by documenting and reporting corruption in the Marin County Superior Court for almost two decades.

The JNE Commission, the Governor, and the Commission on Judicial Performance were repeatedly warned about Judge Wood, including her prior actions in this case, before her appointment to the Bench last fall. Nonetheless she was appointed, even as she was repeatedly violating Mother's most basic due process rights to notice and an opportunity to be heard by engaging in ongoing prohibited ex parte communications with Father.

This year alone, at least three judges (Ohio Judge Tracie Hunter, Texas Judge Denise Pratt, and Ohio Judge Harry Jacob III)  have been indicted on evidence tampering charges, two directly related to backdated orders.  News articles about these indictments are delivered herewith as **Exhibit "J"**.

June 9, 2014 Letter to Officials Re Wood/Turner Evidence Tampering, Etc.                    13

Mother and Mother's counsel have spent a long, brutal, year quietly making an airtight record of gross misconduct by Wood and Turner while being insulted every step of the way, including Wood's gratuitous comments inserted into her orders that Mother and her lawyer were engaging in "conspiracy theories" and focusing on "procedural minutia" with respect to Wood's ongoing violation of Mother's *most basic* due process rights to notice and opportunity to be heard by an impartial decision maker, and a true and correct official court record.

**Mother and her counsel are not going to mince words. They are making a <u>demand</u> (not a request) for a full investigation –including a <u>criminal</u> investigation--of evidence tampering and other illegal/unethical activity (including but not limited to conflicts of interest, and ongoing ex parte communications between bench officers and certain favored litigants) in this and other cases; indictments Wood and Turner and others involved for all possible applicable crimes (including but not limited to Government Code section 6200, CA Penal Code sections 182 and 96.5, RICO, 18 U.S. Code 1512), and *immediate removal of Marin Court Executive Officer Kim Turner and Judge Beverly Wood from the Court system*.**

Respectfully Submitted,

*[signature: Barbara Kauff]*

BARBARA A. KAUFFMAN

June 9, 2014 Letter to Officials Re Wood/Turner Evidence Tampering, Etc.                14

EXHIBIT U

434

*F. Chodosh, et al., v. J. Saunders, et al.*

**July 21, 2020**

**COMPLAINT**

**EXHIBIT – V**

| 01/29/16 | Pac. Curr. Partners PR (Salisbury rep. seller HOA) |
| 07/13/15 | *Coldren v. Hart* (2015) Salisbury Coldren attorney |

EXHIBIT V
435

**FOR IMMEDIATE RELEASE**
**January 29, 2016**

**CONTACT:**
Spencer Engler-Coldren
949.874.8449
spencer@pacificcurrentpartners.com



**Pacific Current Partners Acquires Oceanfront Palm Beach Mobile Home Park**

**- Pacific Current Partners Acquires 126 Unit Ocean Front Mobile Home Park
in San Clemente, California Santa Ana, CA (December 30, 2015) -**

Pacific Current Partners, a manufactured housing investor group led by industry veteran
Mike Cirillo, and Saunders Property Company recently partnered to acquire Palm Beach
Mobile Home Park in San Clemente, California for an undisclosed amount. The seller of
the oceanfront property was San Clemente based Palm Beach Park Association. The 126-
space park has scenic ocean views and offers residents roughly two acres of private
beach.

This transaction represents the eighth manufactured housing acquisition for this team in
the last two years. According to information on their website, they focus on coastal
mobile home and RV parks, including those with apparent legal and managerial
challenges that require specialized expertise to navigate:

"Whereas most other buyers of manufactured housing communities in premium
California markets have aimed to convert their properties to 'higher and better use,'
Pacific Current Partners and John Saunders share a commitment to owning and operating
our properties as manufactured housing communities for the long term and to realizing
value by improving community experience for residents. Our recent purchase of Palm
Beach Park is a validation of our acquisition process, and we are more encouraged and
excited than ever to acquire more assets like it as we enter 2016." The website also
describes the improvements made under their ownership at the other properties,
improvements "such as new or updated gyms and clubhouses with community kitchens,
new landscaping and luxury two-story rental units, themed street names and designs, and
state of the art solar systems."

In an interview with John Saunders and Spencer Engler-Coldren of PCP, the buyers
stated that the transaction "demanded extraordinary patience and collaboration." The deal
had been over two years in the making. "We are all elated to say the least. A whole host
of principals, brokers, and legal advisors on both sides worked together for many months
to get it across the finish line. Once under contract close of escrow was smooth and

EXHIBIT V
436

timely."

The buyer was represented by Philip Anshutz as broker and Pete Roth and Natalie Ferrall of Allen Matkins as legal counsel. The seller team was led by park resident and HOA president Diana Mantelli and was represented by Salisbury Law Group.

About Pacific Current Partners

Pacific Current Partners acquires and operates mobile home and RV park properties, mainly in the western US, that stand to benefit from the group's operational excellence, legal expertise, and industry presence. Fund managers Rob Coldren and Mike Cirillo have worked together for three decades as a legal-managerial team and boast an extraordinary track record of unlocking value in MH and RV park properties. Together with junior partners Brad Hill, Spencer Engler-Coldren and Thom Niederkofler, the group has a combined 80 years of experience in real estate asset management and development. PCP has acquired eight MHRV parks in the past 24 months.

For more information about the Palm Beach Mobile Home Park please visit www.palmbeachMHpark.com. For more information on Pacific Current Partners please visit their website at pcpequity.com

EXHIBIT  V

Filed 7/13/15  Certified for publication 8/5/15 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| ROBERT S. COLDREN, as Trustee, etc., et al.,<br><br>    Plaintiffs, Cross-defendants and Respondents,<br><br>         v.<br><br>HART, KING & COLDREN, INC., et al.,<br><br>    Defendants, Cross-complainants, and Appellants. | G050202<br><br>(Super. Ct. No. 30-2014-00697576)<br><br>O P I N I O N |

Appeal from an order of the Superior Court of Orange County, Frederick P. Horn, Judge.  Reversed.

Grant, Genovese & Barratta, David C. Grant and Ronald V. Larson, for Defendants, Cross-complainants and Appellants.

Pistone Law Group, Thomas A. Pistone; Salisbury Group, Lisa G. Salisbury; Law Office of William J. Kopeny and William J. Kopeny for Plaintiffs, Cross-defendants and Respondents.

EXHIBIT V
438

*F. Chodosh, et al., v. J. Saunders, et al.*

**July 21, 2020**

**COMPLAINT**

**EXHIBIT – W**

| 06/21/04 | <u>National Law Journal</u> "Thinking Outside Box" |
|---|---|
| | Susolik Firm contacts Judge after hours at poker party |

Monday, June 21, 2004     THE NATIONAL LAW JOURNAL/WWW.NLJ.COM     *55*

# DANIEL J. CALLAHAN

# Scoring with jury by thinking outside box

By Tresa Baldas
STAFF REPORTER

ATTORNEY: *Daniel J. Callahan*
FIRM: *Callahan & Blaine, Santa Ana, Calif.*
CASE: Beckman Coulter v. Flextronics, *No. 01 CC 08396 (Orange Co., Calif., Super. Ct.)*

ATTORNEY DANIEL J. Callahan has no problem thinking outside the box.

The flamboyant lawyer recalls how 12 years ago he tracked down a judge by phone at a late-night private poker party and asked him to show up early to court the next day to block the forfeiture of a friend's hotel.

"I told him, 'My name is Dan Callahan. I need you to come in a half-hour early and issue a restraining order to block the foreclosure of the Canyon Hotel,' " recalled Callahan. "[The judge] was so amazed. He said not even his wife knew he was at this party."

Callahan's plan worked and the hotel was saved. Such tactics have become ingrained in Callahan, whose zany and theatrical litigation style has produced more than $1.1 billion in verdicts and settlements in the last five years, the most recent involving a record $934 million verdict issued in a breach of contract suit in Orange County, Calif., on Sept. 24, 2003.

**REDACTED**

EXHIBIT W
440

*F. Chodosh, et al., v. J. Saunders, et al.*

**July 21, 2020**

**COMPLAINT**

**EXHIBIT – X**

| 2014 | JAMS Mission, Vision, Values (2014) |
|------|-------------------------------------|
|      | vs.                                 |
| 2020 | JAMS Purpose, Vision, Values (2020) |

EXHIBIT X



## Mission, Vision, Values

**JAMS Mission, Vision, and Values**

JAMS believes it is essential to understand what our business is about at its core, where we are going, and how the values we live by are instrumental in taking us there.

**Mission**

The mission of JAMS is to be The Resolution Experts, providing the highest quality dispute resolution services to our clients and to our local, national, and global communities. We respect the parties and their representatives, and are committed to achieving the best possible resolution of their dispute.

We accomplish our mission by cultivating a professional and collegial environment that attracts and develops the most effective and respected neutrals and associates; by ensuring uncompromising neutrality, and the highest ethical standards; and by working together to deliver unparalleled resolution services and results.

**Vision**

JAMS vision is to lead the ADR industry as The Resolution Experts, setting the standard of excellence by which all dispute resolution services will be measured. The most respected attorneys and other professionals in the world will choose JAMS for the resolution of disputes, particularly when the stakes are high, the matter is complex, and the parties appear unyielding.

JAMS will be regarded as one of the premier service providers in the world with distinctive dispute resolution services recognizable in all of our resolution centers.

The non-profit JAMS Foundation, JAMS Society (associates serving their communities), and pro-bono activities performed by neutrals and associates, will make a significant contribution to society.

**Values**

Everything we do and say will reflect the highest ethical and moral standards. We are dedicated to neutrality, integrity, honesty, accountability, and mutual respect in all of our interactions.

We are committed to being a positive and motivating influence on others while achieving excellence through teamwork and collaboration. JAMS recognizes and rewards associates based on their contributions to results and to our Mission, Vision, and Values.

January 2014

EXHIBIT X
442



## JAMS Purpose

JAMS is passionate about providing exceptional dispute resolution services to our clients in local, national and global communities.

## JAMS Vision

To lead by setting the standard of excellence by which all dispute resolution services will be measured through:

- Unparalleled client service
- An exemplary panel
- Exceptional associate professionals
- Purpose designed facilities
- Custom-tailored solutions
- Sound business practices

## JAMS Values

JAMS believes and is committed to:

- Neutrality
- Integrity
- Collegiality
- Collaboration
- Innovation
- Our people
- Altruism
- Diversity

## Local Solutions. Global Reach. ™

JAMS successfully resolves business and legal disputes by providing efficient, cost-effective and impartial ways of overcoming barriers at any stage of conflict. JAMS offers customized dispute resolution services locally and globally through a combination of industry-specific experience, first-class client service, top-notch facilities and highly trained panelists.

### Related Resources

- **About JAMS ›**
- **Diversity & Inclusion ›**
- **Careers at JAMS ›**
- **Senior Management Team ›**
- **JAMS Founder ›**

### Kristine Snyder

JAMS Senior Public Relations & Content Manager

- Tel: +1 949-224-4614 (Direct Dial)
- Email: Ksnyder@jamsadr.com

- Additional Media Contacts ›

July 1, 2020

EXHIBIT X
443

*F. Chodosh, et al., v. J. Saunders, et al.*

**July 21, 2020**

**COMPLAINT**

**EXHIBIT – Y**

| 07/15/16 | Primo Mgmt. Partners Stmnt. of Info. Mantelli and Salisbury |
|---|---|
| 2017 & 2020 | Primo Mgmt. Real Estate Sign at Park |

**State of California**
**Secretary of State**

$\boxed{S}$

**Statement of Information**
(Domestic Stock and Agricultural Cooperative Corporations)
FEES (Filing and Disclosure): $25.00.
If this is an amendment, see instructions.
**IMPORTANT – READ INSTRUCTIONS BEFORE COMPLETING THIS FORM**

**FE76212**

**FILED**

In the office of the Secretary of State
of the State of California

**JUL-15 2016**

1. **CORPORATE NAME**
PRIMO MANAGEMENT PARTNERS, INC.

2. **CALIFORNIA CORPORATE NUMBER**
C3924232

This Space for Filing Use Only

**No Change Statement** (Not applicable if agent address of record is a P.O. Box address. See instructions.)

3. **If there have been any changes to the information contained in the last Statement of Information filed with the California Secretary of State, or no statement of information has been previously filed, this form must be completed in its entirety.**
☐ If there has been no change in any of the information contained in the last Statement of Information filed with the California Secretary of State, check the box and proceed **to Item 17.**

**Complete Addresses for the Following** (Do not abbreviate the name of the city. Items 4 and 5 cannot be P.O. Boxes.)

| | | CITY | STATE | ZIP CODE |
|---|---|---|---|---|
| 4. STREET ADDRESS OF PRINCIPAL EXECUTIVE OFFICE 3720 SOUTH SUSAN STREET #110, SANTA ANA, CA 92704 | | | | |
| 5. STREET ADDRESS OF PRINCIPAL BUSINESS OFFICE IN CALIFORNIA, IF ANY | | | | |
| 6. MAILING ADDRESS OF CORPORATION, IF DIFFERENT THAN ITEM 4 | | | | |

**Names and Complete Addresses of the Following Officers** (The corporation must list these three officers. A comparable title for the specific officer may be added; however, the preprinted titles on this form must not be altered.)

| | ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|---|
| 7. CHIEF EXECUTIVE OFFICER/ DIANA MANTELLI | 3720 SOUTH SUSAN STREET #110, SANTA ANA, CA 92704 | | | |
| 8. SECRETARY LISA G. SALISBURY | 3720 SOUTH SUSAN STREET #110, SANTA ANA, CA 92704 | | | |
| 9. CHIEF FINANCIAL OFFICER/ DIANA MANTELLI | 3720 SOUTH SUSAN STREET #110, SANTA ANA, CA 92704 | | | |

**Names and Complete Addresses of All Directors, Including Directors Who are Also Officers** (The corporation must have at least one director. Attach additional pages, if necessary.)

| 10. NAME | ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|---|
| LISA G. SALISBURY | 3720 SOUTH SUSAN STREET #110, SANTA ANA, CA 92704 | | | |
| 11. NAME DIANA MANTELLI | 3720 SOUTH SUSAN STREET #110, SANTA ANA, CA 92704 | | | |
| 12. NAME | ADDRESS | CITY | STATE | ZIP CODE |

13. NUMBER OF VACANCIES ON THE BOARD OF DIRECTORS, IF ANY:

**Agent for Service of Process** If the agent is an individual, the agent must reside in California and Item 15 must be completed with a California street address, a P.O. Box address is not acceptable. If the agent is another corporation, the agent must have on file with the California Secretary of State a certificate pursuant to California Corporations Code section 1505 and Item 15 must be left blank.

14. NAME OF AGENT FOR SERVICE OF PROCESS
LISA G. SALISBURY

| 15. STREET ADDRESS OF AGENT FOR SERVICE OF PROCESS IN CALIFORNIA, **IF AN INDIVIDUAL** | CITY | STATE | ZIP CODE |
|---|---|---|---|
| 3720 SOUTH SUSAN STREET #110, SANTA ANA, CA 92704 | | | |

**Type of Business**

16. DESCRIBE THE TYPE OF BUSINESS OF THE CORPORATION
REAL ESTATE - MANAGING REAL ESTATE FOR O

17. BY SUBMITTING THIS STATEMENT OF INFORMATION TO THE CALIFORNIA SECRETARY OF STATE, THE CORPORATION CERTIFIES THE INFORMATION CONTAINED HEREIN, INCLUDING ANY ATTACHMENTS, IS TRUE AND CORRECT.

| 07/15/2016 | CHEYENNE MOSELEY | AUTHORIZED REP | |
|---|---|---|---|
| DATE | TYPE/PRINT NAME OF PERSON COMPLETING FORM | TITLE | SIGNATURE |

| SI-200 (REV 01/2013) | Page 1 of 1 | APPROVED BY SECRETARY OF STATE |
|---|---|---|

**EXHIBIT Y**



EXHIBIT Y
446

*F. Chodosh, et al., v. J. Saunders, et al.*

**July 21, 2020**

**COMPLAINT**

**EXHIBIT – Z**

|  | Caption Pages Palm Beach |
|---|---|
|  | Park Litigation (2010 – 2020) |
| 04/09/10 | *PBPA v. Eicherly* (unlawful detainer, filed) |
| 06/13/12 | *Chodosh v. PBPA*, main case, G053798 (f: 12/10/10) |
| 12/13/10 | *Haugen v. PBPA* (derivative complaint) |
| 08/10/11 | *PBPA v. Eicherly* ("1 Dog" rule violation) |
| 05/02/14 | *Eicherly v. PBPA* (HOA election challenge) |
| 05/12/14 | *Chodosh v. JAMS, Justice Trotter* |
| 11/12/15 | *Haugen v. PBPA* (stop the Park sale case) |
| 12/09/16 | *Eicherly v. CJP* (for no action on Moss complaint) |
| 12/21/16 | *Eicherly v. O'Leary, Bedsworth, Moss, et al.* (USDC) |
| 10/05/18 | *Chodosh, Padilla v. CJP and AG* (taxpayer suit) |

1  GREGORY BEAM & ASSOCIATES, INC.
   Gregory B. Beam (Bar No. 102443)
2  Ralph R. Loyd (Bar No. 91896)
   23113 Plaza Pointe Drive, Suite 100
3  Laguna Hills, California 92653
   Telephone:  (949) 598-5800
4  Facsimile:  (949) 598-5815

5  Attorneys for Plaintiff
   PALM BEACH PARK ASSOCIATION
6

**FILED**
SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE
HARBOR JUSTICE CENTER
LAGUNA HILLS FACILITY

APR 09 2010

ALAN CARLSON, Clerk of the Court

BY_____ DEPUTY

7

8              SUPERIOR COURT OF CALIFORNIA

9         FOR THE COUNTY OF ORANGE, HARBOR JUSTICE CENTER 2010

10                  LAGUNA HILLS FACILITY      00361637

11  PALM BEACH PARK ASSOCIATION, a          )  Case No.
    California Non Profit Mutual Benefit     )
12  Corporation,                            )  **COMPLAINT FOR UNLAWFUL**
                                            )  **DETAINER**
13                 Plaintiff,               )
                                            )  DEMAND IS LESS THAN $25,000.00
14         vs.                              )
                                            )
15  STEVE EICHERLY, an individual;          )
    SUSAN EICHERLY, an individual;          )
16  and DOES 1 through 10, inclusive,       )
                                            )
17                 Defendants.              )
                                            )
18

19      Plaintiff alleges:

20      1.      Plaintiff, PALM BEACH PARK ASSOCIATION (hereinafter "Plaintiff") is, and at

21  all times herein mentioned was, a California Non Profit Mutual Benefit Corporation doing

22  business in the State of California.

23      2.      Defendants STEVE EICHERLY and SUSAN EICHERLY (hereinafter

24  "Defendants") are, and at all times herein mentioned were, individuals residing in the County of

25  Orange at the premises commonly known as 106 Sandy Drive, San Clemente, California  92672

26  (hereinafter "Premises").

27      3.      The true names and capacities of the Defendant Does 1 through 10, inclusive,

28  whether individual, corporate, associate or otherwise, are unknown to Plaintiff, who therefore sues

2402.5
0158826

1
COMPLAINT FOR UNLAWFUL DETAINER

1 │ PATRICK J. EVANS - State Bar No. 110535
  │ LAW OFFICE OF PATRICK J. EVANS
2 │ 16897 Algonquin Street, Suite F
  │ Huntington Beach, CA 92649
3 │ Tel.: (714) 594-5722; Fax:  (714) 840-6861
  │ pevans@pevanslawoffice.com
4 │ Attorneys for Plaintiffs, FLOYD CHODOSH, et al.,

**ELECTRONICALLY FILED**
Superior Court of California,
County of Orange

**06/13/2012** at 02:41:00 PM
Clerk of the Superior Court
By Enrique Veloz,Deputy Clerk

## SUPERIOR COURT OF THE STATE OF CALIFORNIA FOR COUNTY OF

## ORANGE - CIVIL COMPLEX CENTER

| | |
|---|---|
| FLOYD M. CHODOSH, an individual, and FLOYD M. CHODOSH, in his capacity as trustee of the GLENDIA WATSON LIVING TRUST 2004; SUE EICHERLY, an individual; STEVE EICHERLY, an individual; KATHLEEN A. SCHOWALTER, an individual; MYRLE A. MOORE, in her capacity as trustee of the Moore Family Trust, U/D/T/ dated June 24, 1994; BONNIE P. HARRIS, an individual; OLE HAUGEN, an individual; TODD M. PETERSON, an individual; RODGER KANE, an individual; JOHAN D. KANE, an individual and CHRIS MCLAUGHLIN, an individual, <br><br> Plaintiffs, <br><br> v. <br><br> PALM BEACH PARK ASSOCIATION, a California non-profit mutual benefit corporation; JEAN WILEY, an individual; DAN SMITH, an individual; LYNDA CLINE, an individual; FELDSOTT & LEE, a professional  corporation; STANLEY FELDSOTT, an individual; MURPHY BANK, a corporation;  THE GIBBS LAW FIRM, a professional corporation; GERALD GIBBS, an individual; GREGORY BEAM AND ASSOCIATES, INC.; GREGORY BEAM, an individual; THRIVENT FINANCIAL FOR LUTHERANS, a Wisconsin corporation and DOES 1 - 10 <br><br> Defendants. | LEAD CASE NO. 30-2010-00423544-CU-BC-CXC <br><br> [Dept. CX 105, Hon. Nancy Wieben Stock] <br><br> <u>Consolidated With Case Nos.:</u> <br> 30-2010-00423807 <br> 30-2010-00425213 <br> 30-2010-00425173 <br> 30-2010-00425206 <br> 30-2010-00425291 <br> 30-2010-00425323 <br> 30-2010-00425331 <br> 30-2010-00432261 <br><br> **FOURTH AMENDED AND CONSOLIDATED COMPLAINT FOR:** <br> 1.  **Breach of Contract;** <br> 2.  **Violation of Governing Documents – Articles and Bylaws;** <br> 3.  **Violation of Statutes;** <br> 4.  **Negligent Misrepresentation;** <br> 5.  **Breach of Fiduciary Duty;** <br> 6.  **Negligence;** <br> 7.  **Declaratory Relief;** <br> 8.  **TILA Violation [15 USC §1600]** <br> 9.  **Quiet Title;** <br> 10.  **Wrongful Eviction;** <br> 11.  **Slander of Title** <br><br> Cases Filed: Nov. – Dec. 2010 <br> Trial Date: None Set |

1   PATRICK J. EVANS - State Bar No. 110535
     EVANS & ASSOCIATES
2   16897 Algonquin Street, Suite F
     Huntington Beach, CA 92649
3   Tel.: (714) 594-5722; Fax: (714) 840-6861
     pevans@pevanslawoffice.com
4
     Counsel to OLE HAUGEN,
5   Derivative Plaintiff [Corp. Code §7710] for
     Palm Beach Park Association, a California
6   non-profit mutual benefit corporation

**ELECTRONICALLY FILED**
Superior Court of California,
County of Orange

**12/13/2010** at 09:59:30 AM
Clerk of the Superior Court
By Maarit H Nordman, Deputy Clerk

7

8

9   **SUPERIOR COURT FOR THE STATE OF CALIFORNIA FOR THE COUNTY OF**

10     **ORANGE, CIVIL COMPLEX CENTER**

11

12  OLE HAUGEN, as Derivative Plaintiff for
    The PALM BEACH PARK
13  ASSOCIATION, a California non-profit
    mutual benefit corporation,
14
           Plaintiff,
15
    v.
16
    PALM BEACH PARK ASSOCIATION, a
17  California non-profit mutual benefit
    corporation, nominal defendant, JEAN
    WILEY, an individual; ARMAND
18  CAMELOT, an individual, DON
    ANDERSON, an individual, JEANNE
19  STOVALL, an individual; RON
    THORNTON, an individual, JO ANN C.
20  STRONG, an individual, BOB GERGEN, an
    individual JAN HUBER, an individual, DAN
21  SMITH, an individual, DON HAGE, an
    individual, BILL REYNOLDS, an individual
22  DON HASKELL an individual and
    THRIVENT FINANCIAL FOR
23  LUTHERANS, a Wisconsin corporation, and
    DOES 1-10;
24
           Defendants.

Judge Nancy Wieben Stock

CASE NO.  30-2010-00432259-CU-BC-CXC

**COMPLAINT FOR:**

1.  **Violation of Statutes;**
2.  **Violation of Voting Procedures;**
3.  **Breach of By Laws;**
4.  **Derivative Action against**
    **Directors (Corp. Code §7231);**
5.  **Derivative Action for Breach of**
    **Fiduciary Duty;**
6.  **Negligence;**
7.  **Declaratory Relief;**
8.  **Injunctive Relief;**
9.  **Violations of Calif. Corporate**
    **Securities Law of 1968:**
10. **Unfair Business Practices**
    **(Bus.& Prof. Code §17200); and**
11. **Violation of TILA,**
    **[Truth in Lending Act]**
    **15 U.S.C. §1600 et seq.**

**[Notice of Related Cases Filed
Concurrently]**

**[JURY TRIAL DEMANDED]**

25

26

27

28

**DERIVATIVE PLAINTIFF COMPLAINT**
1

EXHIBIT Z
450

1  GREGORY BEAM & ASSOCIATES, INC.
   Gregory B. Beam (Bar No. 102443)
2  Glendon L. Foster (Bar No. 242939)
   23113 Plaza Pointe Drive, Suite 100
3  Laguna Hills, California 92653
   Telephone: (949) 598-5800
4  Facsimile: (949) 598-5815

5  Attorneys for Plaintiff
   PALM BEACH PARK ASSOCIATION
6

**FILED**
SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE
CENTRAL JUSTICE CENTER

AUG 10 2011

ALAN CARLSON, Clerk of the Court

BY____M PORTER____DEPUTY

7

8              SUPERIOR COURT OF CALIFORNIA

9                FOR THE COUNTY OF ORANGE

10               CENTRAL JUSTICE CENTER

11 PALM BEACH PARK ASSOCIATION, a    )   Case No.   30-2011
   California Non Profit Mutual Benefit )
12 Corporation,                       )   COMPLAINT FOR00498722
                                      )
13          Plaintiff,                )   1. BREACH OF CONTRACT;
                                      )   2. VIOLATION OF THE MOBILEHOME
14    vs.                             )   RESIDENCY LAW (CIVIL CODE § 798
                                      )   ET SEQ.); and
15 STEVE EICHERLY, an individual;     )   3. FRAUD
   SUSAN EICHERLY, an individual;     )
16 and DOES 1 through 10, inclusive,  )   **JUDGE CHARLES MARGINES**
                                      )          DEPT. C19
17          Defendants.               )   Amount Demanded Exceeds $10,000.00
                                      )
18

19    Plaintiff alleges:

20        1.    Plaintiff, PALM BEACH PARK ASSOCIATION (hereinafter "Plaintiff") is, and at

21 all times herein mentioned was, a California Non Profit Mutual Benefit Corporation doing

22 business in the State of California.

23        2.    Defendants, STEVE EICHERLY and SUSAN EICHERLY (hereinafter

24 collectively "Defendants") are, and at all times herein mentioned were, individuals residing in the

25 city of San Clemente, in the County of Orange.

26        3.    The true names and capacities of the Defendant Does 1 through 10, inclusive,

27 whether individual, corporate, associate or otherwise, are unknown to Plaintiff, who therefore sues

28 said Defendants by such fictitious names.  Plaintiff will seek leave of this court to amend this

2403.5
0163290                              1
                                 COMPLAINT

EXHIBIT Z
451

1  PATRICK J. EVANS - State Bar No. 110535
   LAW OFFICE OF PATRICK J. EVANS
2  16897 Algonquin Street, Suite F
   Huntington Beach, CA 92649
3  Tel.: (714) 594-5722; Fax:  (714) 840-6861

4  pevans@pevanslawoffice.com
   Attorneys for Plaintiff, SUE EICHERLY
5

6

**ELECTRONICALLY FILED**
Superior Court of California,
County of Orange
**05/02/2014** at 04:37:36 PM
Clerk of the Superior Court
By Mary M Johnson,Deputy Clerk

7  **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

8  **FOR THE COUNTY OF ORANGE – CENTRAL JUSTICE CENTER**

9

| | |
|---|---|
| 10  SUE EICHERLY, an individual; | CASE NO.  30-2014-00720598-CU-CO-CJC |
| 11         Plaintiff, | Judge Derek W. Hunt |
| 12 | **COMPLAINT FOR:** |
| 13 | |
| 14 | 1.    **Breach of Contract (Member Leases);** |
| 15    *v.* | |
| 16 | 2.    **Breach of Contract against Non-Profit Mutual Benefit Corporation for Violation of Bylaws; Failure to Follow Election Rules and Requirements; Election Challenge, Corp. Code sec. 7616; Civil Code 1363.09(a);** |
| 17  PALM BEACH PARK ASSOCIATION, a California non-profit mutual benefit corporation; and DOES 1 - 10 | |
| 18 | |
| 19         Defendants. | |
| 20 | |
| 21 | 3.    **Breach of Fiduciary Duty; and** |
| 22 | 4.    **Declaratory Relief That August 3, 2013 Member Vote is Void** |
| 23 | |

24        Plaintiff SUE EICHERLY, an individual, hereby states her complaint ("Complaint")
25  against Palm Beach Park Association, a California non-profit mutual benefit corporation and
26  alleges:
27
28

**COMPLAINT**

1

**ELECTRONICALLY FILED**
Superior Court of California,
County of Orange

**05/12/2014** at 02:17:06 PM
Clerk of the Superior Court
By Norri Lau, Deputy Clerk

1 │ PATRICK J. EVANS - State Bar No. 110535
LAW OFFICE OF PATRICK J. EVANS
2 │ 16897 Algonquin Street, Suite F
Huntington Beach, CA 92649
3 │ Tel.: (714) 594-5722; Fax: (714) 840-6861
pevans@pevanslawoffice.com
4 │ Attorneys for Plaintiffs, FLOYD M. CHODOSH, et al.

5

6

7 │ **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

8 │ **FOR THE COUNTY OF ORANGE**

9 │ **CENTRAL JUSTICE CENTER**

10

11 │ FLOYD M. CHODOSH, an individual and in
his capacity as trustee of the GLENDIA
12 │ WATSON LIVING TRUST 2004; SUSAN
EICHERLY, an individual;  BONNIE P.
13 │ HARRIS, an individual; MYRLE A.
MOORE, an individual and in her capacity as
14 │ trustee of the Moore Family Trust U/D/T
dated June 24, 1994; OLE HAUGEN, an
15 │ individual; and CHRIS MCLAUGHLIN, an
individual,
16 │
        Plaintiffs,
17 │
        *v.*
18 │
JOHN K. TROTTER, an individual;
19 │ JAMS, INC. a Delaware  corporation; and
DOES 1 – 10,
20 │
        Defendants.
21 │

CASE NO.   30-2014-00722371-CU-BC-CJC

**COMPLAINT FOR:**     Judge Frederick P. Horn

1. **Breach of Contract;**

2. **Fraudulent Concealment;**

3. **Negligence;**

4. **Intentional Infliction of Emotional Distress;**

5. **Negligent Infliction of Emotional Distress;**

6. **Intentional Misrepresentation;**

7. **Negligent Misrepresentation; and**

8. **Unfair Business Practices;**
   **[Bus. & Prof. Code Sec. 17200]**

22

23 │    FLOYD M. CHODOSH, trustee and individually, SUSAN EICHERLY, MYRLE

24 │ MOORE, trustee and individually, BONNIE P. HARRIS, OLE HAUGEN, and CHRIS

25 │ MCLAUGHLIN, each a Plaintiff and together the Plaintiffs, by this complaint allege and

26

27 │ assert their claims against Defendants JOHN K. TROTTER and JAMS, INC.:

28

EXHIBIT Z
453

ELECTRONICALLY FILED
Superior Court of California,
County of Orange

**11/12/2015** at 08:00:00 AM

Clerk of the Superior Court
By Trinity Mai,Deputy Clerk

1  PATRICK J. EVANS - State Bar No. 110535
   LAW OFFICE OF PATRICK J. EVANS
2  16897 Algonquin Street, Suite F
   Huntington Beach, CA 92649
3  Tel.: (714) 594-5722; Fax:  (714) 840-6861
   pevans@pevanslawoffice.com
4  Attorneys for Plaintiff, OLE HAUGEN

5

6

7                **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

8           **FOR THE COUNTY OF ORANGE – CENTRAL JUSTICE CENTER**

9

10  OLE HAUGEN, an individual;            CASE NO.  30-2015-00819837-CU-BC-CJC
                                                    Judge Randall J. Sherman
11                Plaintiff,              **VERIFIED COMPLAINT FOR:**

12                                        1.   **Breach of Contract - Violation of**
13                                             **Bylaws re:  06/28/15 Membership**
                                               **Vote to Sell Park and Dissolve;**
14      *v.*
                                          2.   **Breach of Statutory Election**
15                                             **Requirements; Corp. Code §7616;**
    PALM BEACH PARK ASSOCIATION, a            **Civil Code §5145, et al.;**
16  California non-profit mutual benefit
    corporation; and DOES 1 - 20          3.   **Breach of Mobilehome Space Lease**
17                                             **[Contract] – for Bylaw Breaches re:**
                  Defendants.                  **06/28/15 Membership Vote;**
18
                                          4.   **Breach of Fiduciary Duty-**
19                                             **Conducting Illegal Vote; Board**
20                                             **Directors Conflicted [and Treble**
                                               **Damages, Civ. Code §3345];**
21
                                          5.   **Financial Elder Abuse Welf. &**
22                                             **Inst. Code §15610.30 et al. [and**
23                                             **Treble Damages, Civ. Code §3345];**
24
                                          6.   **Quiet Title;**
25
                                          7.   **Accounting; and**
26
                                          8.   **Declaratory Relief**
27

28

**VERIFIED COMPLAINT CHALLENGING HOA MEMBERSHIP VOTE AND TO QUIET TITLE**
1

EXHIBIT Z
454

1  PATRICK J. EVANS - State Bar No. 110535
   LAW OFFICE OF PATRICK J. EVANS
2  16897 Algonquin Street, Suite F
   Huntington Beach, CA 92649
3  Tel.: (714) 594-5722; Fax: (714) 840-6861
   pevans@pevanslawoffice.com
4  Attorney for Plaintiff, SUE EICHERLY

ENDORSED
F I L E D
Superior Court of California
County of San Francisco

DEC 0 9 2016

CLERK OF THE COURT
BY ___KALENE APOLONIO___
                    Deputy Clerk

5

6

7

8

9

10

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## IN AND FOR THE CITY AND COUNTY OF SAN FRANCISCO

## UNLIMITED DIVISION

11  SUE EICHERLY,

12

13           Plaintiff,

14

15  vs.

16

17

18  COMMISSION ON JUDICIAL
    PERFORMANCE,

19

20

21           Defendant.

22

23

24

CASE NO. **CGC-16-555780**

**COMPLAINT FOR:**

1.  **Denial and Violation of Plaintiff's
    Right to Due Process under the
    California Constitution
    (Cal. Const. Art. I, sec. 7);**

2.  **Denial and Violation of Plaintiff's
    Rights as a Victim of Crime;
    (Cal. Const. Art. I, sec. 28,
    the California "Marsy's Law");**

3.  **Violation of Separation of Powers
    (Cal. Const. Arts. IV, V and VI); and**

4.  **Declaratory Relief,
    (Cal. Const. Art. VI, sec. 10;
    Code Civ. Proc. sec. 1060)**

25

26

27

28

Plaintiff SUE EICHERLY, an individual and California resident, hereby sets forth her

complaint for declaratory relief ("Complaint") against the COMMISSION ON JUDICIAL

PERFORMANCE of the State of California:

**COMPLAINT**
1

1  PATRICK J. EVANS - State Bar No. 110535
   pevans@pevanslawoffice.com
2  LAW OFFICE OF PATRICK J. EVANS
   16897 Algonquin Street, Suite F
3  Huntington Beach, CA 92649
   Tel.: (714) 594-5722; Fax: (714) 840-6861
4  Counsel to all Plaintiffs,
   Sue Eicherly, et al.
5

6

7

8            **IN THE UNITED STATES DISTRICT COURT**

9            **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

10 | SUE EICHERLY, MYRLE MOORE | CASE NO.: |
   | FLOYD CHODOSH, OLE HAUGEN, | |
11 | TODD PETERSON, KATHLEEN | **COMPLAINT FOR:** |
   | SCHOWALTER and RODGER KANE, | |
12 | individuals, | |
   | Plaintiffs, | 1.  **Violations of 42 U.S.C. §1983;** |
13 | vs. | **Intentional Denial of Due** |
   | | **Process; U.S. Const.** |
14 | ROBERT J. MOSS, individually and in | **5th and 14th Amendments;** |
   | his capacity as Judge of the Orange | |
15 | County Superior Court, CHARLES | |
   | MARGINES, individually and in his | 2.  **Denial of Due Process by** |
16 | capacity as Presiding Judge of the Orange | **Extreme Facts that Indicate** |
   | County Superior Court; KATHLEEN | **Intolerable Probability of** |
17 | O'LEARY, individually and in her | **Lack of Judicial Impartiality;** |
   | capacity as Presiding Justice of the | |
18 | California Court of Appeal, Fourth | |
   | District, Div. 3 ("Div. 3"); WILLIAM L. | 3.  **Violations of 15 U.S.C. §1601** |
19 | RYLAARSDAM, individually and in his | **et seq., "Truth in Lending";** |
   | capacity as a former justice of Div. 3; | **Intentional Failure and** |
20 | WILLIAM W. BEDSWORTH, | **Refusal to Follow and Enforce** |
   | individually and in his capacity as a | **the "TILA" Federal Law;** |
21 | justice of Div. 3; PALM BEACH PARK | |
   | ASSOCIATION, a California non-profit | |
22 | mutual benefit corporation, ICC 35902 | 4.  **Breach of Fiduciary Duty;** |
   | LLC, and 3187 REDHILL LLC, both | |
23 | Delaware limited liability companies; | |
   | JEFFERIES LOANCORE, LLC, a | 5.  **Aiding and Abetting Breach** |
24 | Delaware limited liability company; | **of Fiduciary Duty; and** |
   | FIDELITY NATIONAL TITLE | |
25 | COMPANY, a California corporation; and | |
   | JOHN SAUNDERS, ROBERT | 6.  **Declaratory Relief,** |
26 | COLDREN; LISA SALISBURY, PHILIP | **28 U.S.C. sec. 2201 et seq.** |
   | ANSHUTZ, DIANA MANTELLI; | |
27 | GEORGE FIORI, and DAN SMITH, | |
   | individuals. | |
28 | Defendants. | |

─────────────────────────────────────────

**COMPLAINT FOR VIOLATIONS OF 42 U.S.C. §1983, et al.**
1

EXHIBIT Z

1  PATRICK J. EVANS - State Bar No. 110535
   LAW OFFICE OF PATRICK J. EVANS
2  16897 Algonquin Street, Suite F
   Huntington Beach, CA 92649-3822
3  Tel.: (714) 594-5722; Fax: (714) 840-6861
   pevans@pevanslawoffice.com
4  Attorney for Plaintiffs,
   DINA PADILLA and FLOYD CHODOSH
5

**FILED**
Superior Court Of California,
Sacramento
**10/05/2018**
jimora
By _____ , Deputy
Case Number:
**34-2018-00242031**

6

7               SUPERIOR COURT OF THE STATE OF CALIFORNIA

8               COUNTY OF SACRAMENTO -UNLIMITED DIVISION

9

10  DINA PADILLA, and FLOYD CHODOSH,        CASE NO.
    California residents and taxpayers,
11                                          **COMPLAINT FOR:**

12                                          **1. Violation of Peoples' Right of Access to CJP**
                                               **Information, (Calif. Const. Art. I, §3(b)(1));**
13              Plaintiffs,
                                            **2. CJP Breach of Constitutional Duty to**
14                                             **Report Judge Crime to Prosecuting**
    vs.                                        **Authorities, (Const. Art. VI, §18(m));**
15

16                                          **3. CJP and AG Breach of Separation of**
    COMMISSION ON JUDICIAL                     **Powers, (Art. III, §3, Art. IV, Art. VI):**
17  PERFORMANCE, an agency of the judicial
    branch, and its Director and Chief Counsel, **4. Citizen Complaint for CJP Breach of**
18  GREGORY DRESSER, in his official capacity    **Duty to Report Submitted Proven Judge**
    and not individually; THE CALIFORNIA        **Crime; (Art. VI, §18 (m));**
19  DEPARTMENT OF JUSTICE, OFFICE OF
    THE ATTORNEY GENERAL, an agency of the   **5. Common Law Taxpayer Lawsuit; - CJP;**
20  executive branch; and XAVIER BECERRA, in
    his official capacity as Attorney General, and **6. Common Law Taxpayer Lawsuit; - AG;**
21  not individually, and DOES 1-10,
                                            **7. C. C. P. §526a; – Taxpayer Lawsuit;**
22
                                            **8. Violation of Govt. Code §8314,**
23              Defendants.                     **Misuse of CJP for Political Activity; and**

24                                          **9. Declaratory Relief,**
                                               **(Const. Art. VI, §10; C. C. P. §1060)**
25

26

27          Plaintiffs DINA PADILLA and FLOYD CHODOSH state and allege:

28